IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF TEXAS

McAllen Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. **M-18-855** |
| | ) | |
| | ) | Count 1: 18 U.S.C. § 1349 |
| v. | ) | (Conspiracy to Commit Health Care Fraud) |
| | ) | |
| | ) | Counts 2-6: 18 U.S.C. §§ 1347 & 2 |
| JORGE ZAMORA-QUEZADA, | ) | (Health Care Fraud) |
| | ) | |
| Defendant. | ) | Count 7: 18 U.S.C. § 1956(h) |
| | ) | (Conspiracy to Commit Money Laundering) |
| | ) | |
| | ) | Forfeiture Notice |

### SEALED INDICTMENT

THE GRAND JURY CHARGES THAT:

At all times relevant to this Indictment, unless otherwise stated:

### INTRODUCTORY ALLEGATIONS

**A.     Relevant Individuals and Entities**

1.     **JORGE ZAMORA-QUEZADA** ("**DR. ZAMORA-QUEZADA**") was a physician licensed to practice medicine in the State of Texas.

2.     **DR. ZAMORA-QUEZADA** purported to be a specialist in rheumatology and practiced primarily in the McAllen-area of Texas, within the Rio Grande Valley, and owned medical practices in Brownsville, Edinburg, and San Antonio, Texas.

3.     **DR. ZAMORA-QUEZADA** owned and controlled Jorge C. Zamora-Quezada, MD, MPH, PA, and the Center for Arthritis & Osteoporosis I, PA (collectively, "**DR. ZAMORA-QUEZADA's** medical practices"), which were professional associations that purported to provide

health care services in the State of Texas.  **DR. ZAMORA-QUEZADA's** medical practices did business as the "McAllen Arthritis and Osteoporosis Center" and "Angeles Pharmacy."

4.  **DR. ZAMORA-QUEZADA** was affiliated with several other entities ("**DR. ZAMORA-QUEZADA's** affiliated entities"), to include multiple shell entities, that were based in the State of Texas, including, but not limited to, the Center for Arthritis & Osteoporosis, LTD; A&O Management, LLC; Stinson Hangar, LLC; JCZQ Family, LP; J&M Zamora Family, LP; Zamora-Quezada, Inc.; Alpha-Omega Management, LLC; JZACE #1, LLC; JZACE #2, LLC; JZACE #3, LLC; JZACE #4, LLC; JZACE #5, LLC; JZACE #6, LLC; JZACE #7, LLC; JZACE #8, LLC; JZACE #9, LLC; and JZACE #10, LLC.

**B.  Health Care Benefit Programs**

5.  A "health care benefit program" under Section 24(b) of Title 18, United States Code, was defined as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract."  As used herein, a "health insurance program" or "health care program" means a health care benefit program.

6.  The Medicare Program ("Medicare") was a federal health care program providing benefits to individuals who were over the age of 65 or disabled.  The Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"), administered Medicare.

7.  The TRICARE Program ("TRICARE") was a federal health care program providing benefits to individuals and dependents affiliated with the United States armed forces.  The Department of Defense administered TRICARE.

2

8. The Texas Medical Assistance Program, also known as the Texas Medicaid Program ("Texas Medicaid Program"), was a federal and state health care benefit program. The Health and Human Services Commission, a Texas governmental agency, and HHS administered the Texas Medicaid Program.

9. BlueCross BlueShield was a private health care benefit program that provided insurance contracts and plans, affecting interstate commerce, under which medical benefits, items, and services were provided to individuals.

10. To receive payment from a health care benefit program, a provider was required to submit a claim using a CMS 1500, a Health Insurance Claim Form ("CMS 1500" or "claim form"). Claims could be submitted electronically or by mail.

11. The CMS 1500 required information about: the date of service for the procedure, the name of the attending physician, and the medical diagnosis, among other information. The CMS 1500 was required to contain truthful and accurate information.

12. Health care benefit programs relied upon the truth and accuracy of information on the CMS 1500 to determine whether to pay the provider for the services rendered. Health care benefit programs would not reimburse claims for payment if they knew such claims were based on false, fraudulent, and medically unnecessary services.

**C.  Rheumatoid Arthritis**

13. Rheumatoid arthritis was an autoimmune disorder that caused a patient's immune system to mistakenly attack the patient's own body's tissues. Rheumatologists performed various medical procedures and testing in order to diagnose a patient with rheumatoid arthritis. Rheumatologists prescribed treatments and drugs, including chemotherapy, to treat patients with rheumatoid arthritis. Such procedures were administered through drug injections, drug infusions,

3

and related medical procedures.

14. The Grand Jury incorporates by reference and re-alleges paragraphs 1-13 in each Count of this Indictment as if fully set forth therein.

# COUNT 1
## Conspiracy to Commit Health Care Fraud
### (18 U.S.C. § 1349)

THE GRAND JURY FURTHER CHARGES THAT:

15. From in or about 2000 and continuing through the filing of this Indictment, the exact dates being unknown to the Grand Jury, in the Southern District of Texas and elsewhere, **JORGE ZAMORA-QUEZADA** knowingly and willfully did combine, conspire, confederate and agree with others, known and unknown to the grand jury, to violate Title 18, United States Code, Section 1347, that is, to execute, and attempt to execute, a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b), including but not limited to Medicare, Medicaid, TRICARE, and BlueCross BlueShield and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items and services, in violation of Title 18, United States Code, Section 1347;

### The Purpose of the Conspiracy

16. It was a purpose of the conspiracy for **DR. ZAMORA-QUEZADA** and others, known and unknown to the Grand Jury, to unlawfully enrich themselves by (a) submitting false and fraudulent claims to health care benefit programs; (b) concealing the submission of false and fraudulent claims to health care benefit programs and the receipt and transfer of proceeds from the fraud; and (c) diverting proceeds of the fraud for the personal use and benefit of the defendant and his co-conspirators.

## The Manner and Means of the Conspiracy

17. The manner and means by which **DR. ZAMORA-QUEZADA** and his co-conspirators sought to accomplish the object of the conspiracy included, but were not limited to, the following:

    a. It was a part of the conspiracy that **DR. ZAMORA-QUEZADA** and his co-conspirators would apply for and maintain various Medicare, Medicaid, TRICARE, and BlueCross BlueShield provider numbers associated with **DR. ZAMORA-QUEZADA's** medical practices and affiliated entities.

    b. It was further a part of the conspiracy that **DR. ZAMORA-QUEZADA** and his co-conspirators would fly in **DR. ZAMORA-QUEZADA's** million dollar private jet or drive in his Maserati, which were both emblazoned with his initials "ZQ," between his offices in the Rio Grande Valley and San Antonio in order to perpetuate the fraud.

    c. It was further a part of the conspiracy that **DR. ZAMORA-QUEZADA** and his co-conspirators would falsely diagnose vulnerable patients, including the young, elderly, and disabled, from the Rio Grande Valley, San Antonio, and elsewhere, with various degenerative diseases, to include, but not limited to, rheumatoid arthritis. These patients included, but were not limited to, A.M., J.P., F.H., E.E., M.G., P.T., I.G., M.C., M.L., M.B., A.D.J., E.G. 1, C.H., E.G. 2, M.N., and B.M.

    d. It was further a part of the conspiracy that after **DR. ZAMORA-QUEZADA** falsely diagnosed patients, such patients became a source of substantial revenue, thereby funding **DR. ZAMORA-QUEZADA's** lavish and opulent lifestyle.

e. It was further a part of the conspiracy that **DR. ZAMORA-QUEZADA** and his co-conspirators would administer infusions and/or injections containing chemotherapy and other toxic medications to patients, including patients who had been falsely diagnosed with various degenerative diseases including, but not limited to, rheumatoid arthritis.

f. It was further a part of the conspiracy that **DR. ZAMORA-QUEZADA** and his co-conspirators would conduct a battery of fraudulent, repetitive, and excessive medical procedures on patients in order to increase revenue for **DR. ZAMORA-QUEZADA**.

g. It was further a part of the conspiracy that **DR. ZAMORA-QUEZADA** directed his staff to increase the number of medical procedures that were performed on patients in order to generate profits and pay the salaries of his employees and co-conspirators.

h. It was further a part of the conspiracy that **DR. ZAMORA-QUEZADA** would dismiss patients from his medical practices if they questioned him about his fraudulent diagnoses and medical procedures.

i. It was further a part of the conspiracy that even after **DR. ZAMORA-QUEZADA** was publicly reprimanded and put on notice by the Texas Medical Board for conducting numerous tests on patients, treating patients with toxic drugs such as chemotherapy, and diagnosing patients with rheumatoid arthritis without a legitimate basis, **DR. ZAMORA-QUEZADA** and his co-conspirators continued their false and fraudulent practices.

j. It was further a part of the conspiracy that **DR. ZAMORA-QUEZADA** and his co-conspirators would conceal patient records from other rheumatologists, including multiple rheumatologists in Texas, who requested such records when former patients

7

would visit them to obtain a second opinion on **DR. ZAMORA-QUEZADA's** fraudulent diagnoses.

k. It was further a part of the conspiracy that **DR. ZAMORA-QUEZADA** and his co-conspirators would conceal thousands of patient medical records from Medicare by stashing them in an unsecured and dilapidated barn in the Rio Grande Valley.

l. It was further a part of the conspiracy that **DR. ZAMORA-QUEZADA** would falsify patient records to reflect that patients were experiencing more pain than what they had actually reported in order to create the false appearance that certain procedures were medically necessary.

m. It was further a part of the conspiracy that **DR. ZAMORA-QUEZADA** and his co-conspirators would obstruct investigations and cause false and fictitious patient records to be produced to governmental entities that had requested to review his patient files.

n. It was further a part of the conspiracy that **DR. ZAMORA-QUEZADA** and his co-conspirators would knowingly and willfully submit, and cause the submission of, false and fraudulent claims to health care benefit programs for fraudulent services that did not comply with the health care benefit programs' requirements for reimbursement.

o. It was further a part of the conspiracy that **DR. ZAMORA-QUEZADA** and his co-conspirators would cause Medicare and other health care benefit programs to remit payments of millions of dollars in proceeds from the defendant's health care fraud scheme into various corporate and personal bank accounts controlled by **DR. ZAMORA-QUEZADA.**

p.      It was further a part of the conspiracy that **DR. ZAMORA-QUEZADA** and his co-conspirators would transfer the proceeds derived from the conspiracy to purchase private jets; luxury vehicles such as a Maserati and Porsche; clothing from high-end retailers such as Louis Vuitton; as well as exclusive real estate located throughout the United States and Mexico.

q.      It was further a part of the conspiracy that **DR. ZAMORA-QUEZADA** and his co-conspirators would cause approximately $240 million in claims that were, in part, based on false and fraudulent statements to be submitted to health care benefit programs, which resulted in approximately $50 million being paid to **DR. ZAMORA-QUEZADA** and his affiliated entities.

(All in violation of Title 18, United States Code, Section 1349.)

## COUNTS 2-6
## Health Care Fraud
## (18 U.S.C. §§ 1347 and 2)

THE GRAND JURY FURTHER CHARGES THAT:

A. **Introductory Allegations**

18. The Grand Jury incorporates by reference and re-alleges paragraph 17 as though set forth in its entirety here.

B. **The Scheme to Defraud**

19. From in or about 2000 and continuing through the filing of this Indictment, the exact dates being unknown to the Grand Jury, in the Southern District of Texas and elsewhere, defendant **JORGE ZAMORA-QUEZADA**, along with others known and unknown to the Grand Jury, in connection with the delivery of and payment for health care benefits, items and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting interstate commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare and Medicaid, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of Medicare and Medicaid, all in violation of Title 18, United States Code, Section 1347.

C. **The Execution of the Scheme**

20. On or about the below listed dates, in the Southern District of Texas and elsewhere, for the purpose of executing the scheme and artifice to defraud, and to aid and abet the same, defendant **DR. ZAMORA-QUEZADA** caused the transmission of the following claims to Medicare or Medicaid, which were for the patients, approximate dates of service, and approximate amounts listed below.

| Count | Defendant | Submission Date | Medicare/ Medicaid | Nature of the Falsity, Including but not Limited to | Patient | Amount Billed |
|---|---|---|---|---|---|---|
| 2 | DR. ZAMORA-QUEZADA | October 25, 2013 | Medicare | False Diagnosis of Rheumatoid Arthritis | C.J. | $200.00 |
| 3 | DR. ZAMORA-QUEZADA | October 29, 2013 | Medicaid | False Diagnosis of Juvenile Rheumatoid Arthritis | E.P. | $140.00 |
| 4 | DR. ZAMORA-QUEZADA | January 6, 2014 | Medicare | False Diagnosis of Rheumatoid Arthritis | M.B. | $120.00 |
| 5 | DR. ZAMORA-QUEZADA | February 18, 2014 | Medicare | False Diagnosis of Rheumatoid Arthritis | M.L. | $1,200.00 |
| 6 | DR. ZAMORA-QUEZADA | March 6, 2014 | Medicare | False Diagnosis of Rheumatoid Arthritis | M.P. | $310.00 |

(All in violation of Title 18, United States Code, Sections 1347 and 2.)

# COUNT 7
## Conspiracy to Commit Money Laundering
## (18 U.S.C. § 1956(h))

THE GRAND JURY FURTHER CHARGES THAT:

A. **Introductory Allegations**

21. The Grand Jury incorporates by reference and re-alleges paragraphs 17 and 20 as though set forth in their entirety here.

B. **The Conspiracy**

22. From in or about 2000 through the filing of this Indictment, the exact dates being unknown to the Grand Jury, in the Southern District of Texas and elsewhere, the defendant **JORGE ZAMORA-QUEZADA** did knowingly and willfully combine, conspire, confederate, and agree with others, known and unknown to the Grand Jury, to commit certain offenses against the United States in violation of Title 18, United States Code, Sections 1956 and 1957, to wit:

    a. to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which involved proceeds of specified unlawful activity, that is, health care fraud and conspiracy to commit health care fraud, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i);

    b. to knowingly transport, transmit, and transfer and attempt to transport, transmit, and transfer, a monetary instrument and funds, from a place in the United States to and through a place outside of the United States, that is Mexico, knowing that the

monetary instrument and funds involved in the transportation, transmission and transfer were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, that is, health care fraud and conspiracy to commit health care fraud, and knowing that the monetary instrument and funds involved in the transportation, transmission and transfer represent the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i);

    c. to knowingly engage and attempt to engage in monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, health care fraud and conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1957.

### The Manner and Means of the Conspiracy

23. The manner and means by which **DR. ZAMORA-QUEZADA** and his co-conspirators sought to accomplish the objects of the conspiracy included, but were not limited to, the following:

    a. It was a part of the conspiracy that **DR. ZAMORA-QUEZADA** and his co-conspirators would funnel proceeds of the health care fraud scheme to bank accounts which they also used to conduct further financial and monetary transactions in the United States and Mexico.

    b. It was further a part of the conspiracy that **DR. ZAMORA-QUEZADA** and his co-conspirators would dissipate, transform, and conceal the source, location, and origin of the fraud proceeds by investing such proceeds in commercial and residential real estate

located throughout the United States and Mexico.

    c.    It was further a part of the conspiracy that **DR. ZAMORA-QUEZADA** and his co-conspirators would acquire two luxury penthouse apartments in Puerto Vallarta, Mexico; a condominium in Aspen, Colorado; a condominium in San Diego, California; a condominium in Punta Mita, Mexico; and multiple homes and commercial properties located throughout the State of Texas.

    d.    It was further a part of the conspiracy that **DR. ZAMORA-QUEZADA** and his co-conspirators would purchase and acquire the commercial and residential real estate, in part, through the name of a shell entity.

    e.    It was further a part of the conspiracy that **DR. ZAMORA-QUEZADA** and his co-conspirators would create the false appearance of legitimate wealth and income by renting the various commercial and residential properties that he acquired to individuals and entities.

    f.    It was further a part of the conspiracy that **DR. ZAMORA-QUEZADA** and his co-conspirators would launder fraud proceeds through a McAllen-based *casa de cambio*, or money exchange house, to various accounts maintained by financial institutions in Mexico.

    g.    It was further a part of the conspiracy that **DR. ZAMORA-QUEZADA** and his co-conspirators would spend millions of dollars in fraud proceeds in order to fund his lavish lifestyle, including the purchase of high-end real estate, exotic cars, and a personal jet.

    (All in violation of Title 18, United States Code, Section 1956(h).)

## NOTICE OF FORFEITURE
## (18 U.S.C. § 982(a)(7))

Pursuant to Title 18, United States Code, Section 982(a)(7), the United States gives notice to defendant **JORGE ZAMORA-QUEZADA**, that upon conviction of any of Counts 1 through 6 of this Indictment, all property, real or personal, which constitutes or is derived, directly or indirectly, from gross proceeds traceable to such offenses, is subject to forfeiture.

## NOTICE OF FORFEITURE
## (18 U.S.C. § 982(a)(1))

Pursuant to Title 18, United States Code, Section 982(a)(1), the United States gives notice to defendant **JORGE ZAMORA-QUEZADA**, that upon conviction of Count 7 of this Indictment, all property, real or personal, involved in money laundering offenses or traceable to such property, is subject to forfeiture.

## PROPERTY SUBJECT TO FORFEITURE

The property subject to forfeiture includes, but is not limited to, the following property:

(a)  the following real property, together with all improvements, buildings, structures and appurtenances:

> **Real property titled to J & M Zamora Family Limited Partnership (also known as ("aka"): J & M Zamora FLP, J & M Zamora Family, LP) with a legal description of:**
>
> (1) All of Lots 18, 19, 20, 21, 22, 23, and 24, Block 8, Cornerstone Medical Park, Phase III Subdivision, an addition to the City of Edinburg, Hidalgo County, Texas according to the map or plat thereof recorded in Volume 32, Page 70, Map Records of Hidalgo County together with 4 adjoining tracts of land, described as Tracts I, II, II, and IV as follows:
>
>> **Tract I-** A 0.0005 acre of tract of land, being a part or portion of Lot 17, Block 8, Cornerstone Medical Park, Phase III Subdivision, an addition to the City of Edinburg, Hidalgo County, Texas.

**Tract II-** A 0.0008 acre tract of land, being 0.20 feet perimeter on the North side of Lots 17, 18, 19, 20, 21, 22, 23, and 24, Block Cornerstone Medical Park, Phase III Subdivision, an addition to the City of Edinburg, Hidalgo County, Texas.

**Tract III-** A 0.0016 acre tract of land adjacent to Lots 17 through 24, Block 8, Cornerstone Medical Park, Phase III Subdivision, an addition to the City of Edinburg, Hidalgo County, Texas.

**Tract IV-** A 0.0006 acre tract of land out of Cornerstone Medical Park, Phase II, said 0.0006 acre tract of land lying within 25.0 feet utility easement and a 20' x 20' clip as recorded in said Cornerstone Medical Park, Phase II, an addition to the City of Edinburg, Hidalgo County, Texas, according to the map or plat thereof recorded in Volume 31, Page 161, Map Records of Hidalgo County, Texas.

**aka: 2601 Cornerstone Blvd, Edinburg, Hidalgo County, Texas 78539**

(2) A tract of land out of Lot 21, Kelly Pharr Subdivision, Hidalgo County, Texas, according to the map recorded in Volume 3, Page 133, Map Records in the Office of the County Clerk of Hidalgo County, Texas.

**aka: 3307 S. Closner, Edinburg, Hidalgo County, Texas 78539**

(3) A tract of land out of Lot 21, Kelly-Pharr Subdivision, Hidalgo County, Texas, according to the map recorded in Volume 3, Page 133, Deed Records in the Office of the County Clerk of Hidalgo County, Texas.

**aka: W. Wisconsin Rd, Edinburg, Hidalgo County, Texas 78503**

(4) Lot 21, of The Greens at Cimarron, an addition to the City of Mission, Hidalgo County, Texas, according to the plat or map thereof recorded in Volume 27, Page 38, Map Records of Hidalgo County, Texas.

**aka: 2214 Red River, Mission, Hidalgo County, Texas 78572**

(5) A tract of land containing 13.38 acres out of Lot 6, Block 15, Steele and Pershing Subdivision, as per map or plat thereof recorded in Volume 8, Page 115, Deed Records in the Office of the County Clerk of Hidalgo County, Texas.

**aka: S. McColl, McAllen, Hidalgo County, Texas 78503**

(6) Lot 253, Gardenia Terrace No. 15, an addition to the City of McAllen, Hidalgo County, Texas, according to the plat or map thereof recorded in Volume 22, Page 119, Map Records of Hidalgo County, Texas

**aka: 3112 Goldcrest Ave, McAllen, Hidalgo County, Texas 78501**

(7) All of Lot 56, Sharyland Plantation Village Los Milagros, Phase II, an addition to the City of Mission, Hidalgo County, Texas, according to the map recorded in Volume 39, Page 171, Map Records in the Office of the County Clerk of Hidalgo County, Texas reference to which is here made for all purposes.

**aka: 2804 Santa Teresa, Mission, Hidalgo County, Texas 78572**

(8) Block "A", The Woods Subdivision, Cameron County, Texas, according to the map recorded in Cabinet I, Pages 1682- A and B, Map Records of Cameron County, Texas.

**aka: 451 Alton Gloor Blvd, Brownsville, Cameron County, Texas. 78526**

(9) Lot Twenty-Eight (28), Block Three (3), Leon Springs Mobile Home Villa, Bexar County, Texas, according to plat thereof recorded in Volume 5700, Page 200, Deed and Plat Records of Bexar County, Texas.

**aka: 25006 Ada Mae St, San Antonio, Bexar County, Texas 78257**

(10) Lot Thirty-Four (34), Block Three (3), Leon Springs Mobile Home Villa, Bexar County, Texas, according to plat thereof recorded in Volume 5700, Page 200, Deed and Plat Records of Bexar County, Texas.

**aka: 25110 Ada Mae St, San Antonio, Bexar County, Texas 78257**

(11) Condominium Unit 3, Block 3, New City Block 14281, Turtle Creek Office Park Condominiums, in the City of San Antonio, Bexar County, Texas, according to Condominium Declaration recorded in Volume 11060, Page 1709, Volume 11401, Page 1754, Volume

11936, Page 1992, Condominium Records of Bexar County, Texas, including an undivided interest in the common elements.

**aka: 4230 Gardendale St., San Antonio, Bexar County, Texas 78229**

(12) Condominium Unit 7, New City Block 140, Falcon Bank Condominiums, in the City of San Antonio, Bexar County, Texas, according to Condominium Declaration recorded in Volume 11477, Page 1484, Volume 11905, Page 1500 Volume 12165, Page 1408, Volume 12831, Page 448, Volume 17953, Page 660, Volume 18066, Page 1165, Real Property Records of Bexar County, Texas, including an undivided interest in the common elements.

**aka: 425 Soledad St, San Antonio, Bexar County, Texas 78205**

(13) Residential Unit 10, inclusive, as defined in the Condominium Plan for the la Costa Resort Villas II, Phase I, recorded April 3, 2006, as Instrument No. 2006-0225295, in Lots 24 and 3-0 of Carlsbad Tract, No 03-01-02, recorded September 19, 2005, as map No. 15108, in the Office of the San Diego County Recorder

**aka: 7319 Estrella De Mar Rd, #10, Carlsbad, San Diego County California 92009**

(14) Residence Interest No. 4, consisting of an undivided 1/12 Interest in Residence 2206, Aspen Highland Condominiums, according to the declaration of Condominiums for Aspen Highland Condominiums, recorded January 11, 2001, As Reception No. 450454 as amended and supplemented from time to time and recording to the map of Aspen Highlands Condominiums recorded January 11, 2001 in Plat Book 56, at Page 24, Reception No. 450455, as amended and supplemented from time to time, all in the Office of the Clerk and Recorded of Pitkin County, Colorado. (Residence 2206, Interest 4)

**aka: 197 Prospector Road, Aspen, Pitkin County, Colorado 81611**

(15) Four Seasons Residence Club Punta Mita Time Share, Residence Club Villa, #5431, Residence Club Interest Letter "G", Proportional Interest 1/12th, Residence Club Punta Mita, Punta Mita, Nayarit, México

> aka: Parcel One: Sub-Condominium RC-1/E of Sub-Condominium RC-1 of Punta Mita Condominium, together with its undivided interest in the common areas having an approximate surface area of 76,715.538 square meters.
>
> Parcel Two: A non-exclusive easement (Servidumbre de Paso y Uso) over and across the common areas of Punta Mita Condominium as established in Escritura Publica No. 287,071 of the protocol of Georgina Shila Olivera Gonzalez, Notary Public No. 207 in association with Tomas Lozano Molina, Notary Public No. 10 of the District Federal.

**Real property titled to Jorge C. Zamora-Quezada (aka: Jorge Cresenciano Zamora-Quezada, Jorge Zamora, Jorge C. Zamora-Quezada, MD, MPH) with a legal description of:**

(16) Penthouse Numero E-16-01, Condominio Shangri-La, Paseo De La Marina 385, Colonia Marina Vallarta, Puerto Vallarta, Jalisco, Mexico

(17) Penthouse Numero C-18-01, Condominio Shangri-La, Paseo De La Marina 385, Colonia Marina Vallarta, Puerto Vallarta, Jalisco, Mexico

(b) **the following personal property:**

(i) One (1), blue in color, 2015 Maserati Granturismo Coupe, Vehicle Identification Number #ZAM45VLA8F0144744 and displaying Texas personalized license plate #JCZQ, currently registered to Jorge Cresenciano Zamora-Quezada.

(ii) One (1), white, orange and black colored, Eclipse Aviation Corp, twin-engine jet, Model #EA500, Serial Number #000162, displaying Federal Aviation Administration Aircraft Registration Number N224ZQ, currently registered to JZACE #1, LLC.

## Money Judgment and Substitute Assets

The United States seeks the imposition of a money judgment against the defendant. In the event that a condition listed in Title 21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other property of the defendant in substitution up to the total value of the property subject to forfeiture.

By:

SANDRA L. MOSER
ACTING CHIEF, FRAUD SECTION

Joseph S. Beemsterboer
Deputy Chief, Health Care Fraud Unit

_____
KEVIN LOWELL
Trial Attorney
United States Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20005

By:

RYAN K. PATRICK
UNITED STATES ATTORNEY

_____
ANDREW SWARTZ
Assistant United States Attorney
U.S. Attorney's Office, SDTX
1701 W. Highway 83, #600
McAllen, Texas 78501

A TRUE BILL:

_____
Grand Jury Foreperson