IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.  18-CR-0855 |
| JORGE ZAMORA-QUEZADA | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT JORGE ZAMORA-QUEZADA's
MOTION TO RECONSIDER ORDER OF DETENTION**

The United States of America, by and through undersigned counsel, hereby responds to defendant Jorge Zamora-Quezada's ("Defendant") Motion to Reconsider Order of Detention (the "Motion").  In light of the Defendant's status as a flight risk, and the other factors described herein, the Court cannot trust that he will comply with an order to appear for trial absent confinement.  Nor does the Defendant's reliance on "new" facts alter this conclusion.  Because the Defendant cannot show, as he must, that there is a combination of conditions that would reasonably assure his appearance at trial, his Motion should be denied in its entirety.

**I.    The Defendant's Daughter Has Adult Relatives to Care for Her**

1.    Absent any legal citation, the Defendant argues that he is entitled to pre-trial release because his wife was also charged with health care fraud, was ordered detained pending trial, and consequently no one is available to care for their daughter.  Def. Mot. at 1.  This is false.  The Defendant's daughter has numerous close family members available to live with and care for her, including grandparents and six adult siblings ranging in age from 36 to 20, many of whom live in the Rio Grande Valley.  For example, one of the Defendant's sons, Jorge Alejandro Zamora-Legoff (33 years-old) lives and works in the Rio Grande Valley and lists the Zamora family residence in

Mission, Texas as his address (the same residence at which Defendant's daughter resides).  *See* **Exhibit A**, Texas Medical Board, Public Verification.  Dr. Zamora-Legoff is currently employed as a "physician in training" at the University of Texas RGV in Harlingen, Texas, and thus is likely to continue to reside in the area.  *Id.*

2.      Moreover, the effect of detention on another family member is not one of the factors set forth under 18 U.S.C. § 3142.  The statute focuses only on whether the defendant meets the criteria for pre-trial release.  The status of the Defendant's daughter has no bearing on the court's determination of his detention.

**II.    New Facts Weigh in Favor of Continued Detention, Not Release**

3.      Since the Court originally ordered detention, any newly discovered facts weigh in favor of continued detention, not release.  First, despite the Defendant's confinement, he appears to continue to brazenly disregard the law.  Specifically, the Defendant appears to have been aware of (if not directing) his wife to go to Mexico to evade arrest and find money hidden there, despite knowing that the money could be subject to seizure or forfeiture as a result of this case.  In a call from jail on June 15, 2018, the Defendant learns that Mrs. Zamora fled to Mexico out of concern for being arrested.  Instead of acknowledging that it is wrong to evade law enforcement, he responds "Oh! That was it is.  Okay. Okay."  *See* **Exhibit B** (transcripts of calls referenced herein).  In another call on the same day, the Defendant's son informs him that Mrs. Zamora went to Mexico to "find[] the funds."  The Defendant responds, "Of course. Um-hm."  His son responds that "that was the goal, to do that and that's all."  The Defendant responds "Yes, of course, They should already be…yes, she already told me that she's almost done."  A few days later on June 18, 2018, the Defendant obtains a number in Mexico where he can talk with Mrs. Zamora while she was in Mexico.

4.     Second, the government learned that the Defendant (as well as his wife and others) sought to obstruct, mislead, and influence the grand jury investigating him.  Specifically, prior to indictment in this case, the Defendant ordered others to manufacture and fabricate medical documents and place them into various patient records whose files were subpoenaed by the grand jury as part of this investigation, and provided these falsified records to the government.  The purpose of creating these patient records was to create the false appearance that the Defendant's medical practices were legitimate.  As the government developed evidence regarding these facts, one clinic employee told investigators that he felt uncomfortable when he was told to create false medical records, but that when he raised the concern with Mrs. Zamora, his concerns were brushed aside.  *See* Complaint, *United States v. Meisy Angelica Zamora*, Case No. 18-MJ-1507 at ¶ 16 (**Exhibit C**).  This outrageous conduct illustrates the Defendant's complete lack of respect and disregard for legal proceedings, and compellingly supports pretrial detention.

**III.     Defendant's "New" Circumstances are Not Grounds For Release**
**A.  2014 CMS Findings are Not "New"**

5.     The Motion cites to a 2014 Center for Medicare and Medicaid Services ("CMS") decision finding that the Defendant did not owe $3.3 million in repayment as a purported weakness in the weight of the evidence against the Defendant. Def. Mot. at 2.  Not only is the CMS' finding of questionable weight, but it has no bearing on the weight of evidence, and therefore is irrelevant to detention.

6.     The CMS investigation described in the Motion was based on a review of patient files that the Defendant provided to CMS upon request.  In addition to the witnesses who will testify that they fabricated patient files in response to federal grand jury subpoenas at the Defendant's direction, the government also has identified witnesses who will testify that the

3

Defendant approved of the creation of false patient records for Medicare audits like the CMS investigation.  CMS's decision is worthless if it was based on fabricated or altered records.[1]

7.      Even if the CMS decision were based on accurate records, the decision itself did not vindicate the Defendant: CMS dropped its request for overpayment because CMS lost the records supporting the request.  In Exhibit A, the "rationale" given for CMS' decision was that the contractor was "unable to re-create and verified [sic] the sampling methodology" used in 2005 when it initially requested the overpayment.  The letter explained, "[i]n this particular case, the in-person hearing was scheduled eight years after the overpayment letter was issued.  During this time, some of the documentation was misplaced and could not be verified.  Furthermore, the carrier was unable to certify the validity of the overpayment statistical sampling, rendering the project invalid."  Where CMS did make a ruling, it found that certain of the Defendant's claims were "not medically necessary."  Whatever the import of the 2014 finding by CMS on the volume of the Defendant's medically unnecessary claims, it has no bearing on the court's reconsideration of the Defendant's detention.  The letter is dated 2014 and is not "new."

8.      Ultimately, the defense cites the 2014 letter to show that the Defendant submitted some legitimate claims.  This, however, does not affect the strength of the government's case as it is not a defense to the charges against him.  *See e.g. United States v. Marrero*, 904 F.2d 251 (5th Cir. 1990) (fact that doctor "did not overcharge in every instance in which she had an opportunity to do so is not relevant to whether she, in fact, overcharged as alleged in the indictment").

---

[1] Exhibit A to the Motion also references testimony given to CMS as part of its investigation.  The government has also learned through its investigation that in other instances where Dr. Zamora faced legal scrutiny, Dr. Zamora pressured employees to sign false affidavits, as discussed *infra*.  Therefore, any testimony taken as part of the CMS decision cannot be trusted.

**B. Case Complexity is Not "New" Information**

9.      That the case was designated complex is not a new fact for consideration of detention.  This issue was discussed at the first detention hearing and was rejected by Magistrate Judge Peter E. Ormsby as a reason to order release.

10.      At the initial detention hearing, defense counsel stated "I think we're going to have an agreement that this can be certified as a complex case."  Detention Hearing Tr. at 4:21-23, attached as **Exhibit D**.  Defense counsel argued that the volume of records would make it difficult to prepare with a detained defendant: "if it's going to be declared a complex case, it's a tremendous amount of documents, and it's going to be a complete burden on us to be able to sit down with the witness, to be able to go through all his patient files…" *Id.* at 57:4-15.  The Court responded that, "I've thought of that."  *Id.* at 57:16.  The Court continued, "I've considered, I think, everything you've already said.  It would be better for every defendant not to be in custody while their case is pending, not just Dr. Zamora…." *Id.* at 58:20-25.

11.      At the time when Magistrate Judge Ormsby ordered detention, he already had notice that the case was likely to extend longer than usual, but he nevertheless made the finding that detention was proper given the Defendant's risk of flight.  This order and its consequentially longer pre-trial detention for the Defendant is consistent with other large scale fraud cases.  *See e.g.*, *United States v. Stanford*, 367 Fed. Appx. 507 (5th Cir. 2010) (decision affirming detention in case where defendant in mail and wire fraud and money laundering scheme detained from indictment on June 18, 2009 to trial in January 2012); *United States v. Philip Esformes*, 16 CR 20549 (S.D. Fla.) (defendant charged in health care fraud and money laundering conspiracies detained on August 4, 2016 to the present awaiting trial currently scheduled for October 2018); *United States v. Pon*, 2014 WL 3340584 (M.D. Fla. May 29, 2014) (affirming detention for

defendant charged with health care fraud detained after indictment between April 2014 indictment and September 2015 trial).  There is no reason to revisit the detention decision on this basis.

## IV.   Section 3142(G) Factors Continue to Favor Detention

### A.  Weight of the Evidence

12.      It is necessary to clear up a misconception the defense has about the charged scheme: it is not limited to the false diagnosis of Rheumatoid Arthritis.  That is just one of several ways the Defendant committed fraud.  Indeed, the indictment details an elaborate health care fraud scheme involving the Defendant and his co-conspirators.   Among other things, the Defendant committed fraud by: (a) submitting claims for medically unnecessary services; (b) performing excessive, repetitive, and fraudulent medical procedures; (c) manufacturing false patient records in order to respond to requests for patient records; and (d) administering toxic medications, such as chemotherapy, to patients on the basis of his fraudulent medical practices.   Clearly, the Defendant's scheme extended well beyond the initial false diagnosis of Rheumatoid Arthritis.

13.      Every time that a patient came to the office unnecessarily, losing time at work and being exposed to other sick patients, was subjected to unnecessary radiation from additional X-rays, or received an injection of toxic chemotherapy, the Defendant got paid.  Diagnosing nearly every patient he saw with Rheumatoid Arthritis was the false statement which made it more likely to *seem* appropriate that a patient would need additional procedures or take additional prescriptions.  Each day, the Defendant had the bottom line in mind, not the wellbeing of his patients.  The evidence at trial will show that the Defendant considered each additional patient, additional patient visit, additional test or procedure, and additional prescription as a way to bilk health care benefit programs out of more money.  This enabled him to live a life of luxury at the expense of his patients' health and well-being.

14.     Because the defense incorrectly believes that the case is only about false diagnoses, the Motion inaccurately states that "the government's case is premised on treating physicians." Specifically, the Motion takes issue with the fact that "there is not a single opinion stating that Dr. Zamora-Quezada intentionally misdiagnosed a patient."  Of course there is not.  Federal Rule of Evidence 704 prohibits experts from offering an "opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged."   The government does not plan to elicit such improper testimony.  In any event, the Defendant simply ignores the overwhelming weight of evidence against him.  A cursory review of that evidence makes clear that the government's case is based on the testimony of numerous employees who will describe years of the Defendant's fraudulent conduct, countless patients who will describe how they were irreparably harmed and their lives forever altered after being falsely diagnosed by the Defendant, health insurance claims data that reflect the Defendant's systemic fraud, and the medical records that were falsified at the Defendant's direction.  In short, this is a criminal, not a civil, health care case and thus is not about a difference in medical opinion.

15.     The Motion also argues that "there is no opinion or evidence that based upon Dr. Zamora-Quezada's records, tests, and images, Dr. Zamora-Quezada gave a false diagnosis." Motion at 3. That is also true.  That the Defendant made a false diagnosis is evident without reviewing his "records, tests, and images."  As the government explained in its June 17, 2018 expert disclosure, numerous doctors evaluated and treated patients who had previously been seen by the Defendant.  Those doctors will testify that when they saw patients, they tested negative for Rheumatoid Arthritis and other conditions diagnosed by the Defendant.  The doctors will testify that they stopped patients from taking drugs and receiving injections that the Defendant had insisted upon, and that their patients' health improved thereafter.  For these treating physicians,

they did not need to see the Defendant's files to know whether the patients had been misdiagnosed. As is recognized in medical treatises, and as counsel for the defense noted at the detention hearing, "once you have this disease, there's no cure for it…it's a lifelong treatment."  Hearing Tr. at 15. The jury can draw its own conclusions from the testimony of the patients' treating physicians.

**B. History and Characteristics of the Defendant**

16.    Astonishingly, the Motion suggests that the Defendant's character and background weigh in favor of release.  Pre-trial release assumes, however, that a defendant can be trusted to comply with conditions of release.  That trust is paramount.  Based on this Defendant's track record of fraud and obstruction, particularly in connection with court proceedings, he manifestly cannot be trusted to abide by conditions of release.

17.    In 2008, the Defendant's wife, Mrs. Zamora, sought a temporary restraining order against him.  *See* **Exhibit E**.  In an affidavit in support of the TRO, Mrs. Zamora argued that the order was necessary because the Defendant "disobeyed court orders" and "has shown himself untrustworthy, dishonest, and without regard for court orders or the rule of law."  The affidavit pointed out that rather than comply with court orders in the divorce proceedings, the Defendant filed for personal bankruptcy, as Mrs. Zamora put it, "for illicit purposes [which] is evidence of his evil intentions with respect to" her assets.  *See In re Jorge C. Zamora-Quezada*, No. 08-70008 (Bankr. S.D. Tex.).  Mrs. Zamora's allegation that the personal bankruptcy was frivolous was later corroborated by the fact that the case was abandoned as soon as the divorce proceedings were dismissed.  *See In re Jorge C. Zamora-Quezada*, No. 08-70008, Docket No. 595 (Bankr. S.D. Tex. Apr. 13, 2010 (**Exhibit F**).

18.    The Defendant again used a bankruptcy court to his advantage in 2016 which included concealment of the Debtors' assets by omitting them from the Debtors' statement of financial affairs.  *See In re Jorge C. Zamora-Quezada, M.D., M.P.H., et al.*, No. 16-70270 (Bankr.

S.D. Tex.).  Hitachi sued the Defendant's clinic for non-payment on a contract relating to an MRI machine.  The Defendant failed to appear in court and refused to comply with court process instructing him to do so.  When Hitachi took steps to execute the $1 million judgment against the Defendant's clinic, he filed for bankruptcy protection.  As part of the clinic's bankruptcy proceedings, the Court found it was "not hard pressed to find that . . . [[the Defendant] ha[s] engaged in rampant bad faith conduct prior to and during the course of this bankruptcy proceeding."  *Id.* Docket 167 at 28 (**Exhibit G**).  The Defendant testified as part of the proceedings and the Court wrote of his testimony that: **"[t]he Court finds Dr. Zamora-Quezada's testimony to be—to put it mildly—wholly lacking in credibility."** *Id.* Docket 167 at 15 (emphasis added). The court found that the "[the Defendant's] pre-petition conduct of significant transfers of its assets and income to insiders and affiliates when it was insolvent, unaccounted for assets, and using its bankruptcy as a litigation tactic is indicative of bad faith." *Id.* at 33.

19.     The Defendant has a consistent pattern of taking steps to conceal his assets to enhance his advantage. Though the Defendant worked in the United States between 1988 and 1992, he never filed a federal tax return.  In 1997, the United States Tax Court ordered the Defendant to pay $307,660 in unpaid taxes and $91,308 in "additions" in federal taxes.  *See Zamora-Quezada v. Commissioner*, 74 T.C.M. (CCH) 1019 (1997) (**Exhibit H**).

20.     So, too, when a pre-trial services officer asked the Defendant about his assets as part of this criminal case, the Defendant misrepresented and significantly understated his assets and resources.  *See* Docket No. 10, Pretrial Services Report.

21.     Furthermore, this investigation has determined that the defendant not only obstructed federal grand jury investigations, but also obstructed state investigations.  In one instance, the Defendant directed an employee to swear to a false affidavit to obstruct a local

criminal investigation of a patient who accused the Defendant of sexual assault.  The affidavit described the patient visit but omitted what the employee observed of the Defendant's contact with the patient.  The employee signed the affidavit and the Defendant used it as part of his case.  The employee's statement is corroborated by the patient who made the complaint against the Defendant.  *See* Affidavit of Special Agent J. Bley (**Exhibit I**).

22.     Similarly, in 2009, the Defendant was found liable by a jury for sexual harassment and sexual discrimination against a class of his former female employees.  The Fifth Circuit affirmed the judgment, detailing some of the more egregious and retaliatory conduct of the Defendant.  *See Alaniz v. Zamora-Quezada*, 591 F.3d 761 (5th Cir. 2009) (**Exhibit J**).

## V.     Conditions Are Not Adequate

23.     Against this background, the "history and characteristics" of the Defendant militate heavily in favor of pretrial detention.  The Defendant has a long history of giving false testimony, manufacturing fictitious records, and obstructing investigations.  There is no basis to believe that the Defendant will now comply with court orders.  These facts, combined with his extensive financial resources and international connections, only reinforce the earlier decision to detain him pending trial.

24.     Finally, in the Motion, the Defendant argues that there are certain restrictive conditions which would assure the Defendant's appearance, like those ordered by Judge Rakoff in the Southern District of New York in *United States v. Marc Dreier*.  Motion at 13.  The Motion lists some, but not all of the required conditions imposed in that case.  For example, that case required not only that there be 24-7 armed guards, but that the defendant "expressly consent in writing to the use, by the armed security guards of temporary preventative detention and the use of reasonable force."  *United States v. Dreier*, 596 F.Supp.2d 831, 834 (S.D.N.Y. 2009).  The defendant was required to cover the cost of the guards for three months and the cost was required

to "be paid in advance into an escrow account maintained by the United States' Attorney's office," *Id.* The defendant was also required to remove all computers and potential weapons from his home, and that the defendant not receive any visitors other than those approved by pre-trial services. *Id.* The Defendant relies on *Dreier* but conveniently failed to note these aspects of that defendant's pre-trial release.

25. The government submits that the conditions of release in *Dreier* are not satisfactory here, where the Defendant has a long and well-documented history of obstruction and disregard of courts and court procedures. Therefore, even if the Defendant were to agree to *all* of the conditions from *Dreier*, they would still be inadequate.

26. For the reasons stated herein, the government respectfully requests that the Court deny the Defendant's motion for release pre-trial.

SANDRA L. MOSER
ACTING CHIEF, FRAUD SECTION

Joseph S. Beemsterboer
Deputy Chief, Health Care Fraud Unit

/s Kevin Lowell
Kevin Lowell
Leslie S. Garthwaite
Trial Attorneys
United States Department of Justice
Criminal Division Fraud Section
1400 New York Avenue, N.W.
Washington D.C. 20005


RYAN K. PATRICK
UNTIED STATES ATTORNEY

/s Andrew R. Swartz
Assistant United States Attorney
U.S. Attorney's Office, SDTX
1701 W. Highway 83, #600
McAllen, TX 78501

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this day of August 13, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system and provided an electronic copy to the defendant's counsel of record.

/s Andrew R. Swartz
Assistant United States Attorney
U.S. Attorney's Office, SDTX
1701 W. Highway 83, #600
McAllen, TX 78501