IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.     )<br>) Case No. 18-CR-0855-S1<br>JORGE ZAMORA-QUEZADA,   )<br>MEISY ANGELICA ZAMORA,   )<br>ESTELLA SANTOS NATERA,   )<br>FELIX RAMOS      )<br>)<br>Defendants.  ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANTS'
MOTIONS TO RECONSIDER ORDERS OF DETENTION**

The United States of America, by and through undersigned counsel, hereby submits this Response to Defendant Jorge Zamora-Quezada's Motion to Reconsider Order of Detention (Docket No. 342, *filed under seal*); and Defendant Meisy Angelica Zamora's Renewed Motion to Revoke Detention Order (Docket No. 352) (together, the "Motions to Reconsider"):

**I.      Defendants Do Not Raise Any New Evidence**

Defendants' Motions to Reconsider should be denied because they fail to raise any new evidence that warrants reconsideration (yet again) of the Court's prior detention orders.

In the Motions to Reconsider, the Defendants only re-hash previous arguments against the "weight of the evidence" factor of 18 U.S.C. §3142(g).  As an initial matter, Defendant's mischaracterize the allegations and evidence against them.  *See infra* at Section II.  Furthermore, Defendants' arguments about the patients in the Superseding Indictment are not "new evidence" that warrant reconsideration of the Court's detention orders.  Moreover, weight of the evidence is generally considered the least important factor in considering whether a defendant is a flight risk. *See United States v. Stanford*, 630 F. Supp. 2d 751, 755 (S.D. Tex. 2009), *aff'd* 341 F. Appx. 979

(5th Cir. 2009); *United States v. Akamnonu*, 2012 WL 1466557 *2 (N.D. Tex. Apr. 27, 2012). Defendants' legally misguided arguments are not a basis to reconsider detention.

More importantly, Defendants fail to show any change in the multitude of factors demonstrating that Defendants are a flight risk – multi-million dollar foreign properties, Mexican citizenship, family ties in Mexico, bank accounts in Mexico, and recorded jail calls indicating flight to Mexico to avoid potential arrest. The Government incorporates by reference its previous responses to the Defendants' motions to reconsider Defendants' detention. Docket Nos. 39, 94, 160, 225. As set forth in the Government's prior briefing, as well as the multiple hearings on detention, the factors set forth in 18 U.S.C. §3142(g) *all* weigh in favor of detention in this case.

Furthermore, Defendants do not raise any new conditions or combination of conditions that would reasonably assure their appearance at future proceedings. Defendants again suggest 24-hour armed security. That condition was raised and dismissed previously by this Court. There is no reason to re-consider that condition here.

## II. Weight of the Evidence Supports Continued Detention

### A. Defendants Mischaracterize the Allegations Against Them

Defendants' Motions to Reconsider are based on the incorrect claim that the government "concedes" that the fraud in this case is limited to the specific patients identified in the Superseding Indictment. It is not. First, the Superseding Indictment charges a conspiracy. Like any conspiracy, the offense is the *agreement* to participate in an illegal scheme. Proof of the offense focuses on what each participant in the conspiracy did to join and further it. Here, that evidence includes enrollment in numerous health care benefit programs (Superseding Indictment at ¶20a), use of a private jet to enable the conspirators to travel more easily to churn through more patients (*id.* at ¶ 20b), conspirators pressuring office staff to schedule patients for unnecessary visits to generate profits rather than to treat their conditions (*id.* at ¶ 20g), conspirators providing unnecessary and

2

dangerous infusions and injections on patients (*id.* at ¶ 20e), conspirators subjecting patients to unnecessary and excessive medical testing and procedures (*id.* at ¶ 20f), conspirators concealing patient records from other medical professionals (*id.* at ¶ 20k), and conspirators fabricating and falsifying medical records of patients (*id.* at ¶ 20m), among other things. These allegations relate to practices that were pervasive in the Zamora-Quezada clinic and which affected *thousands* of patients. Accordingly, patients who are specifically identified by initials in the Superseding Indictment (referenced as 24 in one motion and 25 in another) are a small subset of examples of how Defendants carried out the conspiracy.

In addition, the Motions to Reconsider incorrectly assert that the case is about misdiagnosis. As described above, and as is clear from the Superseding Indictment, the conspirators' false diagnoses were a part, but not the whole conspiracy.

### B. The "25 Patients" Are a Small Subset of the Patients Harmed Over the Course of the Conspiracy

The Superseding Indictment identifies examples of specific individuals who were falsely diagnosed with rheumatoid arthritis and other autoimmune diseases. Superseding Indictment ¶¶ 20(c), 23. However, the Superseding Indictment explicitly states that false diagnoses of vulnerable patients *included, but was not limited* to those specifically identified individuals. *Id.* ¶ 20(c). Those individuals are representative of how Defendants carried out the scheme, but they are by no means the only individuals who were misdiagnosed or subjected to unnecessary tests and procedures. Indeed, the evidence at trial will demonstrate that over the course of nearly two decades, the Defendants perpetrated a carefully crafted scheme whereby patients were indiscriminately given medically unsound diagnoses and were subjected to over-testing and potentially devastating and toxic treatments, all so that the Defendants could bill for those patients.

The Superseding Indictment makes clear that false diagnoses were only one aspect of the

scheme to defraud.  The evidence at trial will show that the diagnosis was merely the first step in a lengthy chain of fraud.  Regardless of whether a patient was, or was not, properly diagnosed, the Defendants "conduct[ed] a battery of fraudulent, repetitive, and excessive medical procedures on patients in order to increase revenue for Dr. Zamora-Quezada." *Id.* ¶ 20(f).  The Defendants "directed staff to increase the number of patient office visits and the number of medical procedures that were performed on patients in order to generate profits[.]" *Id.* ¶ 20(g).  For example, all patients, even patients who happened to have rheumatoid arthritis, were subjected to medically unnecessary and excessive procedures like repeated X-Rays, MRIs, and CAT scans, exposing patients to unnecessary radiation.  Patients who had autoimmune diseases received excessive, unnecessary, and in some cases harmful treatments that potentially worsened their conditions.  Those unnecessary procedures and treatments were fraudulently billed to Medicare and private insurance companies, and the Defendants were paid handsomely for the fraudulent billing.

Moreover, the Superseding Indictment makes clear that Defendant's pattern of fraud is not a recent or isolated phenomenon.  In 2009, the Texas Medical Board issued a rare public reprimand of Dr. Zamora-Quezada for conducting excessive and unnecessary "tests on patients, treating patients with toxic drugs such as chemotherapy, and diagnosing patients with rheumatoid arthritis without a legitimate basis[.]" *Id.*  ¶ 20(i).  At trial, the Government will present evidence that despite formally being put on notice that the clinic's practice of misdiagnosis, over-testing, and over-treatment was improper, the same pattern of fraud continued through the filing of the indictment in this case.

The Superseding Indictment also alleges that Defendants had a pattern and practice of concealing patient records from other rheumatologists and physicians.  *Id.* ¶ 20(j).  At trial, the Government will present evidence that the Zamora clinic routinely refused to hand over patient

4

files when patients sought second opinions elsewhere. If a patient file was produced, other rheumatologists and physicians routinely found the file to be incomplete and unreliable. This practice was not just sloppiness; rather, it was central to the broader fraud scheme. If the Zamora clinic had been transparent about its excessive testing and over-treatment, the fraudulent nature of the practice would have been laid bare.

At trial, the Government's evidence will include the specific patients identified in the Superseding Indictment. However, as is common in conspiracy cases, the Government's evidence will also include evidence of the manner and means of how the fraud scheme was carried out at the clinic, which is not specific to particular individuals. For example, the Government anticipates that former employees of the Zamora clinic will testify about how Defendants pressured employees to falsify patient medical records to support fraudulent claims; meet procedure quotas in complete disregard of medical necessity or patient wellbeing; and execute a carefully formulated plan to over-test and over-treat the patients who came to the clinic. In addition to testifying about the specific patients identified in the indictment, numerous physicians and rheumatologists will testify about the countless red flags they observed emanating from the Zamora clinic: refusal to provide medical records; incomplete and unreliable records; and an overall impression that the Zamora clinic was operated in complete disregard of accepted standards of care in the field of medicine and rheumatology.

The Defendants would of course prefer that the evidence in this case were limited to "25 patients." But wishing does not make it so. The Superseding Indictment in this case, returned upon a finding of probable cause by a Federal Grand Jury, details a lengthy, elaborate, and calculating scheme and conspiracy to defraud Medicare and private insurance companies by fraudulently billing for unnecessary tests and procedures. That is the case that the Government

will present to a jury at trial.

### C.     Defendants Confuse Conviction with Sentencing

Defendants' myopic focus on the "25 Patients" confuses conviction with sentencing. Defendants suggest that their sentence will be limited to a loss associated with the specific patients identified in the Superseding Indictment. This position is legally misguided on several levels.

To obtain a conviction for *conspiracy* to commit health care fraud, the Government is not required to identify and submit evidence of *every* patient that was fraudulently misdiagnosed (or subjected to unnecessary procedures) during the conspiracy. The Government is required only to prove "beyond a reasonable doubt that (1) two or more persons made an agreement to commit health care fraud; (2) that the defendant knew the unlawful purpose of the agreement; and (3) that the defendant joined in the agreement willfully, that is, with the intent to further the unlawful purpose." *United States v. Willet*, 751 F.3d 335, 340 (5th Cir. 2014) (quoting *United States v. Grant*, 683 F.3d 639, 643 (5th Cir. 2012)).

Indeed, conspiracy under 18 U.S.C. § 1349 does not require proof that *any* patients were fraudulently misdiagnosed. Conspiracy to commit health care fraud does not require proof of an overt act by the Defendants, such as a fraudulent misdiagnosis. "In fact, the government need not show an overt act at all." *United States v. Gibson*, 875 F.3d 179, 186 (5th Cir. 2017) (citing *United States v. Njoku*, 737 F.3d 55, 67-68 (5th Cir. 2013). While the Government believes that the fraudulent diagnoses are damning evidence of health care fraud and conspiracy, there is ample other evidence of excessive and medically unnecessary tests, harmful procedures, falsification of medical records, and the submission of false claims for a jury to conclude that the Defendants are guilty of conspiracy to commit health care fraud.

At most, the quantity of misdiagnosed patients is one of several factors the Court will

consider in connection with the calculation of "intended loss" at sentencing. U.S.S.G. § 2B1.1. However, at sentencing the determination of the "intended loss" is not limited to the patients identified in the indictment. The Sentencing Guidelines require the Court to consider an expansive range of relevant conduct connected to, arising out of, or resulting from the criminal activity, regardless of what specific instances of misconduct are set forth in the underlying charges. U.S.S.G. § 1B1.3.

Even at sentencing, the Government is not required to prove an exact tally of misdiagnosed patients. At sentencing, the Court's task is to assess the "pecuniary harm that was intended to result from the offense." *United States v. Martin*, Fed. Appx. 358, 368 (5th Cir. 2014) (quoting U.S.S.G. § 2B1.1 cmt. N. 3(A). In carrying out this task, the court "need only make a reasonable estimation based upon the available information." *Id.* (citing *United States v. Cothran*, 302 F.3d 279, 287 (5th Cir. 2002)). District Courts are given "wide latitude in determining the loss resulting from fraud." *United States v. Lesure*, 517 Fed. Appx. 296, 298 (5th Cir. 2013) (quoting *United States v. Sowels*, 998 F.2d 249, 251 (5th Cir. 1993). The standard of proof is preponderance of the evidence. *Id.* (citing *United States v. Nelson*, 732 F.3d 504, 521 (5th Cir. 2013)). At sentencing, the Court will have evidence of misdiagnoses, but it will also have evidence of a widespread ***pattern*** of fraudulent claims arising out of medically unnecessary tests, procedures, and falsified medical records. All of this "relevant conduct" will be taken into account and quantified to arrive at the intended loss under § 2B1.1.

In fact, in cases of "pervasive fraud," the Fifth Circuit has endorsed the shifting of the burden of proof from the Government to the defendant. "[A]lthough the government generally bears the burden of showing that the alleged intended loss was garnered by fraudulent means, where the government has shown that the fraud was so extensive and pervasive that separating

legitimate benefits from fraudulent ones is not reasonably practicable, the burden shifts to the defendant to make a showing that particular amounts are legitimate." *United States v. Hebron*, 684 F.3d 554, 563 (5th Cir. 2012); *see also Martin*, 555 Fed. Appx. at 368; *United States v. St. John*, 625 Fed. Appx. 661, 668 (5th Cir. 2015).

The Government believes that the evidence will show this to be precisely the kind of case involving "pervasive fraud" that warrants shifting the burden to Defendants to prove what, if any, claims are legitimate. This is particularly true given the evidence in this case that medical records at the Zamora clinic were routinely falsified, incomplete, and unreliable.

Defendants' attempt to cabin the "loss" in this case to "25 patients" is a disingenuous mischaracterization of the charges, the evidence, and the law.

### III.    The Government Has Not Delayed these Proceedings

Defendants' Motions to Reconsider complain about "delay," but the government is not the source of any delay. First, the most significant delay in this case stems from the withdrawal of Defendant's lead counsel. On September 24, 2018, lead counsel for Dr. Zamora-Quezada filed motions to withdraw. (Docket Nos. 221 and 222). Lead counsel's representation of the Defendants pre-dated Dr. Zamora-Quezada's indictment, extending back nearly a year. The content of the motions, and the grounds stated by counsel in support of withdrawal, speak volumes about Defendants' conduct and character.

The withdrawal of Defendants' lead counsel apparently placed the Defendants back at square one in terms of trial preparation. At the hearing on October 2, 2018, when the Court granted lead counsel's motions to withdraw, Mr. Martinez informed the Court that it would take a considerable amount of time for him to take stock of the case and prepare for trial. Since then, Mr. Martinez has indicated to the Court on multiple occasions that a significant amount of work

remained to be completed before Defendants would be ready for trial. As recently as the last hearing, on May 3, 2019, Mr. Martinez stated that Defendants were not ready for trial, and would not know until June or July 2019 when Defendants would be ready for trial. Just this week, Defendants requested several additional subpoenas, all of which indicates that Defendants are still in the process of preparing for trial.

Second, Defendants have not complied with their discovery obligations under FED. R. CRIM. P. 16. The Defendants have represented to the Government and the Court that they have retained one or more expert witnesses to testify at trial. However, Defendants have not provided the Government with a "written summary of any testimony that the defendant intends to use[.]" FED. R. CRIM. P. 16(b)(1)(C). Furthermore, the Government has repeatedly requested reciprocal discovery from the Defendants pursuant to Fed. R. Crim. P. 16(b)(1)(A). Despite the fact that Defendants have issued numerous subpoenas over the past year, Defendants have not provided reciprocal discovery to the Government in connection with those subpoenas. *Id.*

**IV.    Conclusion**

Defendants present no new evidence or argument that alters the conclusion already reached by this Court and two United States Magistrate Judges: the factors of 18 U.S.C. §3142(g) all weigh in favor of detention—there is no condition or combination of conditions that will reasonably assure the Defendants' appearance at future proceedings.

Accordingly, the Government respectfully requests that the Court deny Defendants' Motions to Reconsider the orders of detention.

Respectfully submitted,

Joseph S. Beemsterboer
Deputy Chief, Health Care Fraud Unit

/s Kevin Lowell
Kevin Lowell
Leslie S. Garthwaite
Trial Attorneys
United States Department of Justice
Criminal Division Fraud Section
1400 New York Avenue, N.W.
Washington D.C. 20005


RYAN K. PATRICK
UNTIED STATES ATTORNEY

/s Andrew R. Swartz
Assistant United States Attorney
U.S. Attorney's Office, SDTX
1701 W. Highway 83, #600
McAllen, TX 78501


CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on this day of July 10, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system and/or provided an electronic copy to the defendant's counsel of record via email.

    /s Andrew R. Swartz
Assistant United States Attorney
U.S. Attorney's Office, SDTX
1701 W. Highway 83, #600
McAllen, TX 78501