UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  7:18-CR-00855 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | McAllen, Texas |
| | ) | |
| JORGE ZAMORA-QUEZADA, | ) | Thursday, December 5, 2019 |
| MEISY ANGELICA ZAMORA, | ) | |
| ESTELLA SANTOS NATERA, | ) | (9:22 a.m. to 12:26 p.m.) |
| FELIX RAMOS, | ) | |
| | ) | MORNING SESSION |
| Defendants. | ) | |


JURY TRIAL - DAY 2

BEFORE THE HONORABLE RICARDO H. HINOJOSA,
UNITED STATES DISTRICT JUDGE


Appearances:            See next page


Court Interpreter:      M. Foraker / C. de Peña
                        (For Meisy Zamora)

Court Recorder [ECRO]:  Antonio Tijerina

Transcribed By:         Exceptional Reporting Services, Inc.
                        P.O. Box 8365
                        Corpus Christi, Texas 78468
                        361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>APPEARANCES FOR:</u>


Plaintiff:                      ADRIENNE FRAZIOR, ESQ.
                                EMILY GURSKIS, ESQ.
                                REBECCA YUAN, ESQ.
                                CYNTHIA VILLANUEVA, ESQ.
                                Office of the United States Attorney
                                1701 W. Business Hwy. 83
                                Suite 600
                                McAllen, TX 78501


Jorge Zamora-Quezada:           BENIGNO TREY MARTINEZ, III, ESQ.
                                TOMAS TIJERINA, ESQ.
                                STEPHEN LEE, ESQ.
                                1201 E. Van Buren St.
                                Brownsville, TX 78520


Meisy Zamora:                   CHRISTOPHER SULLY, ESQ.
                                5804 N. 23rd St.
                                McAllen, TX 78504


Estella Natera:                 AL ALVAREZ, JR., ESQ.
                                4409 N McColl Rd
                                McAllen, TX 78504


Felix Ramos:                    JAIME PENA, ESQ.
                                ROBERT STEINDEL, ESQ.
                                Pena Garza PLLC
                                900 Kerria Ave
                                McAllen, TX 78501

3

1                              INDEX

2   GOVERNMENT'S WITNESS        DIRECT   CROSS      REDIRECT   RECROSS

3   ELIZABETH GONZALEZ

4     BY MS. FRAZIOR            64                   127

5     BY MR. MARTINEZ                    85

6

7   GOVERNMENT'S EXHIBIT                                       RECEIVED

8   C-55                                                       71

9

10  DEFENDANT'S EXHIBITS                                       RECEIVED

11  61 THROUGH 64                                              85

12

13  OPENING STATEMENT

14  BY MS. FRAZIOR             11

15  BY MR. MARTINEZ            25

16  BY MR. SULLY               34

17  BY MR. ALVAREZ             43

18  BY MR. PENA                46

19

20

21

22

23

24

25

1    <u>**McAllen, Texas; Thursday, December 5, 2019; 9:22 a.m.**</u>

2    **(Call to order)**

3    **(Outside the presence of the jury)**

4    **THE COURT:**  There's some matters that you all were

5    asking I take outside the presence of the jury.

6    **MS. FRAZIOR:**  Yes, your Honor.

7    **MR. MARTINEZ:**  That's correct, Judge.  The Government

8    gave us a list of their first three witnesses yesterday, and

9    the very first witness they're going to be calling is going to

10    be the mom of a patient.  And I spoke with Ms. Frazior this

11    morning just to make sure that she wasn't going to be giving

12    any diagnosis testimony or opinion testimony regarding that and

13    she said that she is, citing a hearsay exception under

14    medical --

15    **THE COURT:**  The hearsay exception being what?

16    **MS. FRAZIOR:**  Your Honor, I'm not offering diagnosis

17    information because she can't testify about the diagnosis.

18    She's not a doctor to that.  But she can testify to what her

19    son was experiencing, his physical symptoms, and the hearsay

20    exception to that would be 803(4), statement of a medical

21    diagnosis.  Additionally --

22    **THE COURT:**  So you're just going to ask her what he

23    was experiencing rather than do you have an opinion as to

24    whether he was --

25    **MS. FRAZIOR:**  Yes.

5

1          THE COURT:  -- improperly diagnosed.

2          MS. FRAZIOR:  Yes.

3          THE COURT:  I -- there's no problem with that.

4          MR. PENA:  Your Honor, actually the concern is, and I

5   think there was some indication, that they were going to try to

6   elicit from the witness testimony that there were other doctors

7   that had diagnosed or not diagnosed these particular

8   conditions, and that's the concern is, number one, it doesn't

9   fall under 803(4).  That is actually going to cause an issue

10   with the Sixth Amendment because we're not going to have a

11   right to confront those witnesses and they're using those

12   witnesses to backdoor testimony from experts --

13          THE COURT:  Well that's --

14          MR. PENA:  -- that have not been (indisc.)

15          THE COURT:  -- hearsay on hearsay.

16          MR. PENA:  That's correct, your Honor.

17          MS. FRAZIOR:  Your Honor, first of all, the second

18   opinion doctor will testify.

19          THE COURT:  Okay, well then you have that one.

20          MS. FRAZIOR:  Yes.

21          THE COURT:  So --

22          MS. FRAZIOR:  But --

23          THE COURT:  -- I don't think you need her then.

24          MS. FRAZIOR:  Your Honor, --

25          THE COURT:  To talk about somebody else telling her -

6

1   - I mean, hearsay is a problem.

2        **MS. FRAZIOR:**  Well she is going to say we went to

3   visit this second doctor.

4        **THE COURT:**  Okay, that's fine, they --

5        **MS. FRAZIOR:**  My son is --

6        **THE COURT:**  -- went to visit the second doctor --

7        **MS. FRAZIOR:**  My son is --

8        **THE COURT:**  -- and that -- maybe that lays a

9   predicate for the second doctor himself to tell us since he's

10  going to testify rather than us having something a problem of

11  on the record of hearsay.

12       **MS. FRAZIOR:**  Your Honor, it's not hearsay to say --

13       **THE COURT:**  Because she wasn't the patient.

14       **MS. FRAZIOR:**  But, your Honor, --

15       **THE COURT:**  It's not even -- no, but you, I mean, --

16       **MS. FRAZIOR:**  I'm just trying to --

17       **THE COURT:**  -- hearsay is a problem.

18       **MS. FRAZIOR:**  I understand --

19       **THE COURT:**  And if you have the doctor here, why

20  create a problem that's going to be an appeal situation if we

21  ever get to an appeal here?

22       **MS. FRAZIOR:**  I'm not getting to that point, your

23  Honor.  I'm not going to introduce hearsay evidence through

24  this patient or this mother.  This mother is going to testify

25  that they went to another doctor, her son no longer takes

7

1    medication.  Her son --

2              THE COURT:  That's fine.

3              MS. FRAZIOR:  Yes.

4              THE COURT:  He went to another doctor, the son takes

5    no medication.

6              MS. FRAZIOR:  Yes.

7              THE COURT:  But she cannot testify if the doctor

8    himself is going to come tell us why the son doesn't --

9              MS. FRAZIOR:  Exactly.

10             THE COURT:  But, yes, she can say that.

11             MS. FRAZIOR:  Yes.

12             THE COURT:  Yes, so we can avoid this whole

13   discussion here --

14             MS. FRAZIOR:  Yes.

15             THE COURT:  -- by just limiting yourself to that.

16             MS. FRAZIOR:  Yes, and that's what I intend to do,

17   your Honor.

18             THE COURT:  Okay.  Is there something else we need to

19   discuss here?

20             MR. PENA:  The only other thing, your Honor, is in

21   the (indisc.) --

22             THE COURT:  And if you all are asking if I had

23   breakfast this morning, no, it's just this is just my

24   personality.

25             MR. PENA:  The other issue is if we can get an

1    instruction to the jury, because there's times, especially

2    going through security that we're running into jurors and our

3    clients are running into jurors, and I'm instructing my client

4    not to make any type of reaction or just to avoid the jurors

5    altogether.  We just don't want any issue --

6          THE COURT:  Well, first of all, the Marshals need to

7    not let anybody else on the elevators except just the jurors.

8          MR. PENA:  And we saw that, that's not a problem.

9    It's just that we end up lining up as we're going through

10   security or we're at the parking lot, we're crossing.  And I'm

11   making it a point to avoid the jurors and I just didn't want

12   it -- you know, just if we can get an instruction from the

13   Court informing them that we're instructed not to acknowledge

14   them or --

15         THE COURT:  Well you want me to say that the reason

16   you haven't been polite is because you're not supposed to.

17         MR. PENA:  Somewhere along those lines.

18         THE COURT:  I will do that.  I'll say, you know,

19   please be mindful that there are people in this building that

20   have something to do with the case, there's not going to be any

21   discussion between you and them.  In fact, they probably won't

22   even acknowledge that you're there.  Don't consider that at

23   all.

24         MR. PENA:  Appreciate it, your Honor.

25         THE COURT:  With regards to the motion that you all

1    asked me to review the documents under seal, there really is

2    nothing helpful in here.  I will ask you to come up here,

3    please.

4            **MS. FRAZIOR:**  Yes, your Honor.

5        **(Pause)**

6            **MR. SPEAKER:**  Should we all come?

7            **THE COURT:**  No, no, just her.

8        **(Bench conference held off the record from 9:26 a.m. to**

9    **9:27 a.m.)**

10           **THE COURT:**  I reviewed the documents that you all

11   wanted me to review with regards to notes of the -- any

12   discussion with Dr. Brown.  A lot of these are just questions

13   that were going to be asked and/or his resume, which is pages

14   and pages.  I've gone through what he actually said and there

15   is nothing beneficial to the defense in those documents.

16           **MR. SPEAKER:**  Thank, Judge.

17           **MR. SPEAKER:**  Thank you, your Honor.

18           **THE COURT:**  Sure.  So therefore this Court doesn't

19   see any reason why these need to be turned over.  Is there

20   anything else we need to do before the jury comes in?

21           **MR. SPEAKER:**  No, your Honor.

22           **THE COURT:**  Everybody's going to be ready with their

23   opening statements.

24           **MS. FRAZIOR:**  Yes, sir.

25           **THE COURT:**  I think you also wanted to say something

1    about somebody that was wearing something, that was the second

2    witness.

3         **MS. FRAZIOR:**  Oh, yes, your Honor.  Our second

4    witness is appearing before the Court in scrubs because she is

5    headed to work right after this.  That's all.  I just wanted to

6    let the Court know she didn't intentionally, you know, dress --

7         **THE COURT:**  Okay.

8         **MS. FRAZIOR:**  -- in normal clothes (indisc.)

9         **THE COURT:**  Go ahead and bring the jury in.

10        **THE MARSHAL:**  All rise for the jury.

11     **(Jurors enter at 9:28 a.m.)**

12        **THE COURT:**  Please be seated.  Good morning, ladies

13   and gentlemen.  This building is really not a federally owned

14   building but it is completely Federal courthouses as far as

15   judges and magistrate judges and everything else.  But I need -

16   - do need to indicate to you that sometimes you will run into

17   people who have something to do with the case.  They're not

18   supposed to in any way have any discussion in front of you with

19   regards to the case whatsoever.  And if you feel that, well,

20   that person didn't even say "hello," they're not supposed to.

21   So please don't take that personally in any way whatsoever, and

22   whether the attorneys or anybody else having to do something

23   with the case, it is not abnormal for them.  In fact, it's

24   required of them really not to have any conversation with you

25   as a juror.  And so please understand that in case you've

1   noticed that and then think, well, what's wrong with this

2   person this morning.  It's just that nobody's supposed to have

3   any kind of conversation with you or discussion with you.

4   That's what that's about.

5           Are you ready to proceed with your opening statement?

6           **MS. FRAZIOR:**  Yes, your Honor.

7           **THE COURT:**  Sure.

8            **OPENING STATEMENT ON BEHALF OF GOVERNMENT**

9           **BY MS. FRAZIOR:**  May it please the Court?  Elizabeth

10  Gonzalez is a mother to ten children.  The baby of her family

11  is Elijah Perez.  At 13 years old, Elijah injured his back and

12  received a referral to Dr. Jorge Zamora-Quezada.  It is a

13  decision Elizabeth Gonzalez regrets to this day.  Elizabeth

14  will tell you that on their very first visit to Dr. Jorge

15  Zamora-Quezada, he did a quick exam of Elijah and immediately

16  diagnosed him with rheumatoid arthritis -- excuse me, juvenile

17  rheumatoid arthritis.  Dr. Zamora was firm, aggressive, and

18  authoritative.  He seemed like he knew what he was doing, and

19  Elizabeth Gonzalez trusted him to treat her child.  On that

20  very first visit, before the lab work had even been run, Elijah

21  Perez was prescribed chemotherapy.  He received his first

22  injection right then and there, right on that first visit.

23          Thereafter, Elijah visited Dr. Jorge Zamora-Quezada

24  for several years, every three months for over the duration of

25  the time that he was there.  He got injections, x-rays, lab

1    work on visit after visit after visit to Dr. Zamora-Quezada's

2    clinics.  He got x-rays on his ankles, hands, feet, wrist,

3    chest, sinuses, even though he came in for back pain.  But he

4    didn't get better.  And as time went on, Elijah deteriorated.

5    Elizabeth and her husband prayed for a cure.  They prayed for a

6    miracle for Elijah.

7            One day Elijah, tired of the injections and tired of

8    the constant enduring pain he was experiencing, asked Elizabeth

9    to take him to a different doctor.  The second doctor did blood

10   work on Elijah, examined him, and did x-rays and then told him

11   and told Elizabeth that he did not have rheumatoid arthritis.

12   Elizabeth rejoiced.  She'll tell you it was the best day of her

13   life.  In fact, she thought this was the miracle she had prayed

14   for.  But it wasn't a miracle.  Elijah had not been granted a

15   miracle.  He'd been the victim of Dr. Jorge Zamora-Quezada's

16   criminal healthcare fraud scheme.  And that's why we're here

17   today.

18           The Defendants in this case billed Medicare,

19   Medicaid, Tricare, and other insurances hundreds of millions of

20   dollars for services patients like Elijah did not need.

21   Dr. Zamora-Quezada, along with his wife, Meisy Zamora, and

22   Estella Natera are charged with conspiring to commit healthcare

23   fraud.  That just means that they agreed to commit the crime of

24   healthcare fraud.

25           Dr. Zamora-Quezada is also charged with eight counts

1    of healthcare fraud.  That means the specific claims that were

2    submitted to Medicare, Medicaid, and other insurance programs

3    that were false for treatment of a disease that the patients

4    did not need.

5          Dr. Zamora-Quezada, Meisy Zamora, and Felix Ramos are

6    also charged with conspiracy to launder money.  This means that

7    when the proceeds from the healthcare fraud scheme came in,

8    they took that money and they spent it, concealed it, and sent

9    it to Mexico.

10          Dr. Zamora-Quezada, Meisy Zamora, and Estella Natera

11   are further charged with conspiracy to obstruct justice.  When

12   the Government requested patient files through the Grand Jury's

13   investigation into this case, Dr. Zamora-Quezada, Meisy Zamora,

14   and Estella Natera agreed to falsify those patient records to

15   cover their tracks.

16          During the course of this case, you will hear from

17   many different witnesses who, just like Elijah, were falsely

18   diagnosed with rheumatoid arthritis and sometimes other

19   conditions.  Their stories will be eerily similar, the quick,

20   aggressive, authoritative diagnosis, the immediate chemotherapy

21   drugs, x-rays, injections, MRI's over and over and over for

22   years on end until they sought a second opinion.

23          But why would Dr. Jorge Zamora-Quezada diagnose

24   somebody with a disease that that person in fact did not have?

25   The answer is really pretty simple.  It's because he got paid.

1   Why subject a 13-year-old Elijah Perez to chemotherapy drugs

2   that he did not need?  Because the Defendant got paid.

3   Rheumatoid arthritis is a drug -- excuse me, rheumatoid

4   arthritis is a disease that requires lifelong care.  In

5   approximately 95 percent of people, it never goes away and it's

6   something that the patients endure for their life.  Rheumatoid

7   arthritis is essentially the body attacking itself in the joint

8   areas.  It is expensive to treat.  And for so many like Elijah

9   Perez and others that you'll hear from, a diagnosis of

10  rheumatoid arthritis became a blank check for Dr. Jorge Zamora-

11  Quezada.  You see, Dr. Zamora-Quezada owned three clinics in

12  Edinburg, Brownsville, and San Antonio.  Each clinic had an

13  MRI, a laboratory, x-ray machines, and infusion center.  It was

14  essentially the Walmart of arthritis, a one-stop shop where you

15  could get all of your services done.  And everything in those

16  facilities was owned by Dr. Jorge Zamora-Quezada.  Each time

17  Dr. Zamora-Quezada prescribed an x-ray for a patient who did

18  not need it, he got paid.  Each time he prescribed an injection

19  for a patient that he had falsely diagnosed, he got paid.  A

20  patient diagnosed with rheumatoid arthritis was a blank check

21  to Dr. Jorge Zamora-Quezada.  You'll also hear from the

22  doctors --

23         **MR. ALVAREZ:**  Your Honor, could I object to her

24  arguing the case to the jury?

25         **THE COURT:**  You are going into closing arguments

 1    rather than just what you think the evidence is going to show

 2    here.

 3            **MS. FRAZIOR:**  Your Honor, I'm moving into the

 4    testimony.

 5            **THE COURT:**  Well that's what you should be doing in

 6    opening statement.

 7            **MS. FRAZIOR:**  Thank you, your Honor.  You will hear

 8    from the doctors that treated patients after Dr. Zamora-Quezada

 9    diagnosed them.  These doctors will tell you about the disease,

10    they'll explain to you how rheumatoid arthritis is diagnosed,

11    how it's treated.  But most importantly, they'll tell you about

12    patient after patient who finally freed themselves from the

13    treatment of Dr. Jorge Zamora-Quezada and sought a second

14    opinion.  They'll tell you that these patients came to them

15    hurting and confused about their conditions.  And they'll tell

16    you that these patients did not in fact have rheumatoid

17    arthritis.  The doctors immediately stopped all chemotherapy

18    medications, and by and large the patients went on to lead

19    normal lives.

20            You might ask yourself why patients would endure this

21    treatment for years if they weren't getting better.  The answer

22    is very simple --

23            **THE COURT:**  Well that's another part of closing

24    argument as opposed to what the evidence is going to show here.

25            **MS. FRAZIOR:**  Sure, your Honor.  The evidence will

16

1    show that the answer is very simple, that these patients will

2    tell you that they trusted Dr. Jorge Zamora-Quezada, just like

3    Elizabeth Gonzalez will testify that she trusted him.  They'll

4    tell you about his successful, beautiful clinic, how he

5    appeared wealthy to them, and to be a successful doctor, and

6    they thought that he knew what he was doing.  They'll tell you

7    again about those aggressive, authoritative diagnosis --

8    diagnoses when they first visit him on those initial visits.

9            But a few of these patients will tell you about how

10   they caught a mistake in Dr. Jorge Zamora-Quezada's practice.

11   Like Jamie Parchman, she saw Dr. Zamora-Quezada from 2012 to

12   2013, and she'll tell you that one time she was visiting with

13   him and he prescribed her an x-ray on her hand.  She forgot and

14   she didn't get that x-ray so she went home that day without

15   getting it.  On the next visit when she went to Dr. Jorge

16   Zamora-Quezada, he put up on the screen an x-ray of a hand, and

17   she knew that wasn't her hand.  She'll tell you she immediately

18   became suspicious of the diagnosis and she confronted him.

19   She'll also tell you that he fired her as a patient right

20   there.  And good thing, because she then went on to get a

21   second opinion from another physician and found out that she

22   never had rheumatoid arthritis.

23           You'll also hear from former employees of Dr. Jorge

24   Zamora-Quezada.  They'll tell you about the quotas, the goals

25   as they were called, at the clinic, organized and set in place

1    by Dr. Zamora-Quezada and Meisy Zamora.  You will see memos and

2    emails outlining services that the clinic had to achieve.  They

3    had to bill services for things like infusions, injections,

4    MRI's, x-rays.  And you'll see that they ran their -- that

5    clinic in that way, more like a car dealership than they did

6    treating patients.  The employees will testify that it was

7    based on amount of money coming in and not really on patient

8    treatment.

9             Those same employees will tell you about Estella

10   Natera, the head of the billing department.  Estella Natera

11   supervised all of the billers at the Zamora-Quezada clinics.

12   Those are the people that are submitting the claims to

13   Medicare, Medicaid, and insurance companies.  And employees

14   will tell you that the buck stopped with her.  But instead of

15   catching and correcting the false mistakes and false

16   information -- not mistakes, false information on the billing

17   records, she instead sent those billing records back to the

18   medical assistants to have them put diagnosis codes on and

19   diagnosis information on that billing paperwork regardless of

20   whether the patient had it or not, regardless of whether it was

21   true, in order to get paid.  Estella Natera's job was simply

22   that, to make sure that the bills going through the clinic were

23   going to be paid by insurance companies.

24             And when the money started flowing in, that's when

25   Felix Ramos came in.  Employees will tell you that Felix Ramos

1  was Dr. Zamora-Quezada's right-hand man.  He's the person who

2  was handing both -- handling both personal and business affairs

3  for Dr. Zamora-Quezada.  For instance, when Dr. Zamora-Quezada

4  was investigated by the Texas Medical Board, it was Felix Ramos

5  who submitted and responded to the medical board, giving him

6  notice of the fact that the medical board had been

7  investigating and was concerned about operations going on at

8  Dr. Zamora-Quezada's clinics.  When employees confronted

9  Dr. Zamora-Quezada about the false billing and false diagnosing

10 going on at the clinic, it was Felix Ramos who fired them.

11 Felix Ramos bought luxury properties in Mexico and elsewhere

12 that were rented out on websites like VRBO.  He handled the

13 incoming money from the healthcare fraud scheme.  You'll hear

14 from a financial analyst who will tell you about those rental

15 properties, and he'll tell you that when proceeds of the

16 healthcare fraud scheme were used to purchase rental properties

17 and then rental income came back from those rental properties

18 to Dr. Zamora-Quezada's accounts, the money looked legitimate,

19 it didn't look like proceeds of a healthcare fraud scheme

20 anymore, it looked like rental property income, and that that

21 is part of the allegations of money laundering in this case.

22 That financial analyst will also talk to you about some of the

23 property and purchases of Dr. Zamora-Quezada, such as a

24 Maserati and an airplane, other items used -- purchased with

25 proceeds of the healthcare fraud scheme, which is the basis of

1  the money laundering counts.  And they will further tell you

2  that Dr. Zamora-Quezada, Meisy Zamora, and Felix Ramos used

3  money exchange houses to send thousands of dollars per month to

4  Mexico that were proceeds of the healthcare fraud scheme.

5          Finally, when the Grand Jury was investigating this

6  case, they sent a subpoena.  The Grand Jury issued a subpoena

7  for patient files to Dr. Zamora-Quezada.  He rounded up the

8  troops and the faithful, loyal employees to gather the patient

9  files that were missing.  Employees will tell you that patient

10  files at Dr. Zamora-Quezada's clinic were not maintained by the

11  name of the patient, they were maintained by the date of

12  service.  That is, they were maintained by the information

13  needed to bill Medicare rather than treat the patient.  So when

14  they received that Grand Jury subpoena, it was very difficult

15  to gather up patient files for certain patients.  They will --

16  so in doing that, Estella Natera provided them the charge

17  sheets that were used to bill insurance, and they went about

18  creating the patient files to submit to the Grand Jury.

19          And gathering the patient files was difficult for

20  another reason, and that's because older files were stored in a

21  dilapidated barn on a ranch in the middle of nowhere.

22  Employees will tell you when they went to the barn, the files

23  were left open to the weather and to animals.  They'll tell you

24  rats nested amongst the patient files of these patients kept in

25  this dilapidated barn.  The evidence will show that Dr. Zamora-

1    Quezada cared about his protection of his inaccuracy of his

2    medical records about as much as he cared about Elijah Perez's

3    correct diagnosis.  When employees told Dr. Zamora-Quezada that

4    ultrasounds and lab work were missing from the patient files,

5    Dr. Zamora-Quezada said, make them appear.  Employees did as

6    they were told.  They took the ultrasound images from other

7    patients, they put them in different patient files requested by

8    the Grand Jury, and they provided them to Dr. Zamora-Quezada to

9    review before they were sent off.  You'll hear evidence that

10   Dr. Zamora-Quezada took advantage of his employees largely like

11   he took advantage of the patients.

12           Ladies and gentlemen, at the conclusion of this case,

13   I'll be back to talk to you again to summarize the evidence and

14   put the kind of -- the case together for you.  And at that

15   point in time after you've heard all the evidence, I will ask

16   you to --

17           **THE COURT:**  Well that's really a closing argument at

18   this point.

19           **MS. FRAZIOR:**  To --

20           **THE COURT:**  This is not what the evidence is going to

21   show.  You're going to be talking about your closing argument

22   so you can do that at the end of the case.

23           **MS. FRAZIOR:**  Yes, sir, yes, your Honor.  At the

24   conclusion of the case, I will be back again to ask you to

25   find --

21

1        **THE COURT:**  Well that is a closing argument.

2        **MS. FRAZIOR:**  Okay.

3        **THE COURT:**  That's what you will be doing at the end

4   of the case.

5        **MS. FRAZIOR:**  Okay.  Ladies and gentlemen, thank you.

6        **THE COURT:**  Can you all come up here, please?  By

7   that, I mean the attorneys.

8      **(Begin bench conference at 9:45 a.m.)**

9        **THE COURT:**  Mr. Sully, your client's not using a

10  headset.

11       **MR. SULLY:**  Oh.

12       **THE COURT:**  Is she not wanting to use a headset?

13       **MR. SULLY:**  Oh, I'll check with her, your Honor.

14  Sometimes it's confusing for her to hear both and (indisc.)

15       **THE COURT:**  Okay, (indisc.)

16       **MR. SULLY:**  -- starts having trouble (indisc.)

17       **THE COURT:**  -- the record is clear that if she's not

18  wearing it, it's because she doesn't want to.

19       **MR. SULLY:**  Yes, your Honor.

20       **THE COURT:**  Because we have it available here.

21       **MR. SULLY:**  Definitely.

22       **THE COURT:**  And we have the interpreters here.

23       **MR. SULLY:**  Yes, your Honor, that's correct.

24       **THE COURT:**  And so let's just make that clear, that

25  it's not anything the Court has not done or anybody else

1    (indisc.) if she feels like she understands English, that's her

2    business.

3            **MR. SULLY:**  Yes, your Honor.

4            **THE COURT:**  We had a note from Juror Number 5 and I

5    didn't get it until you started your opening statement.  Her

6    first question is, is the witness, Ms. Pierce, mother of

7    Jeffrey Pierce?  If so, he is my coworker but I have never met

8    his mother.  The second question is, is Clarissa Martinez

9    (phonetic) from La Villa, Texas?  If so, she is somehow related

10   to a girl I went to high school with but I have never met

11   (indisc.)

12           **MS. FRAZIOR:**  Well, to the first question, your

13   Honor, could you read it one more time?  Did it say Pierce or

14   Perez?

15           **THE COURT:**  Pierce.

16           **MS. FRAZIOR:**  I don't -- I'm not aware of a Pierce

17   testifying.  I think that that may be just a --

18           **THE COURT:**  Maybe she -- yeah, maybe she thought you

19   said Pierce when you said Perez.

20           **MS. FRAZIOR:**  Yes, I think so.  I admit my

21   pronunciation is not great.

22           **THE COURT:**  Okay, well try to find out if she

23   (indisc.) because there is no Pierce.

24           **MS. FRAZIOR:**  Yes, correct.

25           **THE COURT:**  Okay.  And Ms. Clarissa Martinez

1    (indisc.) Texas?  If so, she is somewhat related (indisc.) high

2    school but I have never met the lady.

3              **MS. FRAZIOR:**  I don't --

4              **THE COURT:**  I don't think that's (indisc.) --

5              **MS. FRAZIOR:**  I don't either.

6              **THE COURT:**  -- whatsoever.  And we'll clear up the

7    Pierce versus Perez thing at some break or something.

8              **MS. FRAZIOR:**  Okay.

9              **THE COURT:**  She's Juror Number 5.

10             **MS. FRAZIOR:**  Okay, thank you.

11             **MR. ALVAREZ:**  Was that it, your Honor?

12             **THE COURT:**  Huh?

13             **MR. ALVAREZ:**  Is that it for the Court?

14             **THE COURT:**  Yes, that's it.

15             **MR. ALVAREZ:**  I was just going to ask the Court so

16   you are going to bring her over to (indisc.) whether or not --

17             **THE COURT:**  I (indisc.) first break here and I'll

18   bring her up here.

19             **MR. ALVAREZ:**  Okay.

20             **THE COURT:**  I know these things -- if you all want to

21   be surrounding her, that's fine with me also but --

22             **MR. ALVAREZ:**  I'd like to, Judge, just -- I just want

23   to hear what she says.

24             **THE COURT:**  Okay.

25             **MR. ALVAREZ:**  We have an alternate juror so it's not

24

1    going to be a problem.

2              **THE COURT:**  No, it's not a problem.  First of all,

3    she said obviously never met this other person.  And I don't

4    think we'd (indisc.) then to ask somebody if they're related to

5    Clarissa Martinez from La Villa, Texas.  The other thing is are

6    you all making opening statements at the present time?

7              **MR. ALVAREZ:**  Yes, your Honor.

8              **THE COURT:**  Well let's go on with that.

9              **MR. ALVAREZ:**  With a little bit of closing in my

10   guy's.  We need some latitude.

11             **THE COURT:**  There won't be any latitude other than

12   I'll butt in if I have to.

13             **MR. ALVAREZ:**  Yes, your Honor.

14             **MR. SULLY:**  Yes, Judge.

15             **MS. FRAZIOR:**  Thank you.

16        **(End bench conference at 9:48 a.m.)**

17             **THE COURT:**  Mr. Martinez, did you want to make an

18   opening statement at this time?

19             **MR. MARTINEZ:**  I did, your Honor.

20             **THE COURT:**  Go ahead, sir.  And, ladies and

21   gentlemen, this is our schedule here.  There will be a

22   lunchbreak.  In 36 years on the bench, no juror has ever missed

23   a lunchbreak in my courtroom.  So we will have a lunchbreak

24   usually at noon for about an hour.  In the morning, we -- if

25   we're going a long time and I feel that we need probably a ten-

1    minute break or something, we will do that.  If at any point

2    you need a break for whatever reason, just raise your hand and

3    I'll be glad to take a break.  So please don't feel that you're

4    just stuck here without having the right to ask for a break if

5    you want a break.  We also try to take a short break in the

6    afternoon also.  We do break at 4:00 because I have other cases

7    that have to be handled on the same day.  They're not trials

8    but they are other matters that have to be handled, and the

9    reason is not that we leave here at 4:00, you do, but the Court

10   continues with other cases.  Go ahead, sir.

11        **OPENING STATEMENT ON BEHALF OF DR. JORGE ZAMORA-QUEZADA**

12        **BY MR. MARTINEZ:**  Thank you, Judge.  May it please

13   the Court, counsel?  Ladies and gentlemen of the jury, good

14   morning.  Let me reintroduce myself.  My name is Trey Martinez.

15   And along with Stephen Lee, we represent Dr. Jorge Zamora-

16   Quezada.

17        As the judge told you yesterday and this morning,

18   opening statements are literally an opportunity for the lawyers

19   to give you a roadmap as to what we anticipate the evidence is

20   going to show throughout this trial.  And one of the things

21   that's very, very important is that anything that any of the

22   lawyers say, that being any of the lawyers at this table or any

23   of the lawyers at this table, whether it be through opening or

24   closing, is not evidence.  Evidence actually comes from the

25   witness stand in the form of testimony and exhibits, and that's

1   the evidence that you're going to consider, and not anything

2   that is said over here or over here to try and convince you one

3   way or the other.

4           The prosecution came up here and told you what they

5   anticipate what some of the evidence will show.  They feel that

6   this evidence will be enough to convince you, 12 of you, beyond

7   a reasonable doubt that Dr. Zamora and others are guilty of

8   many things.  We, however, anticipate that the evidence will

9   show the following.  Dr. Zamora is original.  His practice is

10  original in the sense that it really is a one-stop shop and

11  it's efficient.  Patients would come in most of the time via

12  referral from other doctors all over the Valley, or they would

13  come in directly just to see Dr. Zamora for joint problems,

14  arthritic problems.  These patients, like at any other doctor

15  visit that we've all been to, would come in and see Dr. Zamora

16  and other doctors, other physician's assistances, other medical

17  assistants, at one of his three clinics either in Brownsville,

18  San Antonio, or McAllen.  However, Dr. Zamora is an original

19  because he is one of the very few rheumatologists in this

20  country that does what he does, where he has everything under

21  one roof for the benefit of the patients.  He is one of the

22  original doctors that does this because when medical

23  assistants, physician assistants, or doctors would order labs,

24  they don't have to go to another laboratory to go get those

25  labs done.  They could get those labs done right there in the

1   clinic without having to leave and make another appointment

2   somewhere else.  He's original because if a patient required an

3   x-ray, and you're going to hear a lot about rheumatoid

4   arthritis and arthritis in general and arthritic conditions,

5   and what you're going to hear that there are over a hundred

6   different types of arthritis that doctors like Dr. Zamora and

7   others have to deal with.  And you're going to hear that he's

8   original because most of the time doctors go in and order x-

9   rays, especially when you're having problems with your joints.

10  And these patients could get those x-rays does at A and O

11  clinic instead of having to go to another x-ray place, make an

12  appointment to get that done.  He's original because if a

13  patient required an ultrasound, that patient could get that

14  done in this clinic without having to go somewhere else.  If

15  the patient required a DEXA scan, which is a bone density scan

16  normally used in this area of practice, they could do that at

17  this clinic without having to go to somewhere else.  If a

18  patient required physical therapy, they would go to another

19  part of the clinic and get that physical therapy without having

20  to make an appointment and go somewhere else.  If the patient

21  required an injection, they could do that there.  If one of the

22  doctors prescribed an infusion for that patient based upon the

23  diagnosis that they give that patient, including Dr. Zamora and

24  the other doctors that worked for him, it could be done there

25  at A and O clinic.  The evidence will show that Dr. Zamora and

1    all these other doctors and all the other medical assistants

2    and physician's assistants did this for the benefit of the

3    patients that come in with arthritic problems.  They did this

4    for the benefit of the patients who came in with joint issues

5    and had trouble moving around.  While frowned upon by some, the

6    evidence will show that Dr. Zamora is actually on the cutting

7    edge of this type of medicine.

8            And I'll be the first person to tell you, and I think

9    the prosecution alluded to this, that Dr. Zamora, as well as

10   all the people in his clinic, made money.  I'll also be the

11   first person to tell you that Dr. Zamora had detractors, he had

12   haters.  In fact, the evidence will show not once, not twice,

13   but three different times he's already been investigated and

14   cleared by different governmental agencies, and he still

15   practiced medicine knowing that these government agencies

16   cleared him of that.  And this time makes number four.  In

17   2005, Medicare asked for $3.3 million back based upon

18   complaints.  And then in 2014, in that same investigation and

19   nine years later, a hearing examiner for Medicare completely

20   agreed with Dr. Zamora and made a decision that was fully

21   favorable to him.  And the examiner in fact says, and you'll

22   see the evidence that says, Dr. Zamora did not owe any money.

23   A second investigation by Health and Human Services or the

24   Office of Inspector General began in 2007.  And ten years

25   later, ten years later in 2017, that same agency closed that

1    investigation and gave him back all his files without any

2    recourse against Dr. Zamora.  A third investigation began in

3    2008 based upon the complaint to the Texas Medical Board.  And

4    the Texas Medical Board, based upon that complaint, went and

5    assigned what they call monitors to Dr. Zamora's office.  One

6    monitor, I'll be very up front with you, was very critical of

7    Dr. Zamora's practice and the one-stop shop; one monitor not so

8    much.  And the fact of the matter is the Texas Medical Board

9    then cleared Dr. Zamora and allowed him to continue practicing

10   the way that he normally did.  Dr. Zamora was then indicted for

11   this case for intentionally doing the same acts that three

12   other agencies cleared him for in May of 2018.

13           Now, the evidence that we anticipate we will show you

14   is that many of the witnesses that the Government will be

15   calling really do have real issues with their testimony.  And

16   the judge has instructed you about the -- you being the judges

17   of the credibility of these witnesses.  Former employees and

18   others will have some obvious biases.  For example, you will

19   hear about employees that were fired.  They're going to come up

20   here and testify against Dr. Zamora.  You will hear from

21   doctors that in fact are competitors or former employees of

22   Dr. Zamora.  You will hear from patients that went to lawyers

23   after the indictment to go sue Dr. Zamora and others in hopes

24   that their testimony will advance their civil case, and other

25   obvious biases throughout this case.

1          The evidence will show that former employees and

2    patients had statements written up by government agents that in

3    fact contradict what the records that we're going to show you

4    up on the stand.  Witnesses that will be presenting evidence on

5    behalf of the Government will only presenting part of the case.

6    They're cherry-picking evidence as the evidence will show.

7          The evidence will show you, and this is extremely

8    important, that the Government designated an expert witness in

9    this case, an expert witness that we would all deem as somebody

10   that they need.  And the Government's own designated expert

11   witness reviewed four patient files out of the tens of

12   thousands of patients seen at this clinic.  And out of those

13   four patient files, the Government's own expert will tell you

14   that two of those patients were treated appropriately.  The

15   Government's own expert that they're going to call, and you

16   heard it yesterday with Dr. Ruderman, is going to come up here

17   and that the other two patients, you know what, I didn't agree

18   with the fact that these tests were ordered.  The Government's

19   own expert witness is not going to tell you at any point in

20   time based upon his previous notes and his review of the files

21   that any of these patients were misdiagnosed at all.

22          The evidence we will present to you will actually

23   show you the history of arthritis and the treatment of

24   arthritis as it has changed over the years.  You will hear, and

25   as you can imagine, in order to treat rheumatoid arthritis or

1    other arthritic conditions, whether it be osteoarthritis,

2    polyarthropathy arthritis, inflammatory polyarthropathy,

3    psoriatic arthritis, you're going to hear about a bunch of

4    different kinds of arthritis, you're going to hear that you

5    have to treat those aggressively, especially rheumatoid

6    arthritis.  And as Ms. Frazior told you, that rheumatoid

7    arthritis can be debilitating, it can be devastating, it can

8    even be life-threatening.  And if you don't treat it

9    aggressively, it's something that will affect you.

10         You're going to hear through medical books, through

11   treaties, through articles, through photos what happens when

12   you get diagnosed with rheumatoid arthritis, what happens in

13   the earlier stages of rheumatoid arthritis when it looks very

14   normal and what happens if you don't aggressively treat

15   rheumatoid arthritis and the difference between somebody who's

16   been treated after five years that still has the regular use of

17   the hands, they look normal, and then somebody who hasn't been

18   treated after five years, and the deformity in their hands and

19   other joints.

20         The evidence will show you that the other doctors

21   that the Government is going to call in fact have never

22   reviewed Dr. Zamora's files, they've never reviewed

23   Dr. Zamora's patient records.  In fact, a lot of these doctors

24   diagnosed these patients that the Government is going to bring

25   with the same diagnosis, with the same treatment.  And we've

1    only heard about one in opening statement.  All this being

2    said, I'll be the first to tell you that Dr. Zamora or the

3    people that work for him, they're not perfect and they make

4    mistakes just like any one of us.  Mistakes were made at times

5    and there are in fact people that are critical of Dr. Zamora's

6    personality.  However, the evidence will be clear that while

7    the Government must prove each and every act was knowingly and

8    willfully done, they will not be able to show anything close to

9    that.  Their overreaching will be evidenced by the fact that in

10   their own indictment, and you have a copy of that back in the

11   jury room, they claim that Dr. Zamora and his clinics

12   fraudulently billed $240 million.  And what this means is that

13   the Government would have to prove --

14           **THE COURT:**  Well we're getting sort of what I stopped

15   the Government from doing also into closing argument here.

16           **MR. MARTINEZ:**  Absolutely, Judge.

17           **THE COURT:**  So let's limit ourselves to what the

18   evidence will show.

19           **MR. MARTINEZ:**  The evidence will show that this would

20   have to -- the Government would have to prove that every single

21   claim going back to almost the year 2000, every single claim

22   would have to be fraudulently treated, misdiagnosed, and

23   billed.  The Government will not be able to do this.

24           **THE COURT:**  That's closing argument again.

25           **MR. MARTINEZ:**  Thank you, Judge.

1          The Government will actively present evidence to try

2     and convince you that ordering unnecessary tests equals fraud.

3     However, the evidence will also show that if you don't order

4     enough tests, then you could be committing malpractice.

5          The evidence will show you about Dr. Zamora-Quezada,

6     the fact that he went to medical school at Guadalajara

7     University for six years in Mexico.  The evidence will show you

8     that he did his first residency for internal medicine in Mexico

9     City for another four years.  The evidence will show you that

10    he did a second residency for internal medicine here at the

11    University of Texas at Southwestern, at Parkland Hospital in

12    Dallas.  The evidence will show you that Dr. Zamora didn't just

13    stop at internal medicine.  He went to go specialize and get a

14    fellowship in rheumatology.  And he did this up in Boston,

15    Massachusetts at the New England Medical Center for an

16    additional two years.  And he didn't stop there, ladies and

17    gentlemen.  He went on to get his master's in public health at

18    Harvard and another two years.

19          After 16 years of training and over 20 years of

20    private practice, the Government wants you to believe that

21    every single patient that he saw was intentionally

22    misdiagnosed.  The evidence will show you that there was no

23    misdiagnosis, there was no mistreatment, there was no

24    fraudulent billing.  At the end of this trial, based upon that

25    evidence, we'll respectfully ask for a verdict of not guilty on

1  behalf of Dr. Zamora.  Thank you.

2        **THE COURT:**  Mr. Sully, are you making an opening

3  statement at the present time, sir?

4        **MR. SULLY:**  Yes, thank you, your Honor.

5        **THE COURT:**  Go ahead.

6        **OPENING STATEMENT ON BEHALF OF MEISY ZAMORA**

7        **BY MR. SULLY:**  Good morning, ladies and gentlemen.

8  As I mentioned yesterday, my name is Chris Sully, and I have

9  the privilege of representing Meisy Zamora.  And as you know,

10  she in turn has the privilege of being married to Dr. Zamora,

11  or perhaps I should say he has the privilege of being married

12  to her because I think we can all agree, he's the lucky one.

13        So before we talk more about the case, as you may

14  have noticed, I'm a little bit under the weather, so if any of

15  you have any trouble hearing me, please feel free to interrupt

16  me or -- and I'll, you know, try to speak up a little bit

17  louder.

18        So let's start by first addressing the question

19  that's probably on all of your minds before we go on, and that

20  is how exactly do you pronounce her name and how are we going

21  to remember that.  Well let me offer you a way to remember.  We

22  just had Thanksgiving recently and some of you may have seen or

23  heard of the Macy's Thanksgiving Day parade; no relation to

24  Meisy Zamora.  But if you say Macy's, just take off the "S" at

25  the end.  Meisy, that's how you pronounce it.  So now that

1   we've solved that mystery, let's --

2           **THE COURT:**  I thought you were going to talk about

3   your name.

4           **MR. SULLY:**  Oh.

5           **THE COURT:**  Go ahead.

6           **MR. SULLY:**  We can talk about that, too, but that

7   would be a longer story.  So let's move on to the case.  You

8   may recall yesterday one of the things that Judge Hinojosa

9   explained to you all in the instructions that he gave you is

10  that even though Meisy, her husband, Felix Ramos, and Estella

11  Natera, we're all going to trial at the same time, part of your

12  duty as jurors is to consider them individually and to give

13  each of them an individual fair trial.  What the evidence shows

14  you as to one of them doesn't necessarily hold true for the

15  other.  And you need to look at that individually and not just

16  automatically group them together because you're going to trial

17  at the same time.  And we of course trust that you will do

18  that.  The reason I mention that at this point, though, is

19  because listening to the Government's opening statement, you

20  may have noticed how start off talking about Dr. Zamora and

21  what the evidence might show as to him and then sort of say,

22  well, the Defendants and his wife and others, without really

23  specifying.  And as you know, your instructions, your duty as

24  jurors, is not simply to lump everybody together or paint them

25  with the same brush because they happen to be on trial at the

1    same time.

2            So what will the evidence show you about Meisy?

3    Well, it will of course show you that she's not her husband.

4    They're two different people.  The evidence is going to be

5    different as to them, their backgrounds are going to be

6    different.  And as it relates to this case, which is a

7    healthcare fraud case, perhaps the biggest difference is that

8    she wasn't a doctor at the clinic, she wasn't practicing

9    medicine, she wasn't diagnosing patients with rheumatoid

10   arthritis or anything.  And I think even in the Government's

11   opening statement, they never alleged that that was the case,

12   that she was the one doing that.  I believe that they allege

13   that Dr. Zamora was the one who was diagnosing patients.  And

14   of course the difference is the Government's claiming that

15   Dr. Zamora, her husband, was misdiagnosing patients

16   intentionally in order to make more money.  And Mr. Martinez

17   has explained to you the reasons why the evidence will actually

18   show you that there were not false diagnoses in this case, just

19   false accusations.  But as to Meisy, she deserves neither the -

20   - any blame or any credit for those diagnoses, for how the

21   patients were treated at the clinic.  That will be on her

22   husband.  You all ultimately will be the ones that will decide

23   whether he correctly treated and diagnosed patients or whether

24   he was committing fraud as the Government claims.  But that

25   will be a decision that you will have to make as to him and

1    that Meisy will share neither any blame nor credit in.

2            And we'll talk a little bit more in detail about what

3    the evidence will show as to the individual charges, but as you

4    may have listened in the Government's opening statement, when

5    they were discussing the healthcare fraud charges, they

6    clarified to you that as to the actual healthcare fraud

7    charges, Meisy is not even charged in those charges; only

8    Dr. Zamora is the one who is charged in those specific counts.

9    She is charged in a count that they refer to as conspiracy to

10   commit healthcare fraud.  But if you listened closely to the

11   Government's opening statement, as I'm sure you did, the only

12   thing that they mention about Meisy specifically in connection

13   to that --

14           **MS. FRAZIOR:**  Objection, argument, your Honor.

15           **THE COURT:**  We are getting into argument here.

16           **MR. SULLY:**  Yes, your Honor.  The evidence will show

17   you that at no time did Meisy conspire or agree to commit

18   healthcare fraud or commit healthcare fraud.  The evidence may

19   show you that the clinic had what they referred to as goals

20   regarding patients services, regarding making sure that visits

21   were scheduled on time, that x-rays and procedures and tests

22   and injections that Dr. Zamora had ordered were done on time

23   and that the backlog was brought up to date.  But there won't

24   be any evidence that Meisy was engaging or agreeing to engage

25   in any type of healthcare fraud.

38

1          What the evidence will show you about Meisy's

2    background is that she actually attended medical school in

3    Mexico, but then at the time she married not Dr. Zamora but her

4    first husband, who owned a national newspaper in Mexico, and he

5    was I don't know if you would call it old-fashioned, but he

6    demanded that his wife be completely devoted to him and not

7    have her own career.  So at that point she made the decision to

8    abandon any future that she might have had practicing, you

9    know, medicine and in continuing with what she had studied to

10   do.  You may hear from certain witnesses who referred to her as

11   out of respect is Doctora (phonetic) or doctor because of the

12   fact that she did attend medical school at one point in Mexico.

13   But the evidence will show you that she was not involved in the

14   practice of medicine at the clinic, she was not one of the

15   doctors at the clinic.  She never practiced medicine in the

16   United States, she never was licensed to practice medicine in

17   the United States.  The whole part about the practice of

18   medicine at the clinic and whether that was done correctly or

19   not, that is in relation of course to her husband, Dr. Zamora.

20          Now, that first marriage that I just referred to as

21   you might expect didn't last ultimately.  It ended in divorce.

22   And Meisy decided to come to the United States in search of a

23   fresh start, in search of a better life if you will for her and

24   her children.  And when she came here, she used the -- there's

25   actually millions of dollars in assets and millions of dollars

1    in property that she received as part of that divorce to start

2    a career as a real estate investor.  And then later she

3    attended Bible college and became an ordained minister, and

4    that was part of what she did as well.  And then it was after

5    that that she met her now current husband, Dr. Zamora.  And as

6    you will hear through the evidence and as you might expect,

7    their relationship has had ups and downs over the years.  They

8    have often disagreed.  There have even been points during this

9    alleged, you know, 18-year conspiracy that the Government is

10   claiming where they were actually separated, they weren't even

11   together or talking to each other during those times.  And like

12   any relationship, that is something that they went through.

13   But they, you know, ultimately continued with their marriage,

14   they had a child together that turned 16 this year, and have

15   proceeded through the ups and downs.

16          As you will hear from the evidence, there have also

17   been ups and downs financially.  There have been points when

18   both of them have been doing very well financially, have made

19   money, received money, invested money, and spent money.  And

20   the evidence will show you that simply spending money or having

21   money, having nice things is not a crime.  Money laundering,

22   which is what the Government is accusing them of -- or

23   conspiracy to commit money laundry, there will be no evidence

24   that Meisy or anybody else was committing or conspiring to

25   commit the crime of money laundering.

40

1          As I mentioned earlier, you all will be the ultimate

2     judges of whether or not Dr. Zamora correctly, legally

3     diagnosed and treated his patients --

4          **THE COURT:**  And of course you will be able to say

5     that at closing argument.

6          **MR. SULLY:**  Yes, your Honor.  But the evidence will

7     show you that his wife, Meisy, always believed in her husband's

8     innocence and what he was doing as a doctor.  She had no reason

9     to try to commit money laundering or try to falsify anything or

10    try to commit obstruction.  That's what the evidence will show

11    you -- I'm sorry, will show you as to hear.

12         As I mentioned, their relationship, their marriage,

13    had ups and downs.  Obviously one of the biggest, most

14    difficult challenges that they've had started with her

15    husband's arrest in May of last year.  And Meisy was very

16    supportive of her husband.  She would come to his hearings,

17    sometimes in this very courtroom, until two months later she

18    was actually arrested in the parking lot coming to one of his

19    hearings and ultimately charged in the same case that he was

20    charged in, as well as two employees.  You will hear from their

21    attorneys perhaps in a little bit, Estella Natera and Felix

22    Ramos.

23         As far as the evidence that you will hear in this

24    case, you will of course hear from several witnesses, and some

25    of those witnesses will include former employees of the clinic.

 1    And as Mr. Martinez touched on, the evidence will show you that

 2    many of these witnesses, these employees, had a bone to pick.

 3    They had personal disagreements often with their boss, which is

 4    Dr. Zamora, and sometimes also with their boss's wife, which

 5    was Meisy.  Some of them were fired, had actually done things

 6    wrong or allegedly done things wrong and were fired by

 7    Dr. Zamora, and also had a bone to pick because of that.  Some

 8    of them had actually made mistakes, done things they weren't

 9    supposed to, and were trying to basically cover up their

10    mistakes, their failings as employees.

11            And as you've heard a little bit in the opening

12    statements, the evidence will show you that nobody that's on

13    trial is a perfect person, and especially Dr. Zamora had some

14    very apparent personality flaws that often rubbed people the

15    wrong way.  And as his wife, Meisy was, you know, very aware of

16    that, but that's not what he's charged with.  You are

17    ultimately here to decide whether or not a crime was committed.

18    But because of his personality flaws, because of these personal

19    disagreements, it's -- the Government has found employees who

20    are willing to say bad things about their former boss,

21    Dr. Zamora, and may even say negative things about his wife,

22    Meisy.  But when you look at the actual evidence, there won't

23    be any evidence --

24            **THE COURT:**  Well that's a closing argument again.

25            **MR. SULLY:**  Yes, your Honor.  There won't -- the

1   evidence in this case will show you that there is no evidence

2   to back up anything that they may say as far as accusations of

3   crimes regarding Dr. Zamora or regarding his wife, Meisy.

4   There will simply be no evidence that Meisy conspired to commit

5   healthcare fraud, that she conspired to commit money

6   laundering, or that she conspired to commit obstruction of

7   justice.

8          Turning once more to the conspiracy to commit

9   healthcare fraud, as we've already discussed, there's not going

10  to be any evidence that she was involved in any diagnoses, much

11  less any misdiagnoses, falsifying of information, anything like

12  that relating to healthcare fraud relating to the practice of

13  medicine at the clinic.

14         There will be evidence of course that Meisy and her

15  husband, that they had money.  The evidence will show you that

16  she had money even before she met Dr. Zamora, that they had

17  money, that they spent money, that the doctor had a jet, that

18  he drove a Maserati to work.  But ultimately when the evidence

19  will show you that it doesn't matter whether he drove a

20  Maserati, whether he drove a Mazda, whether he traveled in a

21  jet or a Jetta, there won't be any evidence to show that he or

22  Meisy were engaging in money laundering or otherwise conspiring

23  to commit crimes together.

24         And then, finally, the final charge against Meisy,

25  which is conspiracy to commit obstruction -- and toward the end

1   of the trial, the judge will define for you what these terms

2   mean --

3          **THE COURT:**  Right, and so that's why we're just here

4   to hear what you think the evidence is going to show.  And all

5   of you, from the prosecutor on down, have made this closing

6   arguments, but go ahead.

7          **MR. SULLY:**  Yes.  And because of that, I'm not going

8   to go into any detail about what these terms mean, but I will

9   submit to you that the evidence will show you that at no point

10  did Meisy try to falsify information or get somebody else to

11  falsify information or cover up any tracks, as the Government

12  claims, especially because in her mind, her husband had done

13  nothing wrong.  And the evidence, that's what we submit to you

14  will show you as far as the charges against Meisy Zamora.

15  Thank you.

16         **THE COURT:**  Thank you.  Mr. Alvarez, did you want to

17  make an opening statement for your client?

18         **MR. ALVAREZ:**  Yes, your Honor (indisc.)

19         **THE COURT:**  What?

20     **OPENING STATEMENT ON BEHALF OF ESTELLA SANTOS NATERA**

21       **BY MR. ALVAREZ:**  I will.

22         Good morning, ladies and gentlemen.  My name is Al

23  Alvarez and I represent Estella Natera.  And she is being

24  accused in this indictment that you have of being involved in a

25  conspiracy to commit healthcare fraud and also in a conspiracy

1    to hinder a Grand Jury investigation.  So it'd be the first

2    count and the last count.

3           The indictment is going to be what the Government has

4    to prove.  And in the indictment, it says that this conspiracy

5    began in the year 2000 and ended somewhere in the year 2018.

6    Well, the first thing I think that the evidence is going to

7    show is that my client was not there for 18 years, that for

8    that 18-year period when the Government alleges that there was

9    a conspiracy going on, my client had been employed with

10   Dr. Zamora for less than two and a half years.  That is a fact

11   that the evidence will show.

12          What you're going to find out about my client is that

13   she's 46 years old, that she's married and she has been married

14   for the last 16 years.  She has five children.  She has a son

15   that just arrived back from Afghanistan where he was fighting

16   the war.  And the evidence is going to show that my client

17   never entered a conspiracy that's purpose, as described in the

18   indictment, was to enrich themselves, the conspirators.  My

19   client did not enrich herself, the evidence will show.

20          The indictment also will -- discusses about how

21   during this agreement to enrich themselves, a Maserati was

22   brought -- bought, that a plane was bought, that luxury houses

23   were bought, that luxury properties were bought.  But the

24   evidence is going to show that my client has never been in a

25   Maserati, she's never flown nor does she own a private jet,

1    that she doesn't own any commercial properties, that she

2    doesn't own, as alleged by the Government or during the

3    conspiracy was able to purchase properties in Aspen, in Puerto

4    Vallarta, all over the world.  My client was there for two and

5    a half years.  The evidence is going to show that my client

6    never agreed with anyone to obstruct justice when there was a

7    Grand Jury subpoena that had been issued for records.  In fact,

8    the evidence is going to show that all the records that were

9    requested by the Government, those were all handled by

10   attorneys for the clinic.  They're the ones that got the

11   subpoenas, they're the ones the evidence will show that turned

12   them in to the Government; not my client.  The evidence is

13   going to show that my client is not a doctor, that she did not

14   test patients, that she did not diagnose patients, that she did

15   not prescribe any medications, that she did not meet with any

16   patients, that she did not take advantage of any vulnerable

17   patients, young patients, elderly patients.  In fact, she had

18   almost no contact with patients.  Her job was just to have

19   workers submit the bills to the companies that were supposed to

20   be billed for those treatments.  Of the $240 million that has

21   been discussed and as described in this indictment, the

22   charging instrument, against my client, she never made -- she

23   never billed for $240 million and she never received any money

24   in the amount of $50 million, as the Government alleges.

25   Ladies and gentlemen, those are the facts, that's what's going

1   to be shown at this hearing.  We do not have the burden but the

2   Government will not be able to show that.  Thank you.

3           **THE COURT:**  Mr. Pena?

4           **OPENING STATEMENT ON BEHALF OF FELIX RAMOS**

5           **BY MR. PENA:**  Yes, your Honor.  Good morning.  What's

6   this case about?  That's the purpose of the opening statements.

7   What are we going to talk about in this case, what are you

8   going to hear?

9           **THE COURT:**  The opening statements, ladies and

10  gentlemen, is supposed to be just an outline for you as to what

11  the attorneys think the evidence is going to show.  It's not

12  supposed to be a closing argument, which it has turned into on

13  the part of some, and so I'll treat him the same as I have the

14  others.  Go ahead, sir.

15          **MR. PENA:**  Thank you.  So what happens, what's this

16  case about?  What this case is about is what happens when the

17  Government has the power and the resources to bend and twist

18  facts.  That's what you're going to see in the evidence in this

19  case.  Now, you're going to hear testimony, and Mr. Martinez

20  talked about that, we're going to have testimony of witnesses

21  come up here.  But we're also going to do during the case is

22  we're going to examine the methods that were used to get the

23  testimony; because it's just as important as the testimony

24  you're going to hear.  You're also going to hear evidence in

25  the case.  But what we're going to look at with the evidence is

1    the context of that evidence.  And we're going to bring forward

2    in this case the other pieces of evidence that explain the

3    evidence that they're going to present so that we can see the

4    entire picture.  And together, we're going to be detectives,

5    we're going to hear the witnesses and we're going to see the

6    evidence.  And we're going to do two things:  seek the truth,

7    the real truth, and just determination, a justice

8    determination.

9              Now, before I do that, I want to do a little bit of

10   explaining who Felix Ramos is, is who I represent in this case,

11   and tell a little bit of his story or what you're going to hear

12   in the case about him.  He was born 1976, Detroit, Michigan.

13   His father worked for General Motors, he'd been working there

14   for a long time, up until about 1994.  In 1994, he retired and

15   he decided to move his family down to the Valley because he had

16   his brothers and sisters down here.  It was around that time,

17   which I believe was around 1994, that he started at UTPA and he

18   started studying business.  And it took a while (indisc.) and

19   he didn't graduate until 2001, and the reason for that is

20   because he as part-time student.  And as a part-time student,

21   he started working, and he started working in a brokerage.  It

22   was a brokerage that the Zamoras actually had an account there

23   and he was the liaison, or he was the person who worked with

24   the broker and worked with the Zamoras.  And he would take the

25   information back and forth between them.  It was during that

1   time that he got to know the Zamoras and the Zamoras got to

2   know him.  And so they decided, you know what, he might be a

3   good help for us because we need some help in our clinic.  We

4   have three clinics, we're growing, there's a lot of work, and

5   he can probably help us in a particular department, so they

6   asked him to interview, and he did.  And he interviewed there.

7          In about I think it was March, 2002, he started

8   working.  And he started working in the accounts payable

9   department, actually started working under a particular

10  bookkeeper named Maria Avila who you're going to hear about in

11  this case.  His job was to collect invoices.  What he would do

12  is ever week he would go and he would have a sort of like what

13  the prosecutor, I actually have an example up here, he would

14  get a hanging folder.  And his hanging folder -- and he had a

15  cart, it was a metal cart with all these folders, he would

16  collect all the invoices of the clinics and he would file them

17  and he would review them.  Now, he didn't have any authority

18  over them but his job was to go through them and look for is

19  there any penalties, did they mischarge something, something

20  like that, all week.  And he collected all of those and then he

21  would once a week meet with the doctor, sit down with them and

22  say, okay, here's this invoice, Doctor, and there's this much

23  charge they put in this penalty, what do I do.  And the doctor

24  actually had control over the bills.  And you're going to hear

25  in this case how much he worked seeing patients.  You're not

1   going to hear a lot of testimony in this case about him going

2   on vacations to play golf or things like that.  He was a

3   workaholic.  And at the same time, he needed help with things

4   like that.  So once a week, Felix Ramos would go and review the

5   bills and get instructions on what to do.  Do I call them and

6   try to get a payment plan, do I argue about the penalties?

7   That happened for a couple of years until about 2005.

8          In 2005, Dr. Zamora lost a couple different

9   employees.  One of them was the payroll employee.  So he turned

10  to Felix Ramos and he said, besides the account payable, can

11  you also help with the payroll?  Now, that's an entire job in

12  itself, what it entailed.  Besides this work, he had to collect

13  all the timesheets.  And you're going to see evidence in this

14  case that time timesheets were being emailed to him.  He would

15  review the timesheets and then he would see did they not clock

16  in right, did they not clock out right, did they not come in --

17  you know, did they have overtime, and then he would do the

18  calculations.  And then about once a week, he would calculate

19  all the payroll and then he would email it to the doctor and to

20  his wife.  At times, she was copied.  What was the purpose of

21  that?  Was it to make decisions on the payroll, was it to

22  decide where the money would come from for the payroll?  No.

23  It was just to calculate it, get a current calculation, and

24  give it to the doctor.  Then the doctor would decide did I have

25  enough money in the accounts, you know, tell the employees,

don't deposit until Friday, or things like that.  And that was

his job.  He also got on top of that some HR, which was another

responsibility of his.  So there was an employee who needed to

be fired, there was an employee who they needed to give

information to or to collect information for, they would ask

Felix, can you go talk to this employee, the doctor's seeing

patients.  And it's kind of an uncomfortable thing if you have

to fire an employee so it's -- and you're going to find out in

this case, Felix Ramos did not decide to fire employees.  But

if an employee needs to be talked to, say, you know, you can't

come anymore, Felix was the guy that they sent.  He also got a

supervisor's job, and it wasn't a supervisor over the medical

clinic.  What you'll find out in this case is that he got a

supervisor's job over the runners.  Because they were (indisc.)

there were three different clinics.  They would have people go

back and forth between the clinics delivering documents or

delivering medications; because the way the clinics worked is

they would order all the medications at one location and then

they would disburse those medications.  And he was the guy

responsible.  And you're going to see evidence in this case of

email communications to that effect saying we need some more

medications of this in San Antonio.  He would send an email

back saying, okay, and then they would send those medications.

So that was his job.

          About 2006, it expanded, so he had to do accounts

1    payable, check all the invoices, check with the doctor; he

2    would have to do the payroll, every week calculate all the

3    hours and check with all the employees and talk to all the

4    supervisors; he would handle certain HR issues; and then he

5    would supervise the runners.  And did a good job at it.  He was

6    (indisc.) you'll hear about that.  Didn't get involved in any

7    of the dramas, stayed in his office.  And so they asked him if

8    he could also help manage some of the properties.  And you'll

9    find out in this case he did not have an interest in the

10   properties, he did not make a commission on the properties.  He

11   was getting paid the same salary he was getting paid from the

12   very beginning.  And you're going to hear testimony even from

13   some of the doctors who are going to testify in this case that

14   a lot of the doctors are so busy, they have assistants.  And in

15   essence that's what Felix was, he was an assistant.  And so

16   what did that mean?  Well, that meant for the properties

17   themselves, somebody had to make sure they collected the rent.

18   If they owed money, they didn't pay their rent, who would send

19   an email?  Felix.  If they have to give an extension, who would

20   send the email?  Felix.  Now, was he the one that made the

21   decision about the rent, is he the one that's -- you're going

22   to find out in the case did he make a decision on whether to

23   give an extension.  No, that was the doctor.  He was the

24   assistant.  If something needed to be repaired in the building,

25   what are you going to find out?  You're going to find out Felix

1   is the one that would contact the air condition guy or Felix

2   would call to get the painters in.  If the plumbing wasn't

3   working in one of the rental houses and if they couldn't get

4   someone to go do it themselves, who do you think did it?  Felix

5   did.  Felix would go himself and he would fix the plumbing

6   because he was the assistant.  Did he get paid extra for doing

7   this?  No.  You're going to hear the same thing about

8   properties in Mexico.  And the Government's really going to

9   harp on this.  Look at the doctor, he's got these apartments,

10  he's got a timeshare, he's got some penthouses over there.  And

11  somebody was responsible for managing those and you're going to

12  see evidence of the phone calls or the emails that Felix made.

13  Again, we have to page -- paint -- or pay the HOA, we got to

14  pay the loan, and he would communicate back and forth.  That's

15  the evidence you're going to hear.  You heard about two other

16  things.  You heard about the Maserati, you heard about the

17  airplane.  And I'm extremely interested in the evidence the

18  Government's going to present about those items.  Again,

19  bending and twisting.  And what you're going to see is that

20  Felix job was only to if we had to do something with the jet,

21  we have to do maintenance, we have to repair something, he's

22  communicating back and forth.  The Maserati has to get the

23  tires changed, who do you think is the one that's calling

24  (indisc.) Felix.  That was his job, each and every aspect of

25  it.  But what's the evidence -- and we're going to present

1    evidence of it ourselves, but what's the evidence you're not

2    going to hear from the Government regarding Felix?  One, you're

3    going to hear he was not involved in the medical practice.  And

4    it's going to be their own witnesses, the Government witness

5    (indisc.) say he has no clinical background.  And the clinic is

6    basically -- and anybody who's ever been in a clinic, there's

7    kind of two parts to it.  You know when you walk in to a

8    clinic, you see that, you talk to the front office, you talk to

9    the staff.  Those aren't the medical people.  Then there's

10   another half of the clinic, and that's the administrative.

11   Then you have the medical part of the clinic.  Felix was not

12   involved in the medical part of the clinic.  Now, if they

13   needed supplies, they would communicate with him.  You know

14   what, we need a certain medication up in San Antonio, they

15   would email Felix, Felix get the supplies and he'd send a

16   runner.  That's it.  There's going to be no dispute as to that.

17   You're going to find out (indisc.) you heard the Government

18   describe him as handling all the financials.  And you're going

19   to hear evidence from some of the witnesses.  And what are they

20   going to say?  He handled the financial and personal.  You're

21   going to find out Felix did not do bookkeeping.  There were

22   bookkeepers for the doctor.  You're going to find out that

23   Felix doesn't even know how to use QuickBooks because he wasn't

24   involved in any aspect.  He was in the middle if a doctor

25   needed a total, you're going to hear evidence that he would go

54

1    communicate with the bookkeepers and the bookkeepers would give

2    him a report.  If they needed information from the accountants,

3    you're going to hear that those accountants would communicate

4    through Felix communicate to the doctor and the doctor would

5    communicate to Felix and he'd communicate back to the

6    accountants.  That's the way it worked.  You're going to find

7    out he had no access to bank accounts.  This is the guy that

8    they say or you're going to hear they're going to present

9    evidence was involved in the financial and personal

10   transactions of the doctor.  But you're going to find out no

11   passwords, never accessed a bank account.  If something needed

12   to be transferred, if something needed to be done, Felix would

13   have to talk to the doctor and then he would talk to the

14   bookkeepers.  That's it, no decision-making.  There's going to

15   be absolutely no evidence in this case of decision-making;

16   communicating, but no decision-making.

17           Now, what did they charge him with?  You had the

18   indictment yesterday.  One count, one count, conspiracy to

19   commit money laundering; not the healthcare fraud.  Now, what

20   the -- it's an interesting aspect of that charge, and what's

21   the evidence going to show you?  The Government has to present

22   certain elements in a case.  And for conspiracy -- and they'll

23   be first ones, in their evidence they're going to say we don't

24   have to prove the money laundering itself, they only need to

25   present evidence of an agreement to commit money laundering,

1    but that it had three goals.  And so I expect that they're

2    going to try to present evidence to you of those three goals.

3    The first one, transactions to conceal.  I think that's going

4    to be very important because what I think the evidence is going

5    to show you, there never was an intent to conceal whatsoever.

6    There's an absolute record of every single transaction.  Not

7    what we're used to, people dealing with cash and then trying to

8    find a way to insert cash to use it legitimately.  That's not

9    going to be this case.

10           The second thing that they're going to try to present

11   evidence I assume based upon what they said in their opening

12   statement is about the transfers to Mexico and accuse my client

13   of helping to transfer money to Mexico using (indisc.) but I

14   think the evidence in the case is going to show that when

15   you're sending money to Mexico and the reasons why you're

16   sending money to Mexico through a money exchange as opposed to

17   other means is going to become very practical.  But you're also

18   going to find out the purposes of it and you're going to see

19   that every transaction was done on paper, ever transaction was

20   done through emails.  There was no attempt whatsoever to

21   conceal.  And then you're going to see the purpose of those

22   transactions to the evidence and you're going to see that the

23   doctor was making payments to Mexico not to go hide money but

24   to pay for his son's school, to pay for his son's maintenance,

25   to pay for his other children.  And you're going to see emails

1   back and forth that I would hope the Government's going to

2   present in this case showing you where the children would

3   communicate with him and say, hey, talk to dad about paying

4   this and paying that, and he would email back, let me talk to

5   him, yes, we already deposited the money (indisc.) that's his

6   involvement.  Or the doctor's ex-wife.  He had to pay alimony.

7   And then you'll see a bunch of transactions, and we're going to

8   point out (indisc.) in the evidence where he's paying the

9   alimony support.  But they're going to call that money

10  laundering I expect.  You're going to see the properties and

11  how much money was going to pay -- how expensive it was to pay

12  the HOA fees or the maintenance or things like that.  And

13  that's the evidence you're going to see in this case in that

14  respect.

15          Now, the question becomes in the evidence, when we

16  start to look through it step-by-step, is how is this done,

17  what's the evidence going to show us?  But when we start to

18  scrutinize the testimony, especially as it relates --

19          **THE COURT:**  And that's what we're going to do in the

20  closing argument.

21          **MR. PENA:**  I understand that, your Honor.

22          **THE COURT:**  And then limit yourself to what the

23  evidence is going to show here.

24          **MR. PENA:**  The evidence is going to show general

25  words and assumptions.  Just like you heard from the Government

1   in the opening statement, he was the doctor's right-hand man.

2   And you will see through the evidence no follow-up questions,

3   just that, thank you very much.  And those (indisc.) going to

4   bring and then from there assume what they want to assume.

5   What's the evidence going to show you about what they're going

6   to do with the evidence?  When they start to present evidence,

7   you will see they're going to cherry-pick, as Mr. Martinez

8   said, be very selective about the evidence, take one piece and

9   go, there.  But we expect when that occurs that we will then

10  show you the rest of the evidence that will explain what that

11  evidence means.

12          Why?  Why is this being done?  You heard the judge

13  yesterday instructions.  You remember the judge talked about

14  direct evidence and circumstantial evidence.  Well, let's think

15  about the charge, let's think about what they charged him with:

16  an agreement, a conspiracy to commit money laundering.  What

17  they were thinking, how do you prove that?

18          **THE COURT:**  That -- we're -- that will be done at the

19  end of the case.

20          **MR. PENA:**  I understand, your Honor.  So what you're

21  going to see is the reason they charged him, what the evidence

22  is going to show you is they're hoping they could pressure

23  Felix Ramos to testify against the doctor to say there was an

24  agreement; because without that, there's no direct evidence.

25  But you're going to see that the evidence is not going to

1   support (indisc.) Felix Ramos has waited over a year for this

2   day to prove -- I mean to prove what the truth really is, to

3   get a just determination in the case.  So I want to thank you

4   for your time.  I look forward to presenting this case to you

5   (indisc.)

6           **THE COURT:**  Ladies and gentlemen, that's the last

7   opening statement.  You have been here for an hour and 45

8   minutes almost.  We can probably take a short break.  Juror

9   Number 5, you sent me a note but we can talk about it up here.

10  We'll see you all in a few minutes.

11          **THE MARSHAL:**  All rise for the jury panel.

12      **(Jurors, except Juror Number 5, exit at 10:42 a.m.)**

13          **THE COURT:**  You all can go ahead and be excused.

14          **MR. SPEAKER:**  Thank you.

15      **(Begin bench conference at 10:42 a.m.)**

16          **THE COURT:**  You sent me a note.

17          **JUROR NUMBER 5:**  Yes, your Honor.

18          **THE COURT:**  It's Jeffrey Perez, not Pierce.

19          **JUROR NUMBER 5:**  Oh, I heard --

20          **THE COURT:**  Yes, but I think that's the way it was

21  said but it's Perez.

22          **JUROR NUMBER 5:**  Okay.

23          **THE COURT:**  There's no Pierce testifying.

24          **JUROR NUMBER 5:**  Oh, okay.

25          **THE COURT:**  So you don't have to worry about that.

59

1          **JUROR NUMBER 5:**  All right.

2          **THE COURT:**  At least that's what I was told when I

3    asked that question about Jeffrey Pierce and they said, we

4    don't have a Pierce, we have a Perez.

5          **JUROR NUMBER 5:**  Oh, okay.

6          **THE COURT:**  Okay.  Then you don't have any problem

7    Clarissa Martinez if she is somehow related to somebody because

8    you've never met her; is that correct?

9          **JUROR NUMBER 5:**  Correct.

10         **THE COURT:**  Okay, thank you.  And thank you for

11   trying to be careful.

12         **JUROR NUMBER 5:**  All right, thank you.

13         **THE COURT:**  Sure.

14         **MR. SPEAKER:**  You want to (indisc.)

15         **MR. SPEAKER:**  Since we're not --

16       **(End bench conference at 10:43 a.m.)**

17       **(Recess taken from 10:43 a.m. to 11:03 a.m.)**

18         **THE COURT:**  Please be seated.  We have a second jury

19   note.  We've taken care of one already.  In very big letters,

20   "CLOSE THE BLINDS".

21         **MS. FRAZIOR:**  We thought you caught somebody looking

22   out.

23       **(Laughter)**

24         **THE COURT:**  No, I wanted to leave one open for

25   myself, but we've done it.

60

1          The other one is, "Can you please tell the lawyers to

2    speak louder or into the microphone?  It is hard to listen to

3    them".  So, please keep that in mind and try to speak around

4    the microphones and louder.  That one you're going to have to

5    take care of yourselves.  I've taken care of the blinds.

6          That was Jury Note Number 2.  We haven't started

7    evidence yet.

8       **(Laughter)**

9          **THE COURT:**  Go ahead and bring the jury in.

10         **MR. PENA:**  Your Honor, very quickly before.  Just if

11   we haven't invoked the rule, we'd like to invoke the rule.

12         **THE COURT:**  Are there any potential witnesses --

13         **MR. PENA:**  I think there may have been --

14         **THE COURT:**  -- here in the courtroom?

15         **MR. PENA:**  We're afraid we saw one during the opening

16   statement.  So, we just want to make sure --

17         **THE COURT:**  Are they in here someplace?

18         **MS. FRAZIOR:**  No, your Honor.  I don't recognize any

19   witnesses here; only Special Agent James Wilson who I think we

20   talked about is excepted from -- I can't remember if we've

21   discussed that or not; excepted from the rule and he's at

22   counsel table.

23         **MR. PENA:**  I'm assuming they're designating him as

24   the case agent, your Honor?

25         **MS. FRAZIOR:**  Yes.

1      **THE COURT:**  That would be the assumption.  Well, both

2   sides need to tell that the rule has been invoked, and that

3   unless they are testifying, they are to wait outside the

4   courtroom until if and when they are called as witnesses.

5          **MR. ALVAREZ:**  Even character witnesses?

6          **THE COURT:**  Yes.

7          **MR. ALVAREZ:**  All right.

8          **THE COURT:**  Are you leaving us?

9          **MR. ALVAREZ:**  No, I was instructing him to.  I

10  apologize.

11         **THE COURT:**  Okay.

12     **(Pause)**

13         **THE COURT:**  Did you want an exception for character

14  witnesses?  Is that what you're talking about?

15         **MR. PENA:**  Yeah, or spouses, your Honor, I think

16  there's -- that's what we were just discussing is whether would

17  a spouse be excepted, so he's asking Ms. Natera's husband to

18  leave.

19         **THE COURT:**  Is he going to testify?

20         **MS. FRAZIOR:**  Your Honor, I don't have an objection

21  to spouses being in.  I know that's --

22         **THE COURT:**  Yeah, I don't either.  So, I don't have a

23  problem unless the spouse is going to be a witness.

24         **MR. PENA:**  Okay.

25         **THE COURT:**  So, he can stay here.  Is that who you

62

1    took out?

2         **MR. ALVAREZ:**  Yes.

3         **THE COURT:**  Mr. Alvarez, is that who you took out?

4         **MR. ALVAREZ:**  Yes, your Honor.

5         **THE COURT:**  Since when have you become such a

6    stickler for the rules?

7         **(Laughter)**

8         **MR. ALVAREZ:**  Judge, I'm having trouble hearing

9    people, too.  I don't know what -- it's probably my age, but --

10        **THE COURT:**  You or I should not talk about our ages.

11        **MR. ALVAREZ:**  You're correct.

12        **MS. FRAZIOR:**  Your Honor, if I question from this

13   podium, first of all, is that all right to do that?

14        **THE COURT:**  That's fine with me.

15        **MS. FRAZIOR:**  Should I -- would it be okay to move

16   this over, too, so I could have the one at the desk and then

17   the --

18        **THE COURT:**  I don't know that we can move it.

19        **MS. FRAZIOR:**  Okay.

20        **THE COURT:**  We have these right here so that we can

21   try -- the one to just --

22        **MR. SPEAKER:**  There is a mic at the podium.

23        **THE COURT:**  There's a mic on the podium.

24        **MS. FRAZIOR:**  Yes.

25        **THE COURT:**  So, we don't need to do that.  There is a

1    mic on the podium.

2           **MS. FRAZIOR:**  I'm just looking for it.

3           **THE COURT:**  Isn't there?  Okay.  Well, we can put

4    that one back where it was.  Just stay close to the mic.

5           I did have a defendant one time who represented

6    himself and I indicated to him that he couldn't just talk, that

7    he would have to ask himself questions.  I didn't realize that

8    he would turn to ask the questions, and then answer with a

9    different voice.

10          And finally, the jury is looking at me like, what's

11   going on on that witness stand.  I said, "You can just go ahead

12   and testify".

13          **MR. PENA:**  An insanity defense, your Honor.

14          **THE COURT:**  Yeah.  Go ahead and bring the jury in.

15      **(Jurors enter courtroom at 11:07 a.m.)**

16          **THE MARSHAL:**  All rise for the jury.

17          **THE COURT:**  Please be seated.

18          Go ahead and call your first witness, ma'am.

19          **MS. FRAZIOR:**  United States calls Elizabeth Gonzalez.

20          **THE COURT:**  And ladies and gentlemen, you have

21   notepads.  During presentation of evidence, you can take notes

22   if you want, but please bear in mind those are your notes, and

23   if somebody else has notes different than what you heard, it's

24   what you heard that counts; not what somebody else's notes may

25   have been.

Gonzalez - Direct / By Ms. Frazior                    64

1          And those you will leave here every day in your

2    packet.  Nobody is going to look at them, and at the end of the

3    case you can have them, or you can throw them away; whatever

4    you-all want to do with them.  Your own notes.

5          Ma'am, you need to be sworn in right here.

6          **MS. GONZALEZ:**  Oh, okay; I'm sorry.

7          **THE COURT:**  Sorry.

8          **ELIZABETH GONZALEZ, GOVERNMENT'S WITNESS, SWORN**

9          **THE COURT:**  Go ahead and have a seat, ma'am.

10         And ladies and gentlemen of the jury, we've closed

11   the blinds like you asked, and we've asked the attorneys to

12   speak louder.

13                    **DIRECT EXAMINATION**

14   **BY MS. FRAZIOR:**

15   Q    Good morning, Ms. Gonzalez.

16   A    Good morning.

17   Q    Can you introduce yourself to the jury?

18   A    My name is Elizabeth Gonzalez.

19         **THE COURT:**  Ms. Gonzalez, can you move the microphone

20   up as close as you can to yourself.

21         **THE WITNESS:**  Good morning.  My name is Elizabeth

22   Gonzalez.

23   **BY MS. FRAZIOR:**

24   Q    Ms. Gonzalez, how old are you?

25   A    I am 49.

Gonzalez - Direct / By Ms. Frazior                    65

1   Q    Okay.  And I see you've got a badge on there; what is that

2   for?

3   A    Oh, yes.  It's my work badge.

4   Q    What do you do for a living?

5   A    I am a custodian at the University.  I do TR duty.

6   Q    Could you tell the jury a little bit about your family?

7   A    I am the mother of four children.  My oldest is 30.  I

8   have a 25-year-old, a 22-year-old, and my youngest is 19.

9   Q    Do you also -- are you also a stepparent?

10  A    I am a stepparent.  So, my husband and I, together we have

11  ten children, so they're all in between, mixed.  Yes.

12  Q    Who is the youngest child of your family?

13  A    The youngest child of our family is 13.

14  Q    Okay.  Thirteen currently?

15  A    Yes.

16  Q    Okay.

17  A    Uh-huh.

18  Q    Is that one of your husband's minor --

19  A    My husband's, uh-huh.

20  Q    Got you.  And how -- do you have a child named Elijah

21  Perez?

22  A    Elijah, yes.  He's my youngest.

23  Q    How old is he now?

24  A    Elijah is 19.

25  Q    Are you familiar with someone named Dr. Zamora-Quezada?

1    A    Yes.

2    Q    How are you familiar with him?

3    A    I was referred to him to take my son, Elijah, after he got

4    injured in football practice or at school; an injury.

5    Q    How old was Elijah when that injury happened?

6    A    Elijah was 13 then.

7    Q    What part of his body was injured?

8    A    What started out was his shoulder pain and his back pain.

9    He started having some pain.

10    Q    And how did you get that referral to go to Dr. Zamora-

11    Quezada?

12    A    I ended up taking him to the family doctor, and they gave

13    him some medication, and then never got better, you know.  He

14    was getting worse.  So, we ended up getting a referral to

15    Dr. Zamora-Quezada.

16           THE COURT:  And the family doctor was who,

17    Ms. Gonzalez?

18           THE WITNESS:  The family doctor was Dr. Roderick

19    Vergel De Dios.

20           THE COURT:  And was it Dr. De Dios who recommended

21    Dr. Zamora?

22           THE WITNESS:  I don't remember if it was him or

23    whether it was through somebody else that we got referred to

24    Dr. Zamora.

25           THE COURT:  Go ahead, ma'am.

1          **MS. FRAZIOR:**  Thank you.

2   **BY MS. FRAZIOR:**

3   Q    What kind of health insurance did you have at that time?

4   A    In the beginning, we had CHIPs.

5   Q    What is that?  Do you know it by another name?

6   A    We don't qualify for Medicaid, and so we qualified for

7   CHIPs.  And so then once he started getting, you know, more

8   sick, I had to add him onto my insurance from work.

9   Q    All right.

10         **THE COURT:**  And CHIPs is an insurance provided by the

11  Government I take it.

12         **THE WITNESS:**  Yes.  Yeah.

13  **BY MS. FRAZIOR:**

14  Q    And what kind of insurance, or what was your insurance

15  provider when you added him to your insurance?

16  A    Blue Cross Blue Shield.

17  Q    Can you tell the jury about your first visit with Elijah

18  to Dr. Zamora-Quezada's office?

19  A    When we went to go and see Dr. Quezada, we were placed in

20  a room, and Elijah was seen by him.  And he saw him, and he

21  asked Elijah, you know, do -- "Elijah, explain to me how you

22  feel", and Elijah said, "You know, I have pain, shoulder pain,

23  back pain".  And, you know, he touched him by the shoulders and

24  he grabbed him, he said, "You have pain here".  And then of

25  course it's in the joint area, and Elijah cringed; he said,

Gonzalez - Direct / By Ms. Frazior                    68

1   "Yes".  And he grabbed him by the forearm right here, and he

2   said, "You don't have pain here", and Elijah said, "No".

3        And then he grabbed his elbows and he said, and

4   squeezed them; he said, "You have pain here", and he said,

5   "Yes".  So, I'm thinking he knows where Elijah's pain is, and

6   so he said, "Okay".  And, you know, he would touch, you know,

7   where in the joint area.  He said, "This is where it hurts;

8   this is where it doesn't hurt.  And it does hurt here", and

9   like -- like he knew Elijah's pain.

10  Q    Was he speaking to you in English or Spanish?

11  A    In English, uh-huh.

12  Q    Was he asking you where Elijah -- or asking Elijah where

13  he hurt when he grabbed him?

14  A    He asked him, "Where do you hurt?", and then he grabbed

15  the shoulders.  "You have pain here."  "Yes."

16  Q    Okay.  So, he grabbed the shoulders and --

17  A    "You have pain here", "Yes", and he would grab them.  And

18  then, "Not here", "Yes".

19       **THE COURT:**  And Elijah was the one giving the

20  responses.

21       **THE WITNESS:**  Yes.

22  **BY MS. FRAZIOR:**

23  Q    Did he receive a diagnosis at that time?

24  A    Yes.

25  Q    What was the diagnosis that day?

1   A    Arthritis; rheumatoid arthritis.

2   Q    Uh-huh.  What happened after he received the diagnosis of

3   rheumatoid arthritis?

4   A    He started getting treated for rheumatoid arthritis.

5   Q    What happened right there in that visit?

6   A    He decided, yeah, that -- well, he turns to me.  He tells

7   me, "Your son has arthritis".  Of course, we're devastated, you

8   know.  I didn't know; I'm thinking, okay, you know, it's a

9   shock.  Well, my son has arthritis, so then, you know, he

10  started treating him for arthritis and gave him an injection.

11  Q    Did he get the injection that day?

12  A    Yes, he got the injection that day.  He started giving him

13  medication and he told me he has arthritis, so he was going to

14  start getting treated.

15  Q    Where did he get that first injection while you were in

16  the room there?

17  A     It was towards the back; towards the lower buttocks on the

18  butt cheek.

19  Q    Do you know what it was for?

20  A    No.  I don't know what medication he gave him, but he told

21  me it was for arthritis.

22          MS. FRAZIOR:  May I approach the witness?

23          THE COURT:  Sure.  And you don't need to ask that

24  with this witness anymore.

25          MS. FRAZIOR:  Thank you, your Honor.

1    **BY MS. FRAZIOR:**

2    Q    I'm going to show you what's marked as Government's

3    Exhibit C55.

4    A    Yes.

5    Q    Do you recognize that document?

6    A    Yes.

7    Q    Do you know what it is?

8    A    Elijah's medical records.

9    Q    Do you know what clinic it's from?

10   A    It's from the arthritis doctor.

11   Q    Do you know what doctor that is?

12   A    Dr. Quezada.

13        **MS. FRAZIOR:**  At this time, your Honor, I'd move to

14   admit Government's Exhibit C55.  There is no objection from

15   Dr. Zamora-Quezada.  I do not know about the other attorneys.

16        **THE COURT:**  Does anybody have any objection?

17        **MR. PENA:**  Your Honor, we would have an objection on

18   105, which is to limit this evidence to, I guess, the

19   defendants where it's relevant.  We have a 401 and 403

20   objection as to Count 10, that it wouldn't be relevant, and

21   would be 403, unfairly prejudicial as to Mr. Ramos.

22        **THE COURT:**  The instructions are going to be given

23   with regards to the different counts, and the fact that this

24   may be relevant for one count doesn't mean that it's not going

25   to be introduced here.

1          **MR. PENA:**  I understand that.  So, under Rule 105,

2    then, we want a limiting instruction, an instruction to the

3    jury that it's not to be considered as to Count Ten and to

4    Mr. Ramos, but to the defendants who it is (indisc.).

5          **THE COURT:**  Well, I think that's going to be pretty

6    clear, but did you have any objection to that?

7          **MS. FRAZIOR:**  Not really, your Honor.

8          **THE COURT:**  Ladies and gentlemen, this exhibit is

9    introduced with regards to Count Number One.

10          **MR. PENA:**  Thank you, your Honor.

11          **THE COURT:**  And it's C-55?  Is that what you said?

12          **MS. FRAZIOR:**  Yes, your Honor.  Let me double check.

13    Yes.

14          **MR. MARTINEZ:**  And for purposes of the record, Judge,

15    we have no objections.  We have (indisc.).

16          **THE COURT:**  Okay.

17          **MS. FRAZIOR:**  May we --

18          **THE COURT:**  It's admitted.

19        **(Government's Exhibit Number C55 was received in evidence)**

20          **THE COURT:**  Go ahead.

21          **MS. FRAZIOR:**  May we publish to the jury?

22          **THE COURT:**  Yes.

23    **BY MS. FRAZIOR:**

24    Q    You see you've got a screen right there in front of you?

25    A    Uh-huh.

Gonzalez - Direct / By Ms. Frazior                72

1    Q    The document is going to come up on that screen, and we're

2    going to talk about a couple of things in it.

3              Oh, can we switch it over?  Oh, to the ELMO.

4         **(Pause; discussion regarding ELMO)**

5              **THE COURT:**  The jurors can see it, right?

6         **(Pause; voices and whispers off the record)**

7              **MR. SPEAKER:**  We're good, your Honor.

8              **THE COURT:**  Okay.

9    **BY MS. FRAZIOR:**

10   Q    All right.  Let's walk through this document just briefly.

11   Do you see there at the top where it says Center for Arthritis

12   and Osteoporosis?

13   A    Yes.

14   Q    And for the purposes of the record, we're looking at C-55.

15   Do you see at the bottom where there is a number, C-55-001?

16   A    Uh-huh.

17   Q    All right.  Can you see at the top of this document a

18   date?

19   A    Yes.

20   Q    What is that date?

21   A    Twenty thirteen; 10/29 of 2013.

22   Q    And do you see in the middle of the page where it has the

23   age of the person whose records this is?

24   A    Yes.

25   Q    Do you also see underneath it where it says -- does it say

1   female?

2   A    Yes.

3   Q    Is your son male or female?

4   A    Male.

5   Q    And, then, just scrolling down a little bit, do you see

6   over here on the -- let me go all the way down to the bottom

7   real quickly.  Do you see on this lab test where there are some

8   dates over here on the right side that have the words run, ER,

9   and then some dates?

10  A    Yes.

11  Q    Are those dates after the date of your first visit with

12  Elijah Perez?

13  A    It seems to be.  It's in the month of eleven.

14  Q    Okay.  And is it your recollection that you visited

15  Dr. Zamora-Quezada in October of 2013?

16  A    Yes.

17  Q    Okay.  All right.  What happened after that initial visit?

18  How frequently did Elijah visit Dr. Zamora-Quezada?

19  A    He would schedule him frequently to come and visit him;

20  I'm assuming it might have been every three months, and -- and

21  he would check Elijah, make sure that he was taking his

22  medication.

23  Q    Did he always see Dr. Zamora-Quezada?

24  A    He sometimes would see the physician assistant.

25  Q    Do you know that person's name?

1   A    It was a female.  I don't.

2   Q    What kinds of things would happen each time he visited

3   Dr. Zamora-Quezada?

4   A    He would end up getting injections.

5   Q    Any other things?

6   A    He would give him medication.

7   Q    Did he get x-rays?

8   A    He got x-rays; he was recommended for physical therapy;

9   but everything was within that same building.

10  Q    All right.  So, you didn't need to leave someplace else --

11  A    No.

12  Q    -- to go someplace else to get an x-ray?

13  A    Huh-uh.

14  Q    How long would your visits to Dr. Zamora-Quezada last?

15  A    It would last maybe 15, 20 minutes.

16  Q    With the actual doctor?

17  A    With -- with the actual doctor maybe it was, yeah, ten

18  minutes; ten.

19  Q    On that first visit, was that about the time that it took

20  to be in the room with him?

21  A    Maybe 20, 25 minutes.

22  Q    Okay.  And, then, when you -- from the time that you and

23  Elijah arrive at the clinic on the subsequent visits, you

24  arrive at the clinic to the time when you leave, how much time

25  is elapsing?

Gonzalez - Direct / By Ms. Frazior                75

1  A    Including the lobby time?

2  Q    Yes; lobby time and any other services you're getting

3  while you're there.

4  A    It might have been a good hour; 45 minutes to an hour.

5  Q    Can you describe for the jury what Elijah's physical

6  condition was like during this time?

7        **(Pause)**

8        **MS. FRAZIOR:**  Do you need a moment?

9        **(Pause)**

10       **THE COURT:**  Ms. Gonzalez, just kind of explain to us

11  how you thought his physical condition was at the time.

12       **THE WITNESS:**  He was in pain.  He was in pain.  He

13  was -- he was in pain.  He -- you could tell he was in pain.

14  **BY MS. FRAZIOR:**

15  Q    How could you tell he was in pain?

16  A    He would complain about his shoulders hurting.  He was in

17  pain, and -- when we would go and visit the doctor.

18  Q    During this time, this three years that he's visiting

19  Dr. Zamora-Quezada, was he getting better?  Was he getting --

20  A    He was getting worse.

21  Q    What kind of things were you doing at home and with school

22  to help Elijah?

23  A    He couldn't -- he couldn't get up in the mornings to go to

24  school.  He was in so much pain he would -- he couldn't -- he

25  was missing so much school I was getting told at school he's

Gonzalez - Direct / By Ms. Frazior                76

1    missing too much school, and I had to homebound him.  So, we

2    had to look into getting him homebound, which we did.

3    Q    All right.  How long did that last for?

4    A    The last -- his last four years of school.

5    Q    All right.  And --

6             THE COURT:  Was he 19 when you first took him to the

7    doctor?

8             THE WITNESS:  No.  He's 19 now.

9             THE COURT:  He's 19 now.

10            THE WITNESS:  Yes.

11            THE COURT:  So, he first went when he was 13?

12            THE WITNESS:  Thirteen.  Uh-huh.

13            THE COURT:  Go ahead.

14            MS. FRAZIOR:  Thank you, your Honor.

15   BY MS. FRAZIOR:

16   Q    At some point did you visit with another physician?

17   A    After Elijah tells me, "Mom, I'm not getting better, and I

18   need to go and see somebody else," I said, "Okay, let's find

19   another doctor."  And, so, then we went -- we took him to

20   another doctor, made an appointment.

21   Q    I want to back up just a little bit.  Before you made that

22   decision to go to another doctor, was there something about

23   visiting with Dr. Zamora-Quezada that Elijah didn't like?

24   A    He -- he wasn't comfortable, and he said, "Mom, it's not

25   helping," now he's having knee pain, and it wasn't helping him,

Gonzalez - Direct / By Ms. Frazior                    77

1   and he said, "I'm not getting any better, Mom.  I need to" --

2   "I need to try and see if we can find another doctor."

3   Q    Was he getting injections on those -- all those visits

4   with Dr. Zamora-Quezada?

5   A    He was getting injections, yeah.  Not all the time, but he

6   would get refills on the medications, and then when he was --

7   due to his pain, well, he would get injections if he was having

8   a bad pain day.

9   Q    And how was he dealing with taking those injections?

10  A    He didn't want them, but I would tell him, "Okay, you need

11  these shots."

12  Q    All right.  So, at some point you and Elijah seek out a

13  second opinion -- or seek a second doctor; excuse me.

14  A    Yes.

15  Q    How did you find that other doctor?

16  A    I think we just looked, and because -- we couldn't find

17  another doctor because there was no youth rheumatologist.  We

18  would have had to have gone to Harlingen or we would have had

19  to have gone to San Antonio, and he was the only doctor.  But

20  then as he was getting older, then we found somebody else that

21  would take him.

22  Q    Who did you end up going to?

23  A    I don't remember her name.

24  Q    Do you remember where it was?

25  A    It was down -- that medical center.  It was Thelma Caw

1   (phonetic).  And I don't know if it's Michelangelo Street or

2   something.  There's a lady rheumatologist.

3           **THE COURT:**  And that's in Doctor's Hospital?  Or --

4           **THE WITNESS:**  Yes.

5           **THE COURT:**  Is that --

6           **THE WITNESS:**  Before you get there.  Uh-huh.  Before

7   you get to the Doctor's Hospital.

8   **BY MS. FRAZIOR:**

9   Q    Now, Ms. Gonzalez, I don't want you to tell any -- tell us

10  anything anybody said to you, okay?  But I wanted to talk about

11  what your personal experiences were in this situation with

12  visiting the second doctor.  So, how many visits did he go for?

13  A    One.  We went to the initial visit, and then we came back

14  for the results.

15  Q    What happened on that initial visit?

16  A    On the first one?

17  Q    Yes.

18  A    We went, and she asked me what was going on with Elijah.

19  We told her the shoulder pain, the back pain, the knee pain,

20  the hand pain; and so she did -- took everything, saw him, drew

21  some blood, and said, "We'll get the results, and then you can

22  come back and we'll" --

23          **MR. MARTINEZ:**  Your Honor, I'm going to just ask the

24  Court to instruct the witness to refrain from talking about

25  what other people talked about --

Gonzalez - Direct / By Ms. Frazior                79

1              MS. FRAZIOR:  Yes.

2              MR. MARTINEZ:  -- pursuant to the question.

3              MS. FRAZIOR:  Yes.  I'm sorry.

4              THE COURT:  Go ahead.

5              MS. FRAZIOR:  Yes, please don't talk about what the

6    doctor talked to you about.

7              THE WITNESS:  Oh.

8              MS. FRAZIOR:  Just what you did and what you saw

9    there, okay?

10             THE WITNESS:  Okay.

11   BY MS. FRAZIOR:

12   Q    So, did he get lab work done?

13   A    Yes.

14   Q    Did he get x-rays done?

15   A    Yes.  No, I don't remember about the x-rays.

16   Q    Okay.  And that was -- that lab work was on that first

17   visit?

18   A    Yes.

19   Q    And, then, when you came back for the second visit, what

20   was the purpose of that?

21   A    The results of the lab work.

22   Q    Okay.  Is Elijah currently being treated for rheumatoid

23   arthritis?

24   A    No.

25   Q    Do you recall what your reaction was leaving that

Gonzalez - Direct / By Ms. Frazior                    80

1   appointment with the second opinion doctor?

2        **(Pause)**

3   A    You have to understand that we had been praying for

4   Elijah, and I've had people praying for Elijah.

5            **THE COURT:**  Okay.  Ms. Gonzalez, and her question was

6   how did you feel after having seen the second doctor that day.

7            **THE WITNESS:**  I thought my Lord had healed him.  My

8   Lord healed him.  We had been praying for him to be healed of

9   this.

10  **BY MS. FRAZIOR:**

11  Q    Any other feelings?  Were you -- any other feelings after

12  you left that appointment?

13  A    We were confused.  We were confused, but in my mind I

14  said, "My Lord healed my son."  But we were confused with what

15  she had told us.

16  Q    Did you celebrate?

17  A    Yes.

18  Q    What did you do?

19  A    We went to go eat at Whataburger.

20  Q    That's my kind of celebration.

21           **THE COURT:**  Which of the Whataburgers did you have?

22       **(Laughter)**

23           **THE COURT:**  But you don't need to answer that

24  question.

25  *//*

1    **BY MS. FRAZIOR:**

2    Q    All right.  And do you recall how you found out about this

3    case going on?

4    A    It was on the news, and we had seen it, but I still didn't

5    pay any attention to it.

6    Q    Okay.  Were you contacted by someone or did someone

7    contact you?

8    A    Initially I was contacted by someone.

9    Q    Okay.  Do you know how that came about?

10   A    That came about -- my daughter had made a review on his

11   webpage, and she posted what we had gone through and warning

12   other people, you know, this is what happened with us, and

13   somebody saw that and they contacted us.

14            **THE COURT:**  Made a review on whose webpage?

15            **THE WITNESS:**  On the doctor's webpage.

16            **THE COURT:**  Dr. Zamora-Quezada.

17            **THE WITNESS:**  Yes.

18            **THE COURT:**  Okay.  Go ahead.

19            **MS. FRAZIOR:**  Did you have a --

20            **MR. MARTINEZ:**  I think that needs to be clarified, it

21   wasn't Dr. Zamora web pages, it was the FBI website.

22            **THE COURT:**  So what -- whose --

23            **THE WITNESS:**  No, Dr. Zamora's web page.

24            **MR. MARTINEZ:**  Okay.

25            **THE COURT:**  And then you started getting calls from

1    people who had been his patients, is that what you're saying?

2         **THE WITNESS:**  No, I had -- somebody had tried to get

3    in touch, in contact with my daughter and they said "Okay, we

4    saw what you posted and we need to speak to your mom."

5    **BY MS. FRAZIOR:**

6    Q    And tell us what Elijah is like now.

7    A    Elijah, in our mind we always protected Elijah, "No, you

8    can't do this because you're sick.  No, you can't do that

9    because your back, your shoulder.  Don't lift up nothing

10   heavy."  We protected him.  And somehow in our mind we had to

11   try -- okay, once we found out Elijah doesn't have this, but we

12   took care of him so much that sometimes I feel like we still

13   try and protect him, you know, "You can't do this because you

14   might get hurt."  "You know, we don't want to hurt your joints

15   more."  And in a sense I think we are still stuck, him and I

16   mostly, because I still want to protect him, and I think he's

17   stuck, as well 'cause, you know, he was protected.  I mean,

18   homebound with his pain and, you know, and now, okay, you're

19   like "Well, you're okay, you don't have it," and it's trying to

20   make that transition where "You can go out and do anything, you

21   can become anybody, you're not sick, you're healed."

22   Q    The time period that he was treated from 13 to about what

23   age?

24   A    Till maybe he was 14 -- no, 13, 14, 15, 16, 17.

25   Q    Seventeen years old.

Gonzalez - Direct / By Ms. Frazior                    83

1   A    Uh-huh (yes.)

2   Q    Okay.  And do you think that affected how Elijah views

3   himself?

4   A    It affected the way Elijah views himself and the way -- I

5   mean, we need some, you know, changing up here, him and I

6   mostly.

7   Q    Okay.  Do you feel -- do you feel that that might be

8   related to some guilt that you feel?

9   A    I -- I feel a lot of guilt.

10  Q    What is Elijah doing for a living today?

11  A    He is going to school still.  He's trying to get his high

12  school diploma and he's trying to become a welder, yeah.

13  Q    Did he have any other jobs that involved physical

14  activity?

15  A    He worked for awhile in Houston building streets, so they

16  would work with asphalt, which is a lot of, you know, labor.

17  Q    Does -- is he being treated for any other kind of

18  arthritis?

19  A    No.

20  Q    Does he still feel that he has some aches and pains

21  occasionally?

22  A    In his shoulders.

23       MS. FRAZIOR:  Your Honor, if I could have just one

24  moment, I'll try to be quick.

25       (Pause)

1    **BY MS. FRAZIOR:**

2    Q    One other question, Ms. Gonzalez, did you, at some point,

3    seek out a lawyer in this case to represent you?

4    A    Yes.

5    Q    And tell us about that.

6    A    I was told about the case and I still didn't know anything

7    and I just left it.  At the end I was told, "Okay, you need to

8    do something about this because, you know, there was an

9    injustice done to Elijah," and then I spoke to somebody.  And

10   then we have this -- this case, a civil case with him.

11   Q    Okay.  Is that attorney representing you in a civil case

12   against Mr. -- Dr. Zamora-Quezada?

13   A    Yes.

14   Q    Is -- has it been filed or anything like that?

15   A    Yes.  He's representing Elijah and --

16   Q    Elijah.

17   A    Yeah, well, 'cause he's 19 now.

18   Q    Okay.  All right.  Would anything about that

19   representation make you come here to say things that weren't

20   true?

21   A    No.

22   Q    Okay.

23             **MS. FRAZIOR:**  Pass the witness.

24             **THE COURT:**  Go ahead.

25             **MR. MARTINEZ:**  Thank you, Judge.  May I proceed?

Gonzalez - Cross / By Mr. Martinez                         85

1           **THE COURT:**  Sure.

2           **MR. MARTINEZ:**  Your Honor, for purposes of the record

3  we'd ask that Exhibits 61 through 64 be admitted into evidence.

4           **THE COURT:**  And the letter for those is what?

5           **MR. MARTINEZ:**  I'm sorry, Judge?

6           **THE COURT:**  Did you have a letter in front of those?

7           **MR. MARTINEZ:**  I do not have a letter, Judge.

8           **THE COURT:**  Okay, Exhibits 61 through 64, is there

9  any objection to those?

10          **MS. FRAZIOR:**  If I may just (indisc.).

11      **(Counsel confer)**

12          **MS. FRAZIOR:**  No objection.

13          **THE COURT:**  They're admitted.

14      **(Defendants' Exhibits Numbers 61 through 64 were received**

15  **in evidence)**

16          **MR. MARTINEZ:**  Your Honor, may I proceed?

17          **THE COURT:**  Go ahead.

18                        **CROSS EXAMINATION**

19  **BY MR. MARTINEZ:**

20  Q    Ms. Gonzalez, good morning.

21  A    Good morning.

22  Q    My name is Trey Martinez and I represent Dr. Zamora-

23  Quezada here.

24          We have never met --

25  A    No, sir.

1   Q    -- have we?

2        And I want to go over a couple of things that the

3   Prosecutor went over with you just so the jury has a clear

4   understanding, and I apologize for giving you my back but,

5   Ms. Gonzalez, one of the things that I wanted to go over with

6   you

7   is that the records that you have seen or that were presented

8   in C55, did you get those records or did the Government give

9   you those records?

10  A    No, I don't have those records.

11  Q    Okay, so the Government gave those to you?

12  A    Yes.

13  Q    Okay.  Did you happen to go through those records at all?

14  A    No, I don't -- I don't have the records.

15  Q    The C55?

16  A    The ones that I just saw right now?

17  Q    Right.

18  A    Yes.

19  Q    Were those given to you by the Government?

20  A    Yes.

21  Q    Okay, you didn't go get those for the Government?

22  A    No, sir.

23  Q    Okay.  All right, you didn't go through those records, did

24  you?

25  A    No.

Gonzalez - Cross / By Mr. Martinez                87

1   Q    Okay.  You're not telling the ladies and gentlemen of the

2   jury that you are a doctor, correct?

3   A    No, sir, by no means.

4   Q    All right.  You're not claiming to be an expert or in this

5   case for Elijah or for anybody -- any other patients, is that

6   correct?

7   A    No, sir.

8   Q    In fact, would you rely on experts such as

9   rheumatologists, whether it be Dr. Zamora or anybody else for

10  their opinion as to whether or not the diagnosis and treatment

11  of Elijah was appropriate?

12  A    Yes.

13  Q    And you would rely on an expert in the field of

14  rheumatology in order to determine whether that diagnosis and

15  treatment was appropriate for Elijah, is that correct?

16  A    Yes.

17  Q    And one of the things that you talked about was you going

18  to visit Dr. Zamora, and I think you said in your testimony,

19  correct me if I'm wrong, it was because there was an injury?

20  A    Yes.

21  Q    Okay.  And so as a result of that --

22            How long prior to that injury did you go see

23  Dr. Zamora in his clinic?

24  A    He had gotten injured in football at school and --

25  Q    A week before?  Two weeks before?

1   A    I don't remember how long, but we waited -- the family

2   doctor gave him some medication and, you know, tried, "Okay,

3   let's try this" and then the pain persisted --

4   Q    Okay.

5   A    -- and so I don't know the time lapse in between.

6   Q    Longer than a month or not longer than a month?

7   A    To be honest I don't remember how much time passed, but

8   before we were recommended to see a specialist.

9   Q    Okay.  Would you rely on the records in regards to how

10  long that was?

11  A    Yes.

12  Q    Okay.  In your own recollection would it be longer than

13  three months?

14  A    That went by before we saw the specialist?

15  Q    Correct.

16  A    I don't know if it was three months or if it was a month.

17  I just --

18  Q    Okay.  But it wouldn't be longer than six months would it?

19  A    No, sir.  No.

20  Q    Okay.  So anywhere between zero and six months there was

21  an injury, and then it's your testimony that you went to go see

22  Dr. Zamora as a result of that injury?

23  A    Yes.

24  Q    And correct me if I'm wrong, but I believe your testimony

25  was that the reason that you went to go see Dr. Zamora was

Gonzalez - Cross / By Mr. Martinez                    89

1    because of the injury and that it was for lower back pain, is

2    that correct?

3    A    Yes.

4    Q    All right.  And is it your complaint here today that while

5    your son went over then to see Dr. Zamora for lower back pain

6    he was treated for other pain, is that correct?

7    A    He was treated -- when he went to go see Dr. Zamora he was

8    treated for the rheumatoid.

9    Q    Okay.  He was treated for symptoms that -- like you filled

10   out a form for those symptoms --

11   A    That are associated with rheumatoid.

12   Q    Okay.  Apologies, but let me finish my question and that

13   way we can those answers up.

14   A    I'm sorry.

15   Q    But you filled out a form when you went to go see

16   Dr. Zamora, is that correct?

17   A    Yes.

18   Q    Okay.  And in that form you actually put down the symptoms

19   as what your son was suffering from?

20   A    Yes.

21   Q    And we can rely on what it is that you wrote on behalf of

22   your son, is that correct?

23   A    Uh-huh (yes.)  Yes.

24   Q    Okay.  And what was the name of your doctor that you were

25   seeing at the same time or right prior to Dr. Zamora?

Gonzalez - Cross / By Mr. Martinez                    90

1   A    The primary care doctor is Dr. Roderick Vergel De Dios.

2   Q    Okay.  And do you also remember seeing Dr. Makary.

3   A    Makary?

4   Q    Correct.

5   A    I -- I don't remember Makary.

6   Q    Would you be able to -- we'll get into the records, would

7   you rely on the records --

8   A    Yes.  Yes, if it's on record, yes.

9   Q    -- in regards to Dr. Makary as well?

10          And do you remember, actually, during the three-year

11  period that the Prosecution is talking about that you saw

12  Dr. Zamora, in fact, you took about a year break from seeing

13  Dr. Zamora at his office, do you remember that?

14  A    I'm not sure, but if it's there, yes.

15  Q    If it's in the records you're okay with what's in the

16  records?

17  A    Yes.

18  Q    Okay.  Let me start out by showing you Exhibit 65 -- I'm

19  sorry, 63.

20          MR. MARTINEZ:  And if you could pull up Bates Stamp

21  Number 7980, Ms. Sanchez?  I'm sorry, it's 63.

22  Q    Ms. Gonzalez, I'm going to refer you to --

23          MR. MARTINEZ:  Is this on the screen for everybody?

24  Okay.

25  Q    -- to 7980 and I'll represent to you that this is a

Gonzalez - Cross / By Mr. Martinez                      91

1   referral form.  Have you seen that in Dr. Zamora's records that

2   was given to you by the Government?

3   A    No.

4   Q    Okay.  Would you have any reason to dispute, if you'd go

5   down to the third line, that this is a Primary Care Management

6   Referral Form from Dr. De Dios to Dr. Zamora?

7   A    Yes.  No, I don't have any dispute.

8   Q    Okay.  And if you go down to the middle of the page the

9   reason for the referral, in the middle, is because of juvenile

10  idiopathic arthritis, is that correct?

11  A    Yes.

12  Q    Okay.  So, in fact, your patient (sic) was referred by

13  your primary care physician to Dr. Zamora for juvenile

14  arthritis, is that correct?

15  A    Yes.

16  Q    And there was some indication, obviously, from your

17  primary care physician that Elijah suffered from juvenile

18  idiopathic arthritis, is that correct?

19  A    I'm assuming 'cause the pain was persistent and it

20  wouldn't go away, yes.

21  Q    Okay.  And yet it's your testimony that you went to

22  Dr. Zamora because of an injury and then lower back pain, is

23  that correct?

24  A    Yes.

25  Q    Okay.  And that doesn't -- that's not reflected here, is

1    that right?

2    A    Uh-huh (yes.)  Yes.

3    Q    Is that correct?

4    A    Yes.

5    Q    Okay.  And then if we go to Exhibit 63, Bates Stamp Number

6    7971, do you see this, just at the top, this is a patient

7    history and physical?

8    A    Yes.

9    Q    Okay.  And this is something that you filled out on behalf

10   of your son, is that correct?

11   A    Yes.

12   Q    Okay.  And they talked about the date of the first form

13   being 10/29 of '13?

14   A    Uh-huh (yes.)

15   Q    No reason to dispute that date, is that correct?

16   A    Yes.

17   Q    Okay.  And this is your handwriting?

18   A    I think it's my daughter's, she was with me.

19   Q    Okay, so she filled this out with you there?

20   A    Yes.

21   Q    Okay.  And "Briefly describe the present symptoms" says

22   "Joints" meaning plural, is that correct?

23   A    Yes.

24   Q    "Feel stiff" --

25   A    Uh-huh (yes.)

Gonzalez - Cross / By Mr. Martinez                          93

1   Q    -- "having difficulty getting up from bed," is that right?

2   A    Yes.

3   Q    Is there any mention in there that you're there because of

4   a lower back pain injury?

5   A    No.

6   Q    Okay.  And then if you go to the "approximate date of the

7   symptoms range" it talks about this going on for over two

8   years, or two years, is that correct?

9            **MR. MARTINEZ:**  If you could blow that up in the

10  middle of the page, Ms. Sanchez?

11  Q    Do you see that?

12  A    Uh-huh (yes.)

13  Q    Okay.  So what you told the jury a little while ago in

14  regards to this injury happened and then three months later we

15  got referred to Dr. Zamora, that's not what's reflected in the

16  record, is that correct?

17  A    Yes.

18  Q    Okay.  And, in fact, when you went to Dr. Zamora you went

19  in and said that Elijah was suffering from these symptoms for

20  the last two years?

21  A    Yes.

22  Q    Okay.  And it included multiple joints, is that right?

23  A    Yes.

24  Q    And then if you go to the same document that you or your

25  daughter filled out, not Dr. Zamora, is that right?

Gonzalez - Cross / By Mr. Martinez                          94

1    A    Yes.

2    Q    And if you'd go to the "rheumatologic arthritis history,"

3    both you and your husband, I guess the father of Elijah, both

4    suffer from arthritis, is that correct?

5    A    Yes.

6    Q    And, in fact, both you and his father suffer from

7    rheumatoid arthritis?

8    A    Yes.

9    Q    Correct?

10   A    Uh-huh (yes.)

11   Q    Okay.  All right.  And you're not here as a doctor to say

12   whether those are signs, symptoms or indications that Elijah

13   Perez could be suffering from the same thing, is that correct?

14   A    Uh-huh (yes.)

15   Q    You're not here to tell the ladies and gentlemen of the

16   jury that two years of joint morning stiffness and difficulty

17   getting out of bed is not signs or symptoms of juvenile

18   idiopathic arthritis?

19   A    Yes.  Uh-huh (yes.)

20   Q    Correct?

21   A    Yes.

22   Q    It could be that based upon what it is you wrote down

23   here?

24   A    Yes.

25   Q    Would that be reasonable to assume that based upon what

1   you described as symptoms?

2   A    Yes.

3   Q    And then if you'd go to Bates Stamp Number 7972 in Exhibit

4   63, and if you go to the "muscle/joint/bone," again these

5   are --

6            **MR. MARTINEZ:**  If you could blow that up, please with

7   the "muscle/joint/bone?"

8   Q    Okay.  And this is something that you or your daughter

9   filled out on behalf of Elijah Perez, is that correct?

10  A    Uh-huh (yes.)

11  Q    Okay.  And we talk about morning stiffness?

12  A    Yes.

13  Q    And you or your daughter put on behalf of your son "three

14  hours," is that correct?

15  A    The question that was asked here was what -- how long is

16  the morning stiffness for?

17  Q    Correct.

18  A    Okay.

19  Q    And you or your daughter put here "three hours."

20  A    Three hours.

21  Q    And the records here reflect that it was three hours and

22  this is one of the symptoms that's been going on for two years.

23  A    Uh-huh (yes.)  Yes.

24  Q    Is that correct?

25  A    Yes.

Gonzalez - Cross / By Mr. Martinez                    96

1    Q    And that's what the records reflect?

2    A    Yes.

3    Q    And then you also put in a checkmark with "joint

4    swelling," is that correct?

5    A    Yes.

6    Q    Okay, is that all his joints?

7    A    Yeah -- it was the shoulder, the shoulder then --

8    Q    Okay.  Multiple joints.

9    A    Yes.

10   Q    Okay, it wasn't just the shoulder is what I'm -- and we'll

11   get to the records here in a minute.

12   A    Okay, yes.

13   Q    But would you agree with me that Elijah, at the time that

14   he initially saw Dr. Zamora, was suffering from two years of

15   multiple joint pain?

16   A    Yes.

17   Q    Okay.  And, in fact, for two years he had morning

18   stiffness for at least three hours --

19   A    Yes.

20   Q    -- is that correct?

21        And then he also had joint swelling, is that correct?

22   A    Yes.

23   Q    And was that multiple joint swelling?

24   A    Yes.

25   Q    Okay.  And do you know whether or not those are all signs

Gonzalez - Cross / By Mr. Martinez                97

1   or symptoms or indications of juvenile idiopathic arthritis?

2   A    Yes.

3   Q    You would agree with that?

4   A    Yes.

5   Q    Okay.  And then if you go to --

6        And, again, these are all your own words before you

7   even see the doctor, is that correct?

8   A    Yes.

9   Q    And then if we go to Bates Stamp Number 7973 in Exhibit

10  63 --

11       **MR. MARTINEZ:**  Again, if you blow up the "pain

12  review" to the bottom, Ms. Sanchez?  I'm sorry, the "pain" --

13  not the "Family history" but the top.

14  Q    Okay, you see a "pain review" and it says "Please circle

15  where you have had pain in the past week."

16       Once again this is you or your daughter filling out

17  this form, is that correct?

18  A    Yes.

19  Q    Okay.  And you or your daughter circle multiple areas

20  where there is joint pain, is that correct?

21  A    Yes.

22  Q    Okay, and if we look at the diagram we look where the neck

23  is circled, is that right?

24  A    Uh-huh (yes.)

25  Q    The back is circled, correct?

Gonzalez - Cross / By Mr. Martinez                98

1    A    Yes.

2    Q    Okay, and this is based upon complaints that have been

3    going on for the last two years with Elijah?

4    A    Yes.

5    Q    Okay.  And then we go on and we have both shoulders are

6    circled?

7    A    Yes.

8    Q    Okay.  Both elbows are circled?

9    A    Uh-huh (yes.)  Yes.

10   Q    We have his ankle, his right ankle that is circled?

11   A    Yes.

12   Q    Okay, and then we have both his hands that are circled as

13   well?

14   A    Yes.

15   Q    Okay.  Do you have any -- so there is obviously multiple

16   joint symptoms going on with Elijah that have been going on for

17   two years prior to this time that you saw Dr. Zamora, is that

18   correct?

19   A    Yes.

20   Q    This wasn't based upon one injury where he went in for

21   just lower back pain, right?

22   A    No.

23   Q    Okay.  And in addition to that you say "duration" -- to

24   the right of that "duration of the pain" you write down in your

25   own words, before Dr. Zamora sees you, that it's "all day."

Gonzalez - Cross / By Mr. Martinez                    99

1   A     All day.

2   Q     Correct?

3   A     Uh-huh (yes.)  Yes.

4   Q     Okay, you don't have any reason to dispute the records on

5   something that you wrote?

6   A     Yes.

7   Q     Okay.  And we know now that it's not just the lower back

8   pain that you went in for an injury, is that right?

9   A     No.  Yes.

10  Q     Okay.  And then the quality of pain that you wrote in

11  here, I guess, this is, again, I guess, for the last two years,

12  was not dull, but it was sharp pain that would go on all day

13  with Elijah Perez?

14  A     Yes.

15  Q     Okay.  Once again, while you're not a doctor, would this

16  maybe give a doctor an indication that somebody had --

17  A     Rheumatoid.

18  Q     Thank you very much.

19        And then aside from this diagram we talked about the

20  morning stiffness at the bottom and this is the morning

21  stiffness that you said had been going on for two years, at

22  least for three hours at a time, is that correct?

23  A     Yes.

24  Q     Okay.  And you put in here "if yes, where?" and you or

25  your daughter wrote "The hand, arms and shoulders," is that

Gonzalez - Cross / By Mr. Martinez                    100

1    correct?

2    A    Yes.

3    Q    So for two years before Elijah Perez went to go see

4    Dr. Zamora he had already been suffering from morning stiffness

5    for three hours at least in his hand, arms and shoulders, is

6    that correct?

7    A    Yes.

8    Q    Once again, this is not the lower back pain that you said

9    that you initially went in to see Dr. Zamora and then he

10   treated everything else, is that right?

11   A    Yes.

12   Q    You, in fact, went in to see Dr. Zamora so he could treat

13   all these symptoms that you put down on paper yourself, is that

14   correct?

15   A    Yes.

16   Q    And then if we go into your family history, which was also

17   written by you or your daughter, is that right?

18   A    Yes.

19         **MR. MARTINEZ:**  If you go to the bottom of that,

20   Ms. Sanchez.

21   Q    We have his father who is still living, I'm assuming?

22   A    Yes.

23   Q    Okay, and we have his health down there, and he's got

24   rheumatoid arthritis, is that correct?

25   A    Yes.

Gonzalez - Cross / By Mr. Martinez                    101

1   Q    Okay, and then you, the mother, is that correct, you also

2   have rheumatoid arthritis?

3   A    Yes.

4   Q    Okay, and then we have all of these signs or symptoms for

5   two hours in multiple joints indicating maybe the same issues

6   that you have.

7   A    Uh-huh (yes.)

8   Q    Do you think it would be reasonable before you even see

9   the doctor that some of the doctors in Dr. Zamora's office

10  could have a sign, indication or symptoms of rheumatoid

11  arthritis?

12  A    Yes.

13  Q    Would it also be the same sign or symptoms of juvenile

14  idiopathic arthritis?

15  A    Yes.

16  Q    Do you know if any of the doctors prior to the time that

17  you saw Dr. Zamora went in there and basically claimed the same

18  issues with your son?

19  A    Can you repeat the question?

20  Q    Any of the doctors, prior to the time that you saw

21  Dr. Zamora, did they claim or diagnosis the same issues with

22  Elijah Perez?

23  A    I'm assuming that Dr. De Dios send me to Zamora to confirm

24  the rheumatoid arthritis.

25  Q    Okay, so he -- already indication of that --

Gonzalez - Cross / By Mr. Martinez                    102

1    A    Well, he -- I think he wanted confirmation with the

2    specialist.

3    Q    And this is who your primary --

4    A    Primary.

5    Q    -- care physician sent you to?

6    A    Yes.  Yes.

7    Q    Okay.  And, in fact, the records show, and I don't think

8    anybody disputes this, that you saw Dr. Zamora with Elijah for

9    two and a half years, is that correct?

10           And I'll bring up those records here in just a

11   minute.

12   A    Okay, I'm not sure about the years, but yes.

13   Q    Let's first go to Exhibit 61.

14           **MR. MARTINEZ:**  And if I could get you to bring up

15   Bates Stamp Number 18971, please?

16   Q    And if you go to "Subjective" we're talking about --

17           **MR. MARTINEZ:**  Let's go to the top and make sure that

18   we're identifying this correctly.

19   Q    This is for Elijah Perez, is that correct?  That's your

20   son.

21   A    Yes.

22   Q    It says Patient Elijah Perez?

23   A    Yes.

24   Q    Okay.  And this is at Dr. De Dios's family clinic, is that

25   correct?

Gonzalez - Cross / By Mr. Martinez                103

1   A    Yes.

2   Q    Okay, and we're going back to the date of July the 28th of

3   2013, is that right?

4             **THE COURT:**  January 28th.

5             **MR. MARTINEZ:**  I'm sorry, January 28th, thank you,

6   Judge.

7   **BY MR. MARTINEZ:**

8   Q    I'm sorry, do you see that to the right?

9   A    Yes.  But in 20 -- in 2013 Elijah was -- he wasn't 18, was

10  he?

11  Q    Correct, he wasn't 18.

12  A    Yeah, he wasn't 18.

13  Q    And so the Prosecutor pointed out maybe a problem in

14  typing in something to this record --

15  A    Yes.

16  Q    -- but even if you look at Dr. De Dios's records, he's not

17  18, is that correct, at that time?

18  A    Yes.

19  Q    Do you think anybody would intentionally do that?

20  A    Well, it says "Age of 12," he was 12 years old.

21  Q    The patient -- to the left there is a mistake there, is

22  that correct?

23  A    Yes.

24  Q    Okay.  And to the right it actually says "12 years old."

25  A    Twelve years old, yes.

1  Q    Right?  Okay.

2          And then you don't have any reason to dispute that

3  that was a mistake that was made to Dr. De Dios, is that right?

4  A    Well, apparently it is a mistake because he was 12 and he

5  -- there was no way he could have been 18 in 2013.

6  Q    Correct.  But no reason to dispute that that's a simple

7  mistake?

8  A    Yes.

9  Q    Okay.  And then when we talk about in the "Subjective"

10 part of this document we're talking about Elijah and he's seen

11 doctors, obviously, before he was 13, is that right?

12 A    Yes.

13 Q    And, in fact, you know, he had had some issues as he was

14 growing up, is that right?

15 A    Yes.

16 Q    Okay.  And these issues, as we see it, we're going to see

17 with Dr. Makary, were pretty consistent?  I mean, you saw

18 Dr. Makary on a regular basis for some of the problems that

19 Elijah had.

20 A    Remind me who Dr. Makary is.

21 Q    Dr. Makary, and I'll show you his records, he was actually

22 an ophthalmologist.  Do you remember him?

23 A    I don't remember him.

24 Q    And we'll get into those records, okay?

25 A    Okay.

Gonzalez - Cross / By Mr. Martinez                          105

1   Q    So back in -- on 01/28 of 2013 we have "muscle spasm of

2   the right shoulder blade, but it happens on both sides, no

3   injuries," is that correct?

4   A    Yes.

5   Q    So obviously the injury that you're talking about happened

6   sometime after January of 2013?

7   A    This was -- this was the reason that we went to go see

8   Dr. De Dios --

9   Q    Uh-huh (yes.)

10  A    -- so he wrote that he's having problems associated with

11  muscle spasms.

12  Q    Correct.

13  A    Yes.

14  Q    Around -- and pain in the right shoulder blade, but it

15  happens -- so it's what they call "bilateral pain" so it

16  happens on both sides of the shoulder blade, is that correct?

17  A    Yes.

18  Q    Okay, and that, in fact, is one of the things that you

19  circled, you or your daughter circled when you went to go see

20  Dr. Zamora, is that right?

21  A    Yes.

22  Q    Pain in both shoulder blades?

23  A    Yes.

24  Q    Along with pain in both shoulders, and the jury can refer

25  to those specific exhibits, is that right?

Gonzalez - Cross / By Mr. Martinez                    106

1  A    Yes.

2  Q    In addition to that you had "a rash around the area of the

3  arms together with the face and neck," is that right?  Do you

4  see at the bottom there it says "Skin examination?"

5  A    Yes.

6  Q    We may have to get out of there.

7        So if you see here it says "Skin exam shows

8  keratosis, follicular rash around the area of the arms,

9  together with the neck."

10        Do you know whether or not a rash, in addition to

11  arthritis, could be a sign of psoriatic arthritis as well?

12  A    No, I did not know.

13  Q    Okay, would you rely on an expert in this field to

14  determine that?

15  A    Yes.

16  Q    Okay.  And so you see Dr. De Dios in January of 2013 and

17  then the next visit we have with Dr. De Dios comes on Bates

18  Stamp Number 18969, so it's three months later, is that

19  correct?

20  A    I can't see this one.

21  Q    Oh, I'm sorry, so if you go to the top --

22        **THE COURT:**  Can you repeat it?

23        **MR. MARTINEZ:**  I'm sorry, 18969.

24  //

25  //

1    **BY MR. MARTINEZ:**

2    Q    So if you go to the top, and the date of the visit is, in

3    fact, 04/11 of 2013, is that correct?

4    A    Yes.

5    Q    Okay, and again we still have the same mistake that you

6    see over here to the age where he's 18, is that right?

7    A    Yes.

8    Q    And then we have a Chief Complaint of a blister on the

9    left foot, fever, body aches, pain on the back and the head, is

10   that right?

11   A    Yes.

12   Q    Okay, and then when you go down into the "Subjective"

13   portion of this, and the first two lines, again, this is before

14   we see Dr. Zamora, "He develops fever, chills starting about

15   three days ago," is that correct?

16   A    Yes, that's what it says.

17   Q`   Okay.  And then he continues on the second line to have

18   that neck pain and back pain and shoulder pain?

19   A    Uh-huh (yes.)  Yes.

20   Q    Okay.  These are the same symptoms that you had been

21   talking about or filling out with Dr. Zamora months, six months

22   before we actually get into his office, is that correct?

23   A    That the pain was continuous.

24   Q    That's correct.

25   A    Yes.

Gonzalez - Cross / By Mr. Martinez                    108

1   Q    Is that right?

2   A    Yes.

3   Q    Okay.  And then when you go down to the "Objective" this

4   is where the doctor comes in and he talks about, in the last

5   three lines, there is "a muscle spasm, several trigger points

6   right around the area of the neck, around the area of the lower

7   back," is that correct?

8   A    Yes.

9   Q    Okay.  Have you ever heard of fibromyalgia?

10  A    Yes.

11  Q    Okay.  Have you ever heard of trigger points associated

12  with fibromyalgia?

13  A    Yes.

14  Q    Okay.  So your doctor, before you even go see Dr. Zamora,

15  is not only talking about rheumatoid arthritis, correct?

16  A    And fibromyalgia.

17  Q    Or juvenile idiopathic arthritis, correct?  So there's

18  already two diagnoses by your former doctor before you see

19  Dr. Zamora, is that right?

20  A    Yes.

21  Q    And then he's also talking about fibromyalgia?

22  A    Yes.

23  Q    Okay.  Do you remember having that conversation?

24  A    I remember having that conversation.

25  Q    All right.  So before -- six months before Dr. Zamora is

1   even seen, there are some serious indications of what they call

2   "JIA," right?

3   A    Yes.

4   Q    RA, correct?

5   A    Yes.

6   Q    As well as fibromyalgia?

7   A    Yes.

8   Q    Okay.  And so we're going to go through these records, and

9   I know it's going to take some time, but this jury needs to see

10  some of the records that you went through even prior to the

11  time you saw Dr. Zamora, correct?

12  A    Yes.

13  Q    So then if we go to Exhibit 61.  So you see him in

14  January, you see him in April.

15           **MR. MARTINEZ:**  If we come into Bates Stamp Number

16  18967?

17           If you go to the date of service?

18  Q    So you see him one month later, Dr. De Dios one month

19  later, is that correct?

20  A    Yes.

21  Q    Okay.  And then if you go down to the "Chief Complaint,"

22  this is on the -- we're still talking about neck pain, is that

23  correct?

24  A    Yes.

25  Q    Okay, and then if you go down to -- in the "Subjective"

1  part in the last sentence, it talks about including "headache

2  and neck pain" there at the bottom, among a bunch of other

3  things in the Subjective, so your son is still continuing to

4  suffer from indications --

5  A    Head and neck --

6  Q    -- of fibromyalgia, juvenile idiopathic arthritis,

7  rheumatoid arthritis, even before he gets to see Dr. Zamora, is

8  that correct?

9  A    Yes.

10  Q    Okay, and then if we go to the "Objective," if you go to

11  the last two lines in the Objective part of this patient

12  record, we're talking about "straight leg is raising" at the

13  bottom, "negative, but very significant stiffness and pain," is

14  that correct?  Do you see that?

15  A    Yes.

16  Q    Once again, your son is still suffering from all these

17  things we just discussed prior to seeing Dr. Zamora?

18  A    Yes.

19  Q    And in fact, there -- the last sentence is "There are no

20  signs of any depression, anxiety, nor any hallucinations, nor

21  any kind of substance abuse suspicion."  Is that correct?

22  A    Yes.

23  Q    Do you know whether or not he's ever -- your son has ever

24  used any kind of illicit drugs?

25  A    Yes, he has.

Gonzalez - Cross / By Mr. Martinez                    111

1   Q    Okay.  What kind of drugs has he used?

2   A    Marijuana.

3   Q    Have you seen that in some of the records?

4   A    Yes.  I've taken him to the doctor and they've told me.

5   Q    For his marijuana use?

6   A    Yes.

7   Q    Okay.  And the type of marijuana that he's using, is it a

8   very potent type of marijuana?

9   A    I'm not sure.  I wasn't told that.

10  Q    Okay.  Just that he's using marijuana?

11  A    Yes.

12  Q    And he's been using marijuana since how long?

13  A    I think once all this pain was coming and nothing was

14  helping I think he turned to marijuana.

15  Q    Okay.  Do you know whether or not these doctors prescribed

16  medication that he just did not take and decided to smoke

17  marijuana instead?

18  A    He was taking some of the medication and then I think he

19  just turned to it because I think he said it helped him with

20  the pain.

21  Q    Okay.  Do we know whether or not he was compliant with

22  everything that all these doctors ordered for him?

23  A    I'm not sure about all the medications.

24  Q    Okay.  You would rely on the records for that?

25  A    Yes.

Gonzalez - Cross / By Mr. Martinez                    112

1   Q    No dispute with any of the records?

2   A    No.

3   Q    So we see Dr. De Dios in January and April and May, and

4   then if we go to Bates Stamp Number 18965, so if we go to the

5   date of service we then see Dr. De Dios in August of 2013.  Is

6   that correct?

7   A    Yes.

8   Q    Okay.  And we go to the chief complaint there at the

9   bottom -- I mean at the middle of the page, excuse me, and

10  still again we're talking about complaining of pain on both

11  shoulders and neck, headaches painful and swollen in right

12  pointy finger.  Is that correct?

13  A    Yes.

14  Q    Okay.  So now his problems have extended from the

15  shoulders and at one point in the other records to the back,

16  the neck, headaches, and now it's extended to his --

17  A    To his --

18  Q    -- fingers, is that correct?

19  A    To his fingers.

20  Q    And is that one of the things --

21  A    His hands.

22  Q    -- that you circled at the time he saw Dr. Zamora, both

23  these?

24  A    Yes.

25  Q    Do you know whether or not bilateral pain in somebody's

Gonzalez - Cross / By Mr. Martinez                          113

1    joints here in the fingers is a sign or indication of

2    rheumatoid arthritis?

3    A    Yes.

4    Q    You've been told that before?

5    A    Yes.

6    Q    Okay.  And once again, you rely on the experts in order to

7    determine that?

8    A    Yes.

9    Q    And then when you go to the subjective part, you or your

10   son continue to talk about this pain lasting for several

11   months, is that correct?

12   A    Yes.

13   Q    And, in fact, you went to go see a pain management

14   specialist, is that correct?

15   A    Who was the specialist?  Do you have it on record?

16   Q    I do not have that in this record.

17   A    Yes.  If it's on -- if it's there, yes.

18   Q    Do you remember who the pain management specialist was?

19   A    No, I don't.

20   Q    And then if we go -- so we have now four different visits

21   in I guess seven months and then if we go to the next Bates

22   Stamp number with Dr. De Dios, 18963, and then another month

23   goes by and then we have a fifth visit in September of 2013.

24   Is that correct?

25   A    Yes.

Gonzalez - Cross / By Mr. Martinez                    114

1    Q    And again, this is prior to the first time that you saw

2    Dr. Zamora, is that right?

3    A    Yes.

4    Q    Okay.  And then once again the chief complaint in this

5    visit is continues to have a lot of pain, is that correct?

6    A    Yes.

7    Q    It's actually more intense, another work up needs to be

8    done, is that correct?

9    A    Yes.

10   Q    An MRI was ordered but it was not available at that time,

11   is that correct?

12   A    Yes.

13   Q    So you don't have a problem with these doctors ordering

14   either laboratory tests or MRIs or X-rays in order to --

15   A    No.

16   Q    Because at this point in time your son has now obviously

17   for several months, if not more than a year --

18   A    He's been in pain.

19   Q    -- suffered from this continuous pain?

20   A    Yes.

21   Q    How long prior to this was he suffering from all this

22   joint pain?

23   A    How long prior to this date?

24   Q    Let's say prior to that first visit in January was he

25   suffering from all this joint pain?

Gonzalez - Cross / By Mr. Martinez                115

1   A    With Dr. Zamora-Quezada or --

2   Q    No, in January 2013.  You didn't see Dr. Zamora-Quezada,

3   based upon the record, until October of 2013.

4   A    Until October.

5   Q    How long prior to January of 2013?

6   A    Well, on record it's been already a while --

7   Q    Right, because --

8   A    -- yes..

9   Q    -- when you went to go see Dr. Zamora you put in --

10  A    Yes.

11  Q    -- your own handwriting or your daughter's handwriting it

12  had been --

13  A    Two years.

14  Q    -- two years, correct?

15  A    Yes.

16  Q    So he had already been suffering this and you see this

17  progression getting worse?

18  A    Yes.

19  Q    Is that correct?

20  A    Yes.

21  Q    Okay.  And without getting into more details, let me just

22  point out other visits, just the dates.  So we have one in

23  September, so the fifth visit in September, is that correct?

24  A    (No audible response)

25  Q    If you go to Bates Stamp Number 18961, the next visit you

Gonzalez - Cross / By Mr. Martinez                    116

1    have with Dr. De Dios is in October, which is the sixth visit,

2    is that correct?

3    A    Yes.

4    Q    And we'll just very quickly go to the chief complaint.

5    Okay, and so now we go, we're even extending this to the left

6    shoulder, is that right?

7    A    Yes.

8    Q    Okay, so given the diagram you gave Dr. Zamora and

9    everything that's gone on with your son, obviously your son is

10   having multiple joint pain for a long time prior to even seeing

11   Dr. Zamora, is that correct?

12   A    Yes.

13   Q    And this pain is bilateral?

14   A    Yes, both sides.

15   Q    And again, signs or symptoms of what you've now studied as

16   juvenile idiopathic arthritis, RA, or even fibromyalgia trigger

17   points, correct?

18   A    Yes.

19   Q    So we have 10/1 of '13, and then if you go to the next

20   visit, we have on 18959 the next visit is basically nine days

21   later, okay, and the chief complaint is because it's still

22   extending to Elijah's fingers, is that right?

23   A    Yes.

24   Q    Okay.  All right.  And then we have the next visit, which

25   is going to be on Bates Stamp Number in Exhibit --

1            **MR. MARTINEZ:**  All these are Exhibit 61, for the

2   record, by the way, Judge.

3   **BY MR. MARTINEZ:**

4   Q   18958.  And that date of service is 10/18 of 2013, is that

5   correct?

6   A   Yes.

7   Q   Okay.  And then it's after that that you go see

8   Dr. Zamora, is that right?

9   A   After that, yes.

10  Q   Okay.  And after that you then go to see Dr. Mekrie,

11  right, after this 10/18 visit?

12  A   Okay.

13  Q   Okay.  And Dr. Mekrie is your ophthalmologist?  Do you

14  remember that now?

15  A   I don't remember.

16  Q   Okay.

17  A   No.

18  Q   Well, the chief complaint here on this day is because he's

19  got blurry vision.  Do you remember that?

20  A   No.

21  Q   And then we have visits, the next visit with Dr. Dios, if

22  you go to 18956 in Exhibit Number 61, is 11/14 of 2013, is that

23  correct?

24  A   Yes.

25  Q   Okay.  And Elijah comes in with hives all over his body

Gonzalez - Cross / By Mr. Martinez                118

1    after being injected with methotrexate, is that correct?

2    A    Yes, that's what it says.

3    Q    Okay.  And the diagnosis on the assessment on the bottom

4    is -- assessment -- where Dr. Dios talks about polyarticular

5    juvenile rheumatoid arthritis chronic unspecified, is that

6    right?

7    A    Yes.

8    Q    Okay.  Rash and other specific skin eruption?

9    A    Yes.

10   Q    Okay.  And once again, do you know whether or not rash in

11   combination with arthritis --

12   A    Yes.

13   Q    -- is considered psoriatic arthritis?

14   A    Yes.

15   Q    Okay.  So at this point in time now we have indications of

16   juvenile idiopathic arthritis, is that correct?

17   A    Do you mean we have the diagnosis for Elijah?

18   Q    No, we have signs or symptoms.

19   A    Yes.

20   Q    Right?

21   A    Yes.

22   Q    Prior --

23            **MS. FRAZIOR:**  Objection.  I've been letting him go on

24   for a little bit, but she is not saying that those are her

25   medical diagnoses.  She's not --

Gonzalez - Cross / By Mr. Martinez                    119

1              **MR. MARTINEZ:**  No.

2              **MS. FRAZIOR:**  -- a doctor.

3              **THE COURT:**  I don't think she's --

4              **MS. FRAZIOR:**  She can only rely on --

5              **THE COURT:**  I don't think she was being asked to say

6     they were her medical diagnoses.

7              **MS. FRAZIOR:**  He asked her if she had signs of these

8     different things that would lead to her diagnoses.

9              **THE COURT:**  Well, if she was told that, she can

10    answer that.

11             Go ahead.

12    **BY MR. MARTINEZ:**

13    Q    So at this point in time we've got signs or symptoms of

14    juvenile idiopathic arthritis, correct?

15    A    Yes.

16    Q    Rheumatoid arthritis?

17    A    (No audible response)

18    Q    Correct?

19    A    Yes.

20    Q    And we just need an answer for the record.  I apologize.

21    A    Oh, I'm sorry.  Yes.

22    Q    Fibromyalgia?

23    A    Fibromyalgia, yes.

24    Q    And then now we have psoriatic arthritis?

25    A    Yes.

1  Q    Okay.  And this is -- and now you've just seen Dr. Zamora

2  in the two weeks prior to this, is that correct?

3  A    Yes.

4  Q    Okay.  And then I'll represent to you that, without going

5  through each and every single record -- or would you agree with

6  me, and I'll just --

7            **MR. MARTINEZ:**  Your Honor, may I approach?

8            **THE COURT:**  Sure.

9            **MR. MARTINEZ:**  Maybe we can speed this along.

10 **BY MR. MARTINEZ:**

11 Q    I'll represent to you this is Exhibit 61 and these are the

12 rest of Dr. Dios's records.  Do you see those?

13 A    Yes.

14 Q    And so if we look at these, from all these different dates

15 that we've talked about the jury with with all these different

16 issues go from all the way from June 2014 to 2/20 of 2018, is

17 that correct?

18 A    Yes.

19 Q    Okay.  And even after you see -- or finish seeing

20 Dr. Zamora, your son is still complaining of lumbago, lumbar

21 pain, is that correct?

22 A    Yes.

23 Q    Okay.  So even after he sees Dr. Zamora and you've

24 finished seeing him, your son, as of 2018, in February of 2018

25 he's still complaining of back pain?

1   A     Yes.

2   Q     All right.  And he's got slight sciatic pain?

3   A     Yes.

4   Q     The sciatica is right in here on the back --

5   A     Yes.

6   Q     -- right?

7   A     Yes.

8   Q     And then he's also still got skin rashes?

9   A     Yes.

10  Q     Or problems with his skin --

11  A     Yes.

12  Q     -- is that correct?

13          You don't have any reason to dispute the fact that

14  even after he finishes seeing Dr. Zamora he's still having

15  issues?

16  A     Yes.

17  Q     Is he still having issues to this day?

18  A     Yes.

19  Q     At one point in time during your time with Dr. Zamora did

20  you in fact stop seeing Dr. Zamora?

21  A     Yes.

22  Q     And how long did you stop seeing Dr. Zamora for?

23  A     I don't remember the exact time.

24  Q     I'm going to bring up these records, if that's all right,

25  okay?

Gonzalez - Cross / By Mr. Martinez                    122

1    A     Yes.

2    Q     We'll start out with Exhibit 63, which is Bates Stamp

3    Number 8044.  If you go to the date of service or the

4    collection date for this lab, there is actually lab back in

5    October of 2014, is that correct?

6    A     Yes.

7    Q     Okay.  And then if you go to Bates Stamp Number 8059 --

8    okay, let me stop there.  So in October of 2014, that's the

9    last visit that I have of you seeing Dr. Zamora before this

10   break.

11   A     In October of '14.

12   Q     Right.

13   A     That was the last time before this one, when he was 17?

14   Q     When we start -- let's make sure we have this timeline

15   correct.  So we see -- the first time you see Dr. Zamora is in

16   October of 2013, is that correct?

17   A     '13.

18   Q     Okay.  And then you see Dr. Zamora all the way to October

19   of 2014, where you see this lab, is that correct?

20   A     Yes.

21   Q     Okay.  And then the next time you see Dr. Zamora is in

22   9/17 of '15.  Okay?  And if we can go to Bates Stamp Number

23   8058 in Exhibit 63.  Okay, so you would agree with me that

24   there is -- from October 2014 to September of 2015 there is a

25   year break that you didn't see Dr. Zamora, is that correct?

Gonzalez - Cross / By Mr. Martinez                123

1   A    Yes.

2   Q    Okay.  And did you notice during that time whether or not

3   Elijah's problems flared up when they didn't see Dr. Zamora?

4   A    I think the pain was continuous.  I think that's why we

5   might have returned back to see him.

6   Q    Okay.  And so --

7   A    Yes.

8   Q    -- you stopped seeing him and then -- and so in between

9   this time -- and if we can go to Exhibit 61, 18945, the date

10  here is 3/23/15.

11  A    Yes.

12  Q    Okay.  And that is -- during that time, that is

13  approximately five months after you stopped seeing Dr. Zamora,

14  is that right?

15  A    Yes.

16  Q    Okay.  And then approximately it's six months before you

17  start seeing him again, is that correct?

18  A    Six months after this we went back to Zamora?

19  Q    Right.

20  A    Yes.  If it's on record, yes.

21  Q    These are part of the records that I've shown you --

22  A    Yes.

23  Q    -- and I've shown the jury.

24       Okay, and let's look at, if we go down to the

25  subjective, during this time do you know whether or not

Gonzalez - Cross / By Mr. Martinez                    124

1   Elijah's problems started flaring up?

2   A     Yes, that's what we wrote down.

3   Q     Okay.  So you see Dr. Zamora for a period of a year, is

4   that correct?

5   A     Uh-huh.

6   Q     You stop seeing Dr. Zamora for a period of five months,

7   right?

8   A     Yes.

9   Q     You go back to your original doctor because you stopped

10  treatment for whatever reason?

11  A     Yes.

12  Q     Okay.  And then all of his problems start to flare up

13  again, is that correct?

14  A     Yes.

15  Q     Okay.  And then you come back and you see Dr. Zamora

16  approximately six months later on September the 17th of 2015,

17  is that correct?

18  A     I think the thing is that the pain has never subsided.  He

19  still has pain.

20  Q     So he continued to have pain?

21  A     Yes.

22  Q     But you went back to this doctor saying -- let's see what

23  is in this record.  He has not been on treatment for rheumatoid

24  arthritis.

25  A     Yes.

Gonzalez - Cross / By Mr. Martinez                125

1   Q    So he has been having flare up and activity of rheumatoid

2   arthritis, is that correct?

3   A    Yes.  He didn't want to take it because he didn't see any

4   help in it.

5   Q    Okay.  But when he stopped taking the medication --

6   A    He still continued to --

7   Q    -- and stopped seeing Dr. Zamora --

8   A    He still had --

9   Q    -- it started to flare up again.

10  A    He still had it, yes.

11  Q    Well, the words that are used here is it started --

12  A    Were flared up, yes.

13  Q    Meaning it got worse, is that right?

14  A    That's -- yeah, that's what it says.

15  Q    So when this patient, when Elijah stopped seeing

16  Dr. Zamora his pain and his flare up activity got worse with

17  his rheumatoid arthritis, based upon this record?

18  A    Yes.

19  Q    You're not here to say that Dr. Zamora intentionally

20  misdiagnosed your son, are you?

21  A    (No audible response)

22  Q    After all these records and everything that's been shown

23  to you.

24  A    It shows that -- we have a family history of rheumatoid.

25  That's why when I got the diagnosis I automatically assumed

1   that he has it.  We all have it.

2   Q    Okay.  Would any doctor have reason to believe that there

3   were signs or symptoms, based upon all the records that we've

4   seen prior to seeing Dr. Zamora?

5   A    In leads that way, yes.

6            **MR. MARTINEZ:**  No further questions, Judge.

7            **THE COURT:**  Mr. Sully, are you going to have some

8   questions?

9            **MR. SULLY:**  No, your Honor, I don't have any

10  questions for this witness (indisc.).

11           **THE COURT:**  Mr. Alvarez, do you have any questions of

12  this witness?

13           **MR. ALVAREZ:**  I have no questions for this witness,

14  your Honor.

15           **THE COURT:**  Mr. Pena, do you have any questions of

16  this witness?

17           **MR. PENA:**  No questions, your Honor.

18           **THE COURT:**  Okay.

19           **MS. FRAZIOR:**  Redirect, your Honor?

20           **THE COURT:**  How long is this going to take?

21           **MS. FRAZIOR:**  Maybe five minutes.

22           **THE COURT:**  Go ahead.

23  //

24  //

25  //

**REDIRECT EXAMINATION**

**BY MS. FRAZIOR:**

Q    Ms. Gonzalez, you answered yes to a lot of the questions

presented to you by counsel, right?

A    Yes.

Q    You were looking at medical records to do that, is that

right?

A    Yes.

Q    Some of those medical records were Dr. Zamora-Quezada's

medical records, correct?

A    Yes.

Q    And in looking at the medical records, are you assuming

that the information is correct?

     **MR. MARTINEZ:**  I'm going to object to leading.

     **THE COURT:**  She is leading.

**BY MS. FRAZIOR:**

Q    Do you know if the information is correct or not?

A    Apparently there are some mistakes on the paper, yes, and

on the ages, yes.

Q    And that -- to be clear --

     **THE COURT:**  And the one that we saw was the 18 and

that was it?

     **THE WITNESS:**  Yes.

//

//

1    **BY MS. FRAZIOR:**

2    Q    There was the 18-year-old mistake in a previous doctor's

3    records, correct, and then there was the female/male mistake in

4    Dr. Zamora's records?

5    A    Yes.

6    Q    Okay.  Now I want to show you what's marked as

7    Government's Exhibit, I think it's 55.  This is the Dr. Zamora-

8    Quezada record you looked at earlier.  Can you see it on your

9    screen?

10   A    Yes.

11           **UNIDENTIFIED SPEAKER:**  I can't see it on my screen.

12   There you go.

13   **BY MS. FRAZIOR:**

14   Q    This is the -- we need to actually have Page 192.  Let's

15   take a look at this record here.  Do you see -- let's highlight

16   the first section of this document.  Yes.  Do you see under

17   Elijah E. Perez that the line under patient name is somewhat

18   missing?

19   A    Yes.

20   Q    Do you see under the date of birth that the line is

21   somewhat missing?

22   A    Yes.

23   Q    Do you see any other places where that's the case?

24   A    Yes.

25   Q    Do you see down under two years where the line under two

 1  years is missing under the two and missing under the "s"?

 2  A    Yes.

 3  Q    Do you see over diagnosis, over to the right-hand side of

 4  the page do you see where it says diagnosis given?

 5  A    Yes.

 6  Q    I'll wait till the highlighting catches up.  Okay.  And do

 7  you see where there is some area of the line underneath it is

 8  missing?

 9  A    No diagnosis, yes.

10  Q    Now, I want to take this to you, because it's a little

11  easier to see on this document.  This is a paper printout of

12  Government's C55.  Do you see on this document another area

13  that has a long strip of a different color on the paper?

14  A    Yes.

15  Q    Where is that at?

16  A    Underneath the symptoms.

17  Q    Okay.  Is it underneath the joints feel stiff, having

18  difficulty getting up from bed?

19  A    Yes.

20  Q    What does that look like to you?

21  A    It was whited out.

22  Q    Did you make those corrections?

23  A    No, ma'am.

24  Q    Do you have any memory of making those corrections?

25  A    No, ma'am.

1  Q    Looking at this paperwork -- did your daughter make those

2  corrections?

3  A    No.

4  Q    Okay.  Looking at this paperwork, and look at it real

5  closely before we get to this next question, do you see places

6  on the paperwork where the lettering and the handwriting looks

7  different?

8  A    Yes.

9  Q    Where is that?

10 A    On the symptoms and the yes.  I can tell my handwriting

11 from somebody else's.

12 Q    Where is your handwriting?

13 A    The scribbled one.

14 Q    Which part?  Can you read what your handwriting is?

15 A    Where it says Elijah's name, the date of birth,

16 Dr. De Dios, no diagnosis in two years, that is mine.

17 Q    Okay.

18 A    The pretty writing is not mine.

19 Q    The joints feel stiff, do you know whose it is?

20 A    No.  Well, that's why I thought it was my daughter,

21 because I don't write nice.

22 Q    Do you know who made these changes to this document?

23 A    No.

24         **MS. FRAZIOR:**  I pass the witness.

25         **THE COURT:**  Do you have any questions?

1          **MR. MARTINEZ:**  No questions, Judge.

2          **THE COURT:**  Does anybody else have any questions?

3      **(No audible response)**

4          Ms. Gonzalez, you may go ahead and step down.  Thank

5  you very much.

6      **(Witness excused)**

7          Ladies and gentlemen, we're going to go ahead and

8  break for lunch and if you would be back so we can start at

9  1:30 and we thank you for your patience and your attentiveness

10 and we'll see you at 1:30.

11          Please rise for the jury.

12     **(Jurors exit courtroom at 12:24 p.m.)**

13          **THE COURT:**  We'll see you all at 1:30.  Do you all

14 have your witness ready, next witness ready to go?

15          **MS. FRAZIOR:**  Yes.  We have two more witnesses.

16 Actually, we have three more witnesses already ready to go.

17          **MR. PENA:**  Do we have the names?  (Indisc.)

18          **MS. FRAZIOR:**  (Indisc.)

19          **MR. PENA:**  (Indisc.)

20          **MS. FRAZIOR:**  Elizabeth Gonzalez already testified,

21 Jessica Farias, and we have Dr. Alvarez (indisc.) and then

22 Patty Escoe, Angela Christensen, and Silvia Carrillo.

23          **THE COURT:**  And that's all you have as witnesses?

24          **MS. FRAZIOR:**  Yes, today.

25          **THE COURT:**  Oh, today.  Not like --

1          **MS. FRAZIOR:**  Correct.

2          **THE COURT:**  -- well, we probably won't get to all of

3     them today, but --

4          **MS. FRAZIOR:**  Yes.

5          **THE COURT:**  -- those are your next ones?

6          **MS. FRAZIOR:**  Yes.  And we just want to make sure

7     (indisc.)

8          **THE COURT:**  Yes, we'll see you all at 2:30 -- at

9     1:30.

10         **(Morning session concluded at 12:26 p.m.)**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                          **December 6, 2019**

          Signed                                      Dated


*TONI HUDSON, TRANSCRIBER*