UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  7:18-CR-00855 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | McAllen, Texas |
| | ) | |
| JORGE ZAMORA-QUEZADA, | ) | Thursday, December 12, 2019 |
| MEISY ANGELICA ZAMORA, | ) | |
| ESTELLA SANTOS NATERA, | ) | (9:21 a.m. to 12:17 p.m.) |
| FELIX RAMOS, | ) | |
| | ) | MORNING SESSION |
| Defendants. | ) | |


JURY TRIAL - DAY 7

BEFORE THE HONORABLE RICARDO H. HINOJOSA,
UNITED STATES DISTRICT JUDGE



**APPEARANCES:**           See next page


Court Interpreter:      Steven Mines (Standby)

Court Recorder [ECRO]:  Antonio Tijerina

Transcribed By:         Exceptional Reporting Services, Inc.
                        P.O. Box 8365
                        Corpus Christi, Texas 78468
                        361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

<u>**APPEARANCES FOR:**</u>


Plaintiff:                    ADRIENNE FRAZIOR, ESQ.
                              EMILY GURSKIS, ESQ.
                              REBECCA YUAN, ESQ.
                              CYNTHIA VILLANUEVA, ESQ.
                              Office of the United States Attorney
                              1701 W. Business Hwy. 83
                              Suite 600
                              McAllen, TX 78501


Jorge Zamora-Quezada:         BENIGNO TREY MARTINEZ, III, ESQ.
                              TOMAS TIJERINA, ESQ.
                              STEPHEN LEE, ESQ.
                              1201 E. Van Buren St.
                              Brownsville, TX 78520


Meisy Zamora:                 CHRISTOPHER SULLY, ESQ.
                              5804 N. 23rd St.
                              McAllen, TX 78504


Estella Natera:               AL ALVAREZ, JR., ESQ.
                              4409 N McColl Rd
                              McAllen, TX 78504


Felix Ramos:                  JAIME PENA, ESQ.
                              Pena Garza PLLC
                              900 Kerria Ave
                              McAllen, TX 78501

3

1                              INDEX

2    GOVERNMENT'S WITNESSES    DIRECT    CROSS    REDIRECT    RECROSS

3    EMILIA DULGHERU

4     BY MS. YUAN           13                     133

5     BY MR. LEE                        61/68                 138

6     BY MR. SULLY                      102                   139

7     BY MR. ALVAREZ                    105                   --

8     BY MR. PENA                       105                   140

9

10   DEFENSE EXHIBIT                          RECEIVED    NOT RECEIVED

11   299                                        114           119

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          **McAllen, Texas; Thursday, December 12, 2019; 9:21 a.m.**

2                              **Call to Order**

3            **(Official Interpreter Utilized for Translation)**

4            **(Outside the presence of the jury)**

5                **COURT SECURITY OFFICER:**  All rise.

6            **THE COURT:**  Please be seated.  You-all needed to

7    discuss some things outside the presence of the jury.  What are

8    they?

9            **MR. MARTINEZ:**  Yes, Judge.  Trey Martinez on behalf

10    of Dr. Quezada.

11            Judge, we have talked about scheduling for next week

12    and specifically we talked about our expert coming in next

13    week.  He's available next week.  He is not available starting

14    on the 20th through the 4th of January.  We asked the

15    Prosecution if we could take him out of turn in order to

16    accommodate this expert's schedule.  I tried to contact them

17    yesterday because I thought if there was an agreement that

18    could be made, and then I was informed this morning that

19    they're not going to agree to that.

20            **MS. FRAZIOR:**  Your Honor, here's why.  We -- the

21    reason is unavailability of their witness because he's got

22    vacation plans scheduled.  So do all of our witnesses during

23    the Christmas holiday.  Our doctors have rearranged their

24    schedules numerous time to be able to accommodate this.  Our

25    expert has rearranged his schedule, too.  Everybody is kind of

5

1   unavailable during this period.  They had the ability to

2   subpoena him; they haven't done that, they refused to do that.

3   It seems to me that we're trying to create an appellate issue

4   when I'm not even clear that they're going to call that

5   witness.  We haven't received any report --

6           **THE COURT:**  I think they were saying that they are

7   going to call the witness and they just want to do it now.

8           **MS. FRAZIOR:**  No -- well, one thing that Mr. Martinez

9   said to me is that if he's not able to call the witness out of

10  order he wants to proffer to the Court for the record what his

11  witness will testify to and then not call him.

12          **MR. MARTINEZ:**  Judge, what I said was if, for some

13  reason he's not available and they don't agree to take him out

14  of turn, and for some he's not available then I would have to

15  make a record of it, but --

16          **THE COURT:**  Well, I don't understand why he can't

17  appear by a deposition, a videotaped one, you-all can do that

18  whenever you want to.

19          **MR. MARTINEZ:**  And take his deposition next week

20  during trial?  And I'm --

21          **THE COURT:**  Yes.  I mean, at some point.

22          **MR. MARTINEZ:**  Well, your Honor --

23          **THE COURT:**  Before he goes on vacation or whatever it

24  is he's doing.

25          I mean, you did know what the schedule was.  You did

1   know what was going to happen next week.  I mean it's --

2         MR. MARTINEZ:  And that's why I'm asking for the

3   Court to basically allow him to take out of turn, and I could

4   research this issue for the Court, as well.  I think the Judge

5   has the discretion to allow --

6         THE COURT:  I have the discretion, yes, I have a lot

7   of discretion, I understand that.  The question is it's going

8   to look kind of weird to do it that way, so I'm suggesting a

9   deposition that you-all -- both sides could be present for the

10  deposition at a time that's convenient for everybody, and if

11  there's objections made there it will be stopped and I will

12  rule on the objection before we allow him to continue with

13  whatever he said or didn't say.

14        MR. MARTINEZ:  And so would it be, I guess, a video-

15  taped deposition --

16        THE COURT:  It would be Direct and Cross examination.

17  I mean, that's -- yes, that --

18        MR. MARTINEZ:  And then we submit that videotaped

19  deposition to the Court in order for the Court to --

20        THE COURT:  It would be played to the jury.

21        MR. MARTINEZ:  My question is, Judge --

22        THE COURT:  As far as the objections, we'd have some

23  discussion outside the presence of the jury and if I rule for

24  or against him or whatever, (indisc.) you can't afford them, I

25  will say take that off or whatever, we'll work it out.

1          **MS. FRAZIOR:**  We could edit the video.

2          **THE COURT:**  Right, we can edit the video or we can do

3     whatever we're going to do.

4          **MR. MARTINEZ:**  So we would ask that the --

5          **THE COURT:**  And any more than what we do when there's

6     an objection in front of a jury and the person has already said

7     something sometimes.

8          **MR. MARTINEZ:**  So we'd ask that the videotaped

9     deposition be done next week.

10         **THE COURT:**  Well, it's up to you-all to decide.  I

11    mean, it's your problem --

12         **MR. MARTINEZ:**  Well, I'm asking --

13         **THE COURT:**  -- because he's not available according

14    to you.  Everybody knew how long this case was going to last so

15    it doesn't come as a surprise to you-all that somehow his

16    vacation might interfere, everybody else's time is interfering

17    with that also, but he's your witness, you figure out how to

18    get him there or here and get it done the way I suggested.  But

19    I don't -- it would look kind of weird in the middle of their

20    case to have a witness come here and you start off and --

21         **MS. FRAZIOR:**  It would just be very confusing to the

22    jury.

23         **THE COURT:**  I think so, too, and so, therefore, I'm

24    suggesting this, and I think it's a very nice suggestion.  Most

25    people would say "Sorry, he needs to be here.  We all would

8

```
1    love to be on a vacation during that period of time, but we're

2    not," so certainly he gets paid for it, the rest of us get our

3    usual salary.

4            MR. MARTINEZ:  Yes, Judge.

5            THE COURT:  Okay.

6            MR. MARTINEZ:  And so I hope -- by the end of the day

7    can we at least agree to a date --

8            THE COURT:  But it depends on your discussion.  I'm

9    not here to tell you what days or whatever, you-all discuss it

10   among yourselves.  It is inconvenient for the Government

11   because they're going to have to do something that they weren't

12   planning on doing timewise.

13           MR. MARTINEZ:  I think it's going to be inconvenient

14   for everybody, Judge, if I have to go take a deposition --

15           THE COURT:  Well, it wouldn't be inconvenient if you

16   got your witness to show up when the witness should show up,

17   and if he had been subpoenaed he'd have to show up, but you

18   didn't subpoena him.

19           MR. MARTINEZ:  I'm not going to subpoena my own

20   expert witness, Judge.  But the schedule --

21           THE COURT:  Well, if you want the person to show up I

22   guess you would because I could easily say "Sorry," I think a

23   lot of Judges I know, even in this District, would say "Sorry,

24   that's your problem, you get that person here."

25           MR. MARTINEZ:  Thank you, Judge.
```

1            A second issue that we have, Judge is there is a

2    doctor that's going to be called today who was on the witness

3    list for today, Dr. Angela Christensen.

4            There was another patient that was disclosed for the

5    first time on November the 12th in an exhibit list, and this

6    was three weeks before trial was set to begin.  Of course, with

7    a patient like that I don't have time to issue the 17(c)

8    subpoenas for records that were done prior to this visit or

9    after that visit, much less anybody comply with that.  I have

10   asked the Government if they would -- this is not a witness --

11   or a patient that was in the Indictment in the substantive

12   account, the conspiracy account.  We don't have complete data

13   information for this patient so I have asked that --

14           **THE COURT:**  But the records would be your records,

15   your client's records.

16           **MR. MARTINEZ:**  We have our own client records.

17           **THE COURT:**  Okay.

18           **MR. MARTINEZ:**  Our patient records.  We don't have

19   the opportunity to go get records from any doctors that she saw

20   prior to Dr. Zamora or after Dr. Zamora, and those have been

21   important throughout this trial.

22           **THE COURT:**  Well, you do have that opportunity

23   because you can go ahead and try to get them.

24           **MR. MARTINEZ:**  Okay.  Judge, the last time we started

25   the 17(c) subpoenas it took a month just to get those signed

1    and then it takes another two months in order to get any kind

2    of records from these doctors.

3              **THE COURT:**  Why would it take two months?

4              **MR. MARTINEZ:**  Because that's been basically what

5    we've been working with.

6              **THE COURT:**  Because that's your agreement that it

7    takes two months?

8              **MR. MARTINEZ:**  No, I think it --

9              **THE COURT:**  Okay, so why would it take two months if

10   there's a subpoena for a record?

11             **MR. MARTINEZ:**  Because the doctors that we have

12   subpoenaed for these records have basically taken anywhere

13   between six to eight weeks to get us those records, Judge.

14             Now if we had an Order saying "Get us those records

15   within two days" --

16             **THE COURT:**  Right, if you file that Motion I will do

17   that.

18             **MS. FRAZIOR:**  Your Honor, I think in the interest of

19   time we'll just not discuss that patient so we can just keep

20   moving the trial forward.

21             **THE COURT:**  Okay.

22             **MS. FRAZIOR:**  Thank you.

23             **THE COURT:**  Sure.  We have that other issue about

24   whether a doctor can be asked about medical malpractice, it's a

25   lawsuit that hasn't even gone to court.

1           **MR. MARTINEZ:**  Yes.

2           **THE COURT:**  And based on what you-all have given me

3   and what I have found you're not allowed to ask that question.

4   That question is not relevant from the standpoint of anybody's

5   credibility when a lawsuit has just been filed, and if it was a

6   lawsuit and there was a judgment that would be totally

7   different in my mind, but just having a lawsuit filed against

8   somebody doesn't mean anything from the standpoint of the

9   possibility of it being truthful and without having been tested

10  and, in fact, I even found a Federal case that indicates that

11  those should not be asked.  So if you-all don't have anything

12  else on that issue that's it.

13          **MS. FRAZIOR:**  Thank you, your Honor.

14          **THE COURT:**  Sure.  And the reason for that is the

15  reliability of something like that is really not at the level

16  of when you actually have a judgment.

17          **MS. FRAZIOR:**  I understand.  Thank you, Judge.

18          **THE COURT:**  Is there anything else you-all need

19  outside the presence of the jury?

20          **MS. FRAZIOR:**  I don't think so, not from the

21  Government.

22          **MR. LEE:**  Not from the Defense, your Honor.

23          **THE COURT:**  Okay.  And you have your next witness

24  ready?

25          **MS. FRAZIOR:**  Yes, we do.  Is she ready to come up?

1    **(Counsel confer)**

2        **MS. YUAN:**  Judge, can the United States call it's

3    next witness, your Honor.

4        **THE COURT:**  Well, once they walk in.  I just want to

5    make sure the person is here close enough to walk in, or

6    already here.

7        **MS. FRAZIOR:**  She is already here, your Honor.

8    **(Counsel confer)**

9    **(Pause)**

10       **COURT SECURITY OFFICER:**  All rise for the jury.

11   **(Jurors enter courtroom at 9:29:44 a.m.)**

12       **THE COURT:**  Please be seated.  Good morning, ladies

13   and gentlemen.  Did you-all make a decision on the days?

14       The vote from the jury is the 23rd, the 24th and the

15   25th, and you made that decision and that's what we're doing.

16       Go ahead and call your next witness.

17       **MS. YUAN:**  Good morning, Rebecca Yuan on behalf of

18   the United States.

19       The United States calls Dr. Emilia Dulgheru.

20       **THE COURT:**  Ma'am, if you don't mind coming up to the

21   front right here so you can be sworn in?

22       **THE CLERK:**  Raise your right hand.

23   //

24   //

25   //

1        **EMILIA DULGHERU, GOVERNMENT'S WITNESS, SWORN**

2        **THE WITNESS:**  I do.

3        **THE COURT:**  Go ahead and have a seat right up here,

4    please, ma'am.

5        Go ahead.

6                        **DIRECT EXAMINATION**

7    **BY MS. YUAN:**

8    Q    Good morning, Dr. Dulgheru.

9    A    Good morning.

10   Q    Can you please state your name for the record?

11   A    Emilia Cordena Dulgheru.

12   Q    Dr. Dulgheru, what do you do for a living?

13   A    I'm a rheumatologist.

14   Q    Please tell the jury about your educational background

15   starting with medical school.

16   A    So I'm originally from Romania, so I was trained, I did my

17   medical school in Bucharest, Romania between 1988 to 1995.

18       Then I started a family residence -- a family

19   practice residency also in Romania and I graduated or I

20   completed that in '98.

21       And then I moved to the United States and I started

22   my training here in the United States at St. Johns Episcopal

23   Hospital in New York, and I completed that in 2001.

24       Then I did my fellowship in rheumatology from 2001 to

25   2003 at State University of New York in Buffalo.

1  Q    And, Dr. Dulgheru, you can pull the microphone a little

2  closer to you if that will make you more comfortable.

3  A    Uh-huh (yes.)

4  Q    After you completed your residency and fellowship in

5  rheumatology in the United States did you obtain any Board

6  certifications?

7  A    So I was initially Board Certified in internal medicine

8  when I graduated internal medicine.  And then when I finished

9  my fellowship in rheumatology I became Board Certified in

10 rheumatology.

11 Q    What year did you become Board Certified in rheumatology?

12 A    In 2003.

13 Q    Where was your first job after you became Board Certified

14 in rheumatology in 2003?

15 A    At Arthritis and Osteoporosis Center in Edinburg.

16 Q    How long did you -- and who was your supervisor at the

17 Arthritis Center in Edinburg?

18 A    Dr. Zamora-Quezada.

19 Q    How long did you work for Dr. Zamora-Quezada?

20 A    For three years.

21 Q    From 2003 to 2006?

22 A    '06, yes, correct.

23 Q    Before we discuss your work with Dr. Zamora-Quezada I'd

24 like to briefly discuss your work since you stopped working for

25 him in 2006.

1           What have you done professionally since 2006?

2    A    I continued to work as a rheumatologist so initially I

3    practiced in Missouri at a multi-specialty clinic called

4    Kneibert Clinic which was in Poplar Bluff, Missouri.

5           Then I returned to the Valley in 2010 and I briefly

6    worked with Dr. Bricia Toro in Brownsville from 2010 to 2011.

7           And then I opened my own practice from 2011 to 2017.

8    I guess I worked two years for UTRGV where I was employed by

9    UTRGV.

10   Q    Let's stop there for a second.  You said you opened your

11   own practice in 2011?

12   A    Yes.

13   Q    What kind of practice was it?

14   A    Rheumatology.

15   Q    Where was your practice?

16   A    It was located in Edinburg.

17   Q    And then you mentioned that you started working for UTRGV.

18   A    So basically the same practice.  I gave it to the

19   University, it was my own practice, so I continued to work as

20   an Assistant Professor with the Internal Medicine Department,

21   and I had three days of rheumatology and two days of internal

22   medicine with UTRGV.

23   Q    Can you briefly describe your responsibility as an

24   Assistant Professor at UTRGV?

25   A    So when I was working in the Rheumatology Clinic I was

1    supervising students and residents, so we were seeing patients

2    together, and then at the end we will debrief the case and we

3    will discuss the case and the assessment and the plan.

4           Then when I was in the Internal Medicine we were

5    doing the same for internal medicine patients.

6           We also -- I also had conferences and teaching for

7    students and residents, and I was also the Clerkship Director

8    for internal medicine students for a year, and with that I was

9    organizing their lectures and I created the curriculum and I

10   invited other faculty to teach the students so I organized

11   their entire schedule, and I -- it was the first batch of

12   students and it was kind of a new terrain so I was very excited

13   and very proud of that at the end.

14   Q    Did you enjoy teaching?

15   A    Yes.

16   Q    For how long did you teach at UTRGV?

17   A    For two years.

18   Q    Until what year?

19   A    2019.

20   Q    Have you ever testified as an expert before?

21   A    No.

22          MS. YUAN:  Your Honor, the United States moves to

23   qualify Dr. Emilia Dulgheru as an expert in rheumatology.

24          MR. LEE:  No objection, your Honor.

25          THE COURT:  No objection?

1       **MR. LEE:**  No objection.

2       **THE COURT:**  Okay, she is qualified as an expert.

3   **BY MS. YUAN:**

4   Q    I'd like to go back to the time period of 2003,

5   Dr. Dulgheru.

6            How did you come to work for Dr. Zamora-Quezada?

7   A    So I was in the United States with a visa called J-1 visa.

8   So at the end of your training you kind of have to go back to

9   your country for two years unless you obtain something called a

10  waiver that will excuse you from going back to your country if

11  you work in an underserved area, so I was looking for a job in

12  an underserved area and I was really passionate about

13  rheumatology and I really, really wanted full time

14  rheumatology.  I found some jobs that were combinations of

15  rheumatology and internal medicine and this was the opportunity

16  to be just full time rheumatologist, so I was really excited

17  about that.  So I came to the Valley with this visa waiver to

18  work with Dr. Zamora.

19  Q    And because of the terms of the visa waiver did you have

20  to stay working for Dr. Zamora-Quezada for a certain period of

21  time?

22  A    For three years, yes.

23  Q    Which of Dr. Zamora-Quezada's clinics did you work at?

24  A    So I worked initially in the Edinburg office, and then at

25  the end I worked in Brownsville office.

1   Q    Who supervised you during that three-year period?

2   A    I believe he was my supervisor, Dr. Zamora-Quezada.

3   Q    Do you see Dr. Zamora-Quezada in the courtroom today?

4   A    Yes, I do.

5   Q    Can you identify him by an article of clothing he's

6   wearing?

7   A    He has a bow tie, yes.

8         MS. YUAN:  Your Honor, may the record reflect that

9   the witness has identified Defendant Zamora-Quezada.

10        THE COURT:  And that he has a bow tie.

11        THE WITNESS:  Yeah.

12  BY MS. YUAN:

13  Q    Dr. Dulgheru, do you know someone named Felix Ramos?

14  A    Yes.

15  Q    Do you -- how do you know Felix Ramos?

16  A    I think -- I don't know exactly his job title, but I

17  believe he was Dr. Zamora's secretary.

18  Q    And so you knew him during the time he worked at

19  Dr. Zamora's clinic?

20  A    Yes.  Yes.

21  Q    Do you see Felix Ramos in the courtroom today?

22  A    That will be a little bit more difficult.  Would he be at

23  this table?

24        THE COURT:  Well, we're asking you if you can

25  identify him in this courtroom.

1           **THE WITNESS:**  I don't see him.

2    **BY MS. YUAN:**

3    Q    Do you see anyone at the table that Dr. Zamora-Quezada is

4    at that would like Felix Ramos?

5    A    Oh --

6           **MR. LEE:**  Objection, your Honor, leading.

7           **MR. PENA:**  Objection, your Honor.

8           **THE COURT:**  Leading is correct and that's corrected,

9    objection granted.

10   **BY MS. YUAN:**

11   Q    I'll just give you one more minute, Dr. Dulgheru, I know

12   there's a lot of people in the room.

13   A    It might be the person with the -- with the pullover with

14   the gray --

15          **THE COURT:**  But you're not sure?

16          **THE WITNESS:**  No, I'm not because he used to wear

17   glasses, so --

18   **BY MS. YUAN:**

19   Q    The Felix Ramos you knew used to wear glasses?

20   A    Yes, I think.  Yes, I believe --

21          **THE COURT:**  You think so?

22          **THE WITNESS:**  Yes.

23   **BY MS. YUAN:**

24   Q    What was Felix Ramos's role at Dr. Zamora's clinic?

25   A    Honestly, I really don't know his role.  I rarely

1    interacted with him.  He was not somebody who I had direct

2    contact with and I think he was handling the finances.

3              **THE COURT:**  So you really don't know?

4              **THE WITNESS:**  No, I don't, honestly I don't.

5    **BY MS. YUAN:**

6    Q    What made you think that he was handling the finances?

7    A    I remember that Dr. Zamora asked him once to purchase a TV

8    and that's the only thing I remember.

9    Q    You earlier described him as a secretary for Dr. Zamora-

10   Quezada.

11   A    Yes.

12   Q    How would you describe the relationship between

13   Dr. Zamora-Quezada and Felix Ramos that you observed during

14   your three years at the clinic?

15   A    So I guess the proximity and the location of his office,

16   and that's the reason I'm saying he was a secretary because his

17   office was right next to Dr. Zamora's office and I think in

18   order to go to Dr. Zamora's office you will have to go through

19   Felix's office and then you will take a left and go to

20   Dr. Zamora's office.

21   Q    Did you ever have to do that, go through Felix Ramos's

22   office to get to Dr. Zamora's office?

23   A    Yes.

24   Q    Dr. Dulgheru, were you a salaried employee while working

25   for Dr. Zamora-Quezada?

1   A    Yes, I was.

2   Q    Who paid your salary?

3   A    I would get the check but, of course, it was signed by

4   Dr. Zamora.

5   Q    Who billed the insurance companies like Medicare for the

6   services that you provided at Dr. Zamora's clinic?

7   A    Dr. Zamora.

8   Q    Can you briefly describe what your job responsibilities

9   were while working for Dr. Zamora between 2003 and 2006?

10  A    So I mainly saw patients in the clinic as outpatient from

11  8:00 in the morning till 5:00 in the afternoon with a noon

12  break.  And then I was on call for different hospitals across

13  the Valley when we would get consults, and I was covering

14  McAllen Medical, Edinburg Hospital, Mission Hospital and at the

15  end even Rio Grande Regional and even DHR.  So mainly I was

16  seeing patient as outpatient.

17  Q    What do you mean by "outpatient?"

18  A    So it's in the clinic, not in the hospital, but we would

19  have consults in the hospital.

20  Q    And were those the clinics in Edinburg and Brownsville

21  that you discussed earlier?

22  A    Yes, correct, uh-huh (yes.)

23  Q    Did any other rheumatologist work at Dr. Zamora-Quezada's

24  clinic while you were there?

25  A    So Dr. Toro was assigned to the Brownsville office and she

```
 1  was there with me I guess at the same time, probably the only

 2  rheumatologist.  And then we had some other doctors from the

 3  outside that were covering briefly.  I remember a gentleman

 4  that was older, and then a lady who was from New Orleans, but I

 5  don't remember her name.

 6  Q    What is Dr. Toro's first name?

 7  A    Bricia.

 8  Q    Did you go on maternity leave for any period of time while

 9  you were there?

10  A    In fact I went on pre-term labor, it was a maternity

11  leave.

12  Q    And did a doctor come in to cover you while you were on

13  leave?

14  A    I believe so, yeah.

15  Q    Do you remember the name of that doctor?

16  A    Dr. Persellin.

17  Q    At Dr. Zamora's clinic which rheumatologist, you mentioned

18  that there was you, Dr. Toro and Dr. Zamora --

19  A    Uh-huh (yes.)

20  Q    -- which rheumatologist saw patients on their first visit?

21  A    Most of the time Dr. Zamora.

22  Q    Did you ever see patients on their first visit?

23  A    Rarely, yes.

24  Q    And so most of the time would you see patients on follow-

25  up visits?
```

1   A    Yes.

2   Q    When you saw patients on a follow-up visit which

3   rheumatologist had seen them on the first visit?

4   A    Dr. Zamora.

5   Q    About how many patients did you see per day at the clinic?

6   A    I was trying to see 25 --

7   Q    Each day?

8   A    -- maximum -- yeah, 30 I think it's been, uh-huh (yes.)

9   Q    Before you saw a patient for a follow-up visit what

10  information or records did you have?

11  A    So I had the information from the initial visits from

12  Dr. Zamora, including his H and P, the laboratory results and

13  the x-ray results, MRI, nerve conduction studies and all other

14  things that were done at the first visit.

15  Q    You mentioned that you had Dr. Zamora's notes and you said

16  "H and P," what is that?

17  A    It's the first encounter with the patient, it's called

18  history and physical for a new patient.

19  Q    Did you review Dr. Zamora's notes and all of the other

20  medical records before you saw a patient for a second or

21  follow-up visit?

22  A    Yes, I had to review them in order to make an assessment.

23  Q    And in doing this did you become familiar with

24  Dr. Zamora's diagnosis and treatment of patients?

25  A    Yes.

1   Q    What did you notice with respect to Dr. Zamora's diagnosis

2   of patients?

3   A    Very frequent diagnosis of rheumatoid arthritis and

4   combinations of diagnoses that, in general, are not encountered

5   in one single patient.  For example, rheumatoid arthritis and

6   lupus, rheumatoid arthritis and psoriatic arthritis, rheumatoid

7   arthritis and ankylosing spondylitis, pretty much a lot of

8   patients had fibromyalgia, osteoarthritis.  There were multiple

9   diagnoses.

10  Q    So for a single patient, to be clear, you noticed that

11  Dr. Zamora would give multiple diagnoses?

12  A    Yes.

13  Q    What, if any, pattern did you notice about those multiple

14  diagnoses that each patient got?

15  A    So the first diagnosis in general would be rheumatoid

16  arthritis, then fibromyalgia, lupus, bursitis, trochanteric

17  bursitis, shoulder bursitis, maybe osteoarthritis and

18  sacroiliitis.

19  Q    So each patient would get all of those diagnoses on the

20  first visit?

21  A    Not the exact combination, but they will get multiple

22  diagnoses.

23  Q    And then you mentioned that you noticed combinations that

24  were rare to you --

25  A    Uh-huh (yes.)

1  Q    -- and gave us a few examples.  One was lupus and

2  rheumatoid arthritis.

3  A    Yes.

4  Q    Why was that unusual to you to see that combination from

5  Dr. Zamora?

6  A    Because that combination, it's very rare.  From -- from

7  the studies it shows that it's about 0.1 percent of patients

8  that can have both diagnoses.  Even though it happens it's

9  very, very rare.

10 Q    How frequently were you seeing that combination of lupus

11 and rheumatoid arthritis being diagnosed by Dr. Zamora-Quezada?

12 A    I can't tell exactly.  I can't tell.

13 Q    Was it more than the .01 percent?

14 A    Oh, definitely.

15 Q    When you saw patients on their follow-up visit --

16 A    Uh-huh (yes.)

17 Q    -- for example, on their second visit, did you ever

18 disagree with Dr. Zamora's diagnoses?

19 A    Yes.

20 Q    Based on your observation during the time that you worked

21 for Dr. Zamora-Quezada, approximately what percentage of

22 patients did you -- did Dr. Zamora diagnose with rheumatoid

23 arthritis?

24 A    I can't -- close to 80 or 90 percent or more.

25 Q    Did you ever disagree with Dr. Zamora's diagnosis of

1  rheumatoid arthritis in 80 to 90 percent of the patients that

2  you saw?

3  A    Yes.

4  Q    How frequently did you disagree with Dr. Zamora's

5  diagnosis of rheumatoid arthritis?

6  A    About 50 percent.

7  Q    What did you do for the patients when you disagreed with

8  Dr. Zamora's diagnosis?

9  A    I would change the diagnosis and I would continue to treat

10 them for that particular diagnosis.

11 Q    Would you do anything with respect to the treatments for

12 those patients?

13 A    I would taper down cautiously their medications and

14 eventually discontinue if the patients did not have a flare of

15 arthritis.

16 Q    When you say "taper down," do you mean decrease the

17 medications that Dr. Zamora had prescribed?

18 A    Yes, decrease the dose.

19 Q    And then you also mentioned that you would change the

20 diagnosis for the patient?

21 A    Yes.

22 Q    Did Dr. Zamora-Quezada ever see the patients, for example,

23 on a third or a follow-up visit after you had seen the patient

24 on the second visit and changed the diagnosis?

25 A    He would see them occasionally, but not after third or

1  fourth, it would be later, maybe in a year, and he would change

2  the diagnosis back.

3  Q    Back to what?

4  A    Rheumatoid arthritis.

5  Q    Which he had initially diagnosed?

6  A    Yes.

7  Q    What, if anything, did you notice that he would do to the

8  treatment for those patients who he changed the diagnosis back

9  to rheumatoid arthritis?

10 A    He would restart the treatment.

11 Q    What treatment?

12 A    Mostly it was biologics or methotrexate.

13 Q    And was that the treatment that he had originally

14 prescribed?

15 A    Most of the time, yes.

16 Q    Was that the treatment that you had then tapered down as

17 you said?

18 A    Yes.

19 Q    Were you ever with Dr. Zamora-Quezada when he saw patients

20 and gave exams?

21 A    Yes.

22 Q    When was that?

23 A    In the beginning when I started.

24 Q    About how many times were you with him with the patients?

25 A    Maybe 10 times.

Dulgheru - Direct / By Ms. Yuan                    28

1   Q    Were you familiar with Dr. Zamora-Quezada's schedule in

2   terms of how many patients he saw per day?

3   A    I have seen the schedule on few occasions.

4   Q    Where did you see the schedule?

5   A    On the nursing station on the table.

6   Q    What did the schedule have on it?

7   A    About 70 patients.

8   Q    Who were those 70 patients for?

9   A    For Dr. Zamora.

10  Q    How did you know?

11  A    Because it was his separate schedule.

12  Q    Was that schedule for one day that he was scheduled to see

13  70 patients?

14  A    It might have been for the morning when he was in that

15  clinic because he would be in the morning in Edinburg clinic

16  and in the afternoon in Brownsville.

17  Q    Were you familiar with how much time Dr. Zamora-Quezada

18  spent with each patient?

19  A    Five to 10 minutes.

20  Q    How do you know?

21  A    I would see him coming out of the examining room because I

22  was right there next to his examining rooms.

23  Q    Were your exam rooms right next to each other?

24  A    Yes.

25  Q    For the six years that you had your own rheumatology

1    practice, so now this is now moving forward here in the Valley

2    starting in 2011 to 2017, how many patients would you see per

3    day in your rheumatology practice?

4    A    No more than 22.

5    Q    Does this include new visits and follow-up visits?

6    A    Yes.

7    Q    And approximately how long did you spend with each patient

8    on a visit?

9    A    So new patients take up to 45 minutes, sometimes you

10   finish in 30 minutes, but the average is between 30 and 45

11   minutes.  And the follow-up patients may be between 15 to 25

12   minutes.

13   Q    Why does it take that long, especially for those new

14   visits?

15   A    You have to evaluate the medical records for rheumatology

16   patients.  Sometimes they have already blood tests done with

17   the primary care provider and other tests that you have to

18   review, and the history actually is quite long, it takes a long

19   time to obtain a rheumatological history and the exam is quite

20   extensive, there are multiple joints and you have to examine

21   every single joint.  It's almost like a neurological exam.

22   Q    And you said that on your first visit, when you had your

23   own practice, you would take 30 to 45 minutes for this first

24   visit?

25   A    Yes, correct.

1  Q    So then now going back to your time with Dr. Zamora in

2  2003 to 2006, tell the jury what diagnostic testing or

3  procedures were done in house at Dr. Zamora's clinic.

4  A    So labs were done in house.  X-rays were done in house.

5  CT scans, MRIs, ultrasounds, nerve conduction studies and I

6  guess that's pretty much it.

7  Q    Generally speaking what did you notice with respect to the

8  procedures and diagnostic testing ordered by Dr. Zamora-

9  Quezada?

10 A    They were pretty intense.

11 Q    What do you mean by "intense?"

12 A    There were multiple tests from labs, x-rays, MRIs for one

13 single patient.

14 Q    So let's talk about some of those diagnostic testing.  You

15 first mentioned that Dr. Zamora did labs or blood work in

16 house?

17 A    Uh-huh (yes.)

18 Q    What, if anything, did you notice with respect to the labs

19 or blood work that Dr. Zamora-Quezada ordered?

20 A    We have the protocol for first visit, labs and second

21 visit labs and third visit labs in respect to laboratories.

22        For x-rays there were multiple x-rays --

23 Q    Before we get to x-rays let's stick with the blood work

24 and the labs for a little bit.

25        You said there was a first visit, second visit and

1  third visit.  Describe that a little more please.

2  A     So on the superbill, which is the form that we use to bill

3  the insurances, we have something called first visit, second

4  visit, and third visit, and then multiple other tests.

5        When you get the report of the first visit labs, there

6  were multiple tests on that report.  And I don't remember

7  exactly all the tests, but I remember there were multiple

8  pages -- like five pages of lab results.

9  Q     Was this usual or unusual to you?

10 A     This was unusual.

11 Q     Why was it unusual to have the same set of first visit,

12 second visit, and first visit labs to you?

13 A     As you come out of your training, you are taught to use

14 critical thinking when you order labs in any particular

15 patient, based on the clinical presentation.

16       And the clinical presentation gives you the diagnosis 80

17 percent, and the labs is just enhancing what you assessed

18 clinically.

19       So that's why this was completely unusual for me.

20 Q     When you say, "clinical presentation," what do you mean?

21 A     So the history and the physical examination, it follows a

22 pattern in rheumatology.

23       So there are patients who present with multiple joint

24 complaints; there are patients who present with one single

25 joint complaint; there are patients that present with five

Dulgheru - Direct / By Ms. Yuan                    32

1  joints involved.

2      And for single -- for every single pattern, you already

3  have a differential diagnosis in your mind.  So you focus on

4  that presentation and you order, based on what the patient came

5  with clinically.

6  Q    In your rheumatology practice, after you left Dr. Zamora's

7  clinic, did you order the same blood test for each patient on

8  the first, second, and third visits?

9  A    No.

10 Q    How did you determine what blood work to order for each

11 patient?

12 A    The presentation -- the clinical presentation of the

13 patient.

14 Q    At Dr. Zamora's clinic, were you required to follow this

15 first visit, second visit, third visit, protocol for blood

16 work?

17 A    We were required.  But I abandoned it.  I took it upon

18 myself.  And I did it in the beginning, and then I stopped

19 doing it.

20 Q    After you stopped doing it, did there come a time where

21 Dr. Zamora-Quezada confronted you about that?

22 A    Yes.  When I didn't order enough lab tests for one

23 patient, I remember.

24 Q    Where was that confrontation?

25 A    In the clinic.

1   Q    Do you remember where in the clinic it was?

2   A    It might have been in the patient room, but not with the

3   patient inside.

4   Q    What did Dr. Zamora say to you?

5   A    I think it was a patient with carpal tunnel syndrome.  And

6   I didn't order TSH, hemoglobin A1c.

7        And he told me that I should have ordered those tests.

8   Q    How did you respond?

9   A    Well, I said that, usually, those are ordered by the

10  primary care physicians, and it's not for specialists to do

11  those tests.

12       And he told me I don't know anything.

13  Q    Did you tell him that you didn't think the tests were

14  medically necessary?

15  A    Yes.

16  Q    What was his tone when he told you that you didn't know

17  anything?

18  A    He was angry.

19  Q    How did that make you feel?

20  A    Small and humiliated.

21  Q    Did he say anything else to you during that confrontation?

22  A    I don't recall.

23  Q    Did you say anything else to him?

24  A    No.

25  Q    How did it end?

Dulgheru - Direct / By Ms. Yuan                    34

1   A    Well, I just didn't say anything, and I left.

2   Q    So we talked about the blood work and the confrontation

3   with Dr. Zamora, and you started to tell us about X-rays that

4   were done in-house, at Dr. Zamora's clinic.

5        What, if anything, concerned you with respect to the X-

6   rays that Dr. Zamora-Quezada ordered?

7   A    So there were multiple X-rays ordered.

8        I was concerned with the amount of X-rays, and I was

9   concerned that they are not medically necessary.  And I was

10  concerned even with the interpretation.

11  Q    Let's break that down.

12       First, why were you concerned that they were not medically

13  necessary?

14  A    Again, like I told you, in rheumatology, there is a

15  certain pattern that the patients present with.  And you are

16  supposed to do a focus X-ray, depending on the area that is

17  involved.

18       And multiple times, these patients had X-rays of multiple

19  joints.

20  Q    And when you reviewed the patient files, you noticed that

21  the patients were complaining of all of those joints that

22  Dr. Zamora ordered X-rays for?

23  A    Yes.

24            MR. LEE:  Objection, your Honor; leading.

25            THE COURT:  She's already answered the question.

```
 1   It's fine.

 2           Go ahead.

 3   BY MS. YUAN:

 4   Q     Do X-rays expose patients to radiation?

 5   A     Yes.

 6   Q     In your experience and your training, could ordering

 7   numerous X-rays be harmful to patients?

 8   A     It can be harmful if they have X-rays on their spine,

 9   especially for younger population and for women.  And it can be

10   harmful if you have multiple CT scans.

11           The X-ray radiation for regular X-rays is not significant,

12   but -- unless it's done on the spine.

13   Q     Did you notice that Dr. Zamora-Quezada was ordering X-rays

14   on the spine for patients?

15   A     Yes.  That included the spine as well.

16   Q     You also mentioned that you had concerns about the

17   interpretation of X-rays that you saw.

18           What do you mean by, "Interpretation"?

19   A     So for rheumatoid arthritis, there's early changes on the

20   X-rays, and there are late changes.

21           And almost every single X-ray had early changes, even if

22   those X-rays looked normal to me.

23   Q     And let's be clear.  Would you -- what did you actually

24   receive when you got X-ray results that had been ordered by

25   Dr. Zamora?
```

1   A    The report.

2   Q    What does the report have on it, for those of us who don't

3   know?

4   A    So the area that has been X-rayed and the result; what do

5   you actually see -- how the bones look, how the joint space

6   look, if there's any other erosions or spurs.  And there was a

7   list of multiple joints and multiple reports on --

8   Q    And so the report or the interpretation, is that just

9   written by the person reading the X-ray film?

10  A    Correct.

11  Q    Who read the X-ray films while you were at Dr. Zamora-

12  Quezada's clinic?

13  A    Dr. Zamora.

14  Q    What did you notice with respect to the X-ray reports or

15  interpretations that Dr. Zamora wrote?

16  A    They match the history and physical in a way.

17       So if the patient was diagnosed with rheumatoid arthritis,

18  the X-ray would match the diagnosis of rheumatoid arthritis.

19       You know, if the patient was diagnosed with bursitis, then

20  that X-ray -- you know, possible bursitis.  So they match; they

21  have the history and physical.

22  Q    What, if anything, did you notice about the descriptions

23  that were written by Dr. Zamora-Quezada on these X-ray reports?

24  A    They were very similar from one patient to the other.

25  Q    In what way?

1    A    You know, it's cookie-cutter, basically.  So they were all

2    the same.  Early changes of rheumatoid arthritis suggested MRI,

3    or possible sacroiliitis, or osteoarthritis.

4    Q    Was that usual or unusual to you?

5    A    That was unusual.

6    Q    Why?

7    A    First, because I generally ordered focused X-ray.

8         And because there's a lot of X-rays that are completely

9    normal, even in patients who have rheumatoid arthritis,

10   especially early during the disease presentation.

11   Q    And so a lot of patients have normal X-rays.

12        What was the case that Dr. Zamora's clinic -- about

13   whether the X-rays were read normal or abnormal?

14   A    Most of them were abnormal.

15   Q    But what percentage were read abnormal?

16   A    Close to 100 percent.

17   Q    Did you rely on Dr. Zamora-Quezada's X-ray reports in your

18   treatment of patients at Dr. Zamora's clinic?

19   A    No.

20   Q    Why not?

21   A    Because they were not accurate and they were not helpful.

22   Q    Moving on to MRIs, what did you notice with respect to the

23   MRIs that Dr. Zamora-Quezada ordered?

24   A    Again, the intensity; the number of MRIs that were being

25   ordered.

1  Q    And when you say, "The number of MRIs," do you mean per

2  patient?  Or what do you mean by the number --

3  A    Per patient.

4  Q    -- of MRIs?

5  A    Per patient.

6       So one patient may have three or four MRIs over the course

7  of time.

8       Eventually or later, patients with rheumatoid arthritis

9  will have a special MRI of their hands.  And every single

10 patient with rheumatoid arthritis had that later on, when that

11 machine became available.

12 Q    So what percentage did you notice of Dr. Zamora-Quezada's

13 patients were getting MRIs at his clinic?

14 A    It's hard to say percentage of patients with diagnosis of

15 rheumatoid arthritis.  Close to 100 percent.

16 Q    What, if anything, concerned this -- was concerning about

17 this to you?

18 A    I wasn't sure about the price of these MRIs.  And I was

19 concerned that there were abnormalities on these MRIs that I

20 really questioned as well.

21 Q    Who was reading -- you mentioned that Dr. Zamora read the

22 X-rays.

23 A    Uh-huh.

24 Q    Who was reading the MRIs that were taken at Dr. Zamora's

25 clinic?

1   A    The radiologists.

2   Q    Do you remember the radiologists' names?

3   A    I remember Dr. Quraishi -- and it might have been two of

4   them, because I think there were two brothers -- and

5   Dr. Lorenzo Farolan.

6   Q    Did you review the MRI reports written by Dr. Farolan and

7   the two Drs. Quraishi?

8   A    Yes.

9   Q    Did you have any concerns with those reports?

10  A    I have concerns with the reports, especially from

11  Dr. Quraishi.

12  Q    What were your concerns?

13  A    Again, all of them were positive.  So all of them would

14  show some abnormalities.

15       And at the time everything was very new.  We were learning

16  about it.  So I didn't know how to interpret them.

17  Q    What, if anything, did you notice about the descriptions

18  written in Dr. Quraishi's MRI reports?

19  A    For MRI of sacroiliac joints, everybody had sacroiliitis,

20  which that was very surprising to me.

21       And I don't remember exactly the MRI of the hands, but all

22  of them had erosions also, which was surprising to me.

23  Q    Do these MRI reports have written descriptions on them?

24  A    The reports?  Yes, they have written descriptions.

25  Q    What, if anything, did you notice about the written

Dulgheru - Direct / By Ms. Yuan                    40

1   descriptions from patient to patient?

2   A    They were very similar.

3   Q    And these are the reports written by the Dr. Quraishi --

4   the brothers?

5   A    Yes.

6   Q    After you noticed this about the readings by the two

7   Dr. Quraishis for the MRIs ran at Dr. Zamora's clinic, did you

8   rely on those MRI reports in your treatment of patients?

9   A    No.

10  Q    Why not?

11  A    I didn't trust them.  I trusted Dr. Farolan.  And,

12  occasionally, I would call him with specifics about a certain

13  report.

14  Q    Why didn't you trust the reports from Dr. Quraishi?

15  A    As I said, they were very, very similar.  And that's not

16  what you see in clinical practice.

17  Q    Moving on to nerve conduction tests --

18  A    Uh-huh.

19  Q    What did you notice with respect to the nerve conduction

20  tests that were ordered by Dr. Zamora-Quezada?

21  A    They were, again, very frequent.

22  Q    In what way?

23  A    Multiple nerve conduction tests on patients that may not

24  have clinical presentation that would require such testing.

25  Q    Each patient was getting multiple tests?

Dulgheru - Direct / By Ms. Yuan                    41

1   A    Each patient was getting all the extremities.

2        So nerve conduction studies can do right-upper, left-upper

3   extremity, or right-lower or left-lower extremities.  So

4   patients will get all of them most of the time.

5   Q    What is the nerve conduction study or test?

6   A    It's a test that assesses if the patient has some form of

7   nerve involvement, some form of radiculopathy or neuropathy.

8   Q    In your training and experience, when is a nerve

9   conduction test medically necessary?

10  A    When the patient presents with certain types of pain that

11  we call, "neuropathic pain," such as sciatica, being an

12  example; when they present with symptoms suggestive of carpal

13  tunnel syndrome, where they have pain in their hands and

14  numbness and pins and needles.

15       There's certain type of pain that requires neurological

16  testing.

17  Q    What percentage, approximately, if you recall, of the

18  patients that Dr. Zamora's clinic did Dr. Zamora order nerve

19  conduction studies for?

20  A    I believe, at some point, all the patients were getting

21  those.

22  Q    Was this usual or unusual to you?

23  A    Unusual.

24  Q    Why?

25  A    I have never ordered a nerve conduction test during my

1   training, because most of the time those were done by

2   neurologists.

3        Then these are patients that do not generally present with

4   neurological complaints.  These are rheumatological patients.

5   They don't come with a primarily neuropathic pain.  They

6   present with arthritis pain.

7        And then the technology was new.  The interpretation was,

8   I think, generated by a computer.  So the MA would do the test

9   and this would be forwarded to -- I guess it was a company out

10  of Boston.

11       And the report would be generated, not by a physician, but

12  by a computer.

13  Q    For the patients that both you and Dr. Zamora-Quezada saw,

14  at Dr. Zamora's clinic, what percentage of the patients were

15  presenting with those neurological symptoms for which you would

16  have ordered a nerve conduction test?

17  A    If you think of spine complaints, maybe less than 50

18  percent.  If you think of rheumatoid arthritis, maybe 10, 20

19  percent.

20  Q    How often were these nerve conduction test results useful

21  for your diagnosis and treatment of patients at Dr. Zamora's

22  clinic?

23  A    Rarely.

24  Q    And, finally, moving on to ultrasounds.

25       What, if anything, was abnormal to you with respect to the

1   ultrasounds ordered by Dr. Zamora-Quezada?

2   A    I would have to review the report and follow up on that.

3        If there is an incidental finding, like a tumor, you have

4   to refer the patient appropriately.

5   Q    Did you notice anything with respect to how frequent

6   Dr. Zamora was ordering ultrasounds?

7   A    Those were not very frequent.  I think we only have the

8   technician in the office once a week.  There were not that many

9   ultrasounds at the time.

10  Q    What did you notice with respect to whether the

11  ultrasounds ordered by Dr. Zamora were medically necessary?

12  A    It's strictly related to the specialty.

13       We were rheumatologists, so we don't generally order

14  ultrasounds of the thyroid unless we suspect an autoimmune

15  thyroid disease.

16       There were multiple ultrasounds of the thyroid.

17  Occasionally, ultrasounds of abdomen.  So this is more like a

18  primary care type of evaluation.

19  Q    Did you notice whether patients were presenting symptoms

20  that would have required an ultrasound?

21  A    Not really.  I can't recall.

22  Q    So we talked about the labs, the X-rays, the MRIs, nerve

23  conduction tests, and ultrasounds ordered by Dr. Zamora-

24  Quezada.

25       How did all of these tests affect your treatment of

1    patients at Dr. Zamora's clinic?

2    A    First of all, you have to review all these reports; all

3    these tests that they were being done.  You cannot ignore them.

4    You just have to go one by one and draw a conclusion whether

5    this is relevant or irrelevant, which takes a lot of work.

6         And I could probably -- I was able to do it.  And,

7    eventually, I learned things that are useful and things that

8    are not useful.

9         But it was very, very difficult for the P.A.s and for the

10   nurse practitioners.

11   Q    How much of it was relevant as opposed to irrelevant for

12   your diagnosis and treatment of patients?

13   A    I can't say.  But, probably, more than 50 percent would be

14   relevant.

15   Q    Did you ever confront Dr. Zamora-Quezada about your

16   concerns?

17   A    I only asked him or confronted him once about the labs.

18   Q    Where was that?

19   A    It was during a meeting that we had with the employees.

20   And I asked him, how do you justify a test for vasculitis on

21   the first visit when the patient does present with any symptoms

22   of vasculitis.

23        And I asked him if the insurances actually paid for this

24   test when it's not necessary.  And he kind of dismissed it,

25   then said, "Yeah, they do pay."

```
 1   Q    What did he say?

 2   A    That they do pay.

 3   Q    Who pays?

 4   A    The insurances.

 5   Q    Where was this meeting?

 6   A    It was in the conference room, in the Edinburg office.

 7   Q    Who was present at the meeting?

 8   A    He was present, Meisy, I believe the billers, and the

 9   M.A.s. --

10   Q    Who is --

11   A    -- that I recall.

12   Q    Who is Meisy?

13   A    Dr. Zamora's wife.

14   Q    And you said the billers and the M.A.s?

15   A    Uh-huh.

16   Q    Who are -- is that a, "Yes"?

17   A    Yes.

18   Q    Who are M.A.s?

19   A    Medical assistants.  We had, at that time -- I don't know

20   their last names.  We had Marie (phonetic), Annette (phonetic),

21   Angelica (phonetic), Willie Thomas (phonetic) -- I don't recall

22   anybody else.

23   Q    Was everyone present when you confronted Dr. Zamora about

24   this?

25   A    I don't recall exactly.  But I'm sure the billers -- the
```

Dulgheru - Direct / By Ms. Yuan                46

1   billers were.

2   Q    What was your tone when you confronted him?

3   A    He was calm.  I was not.

4   Q    What was Dr. Zamora's tone when he responded, "They will

5   pay"?

6   A    Calm as well.

7   Q    Did anything else happen after he said that?

8   A    He asked to remain with the billers only, that

9   everybody be dismissed, and he stayed with the billers only.

10  Q    Did there come a time when a patient brought to you that

11  patient's explanation of benefits?

12  A    Yes.

13  Q    What is an explanation of benefits?

14  A    The explanation of benefits is what the insurance are

15  actually sending to the patients for the services that were

16  billed out during that particular encounter.

17       It's not a bill.  It's just an explanation of what has

18  been asked from the insurance to pay.

19  Q    What did you do when that patient came to you with his

20  explanation of benefits?

21  A    I had some angry patients and I recall a particular

22  patient that was very, very angry.

23       He was a "Winter Texan."  And he told me that he's EOB

24  stated there were $8,000 on one single visit -- was out-patient

25  visit.

1    Q    What did you do with that information?

2    A    I took it to Dr. Zamora, because I was overwhelmed by

3    patient's comment and I didn't know how to answer.

4    Q    So for that patient who brought you the explanation of

5    benefits with an $8,000 bill, that you took to Dr. Zamora, what

6    did you say to Dr. Zamora?

7    A    I told him that the patient was very angry that he

8    received this $8,000 EOB.

9         And he said, "Well, no, no, no.  But that's what we bill

10   all.  This is not what we get."  Which is true, but it's still

11   overwhelming.

12   Q    How did you respond?

13   A    I was shy, so I don't think I said anything else.

14   Q    Was there any other time that you confronted Dr. Zamora?

15   A    No -- or not that I recall.

16   Q    When you saw patients at Dr. Zamora's clinic, did you fill

17   out something called a "superbill"?

18   A    Yes.

19   Q    What is a superbill?

20   A    So the superbill are basically the charges for that visit,

21   along with a diagnosis.

22        So, first, you have to put on the superbill the diagnosis

23   of the patient.  And then your consultation level, and then the

24   labs, the MRIs, CT scans, or whatever else is ordered at that

25   particular visit.

1  Q    When you said, "the labs and the MRIs," it was what you

2  ordered that you put on the superbill?

3  A    Yes.

4  Q    When you said that the superbill includes charges, what do

5  you mean by that?

6  A    It doesn't show charges.  It just includes what you've

7  done on that particular day, that you are asking the insurances

8  to pay.

9  Q    When would you fill out a superbill for each patient?

10 A    At the end of the visit.

11 Q    After filling it out, did you ever notice anything with

12 respect to changes that happened to your superbills?

13 A    Yes.

14 Q    What did you notice?

15 A    There were additional tests that were added after I saw

16 the patient.

17 Q    How did you notice this?

18 A    I noticed this because there were reports of tests that I

19 didn't recall ordering.  And then I asked the technician who

20 performed the test, and she said that Meisy or Dr. Zamora came

21 and added those tests on the superbill.

22         **MR. SULLY:**  I object to hearsay, your Honor.

23         **THE COURT:**  What was that?

24         **MR. SULLY:**  Object as to hearsay as to what she was

25 told by somebody else.

1              **THE COURT:**  She can testify as that one.

2              Go ahead.

3    BY MS. YUAN:

4    Q    Did this happen just once or frequently?

5    A    It happened frequently.  And it was mainly with MRIs.

6    Q    You mentioned Meisy again, and you said that she was

7    Dr. Zamora's wife.

8    A    Uh-huh.

9    Q    Take a minute to look in the courtroom and see if you can

10   identify Meisy Zamora by an article of clothing that she's

11   wearing.

12   A    She has a black -- oh, no.  It's what -- what color is

13   that -- turquoise, right?

14        She has something turquoise with blue. She's blond with

15   long hair.

16   Q    I think that narrows --

17   A    The last --

18   Q    -- it down.

19   A    -- person on the -- on this side of the table.

20              **MS. YUAN:**  Your Honor, may the record reflect an in-

21   Court identification of Defendant Meisy Zamora?

22              **THE COURT:**  The record will show that.

23   BY MS. YUAN:

24   Q    What was Meisy Zamora's role at the clinic?

25   A    When I was there, she was just coming once in a while and

Dulgheru - Direct / By Ms. Yuan                                    50

1   supervising the activity.

2   Q    In what way did she supervise activity?

3   A    Honestly, I don't know how she was involved; how much she

4   was involved.

5        I would see her just making -- walking through the clinic.

6   And I guess she would meet with people in the clinic.

7   Q    What makes you think that she met with people in the

8   clinic?

9   A    Well, what I heard from the medical assistants --

10            MR. SULLY:   Objection, your Honor; hearsay, calls for

11   speculation.

12            THE COURT:   Objection is sustained.

13   BY MS. YUAN:

14   Q    What did you see Meisy Zamora do in the clinic?

15   A    Again, just walking through the clinic and talking to

16   M.A.s.  And I only remember one time that she asked her

17   daughter to time us.

18   Q    She asked your daughter to time you?

19   A    Yeah.

20   Q    -- her daughter to time you?

21   A    Yes.

22   Q    Tell us about that?

23   A    So the daughter was sitting outside of our examining

24   rooms, and she would time when we would go in and when we would

25   come out.

1   Q    How old was her daughter at the time?

2   A    Fourteen.

3   Q    How would she time how long patients were in the room with

4   you?

5   A    I guess you write the time when you go in and when you

6   come out.

7   Q    How did you see this?

8   A    She was right outside of the examining room.

9   Q    Was she standing up, sitting down?

10  A    She was standing.

11  Q    How long did she do this for?

12  A    I think it was for like two, three days.

13  Q    How did you know that it was Meisy Zamora that had her

14  daughter stand outside your exam room and time how much time

15  you spent with patients?

16  A    I don't recall exactly.  I think it was her daughter.  It

17  must have been the mom that asked.  But I'm not sure.

18          **MR. SULLY:**  Objection, your Honor; lack of personal

19  knowledge.

20          **THE COURT:**  The objection's sustain.

21          You need to disregard that, because she doesn't --

22  she's not really sure of it at all.

23          Go ahead.

24          //

25          //

1    BY MS. YUAN:

2    Q    Do you remember, after the daughter was timing, how much

3    time you spent with patients -- do you remember if anything

4    happened with that information?

5    A    No.

6    Q    Did you ever hear Meisy Zamora give any orders or

7    instructions at Dr. Zamora's clinic?

8    A    Not directly, no.

9    Q    In addition to confronting Dr. Zamora directly -- and we

10   talked about that one time that you did that in the meeting --

11   did you try to do anything else to stop the concerning

12   practices that you saw while you were at Dr. Zamora's clinic?

13   A    I was trying to leave myself from the practice, but it was

14   very difficult, given the situation I was in.

15            THE COURT:  The situation you were in, you mean

16   because of your immigration status?

17            THE WITNESS:  Yes, correct.

18   BY MS. YUAN:

19   Q    What, if anything, did you do with the other nurse

20   practitioners that were there?

21   A    So I give them lectures and I train them with formal

22   lectures -- and on patient-by-patient basis as well.

23        And we had multiple nurse practitioners and P.A.s at the

24   time.

25   Q    Did anyone order you to do that?

1  A    No.

2  Q    Why did you do that?

3  A    I thought that was important that they learn the correct

4  way to practice.

5  Q    Did they listen to you?

6  A    No.

7  Q    How do you know they didn't listen to you?

8  A    I would see the same tests being ordered and being done.

9  And they were under a lot of stress.

10 Q    How do you know?

11 A    From one particular nurse practitioner who resigned; he

12 told me that the stress level --

13          MR. LEE:  Objection, your Honor; hearsay.

14          THE COURT:  Objection sustained.

15 BY MS. YUAN:

16 Q    How do you know that they didn't listen to you?

17 A    I would see the orders that they would order on the

18 patients, because I would take turns to see their patients.

19 Q    Who were they listening to?

20 A    Dr. Zamora.

21 Q    You mentioned that your employment finally ended in 2006.

22      How did your employment end?

23 A    I left.  I was supposed to continue with the same employer

24 in order to obtain the labor certification and the green card.

25      And I refused the labor certification, which actually was

1   approved.  And I moved on to a different location.  I moved to

2   Missouri.

3   Q    Was this in October of 2006?

4   A    Correct.

5   Q    Did you want to leave earlier?

6   A    Oh, absolutely.

7   Q    Why?

8   A    I just did not feel comfortable.  I was under a lot of

9   stress.  And I just didn't know what to do.

10  Q    After you stopped working for Dr. Zamora-Quezada, you

11  testified that you lived in Missouri --

12  A    Uh-huh.

13  Q    -- for a few years, and then you returned to the Valley in

14  2010?

15  A    Uh-huh.

16  Q    Is that right?

17  A    Yes.

18  Q    You said you started your own rheumatology practice in

19  2011?

20  A    Correct.

21  Q    So let's talk about that period.  Since 2011, have you

22  been living in the Valley the whole time?

23  A    Yes.

24  Q    Have you treated rheumatology patients who were formally

25  treated by Dr. Zamora-Quezada?

1   A    I kind of tell them that this is not the diagnosis --

2             **MR. LEE:**  Objection, your Honor.

3             **MS. YUAN:**  The question was just --

4             **THE COURT:**  What's the objection?

5             **MR. LEE:**  That was not the answer to the question she

6   was asked.

7             The question simply -- had she seen patients who had

8   seen Dr. Zamora-Quezada.

9             **THE COURT:**  Do you want to ask the question again?

10            **MS. YUAN:**  Yes.

11  **BY MS. YUAN:**

12  Q    Since 2011, Dr. Emilia Dulgheru, have you treated patient

13  who were formally treated by Dr. Zamora-Quezada?

14  A    If they were diagnosed correctly, I would continue the

15  treatment; if they diagnosed incorrectly, I would let them

16  know.

17  Q    Was one of those patients that you treated, who was

18  formally treated by Dr. Zamora-Quezada, named Irma Gonzalez?

19  A    Yes.

20  Q    Directing your attention to January of 2015, did Irma

21  Gonzalez come to you for her first visit?

22  A    Yes.

23            **MS. YUAN:**  If now, Ms. Barton (phonetic), we can pull

24  up Government Exhibit C-5, which has been previously admitted.

25  //

1   **BY MS. YUAN:**

2   And Dr. Emilia Dulgheru, this is your patient file for that

3   patient named, Irma Gonzalez.

4   A    Uh-huh.

5         **MS. YUAN:**  And let's please zoom in to the top

6   portion so we can all read this clearly.

7         **THE WITNESS:**  That's a --

8         **MS. YUAN:**  And right now -- actually, let's go to

9   page 20 of this exhibit, please.

10        So Government Exhibit 5, page 20.  And please zoom

11  into the top portion, Ms. Barton.

12  **BY MS. YUAN:**

13  Q    Dr. Emilia Dulgheru, do you recognize this document?

14  A    Yes.

15  Q    And so what is this?

16  A    This is the electronic medical record document on that

17  patient, the file of the patient.

18        **MS. YUAN:**  If we can highlight the patient's name.

19  **BY MS. YUAN:**

20  Q    Which patient is this --

21  A    Irma Gonzalez.

22  Q    -- for?

23        How old was Irma Gonzalez at the time that you saw her?

24  A    Seventy-three.

25  Q    Do you see your name next to progress notes?

1   A    Yes.

2   Q    What is the date on these progress notes?

3   A    January 27, 2015.

4   Q    Was this your first visit with your patient Irma Gonzalez?

5   A    Yes.

6        **MS. YUAN:**  Ms. Barton, if we can go to the next page.

7   **BY MS. YUAN:**

8   Q    So this is still your first visit with Irma Gonzalez.

9        And looking at page 2 -- so this is page 21 of Government

10  Exhibit C-5.

11       **MS. YUAN:**  Please zoom into the part where it says,

12  "Assessments."

13  **BY MS. YUAN:**

14  Q    Dr. Emilia Dulgheru, what diagnosis did you give Irma

15  Gonzalez, in January of 2015?

16  A    Systemic sclerosis.

17  Q    What is systemic sclerosis?

18  A    Systemic sclerosis; it's a disease in the category of

19  connective tissue diseases.

20       And the reason it's called systemic sclerosis is because

21  it affects the skin, and it can cause induration and thickening

22  of the skin.

23       It can also affect the internal organs, such as pulmonary

24  arteries or the stomach or the lungs.  And it can cause

25  pulmonary hypertension and other complications.

1   Q    There's a second diagnosis listed here.  What is it?

2   A    Dysphagia.

3   Q    What is that?

4   A    Dysphagia is problems swallowing.  That's very common in

5   the patients with scleroderma, actually.

6   Q    Okay, did you continue to treat Irma Gonzalez periodically

7   through 2018?

8   A    Yes.

9   Q    Did you ever diagnose Irma Gonzalez with rheumatoid

10  arthritis?

11  A    No.

12  Q    Did you find any evidence of rheumatoid arthritis in the

13  three years that you treated Irma Gonzalez?

14  A    No.

15  Q    What if you learned that another rheumatologist had

16  diagnosed Irma Gonzalez with rheumatoid arthritis, lupus,

17  shoulder bursitis, knee osteoarthritis, and fibromyalgia three

18  months before you first saw her?

19       Would that change your opinion as to whether Irma Gonzalez

20  had the diagnosis that you gave her?

21           **MR. LEE:**  Objection, your Honor.

22           **THE COURT:**  What's the objection?

23           **MR. LEE:**  A hypothetic -- this is not like a --

24           **THE COURT:**  She's asking --

25           **MR. LEE:**  -- hypothetical.

 1              **THE COURT:**  -- her a hypothetical.

 2              **MR. LEE:**  Fine, your Honor.

 3              **THE COURT:**  Go ahead.

 4    **BY MS. YUAN:**

 5    Q    Would you like me to repeat the question?

 6    A    Yes.  Yes, please.

 7    Q    So your visit with Irma Gonzalez was when?

 8    A    2015.

 9    Q    What month?

10    A    January.

11    Q    So if you learned that another rheumatologist diagnosed

12    Irma Gonzalez, three months earlier, with rheumatoid arthritis,

13    lupus, shoulder bursitis, knee osteoarthritis, and

14    fibromyalgia, would that change your opinion as to whether Irma

15    Gonzalez had rheumatoid arthritis?

16    A    No.

17    Q    In your three years treating Irma Gonzalez, did you ever

18    diagnose her with rheumatoid arthritis?

19    A    No.

20              **MS. YUAN:**  You can take that down.  Thank you,

21    Ms. Barton.

22    **BY MS. YUAN:**

23    Q    Dr. Emilia Dulgheru, while at Dr. Zamora-Quezada's clinic,

24    did you ever report your concerns to law enforcement?

25    A    I would get calls from the State every year because of my

1    immigration status.

2        But I don't recall the name of the person who was calling

3    me every year.  And he was asking me, "How is everything?"

4        And I said -- I was telling him, "It's terrible.  Is there

5    any way that you can get out of here?"

6    Q    Did you report your concerns to anyone else?

7    A    I went to FBI.

8    Q    When did you do that?

9    A    Might have been 2005 or 2006; I'm not sure.

10            **THE COURT:**  And, Doctor, was that while you were

11   still working there or --

12            **THE WITNESS:**  Yes.

13            **THE COURT:**  -- after you had left?

14            **THE WITNESS:**  No, I was still working there.

15   **BY MS. YUAN:**

16   Q    Did you report your concerns to anyone else?

17   A    Well, my peers, my family, of course.

18        But, officially, no.

19   Q    After you left, did you ever report your concerns to

20   anyone?

21   A    I thought there was already a file that was started, so I

22   didn't find that necessary.

23            **MS. YUAN:**  Pass the witness, your Honor.

24            **THE COURT:**  Mr. Lee?

25            //

1                        **CROSS EXAMINATION**

2    **BY MR. LEE:**

3    Q    Good morning, Dr. Emilia Dulgheru.

4    A    Dulgheru.

5    Q    Dulgheru.

6    A    Good morning.

7    Q    Good morning.  Just for the record, you and I have never

8    met before, correct?

9    A    No.

10   Q    Okay, all right.  I was a little nervous about that.  You

11   worked with Dr. Zamora for about three years, correct?

12   A    Yes, correct.

13   Q    Starting in about 2003, correct?

14   A    Yes, correct.

15   Q    And ending about 2006?

16   A    Correct.

17   Q    Correct?  So you stopped working there about 13 years ago,

18   correct?

19   A    Yes, correct.

20   Q    All right, and so you have no personal knowledge of what

21   the practices were at the center after you left, correct?

22   A    Correct, except for a few patients that I saw.

23   Q    Right.  But you didn't -- you weren't actually at the

24   center after 2006?

25   A    No.

Dulgheru - Cross / By Mr. Lee                        62

1    Q    Correct?

2    A    Correct.

3    Q    All right, and sitting here today, you talked about some

4    things that you observed while you were working at the center?

5    A    Uh-huh.

6    Q    But you don't recall any specific patient names now,

7    right?

8    A    Only the patient that are still following me.

9    Q    Okay, so --

10   A    But those were my patients.

11   Q    Right.  But you recall them because they came to see you -

12   -

13   A    After.

14   Q    -- the past six or so years, correct?

15   A    Yes, correct.

16   Q    Okay, but when you're talking about, for example, some of

17   the patients -- you talked in general about patients earlier?

18   A    Uh-huh.

19   Q    You don't remember their actual names, correct?

20   A    No, no.

21   Q    Okay, and you don't -- you were asked about various

22   records that you described, correct?

23   A    Correct.

24   Q    All right, but you don't have any examples of that,

25   correct?

Dulgheru - Cross / By Mr. Lee                          63

1    A    Correct.

2    Q    All right, and the Government, they didn't have you review

3    records to see if these -- certain records matched what you

4    were describing, correct?

5    A    Recently, yes.

6    Q    Okay, but -- well, I'm putting aside --

7    A    Uh-huh.

8    Q    -- the -- anything relating to a specific -- one specific

9    patient?

10   A    No.

11   Q    I'm asking for records in the 2003 to 2006 time period.

12        Did they show any records from 2003 to 2006 --

13   A    No.

14   Q    -- that might match what you're describing?  Correct?

15   A    Correct.

16   Q    They didn't show anything, correct?

17   A    No.

18   Q    And so you have no examples to show us, here in Court, of

19   the things you're talking about?

20   A    Personally --

21   Q    Correct?

22   A    -- no.

23   Q    Okay, and during the time that you worked at the clinic,

24   there was a point -- I think you mentioned on direct

25   examination -- when you went out for maternity leave, correct?

Dulgheru - Cross / By Mr. Lee                    64

1    A    Pre-term labor.

2    Q    Pre-term labor, sorry.

3         And so you were out for a few months, correct?

4    A    Correct.

5    Q    And during that time when you were out, someone else took

6    over your patients for you, correct?

7    A    Correct.

8    Q    All right, and that was this older gentleman that you

9    described, correct?

10   A    Yes.

11   Q    So if -- so he took over your patients.  And so he would

12   have seen the patients that you would have seen or had been

13   seeing, correct?

14   A    Correct.

15   Q    All right, and so, if he was correcting -- if he was

16   making any changes or make -- keeping things going along with

17   those patients, it would be your files that he was looking at,

18   correct?

19   A    Correct.

20   Q    All right, now, during the time -- you were just asked

21   some questions about some confrontations that you had with

22   Dr. Zamora, correct?

23   A    Correct.

24   Q    And you were also asking questions about complaints that

25   you made, correct?

Dulgheru - Cross / By Mr. Lee                                    65

1   A    Correct.

2   Q    All right, the only -- you made a written complaint to the

3   center, in 2006, about a billing issue, correct?

4   A    Probably, yes.

5   Q    All right, you made a written complaint, in 2006 --

6   A    Uh-huh.

7   Q    -- about how -- about your relationship with mid-level

8   practitioners, correct?

9   A    Correct.

10  Q    Okay, that was the only written complaint you made to the

11  center while you were working there, correct?

12  A    Written, yes.

13  Q    Right, that was the only time you put something down in

14  writing, correct?

15  A    Probably, yes.

16  Q    All right, and that issue dealt with mid-level

17  practitioners, correct?

18  A    Correct.

19  Q    All right, now, this was your first job in private

20  practice, right?

21  A    Yes.

22  Q    All right, and you were not -- you were just learning

23  about how Medicare billing and billing generally works,

24  correct?

25  A    Correct.

Dulgheru - Cross / By Mr. Lee                                    66

1  Q    All right, and now you've been practicing for many years,

2  correct?

3  A    Yes.

4  Q    And you have your own practice now, correct?

5  A    Yes.

6  Q    And you're now more familiar with how billing works,

7  correct?

8  A    Yes.

9  Q    Okay, and you now know that if a mid-level practitioner

10 does a service but does not have his or her own NPI, a service

11 can be billed using the NPI of the supervising physician,

12 correct?

13 A    Correct.

14 Q    All right, and that related to the issue that you raised

15 back in 2006, correct?

16 A    Correct.

17 Q    Okay, and so that was an issue that you raised, in 2006,

18 because you didn't fully understand some of the Medicare rules

19 at the time, correct?

20 A    Correct, maybe.

21 Q    Okay, and that was the only -- that was the only written

22 complaint you made while you were working at the center?

23 A    Yes.

24 Q    Correct?

25         MS. YUAN:  Objection; asked and answered.

Dulgheru - Cross / By Mr. Lee                    67

1          **THE COURT:**  She has answered that.

2   **BY MR. LEE:**

3   Q    Okay, and you wrote -- and in your written complaint, you

4   didn't mention anything about false diagnosis, correct?

5   A    Correct.

6   Q    You didn't mention anything in your written complaint

7   about unnecessary tests, correct?

8   A    Correct.

9   Q    And then after -- and the center responded with a letter

10  to your concern, correct?

11  A    I guess, yes.

12  Q    Do you --

13  A    I don't remember, honestly.

14  Q    All right, perhaps I can show you something.

15       All right, I'm going to -- Dr. Dulgheru, I'm going to hand

16  you what's been marked as Defendant's Exhibit 296, 297, and

17  298.  I want you to just look these over and wait until I ask

18  you a question.

19          **THE COURT:**  No, you're not going to ask a question,

20  because we're going to have a break at the request of the jury.

21          Please rise for the jury.

22      **(Jury exits the Courtroom)**

23          **THE COURT:**  We'll see you-all in about ten or fifteen

24  minutes.

25          And, Doctor, you will be back on the stand.  But

Dulgheru - Cross / By Mr. Lee                    68

1    right now, you can get up.

2              THE WITNESS:  Okay.

3              THE COURT:  You don't have to sit there for the --

4              THE WITNESS:  Okay.

5              THE COURT:  -- ten or fifteen minutes.

6              THE MARSHAL:  All rise.

7         (Recess taken from 10:38 a.m. to 11:04 a.m.)

8         (Jurors present)

9              THE COURT:  Please be seated.  Go ahead and proceed,

10   sir.

11             MR. LEE:  Thank you, your Honor.

12                   CROSS EXAMINATION (CONTINUED)

13   BY MR. LEE:

14   Q    Dr. Dulgheru, right before the break, we were just

15   starting to talk about the one time you made a written

16   complaint to the Center, correct?

17   A    Correct.

18   Q    All right.  And I showed you some documents.  Again,

19   without getting into, without reading out loud anything from

20   the documents, do those documents refresh your recollection as

21   to what happened here?

22   A    Yes, somewhat.  Yes.

23   Q    Okay.  I'm just going to ask a few questions about this.

24   A    Uh huh.

25   Q    So first of all, just to be clear, you had a conversation

1   with Mario Garza, the chief operations officer at the time,

2   correct?

3   A    Yes.

4   Q    And you followed up with an email, correct?

5   A    Yes.

6   Q    You copied Dr. Zamora and others on the email --

7   A    Correct.

8   Q    -- correct?

9   A    Uh huh.

10  Q    And the Center came back and provided a written response -

11  -

12  A    Yes.

13  Q    -- correct?

14  A    Correct.

15  Q    And they also provided, with that response, a letter that

16  you understood to be from an attorney, correct?

17  A    Correct.

18  Q    And that letter from the attorney, that went through

19  various provisions of the Texas Code, correct?

20  A    Correct.

21  Q    Okay.  And you also understood from the response that you

22  got back, that the Center was going to do some things to

23  address your concerns, correct?

24  A    Yes.

25  Q    Okay.  And that's the only time you made a written

Dulgheru - Cross / By Mr. Lee                    70

1    complaint to the Center, correct?

2            **MS. YUAN:**  Objection, your Honor.  Asked and

3    answered.

4            **THE COURT:**  I don't know if she said it was the only

5    time, but you wrote one written complaint, right?

6            **THE WITNESS:**  Yes.

7            **THE COURT:** But, you indicated there were other verbal

8    complaints?

9            **THE WITNESS:**  Verbal, multiple verbal complaints.

10   Q    All right.  Let's go into those.  All right.  You

11   testified on direct examination about what was, what, about,

12   what was characterized as a confrontation with the doctor about

13   a patient who had carpal tunnel syndrome.  Is that correct?

14   A    Yes.

15   Q    Okay.  And just to be clear, you don't remember the

16   patient now --

17   A    No.

18   Q    -- correct?  All right.

19   A    No.

20   Q    You just remember that the patient had carpal tunnel

21   syndrome --

22   A    Yeah.

23   Q    -- but, and had a test ordered, correct?  Or a TSH,

24   correct?

25   A    Didn't have the test ordered.  That I was the patient's, I

1   was the doctor seeing the patient and I did not order lab

2   tests.

3   Q    Okay.  You, the confrontation was about whether or not a

4   certain test would be ordered, given his carpal tunnel

5   syndrome --

6   A    Yes.

7   Q    -- correct?

8   A    Yes.

9   Q    Okay.  And your concern was that this was a test that the

10  primary care physician should order, not you, correct?

11  A    Yes.

12  Q    All right.  But, you didn't necessarily, you didn't

13  believe one way or another that the test shouldn't have been

14  done by anyone, correct?

15  A    At some point.  You can argue that you can do it, or

16  shouldn't do it.

17  Q    Okay.

18  A    Either way, it's acceptable.

19  Q    All right  But, your concern was more that this should be

20  done by someone else, not by you.

21  A    Yes.

22  Q    Okay.  And you talked to Dr. Zamora about this particular

23  incident, correct?

24  A    Correct.

25  Q    Okay.  You weren't fired after you talked to him, correct?

Dulgheru - Cross / By Mr. Lee                    72

1    A    Correct.

2    Q    You didn't have your salary docked after this --

3    A    No.

4    Q    -- conversation, correct?

5    A    No, yes.

6    Q    Okay.  You weren't sent back out of this country, correct?

7    A    Correct.

8    Q    Okay.  You also testified under examination about a

9    meeting where you raised the topic of a test for vasculitis,

10   correct?

11   A    Correct.

12   Q    And you asked the doctor about this vasculitis test in

13   this conference room, in a meeting, correct?

14   A    Correct.

15   Q    And you testified that your tone was calm when you raised

16   this, correct?

17   A    Yes.

18   Q    And you testified that Dr. Zamora's tone was calm when he

19   responded, correct?

20   A    Correct.

21   Q    All right.  And again, you weren't fired after this

22   conversation, correct?

23   A    No.

24   Q    And you didn't have your salary docked after this test,

25   after this conversation, correct?

Dulgheru - Cross / By Mr. Lee                    73

1    A    No.

2    Q    And you weren't threatened, no one threatened to send you

3    out of the country after this conversation, correct?

4    A    No.

5    Q    Okay.  Actually, sitting here today, do you know the CPT

6    code for this test for vasculitis that you were talking about?

7    A    No.

8    Q    All right.  And do you know the test, the CPT code, for

9    the test you were talking about just earlier, for the patient

10   with carpal tunnel syndrome?

11   A    No.

12   Q    Okay.

13   A    I don't need to know it.

14   Q    Right.  Okay.  And you also testified on direct

15   examination about a time that you talked to the doctor about a

16   patient, one or more patients who had brought in their

17   explanation of benefits forms.

18   A    Correct.

19   Q    Correct?  All right.  And you, and you talked about how

20   the total amount on those EOBs was higher than what the

21   patients may have expected, correct?

22   A    Correct.

23   Q    All right.  And the doctor responded that, yes, those are

24   the billed amounts, but the paid amounts are lower, correct?

25   A    Correct.

Dulgheru - Cross / By Mr. Lee                          74

1    Q    And that's actually true, right?

2    A    It is true.

3    Q    You know that from your medical experience, right?

4    A    Sure, uh huh.

5    Q    Billed amounts are usually much higher than the actual

6    paid amounts.

7    A    Correct.

8    Q    And when you submit a bill to Medicare or whoever, you

9    don't expect to get paid the full amount you bill, correct?

10   A    No.

11   Q    You expect to get paid a much smaller percentage --

12   A    Sure.

13   Q    -- correct?

14   A    Yeah.

15   Q    Okay.  So, the doctor's response was completely accurate,

16   correct?

17   A    Yes.

18   Q    Okay.  And again, you weren't terminated after you had

19   this conversation, correct?

20   A    No.

21   Q    And you didn't have your salary docked after you had this

22   conversation, correct?

23   A    He couldn't afford to terminate me.

24   Q    And no one threatened to send you back to Romania,

25   correct?

Dulgheru - Cross / By Mr. Lee                    75

1    A    No.

2    Q    And those were, in direct examination, those are the only

3    confrontations with the doctor that you talked about, correct?

4    A    Correct.

5    Q    Okay.  Now, in terms of the labs, you testified on direct

6    examination that you decided in the course of your work, to not

7    follow the lab protocols, correct?

8    A    Correct.

9    Q    All right.  And when you decided that, so you would not

10   order some of the tests that you had been expected to order,

11   correct?

12   A    Correct.

13   Q    All right.  Now, when you were working at the Center,

14   Dr. Zamora was your supervisor, correct?

15   A    Yes.

16   Q    And he had access to your files, correct?

17   A    Correct.

18   Q    And so, he could see what you were doing and not doing,

19   correct?

20   A    Sure.  Yeah.

21   Q    Okay.  And again, when you decided just to not, not

22   necessarily order all of the tests in the protocol, you didn't

23   get terminated for that, correct?

24   A    No.

25   Q    And again, you didn't have your salary docked, correct?

Dulgheru - Cross / By Mr. Lee                          76

1    A    No.

2    Q    Okay.

3    A    But, that's very illegal to interfere with another

4    practitioner's billing.  So, he wouldn't do that, no.

5    Q    And he didn't do that --

6    A    No.

7    Q    -- correct?

8    A    No.

9    Q    Okay.  So, when you decided, when you made the decision to

10   order certain tests, but not other tests, again, you didn't

11   suffer any consequences for that, correct?

12   A    No.

13   Q    Okay.  Now, you said that while you were working at the

14   practice, you saw about 22 to 25 patients a day, correct?

15   A    Correct.

16   Q    All right.  Now, your schedule, there were some times when

17   you were scheduled to see more, but you ended up seeing 22 to

18   25, correct?

19   A    Correct.

20   Q    Because sometimes, patient is scheduled to come in, but

21   they don't actually show up --

22   A    Yes.

23   Q    -- correct?

24   A    Yes.

25   Q    And that's why, sometimes, doctors schedule more patients

Dulgheru - Cross / By Mr. Lee                          77

1    for a day than they actually end up seeing, correct?

2    A    Correct.

3    Q    Because they want to make sure they bill the day, correct?

4    A    Correct.

5    Q    Okay.  So, when you were testifying earlier about what you

6    saw the doctor schedule, that was what you saw, of what was

7    scheduled for the day, correct?

8    A    For him?

9    Q    Yes.

10   A    Yes, probably.

11   Q    All right.  So, when you testified earlier, you were

12   talking about what was scheduled --

13   A    Uh huh.

14   Q    -- you don't actually know how many patients he typically

15   saw in a day?

16   A    No.

17   Q    Okay.  All right.  Now, you testified on direct

18   examination about super bills, correct?

19   A    Yes.

20   Q    All right.  And you testified about how one of the things

21   that goes on a super bill is the diagnosis code going along

22   with that visit, correct?

23   A    Yes, correct.

24   Q    All right.  And the form allows for multiple diagnoses, if

25   multiple diagnoses are treated during the course of a visit,

1   correct?

2   A    Sure.  Yes.

3   Q    Okay.  That's not unusual --

4   A    No.

5   Q    -- correct?

6   A    No. No.

7   Q    All right.  You also testified on direct examination about

8   something you called the consultation level, correct?

9   A    Yes.

10  Q    All right.  Consultation level refers to the complexity of

11  a provider's visit with a patient, correct?

12  A    Yes, correct.

13  Q    All right.  And there's two kids of visit codes.  There's

14  visits for new patients and there's visits for established

15  patients --

16  A    Correct.

17  Q    -- correct?

18  A    Uh huh.

19  Q    And so the first time you see a patient, that's considered

20  a new visit.

21  A    Yes.

22  Q    And if it's the first time you've seen a patient after a

23  long gap in time, you might be, well, do a second new patient?

24  A    Yes.

25  Q    For the patient.  And established patient visits are for

1    when you see follow ups, when you see the patient on follow up?

2    A    Sure.  Sure.

3    Q    Now, and there's different levels of complexity --

4    A    Yeah.

5    Q    -- that go along with visits --

6    A    Yes.

7    Q    -- correct?

8    A    Uh huh.

9    Q    All right.  And that's the determining factor for how a

10   visit is billed, correct?

11   A    Correct.

12   Q    Right.  And so, typically, there are visits coded at the

13   lower level, correct?

14   A    Uh huh.

15   Q    And there's visits coded at the middle, or medium level,

16   correct?

17   A    Yeah.  Uh huh.

18   Q    And there's visits coded at the high level, correct?

19   A    Yes, correct.

20   Q    And there's different CPT codes, depending on whether it's

21   a new visit or established patient visit, correct?

22   A    Yes.

23   Q    Okay.  And --

24   A    ICD.

25   Q    -- right.

Dulgheru - Cross / By Mr. Lee                    80

1  A    Uh huh.

2  Q    And the CPT codes, or visit codes, are not specific,

3  there's no, it's based on complexity rather than based on

4  specific time, correct?

5  A    Correct, yeah.

6  Q    Because you can do a short visit, but engage in

7  complicated medical decision making, and the visit can probably

8  be coded at the high level, correct?

9  A    I doubt you can do that in five minutes.

10  Q    Okay.  I'm not asking that.

11  A    Yeah.

12  Q    Dr. Dulgheru --

13  A    Yeah.

14  Q    -- I'm just asking in your, from your knowledge of medical

15  billing --

16  A    Uh huh.

17  Q    -- you can do, the time, it does not matter.  It's the

18  complexity of the visit.

19  A    The complexity matters, yes.

20  Q    Right.  Okay.

21      **(Pause)**

22  Q    Now, you were asked on direct examination about certain

23  tests.  And I want to ask you about some tests that you may or

24  may not use as a rheumatologist in your practice.  Let's see,

25  are you familiar with the rheumatoid factor test?

Dulgheru - Cross / By Mr. Lee                    81

1   A    Yes.

2   Q    Is that something you use as a rheumatologist?

3   A    Absolutely.

4   Q    Is that something you commonly order?

5   A    Yes.

6   Q    Okay.  And that has helped to determine where, what does

7   that help chart?

8   A    If the patient has rheumatoid arthritis, or

9   rheumatological conditions.

10  Q    Okay.  And a rheumatoid factor, that can fluctuate over

11  the course of a patient's life, that can fluctuate, correct?

12  A    Not much.

13  Q    But it can, correct?

14  A    If you want to make the point like that, yes.

15  Q    Okay.  CRP, what is that?

16  A    The C-reactive protein, it's a marker of inflammation.

17  Q    All right.  Is that a test you commonly order?

18  A    Yes.

19  Q    Sedimentation rate, what is that?

20  A    It's a marker of inflammation as well.

21  Q    Is that a test you commonly order?

22  A    Sure.

23  Q    ANA, what is that?

24  A    Antinuclear antibody.

25  Q    Is that a test you order?

Dulgheru - Cross / By Mr. Lee                    82

1    A    Sure.

2    Q    Okay.  Are you familiar with something called a Vectra

3    test?

4    A    Sure.

5    Q    And what is that?

6    A    It's a disease activity test, only for rheumatoid

7    arthritis.

8    Q    Okay.

9    A    Only for rheumatoid arthritis.

10   Q    Right.  And do you order those tests?

11   A    Once in a while, yes.

12   Q    All right.  And when you order those tests, do you get

13   paid for ordering them?

14   A    No.

15   Q    There's no financial benefit to you ordering a Vectra

16   test, correct?

17   A    Not for me, because I don't own a lab.

18   Q    Right.  The only one who gets paid when Vectra test is

19   ordered, is the lab that performs the Vectra test, correct?

20   A    Yes, correct.

21   Q    All right.  And Vectra tests are done, by a large company,

22   correct?

23   A    Correct.

24   Q    All right.  And Dr. Zamora does not own that company,

25   correct?

Dulgheru - Cross / By Mr. Lee                    83

1    A    No.

2    Q    No.

3    A    But, he owned a lab.  Not for Vectra --

4    Q    Right.

5    A    -- but for the rest.

6    Q    But the Vectra tests, there's no, he does not own the lab

7    that conducts the Vectra tests, correct?

8    A    No, we didn't even have a Vectra when I was there.

9    Q    Right.  But, I'm asking you --

10   A    No, no.

11   Q    -- did the government ask you questions about your time as

12   a rheumatologist --

13   A    Yes, no.

14   Q    -- I don't know if, Vectra tests may not have existed back

15   in 2003 --

16   A    No.

17   Q    -- correct?

18   A    Correct.

19   Q    But, in your practice, you've ordered Vectra tests?

20   A    Sure.

21   Q    Correct?

22   A    Yes.

23   Q    And there's no financial benefit to you--

24   A    No, absolutely.

25   Q    -- for ordering that.  Okay.

Dulgheru - Cross / By Mr. Lee                          84

1        **(Pause)**

2   Q    All right.  You were asked some questions about Irma

3   Gonzalez on direct examination, correct?

4   A    Correct.

5   Q    And you saw Irma Gonzalez for the first time in about

6   2015 --

7   A    Yes.

8   Q    -- correct?

9   A    Uh huh.

10  Q    And that was about eight or so years after you left

11  Dr. Zamora's practice, correct?

12  A    Correct, yes.

13  Q    All right.  I'm going to put on the screen, on direct, on

14  direct you were asked, you were shown, this, wait, sorry, wrong

15  page.  I'm going to put on the screen page 20, of Government

16  Exhibit C5.  And I'm going to make sure it's all plugged in so

17  everyone can see.

18       **(Pause)**

19  Q    All right.  Do you see, on the screen, the page 20 of

20  Government Exhibit C5?

21  A    Yes.

22  Q    All right.  And this is the page, one of the pages that

23  the government showed you on direct examination, correct?

24  A    Yes.

25  Q    All right.  And this goes, this is a chart for a January

Dulgheru - Cross / By Mr. Lee                                    85

1  27, 2015 visit that you had with Irma Gonzalez, correct?

2  A    Correct.

3  Q    All right.  And this patient was referred to you for

4  evaluation of systemic sclerosis, correct?

5  A    Correct.  Do you know why?  She was referred by a

6  cardiologist.

7  Q    Thank you, Dr. Dulgheru.

8         **THE COURT:**  You can go ahead and give the answer, you

9  just don't have to do it in the form of a question to him.

10        **(Laughter)**

11        **THE COURT:**  Or, we'll have to put him on the stand

12  here.

13  Q    All right.  Okay.  Dr. Dulgheru, I've highlighted the

14  history of present illness for this patient.  Do you see that

15  on the screen?

16  A    Yes.

17  Q    All right.  And these are your notes for when this patient

18  came to see you, correct?

19  A    Yes.

20  Q    All right.  And it says here, in the second line, that she

21  was diagnosed 8 years ago by Dr. Encarnacion Rodriguez.

22  A    Yes.

23  Q    Okay.  All right.  Are you familiar with that doctor?

24  A    Yes.

25  Q    All right.  Is he a rheumatologist?

Dulgheru - Cross / By Mr. Lee                    86

1    A    She.  Yes.

2    Q    All right.

3              THE COURT:  Can we spell her first name?

4              THE WITNESS:  Probably me.

5         **(Laughter)**

6              THE COURT:  Okay.  The T probably should be a C on

7    this.  I'm totally wrong.  On this, we're going to call her

8    Incarnation.

9         **(Laughter)**

10             THE COURT:  Go ahead.

11   Q    All right.  In the next line of this page, it refers to

12   this patient seeing Dr. Glazer in the past.

13   A    Yes.

14   Q    Are you familiar with Dr. Glazer?

15   A    Yes.

16   Q    And what is Dr. Glazer's specialty?

17   A    Rheumatology.

18   Q    All right.  And then, the next line refers to this patient

19   going to see Dr. Elvin Garcia, correct?

20   A    Yes.

21   Q    Are you familiar with Dr. Elvin Garcia?

22   A    Yes.

23   Q    Is he a rheumatologist?

24   A    He is.

25   Q    All right.  And then it refers to this patient being

Dulgheru - Cross / By Mr. Lee                    87

1   evaluated by Dr. Zamora --

2   A    Yes.

3   Q    -- correct?

4   A    Uh huh.

5   Q    And you know from your experience, that Dr. Zamora is a

6   rheumatologist.

7   A    Yes.

8   Q    Dr. Dulgheru, have you heard the joke that if you get four

9   rheumatologists in a room, you would get six opinions?

10  A    That's possible, yes.

11  Q    Okay.  And you're the fifth rheumatologist to now see this

12  patient --

13  A    Yes.

14  Q    -- correct?

15  A    Yes.

16  Q    All right.  Now, in looking down at the bottom of the HPI

17  interim history section, it referred, it states here that the

18  patient is experiencing hand pain while still being able to

19  make a full fist, correct?

20  A    Yes.

21  Q    All right.  And also, and it also refers to Raynaud's

22  being significant.  Do you see that?

23  A    Which one?

24  Q    The last line, Raynaud's significant?

25  A    Yes.

Dulgheru - Cross / By Mr. Lee                                    88

1  Q    All right.  I'm now going to put on the right hand side of

2  the screen, the next page of the exhibit.  And I'm going to

3  highlight the family history.  All right.  And looking at this,

4  it states here that the family history shows that the mother,

5  that this patient's mother had rheumatoid arthritis, correct?

6  A    Yes, uh huh.

7  Q    All right.  And if a patient's family history showed a

8  family member with rheumatoid arthritis, that could be relevant

9  to a diagnosis decision, correct?

10 A    Yeah, but not necessarily rheumatoid arthritis.

11 Q    Okay.  All right.

12      **(Pause)**

13      And looking at the treatment section.

14 A    Uh huh.

15 Q    You ordered various labs for this patient, correct?

16 A    Correct.  Yes.

17 Q    All right.  And these labs, well let's go through them.

18 Rheumatoid arthritis factor.  That's the one we were talking

19 about before, correct?

20 A    Yes.

21 Q    And that's a test you commonly order.

22 A    Yes.

23 Q    All right.  Scleroderma diagnostic profile, that's a test,

24 why do you, what's this test for?

25 A    So, it includes the SCL 70 and centromere antibodies, and

Dulgheru - Cross / By Mr. Lee                    89

1    it's for scleroderma.

2    Q    Okay.  Is that a test you commonly order if you might

3    suspect a patient having scleroderma?

4    A    Yes.

5    Q    All right.  ESR, what is this?

6    A    This is the test for inflammation.

7    Q    Right.  And this test, you commonly order if you suspect

8    the patient might have autoimmune disease, including something

9    like --

10   A    Correct.

11   Q    -- rheumatoid arthritis?

12   A    Correct.  Uh huh.

13   Q    Comprehensive metabolic panel.  Is this a test you

14   commonly order?

15   A    I ordered due to the medication that I'm going to use on

16   the patient.  I want to have a baseline.

17   Q    Okay.  Is this something that you commonly order when you

18   first see a patient?

19   A    Absolutely, yes.

20   Q    All right.  CBC, what is this test?

21   A    The same.  It's for all the cells, white cells,

22   hemoglobin, platelets, and it also guides your treatment in the

23   future.  Also, it may indicate if the patient has anemia

24   related to inflammation, or if they have low white count, low

25   platelets, that may indicate another disease like lupus.  So,

Dulgheru - Cross / By Mr. Lee                          90

1    it's absolutely necessary also.

2    Q    All right.  And is this a test you commonly order when you

3    first see a patient?

4    A    Yes. Yes.

5    Q    Okay.  The next test, ANA IFA screen.  This is for the ANA

6    you were talking about earlier?

7    A    Yes.  Antinuclear, uh huh.

8    Q    All right.  Is this a test you commonly order when you

9    first see a patient?

10   A    Depends.  So, this patient, clinical examination was

11   suggestive of scleroderma, and all the patients with

12   scleroderma were 98% are ANA positive.  So, yes.

13   Q    Okay.  All right.  So, because you thought this patient

14   might have scleroderma --

15   A    Yeah

16   Q    -- this would be a common test to order --

17   A    Yes.

18   Q    -- if you thought the patient had scleroderma?

19   A    Yes.

20   Q    Okay.  The next test, Sjogren's.

21   A    Yes.

22   Q    All right.  Is this a test you commonly order when you

23   first see a patient?

24   A    I order in somebody, for example like her, that complained

25   of dryness of the mouth, right?  So, you're suspecting Sjogren.

Dulgheru - Cross / By Mr. Lee                    91

1   Q    Is this a test you commonly order when you suspect a

2   patient might have Sjogren's?

3   A    Yes.

4   Q    Okay.  The next test, the next lab, what is that?

5   A    That's for lupus.  SM and RMP antibodies are tested.  If

6   they're positive, a patient may have lupus.

7   Q    Is this a test you commonly order when you suspect a

8   patient might have lupus?

9   A    Yes.

10  Q    All right.  And the final test here.  What is that?

11  A    The test for inflammation, the high sensitivity CRP.

12  Q    All right.  And is this a test you commonly order when you

13  see a new patient?

14  A    Yes.

15  Q    Okay.  And what do you order this for?

16  A    Just to see if the patient has inflammation at a time.

17  Q    Okay.  So, if a patient comes to you --

18  A    Uh huh.

19  Q    -- a rheumatologist --

20  A    Uh huh.

21  Q    -- this would be a test you would commonly order at the

22  first visit?

23  A    Commonly ordered, yes.

24  Q    Okay.  All right.  I'm now going to put on screen, the

25  next page of this exhibit.  Now, Dr. Dulgheru, you saw this

Dulgheru - Cross / By Mr. Lee                          92

1   patient on January 27th, 2015, correct?

2   A    Uh huh, yes.

3   Q    All right.  And I'm now highlighting a line from the top

4   of page 22, Government Exhibit C5.  And that states that this

5   document was electronically signed by you on August 18th, 2015,

6   correct?

7   A    Correct.

8   Q    All right.  That's about 7 months after the visit,

9   correct?

10  A    Correct.

11  Q    All right.  Now, in your practice sometimes, now is it

12  better for to complete a visit note soon after you do the

13  visit?

14  A    Yes, and I'm sure it was completed, but I didn't sign it.

15  Q    Okay.  All right.  There's nothing wrong with you signing

16  it a bit later than you should have, correct?

17  A    It's not the correct practice, but, yes.

18  Q    It happens, correct?

19  A    It happens.

20  Q    Okay.  It's not best practice, but you weren't trying to

21  do anything wrong by signing it later, correct?

22  A    Oh, no, no, no.  Absolutely not.

23  Q    Okay.  All right.  I'm now going to turn to the next visit

24  with this patient.

25       **(Pause)**

Dulgheru - Cross / By Mr. Lee                    93

1        I'm putting on the left hand side of the screen,

2   Government Exhibit C5, page 17.  All right.  And this is a

3   visit note by you for a visit on February 24th, 2015, correct?

4   A    Yes.

5   Q    All right.  And so, this is a follow up visit, correct?

6   A    Yes.

7        **(Pause)**

8   Q    All right.  And the HPI section, in the interim history,

9   the first paragraph describes the results of the tests you had

10  ordered, correct?

11  A    Yes.

12  Q    Okay.  Now, you or your office were asked to provide your

13  file for this patient, correct?

14  A    Yes.

15  Q    All right.  Now, this document that we have here, it

16  doesn't include copies of these actual labs, correct?

17  A    No.

18  Q    All right.  But the labs happened, right?

19  A    Yes.

20  Q    Okay.  So, the fact that you wrote these down and had the

21  report of the lab results --

22  A    Yeah.

23  Q    -- that, you don't see anything wrong with you having that

24  report, even if you don't have the labs at this time, correct?

25  A    No, I don't see anything --

Dulgheru - Cross / By Mr. Lee                    94

1   Q    Okay.

2   A    -- wrong with it.

3        **(Pause)**

4   Q    All right.  I'm now going to go to the next visit.  And

5   going to put on the right hand side of the screen, page 13 of

6   this exhibit.  All right.  And this is for a visit from March

7   24th, 2015, correct?

8   A    Uh huh.  Yes.

9   Q    All right.  And in the HPI section, you again refer to

10  labs, correct?

11  A    Yes.

12  Q    All right.  Now, reading this, does this indicate that you

13  ordered labs after the second visit?

14  A    No.

15  Q    All right.  Or is this just repeating the information from

16  the prior visit?

17  A    We often do that because you want to refresh your memory

18  about the results that that patient had initially.  And that

19  tells you about the diagnosis.  So, we often repeat them.

20  Q    Okay.

21       **(Pause)**

22  Q    All right.  I'm now going to put on the screen, September

23  21st visit, 2015.  Page 5.  And this is from, this is a note by

24  you from September 21st, 2015, correct?

25  A    Uh huh.

1        **(Pause)**

2    Q    All right.  And I'm going to put the next page on the

3    right hand side.  And I'm going to highlight the treatment

4    section.  Okay.  And in your clinical notes, you have the line,

5    discussed differential diagnosis, clinical assessment,

6    impression, working diagnosis, treatment options, and plan of

7    care with patient.  What are you referring to there?

8    A    So, the diagnosis.  And then, what options do we have for

9    that particular diagnosis.  And the recommended medications,

10   and the possible side effects.  This is just a phrase that we

11   use when we prescribe certain medications.

12   Q    Okay.  The phrase differential diagnosis, what does that

13   mean?

14   A    So, differential diagnosis, it means what other

15   possibility, diagnostic possibility could the patient have.

16   Q    Okay.  So, at this point, you're discussing, you have made

17   an evaluation of the patient --

18   A    Yeah.

19   Q    -- but you're discussing with her that it could be

20   something else, correct?

21   A    You always discuss with a patient if it could be something

22   else depending on their level of understanding.

23   Q    Right.  Well, you're discussing with her the other

24   possible diagnoses that the patient could have --

25   A    Yes.

Dulgheru - Cross / By Mr. Lee                    96

1  Q    -- in addition to the one that, you have an opinion about

2  what she has.

3  A    Yes.

4  Q    But you're explaining, but it's possible she might have

5  something else, correct?

6  A    This is a phrase we're using.  Of course, that's a

7  differential diagnosis.

8  Q    Right.  And this is going to something we talked about

9  earlier.  Which is, that different rheumatologists might have

10  different opinions, correct?

11  A    Correct.

12  Q    Okay.  All right.  Now, this is when you saw the patient

13  in 2015.  And from your records, it looks like you see her

14  again about two years later.  Does that sound about right to

15  you?

16  A    Yes.

17      **(Pause)**

18  Q    Okay.  And I'm putting on the left hand side of the

19  screen, the first page of this document, which is a visit note

20  by you for August 29th, 2017, correct?

21  A    Correct.

22  Q    And I'm highlighting the history of present illness.  And

23  this is, these are your notes, correct?

24  A    Yes.

25  Q    And among other things, she refers, and there's a

Dulgheru - Cross / By Mr. Lee                    97

1    reference here to the patient being told that she quote, she

2    has inflammation, correct?

3    A    Yes.

4         **(Pause)**

5    Q    All right.  And turning to the next page, putting that on

6    the right hand side of the screen, I'm going to highlight the

7    treatment at the top of the treatment section.  And according

8    to this note, you ordered some labs for this patient, correct?

9    A    Yes.

10   Q    All right.  And creatine kinase total, what is that?

11   A    It's for a muscle enzyme.  That tells you if the patient

12   has muscle inflammation.

13   Q    Okay.  And is this something that you order based, in

14   part, on what you were told about this patient's having

15   inflammation?

16   A    Yes.  It's, her complaints also.

17   Q    Right.  And it's not, it would not be uncommon for you to

18   order this --

19   A    No.

20   Q    -- given what you saw --

21   A    No.

22   Q    -- correct?  All right.  The next test, sedimentation rate

23   by modified westergren?

24   A    Yeah.

25   Q    Is that the same test you had ordered before?

Dulgheru - Cross / By Mr. Lee                              98

1    A    Yes.

2    Q    All right.  But you're ordering it a second time, correct?

3    A    Two years later.

4    Q    Okay.

5    A    Yeah.

6    Q    And you're ordering it because it might be helpful for you

7    to see --

8    A    Yes.

9    Q    -- if this --

10   A    It fluctuates.

11   Q    -- right.  Okay.  And so C-reactive protein.  That's a

12   test that you ordered before, correct?

13   A    Correct.

14   Q    All right.  But, you're ordering it again based on what

15   you're seeing, correct?

16   A    Correct.

17        **(Pause)**

18   Q    Okay.  Now, Dr. Dulgheru, I just want to go through a

19   little bit of your time after you left Dr. Zamora.

20   A    Uh huh.

21   Q    So, after you left Dr. Zamora, you left this entire area

22   for a few years, correct?

23   A    Yes, correct.

24   Q    All right.  And you were practicing in?

25   A    Missouri.

Dulgheru - Cross / By Mr. Lee                          99

1    Q    Missouri.

2    A    Uh huh.

3    Q    And what kind of, what was your practice in Missouri?

4    A    So, I was a rheumatologist as well.  And I worked with a

5    multi-specialty clinic in the beginning; and then I had my own

6    practice after that.

7    Q    All right.  Now, you mentioned earlier that you were board

8    certified in rheumatology.

9    A    Uh huh.

10   Q    And I believe you also mentioned that you were perhaps

11   board certified in internal medicine --

12   A    Yes.

13   Q    -- correct?

14   A    Yes.

15   Q    All right.  What is internal medicine?

16   A    What is internal medicine?

17   Q    Yes.  Can you explain it for the jury?

18   A    So, it's the basic specialty that everybody, that

19   subspecializes in rheumatology, cardiology, pulmonary, has to

20   be gone through training.  So, it's three years that are

21   mandatory in order for you to become a rheumatologist, or a

22   cardiologist, or pulmonologist.  And it just tells you about

23   different diseases.  You learn about different conditions that

24   are not as focused as the subspecialties are.

25   Q    Okay.

Dulgheru - Cross / By Mr. Lee                    100

1   A    It's generally, general medicine.

2   Q    Are there patients you see as an internal, given your

3   expertise in internal medicine --

4   A    Uh huh.

5   Q    -- as opposed to your expertise in rheumatology?

6   A    Uh huh.

7   Q    Okay.  Are the patients who come to you, because internal

8   medicine, not because you're a rheumatologist?

9   A    Most of the patients come because of rheumatologist,

10  because I'm a rheumatologist.

11  Q    Okay.  All right.  And then you came back to the valley,

12  here.

13  A    Yes, uh huh.

14  Q    All right.  And where do you work when you came here?

15  A    The first year, I worked with Dr. Bricia Toro in

16  Brownsville.

17  Q    All right.  And was that an office setting?

18  A    It was an office setting, yes.

19  Q    All right.  And what did you do after that?

20  A    I opened my own practice in Edinburgh.

21  Q    Okay.  During the time, have you also worked at hospitals?

22  A    Yes.

23  Q    All right.  Which hospitals have you worked at?

24  A    I worked at Valley Regional, I think it was called, in

25  Brownsville.  I was seeing patients, inpatient, there as well.

Dulgheru - Cross / By Mr. Lee                    101

1    Q    Right.  So you're seeing some patients in the office

2    setting.

3    A    Yeah.

4    Q    And you're also seeing patients in an inpatient setting?

5    A    Yes, uh huh.

6    Q    And about, given, can you estimate about how many patients

7    you're seeing in the office versus in the inpatient setting?

8    A    Oh, inpatients are very rare.  The consultations are very

9    rare for rheumatology.  Very few consults.

10        **(Pause)**

11   Q    All right.  Now, you were asked on direct examination

12   about whether you had seen patients who had also seen

13   Dr. Zamora from time to time --

14   A    Yes.

15   Q    correct?

16   A    Yes, uh huh.

17   Q    And you testified that sometimes you agreed, sometimes you

18   disagreed with Dr. Zamora, correct?

19   A    Yes, correct.

20   Q    But, there's also times where you've agreed with his

21   diagnosis --

22   A    Yes.

23   Q    -- correct?

24   A    Yes.

25   Q    Okay.  And if the claims data showed that Dr. Zamora had

Dulgheru - Cross / By Mr. Sully                    102

1    treated a patient for rheumatoid arthritis, and if your claim

2    data showed that you had treated the patient for rheumatoid

3    arthritis, you'd have no reason to dispute that data, correct?

4    A    No.

5    Q    Okay.

6         **MR. LEE:**  Let me have one moment, your Honor.

7         **(Pause)**

8         I'll pass the witness, your Honor.  Nothing further

9    at this time.

10        **THE COURT:**  Mr. Sully?

11        **MR. SULLY:**  Thank you, your Honor.

12                        **CROSS EXAMINATION**

13   **BY MR. SULLY:**

14   Q    Good morning.

15   A    Good morning.

16   Q    Is it Dr. Dulgheru?

17   A    Yes.

18   Q    Did I pronounce it correctly?  Thank you.

19        My name is Chris Sully, and I represent Meisy Zamora.

20   A    Uh-huh.

21   Q    Doctor, we've never met before, right?

22        **THE COURT:**  You need to be closer.  Turn --

23        **MR. SULLY:**  Oh, I'm sorry.

24        **THE COURT:**  -- the microphone.

25        **MR. SULLY:**  Let me move the mic.

1   BY MR. SULLY:

2   Q    All right, is this better, Doctor?

3   A    Yes.

4   Q    Thank you.  We've never met before, right?

5   A    No.

6   Q    Okay, but you've met with Federal agents and with

7   prosecutors relating to this case a few times, right?

8   A    Yes, uh-huh.

9   Q    How many times, more or less, would you say that you've

10  met with them or talked with them?

11  A    With prosecutors or with --

12  Q    Or with agents; either one.

13  A    About six times, maybe.

14  Q    About six times, total?

15  A    Uh-huh.

16  Q    Okay, I'd like to ask you some questions about Meisy,

17  specifically.

18  A    Yes.

19  Q    But only based on your personal knowledge; so only things

20  that you saw her do or saw her say, okay?

21  A    Correct, uh-huh.

22  Q    At any point, did you ever see Meisy add anything to a

23  superbill?

24  A    No.

25  Q    Okay, you never heard Meisy tell anyone to add something

1   to a superbill?

2   A    No.

3   Q    You never saw Meisy, in an examining room, examining a

4   patient?

5   A    No.

6   Q    You never saw her practicing rheumatology or anything like

7   that?

8   A    No.

9   Q    And she's not a rheumatologist, right?

10  A    No.

11  Q    You never saw her falsify or fabricate any record, right?

12  A    No.

13  Q    And you never saw her tell anybody to falsify or fabricate

14  any records?

15  A    No.

16  Q    She never told you to make a false diagnosis, right?

17  A    No.

18  Q    You mentioned that you were board certified in

19  rheumatology and internal medicine, right?

20  A    Yes.

21  Q    And that was true at the time that you were working at the

22  clinic; Dr. Zamora's clinic?

23  A    Yes.  I think I was board certified in both, yes.

24  Q    Okay.

25  A    Uh-huh.

1  Q    And you were aware that Dr. Zamora was also board

2  certified in rheumatology and internal medicine, right?

3  A    Yes.

4  Q    And you would agree that it would be better for a doctor

5  practicing in rheumatology to have a board certification in

6  rheumatology if they're seeing patients as opposed to not

7  having one, right?

8  A    Yes.

9          MR. SULLY:  I'll pass the witness, your Honor.

10         THE COURT:  Mr. Alvarez?

11                    CROSS EXAMINATION

12 BY MR. ALVAREZ:

13 Q    I'm just trying to get the time frame right.

14      Doctor, you left the clinic in 2006, correct?

15 A    Yes.

16 Q    And you never returned?

17 A    No.

18         MR. ALVAREZ:  No further questions, your Honor.

19         THE COURT:  Mr. Pena?

20         MR. PENA: Thank you, your Honor.

21                    CROSS EXAMINATION

22 BY MR. PENA:

23 Q    Good morning, Doctor.

24 A    Good morning.

25 Q    I was taking notes during your testimony.

1    A    Yes.

2    Q    I want to discuss a few topics with you.

3    A    Uh-huh.

4    Q    Okay?

5         First one is, my understanding is that you were working

6    with Dr. Zamora because there's a special pathway in

7    immigration for you to get citizenship here in the United

8    States if you work for three years in an underserved area,

9    correct?

10   A    Yes, correct.

11   Q    And that was the reason why you were working with him?

12   A    Yes.

13   Q    And then you completed it.

14        Were you able to get your citizenship?

15   A    Yes.

16   Q    Okay, so that all worked out?

17   A    Yes.

18   Q    Okay, now, my understanding also is that you had different

19   choices where you could work.  And you could work with

20   rheumatologists who also had an internal medicine practice?

21   A    Yes.

22   Q    And you discussed that with --

23   A    That is --

24   Q    -- with mister --

25   A    It is actually the other way around.

1       There were internists that wanted to create a rheumatology

2  practice.

3  Q    And that wasn't the idea that you wanted.  You wanted --

4  A    No.

5  Q    -- to specialize further in rheumatology?

6  A    Yes.

7  Q    And is that something you see often -- or at least, at

8  that time, you saw that, where there were a lot less full-time

9  specialty rheumatologists?

10 A    This is a trend, and it's going to get much worse.  So

11 there is very -- there is a shortage of rheumatologists.  So I

12 guess some primary care offices are trying to hire

13 rheumatologists to cover their patients.

14 Q    Okay, and is that something you see now in the Valley, for

15 example?

16      Are there a lot of doctors who are practicing physicians,

17 internists who are also doing rheumatology on the side?

18 A    No.

19 Q    Okay, so it's only rheumatologists?

20 A    Only rheumatologists, yes.

21 Q    But in 2003, it wasn't the case?

22 A    In the Valley?

23 Q    Well, my understanding was that you had different options.

24 You said there were a lot of internists who are trying to open

25 up rheumatology.  But you found Dr. Zamora, who was a full-

Dulgheru - Cross / By Mr. Pena                          108

1   time, 100 percent rheumatologist?

2   A    There were different states, you know --

3   Q    Okay.

4   A    -- that have different regulations as far as waivers.

5        Some of them are harder than the other to get in.  And

6   this was a regulation that only opened for Texas when I was

7   applying.  It was just, I don't know, fate.

8        The State 30 didn't exist for Texas, so there was no way

9   to get a waiver in Texas before that year.  And that year they

10  opened and, you know, I thought that was a sign, you know.  So

11  I took the opportunity.

12  Q    And then you eventually came back after Missouri?

13  A    Yeah.  I had a house here, and I love the Valley.

14  Q    Excellent.  Me too.

15       Okay, so I want to clarify something else, which is, when

16  did you leave for Missouri?

17  A    From Missouri?

18  Q    No, to Missouri.  You left here --

19  A    In October 2006.

20  Q    Okay, so the three years --

21  A    Uh-huh.

22  Q    -- that we discussed, you started in October -- and I

23  think it was October --

24  A    Yeah.

25  Q    -- 15th of 2003, correct?

1  A    Yeah, uh-huh.

2  Q    And then it went all the way to October of 2006?

3  A    Yes.

4  Q    And then, in that same month of October 2006, you had a

5  position over in Missouri?

6  A    Yes.

7  Q    Where was that?

8  A    At Kneibert Clinic, Missouri.

9  Q    Okay, and you had -- I guess you had to look for a

10 different position, correct?

11 A    Yes.

12 Q    Did you look at different locations?

13 A    Yes, I believe I did.

14 Q    How long did that process take?

15 A    That takes a while; months.

16 Q    Months?

17 A    Uh-huh.

18 Q    Okay, would you say -- when you say, "months," closer to a

19 year that you were looking?

20 A    No.  Probably six months.

21 Q    Okay, so six months prior, you were looking, and you

22 finally located Missouri, correct?

23 A    Yeah.

24 Q    Okay, now, let's go back to the discussion you had with

25 Mr. Lee, which is -- he brought some documents up to you, and

1  he said -- and, you know, these were letters that you reviewed?

2  A    Uh-huh.

3  Q    Did you remember reviewing those?

4  A    Yes, yes.

5  Q    And those were letters that you wrote.  I think you wrote

6  two of them, correct?

7  A    One e-mail and one letter, probably.

8         **MR. PENA:**  Your Honor, can I approach?

9         **THE COURT:**  Sure.

10         **THE WITNESS:**  I don't know if this is an e-mail or --

11  **BY MR. PENA:**

12  Q    Looks like it.

13  A    It's an e-mail.

14  Q    Okay, I'm going to show you exhibit -- let's start with

15  Exhibit 296.  You see that?

16  A    Here?

17  Q    Right here, in the file.

18  A    Yeah, yeah, yeah.

19  Q    And then you can see that this -- on the top, that's --

20  A    Yeah.

21  Q    -- your name?

22  A    Uh-huh.

23  Q    And it looks to appear to be an e-mail?

24  A    Yeah.

25  Q    And what is the date of the e-mail?

1   A    April 21, 2006.

2   Q    Okay, so April 21, 2006 --

3   A    Uh-huh.

4   Q    -- you wrote an e-mail.

5        And you wrote an e-mail to -- who was that?

6   A    Mario Garza.

7   Q    Okay, so Mario Garza worked for the clinic?

8   A    Yes, yes.

9   Q    And he's listed -- does it have his title there?

10  A    COO.

11  Q    Okay, What is your understanding of COO?  Would that be --

12  A    Chief Operating Officer.

13  Q    And that's what you knew him to be, correct?

14  A    Yes, uh-huh.

15  Q    Okay, and then I think you discussed, with Mr. Lee, that

16  the concern you had in this letter --

17  A    Uh-huh.

18  Q    -- was some billing problems, correct?

19  A    Yes.

20  Q    I believe -- my understanding is, for about three weeks

21  prior to this letter --

22  A    Uh-huh.

23  Q    -- you were complaining that they had been billing some of

24  the, I guess P.A.s or nurse practitioners under your name?

25  A    Exclusively under my name.

Dulgheru - Cross / By Mr. Pena                    112

1    Q    And you believe that it should have been under the name of

2    Dr. Zamora, correct?

3    A    Because he was also present in the clinic.

4    Q    Okay.

5    A    Yes.

6    Q    So this was a dispute, correct?

7    A    It was a dispute, obviously.

8    Q    Okay, and then I think there's another letter.  No, it's

9    not one of these.

10        I actually think there was one more letter.

11            **THE COURT:**  Do you have a question?

12            **MR. PENA:**  I'll give her an opportunity, your Honor.

13            If she wants to --

14   **BY MR. PENA:**

15   Q    You wrote in a -- while she's doing that, let me ask you

16   this.

17        At the time one of your concerns was, you were -- you said

18   you did not want to have them billed under you unless you were

19   directly supervising them, correct?

20   A    Yes.

21   Q    Okay, because you didn't have the oversight?

22   A    Yes.

23   Q    Now, I heard you testify, also, about protocols and things

24   like that, that you said you were not happy with the doctor

25   because he had established protocols or standing orders that

Dulgheru - Cross / By Mr. Pena                    113

1   you did not necessarily want to follow, correct?  Is that

2   correct?

3   A    Yes.

4   Q    Because you don't believe in protocols; you believe it

5   should be treatment on a patient-by-patient basis, correct?

6   A    Yes, correct.

7   Q    That's your opinion?

8   A    Uh-huh.

9   Q    Correct?  Okay.

10  A    Yeah.

11  Q    I'm going to mark Defendant's Exhibit 299.  I'm going to

12  hand you that.

13       Do you recognize that document?

14  A    Maybe I recognize, but I think this was a lawyer.

15  Q    Right.  It's a letter that you wrote, correct?

16  A    Uh-huh, yeah.

17  Q    And it's dated, May 12, 2006?

18  A    Uh-huh.

19  Q    Correct?

20  A    Yes.

21  Q    And that's a communication --

22  A    Uh-huh.

23  Q    -- to the lawyer --

24  A    Uh-huh.

25  Q    -- regarding your agreement --

Dulgheru - Cross / By Mr. Pena                         114

1   A      Uh-huh.

2   Q      -- with Dr. Zamora --

3   A      Yeah.

4   Q      -- and the concerns that you had with Dr. Zamora, correct?

5   A      Yes.

6   Q      And what you wanted done at Dr. Zamora's practice, in

7   order for you to continue working under that contract; is that

8   correct?

9   A      Can you reformulate the question?

10  Q      Sure.  And those words -- listing out your concerns, in

11  particular, about Dr. Zamora's practice, correct?

12  A      Yes.

13          **MR. PENA:**  Your Honor, we offer Defendant's Exhibit

14  299.

15          **THE COURT:**  Is there any objection to it?

16          **MS. YUAN:**  No objection, your Honor.

17          **THE COURT:**  It's admitted.

18      **(Defendant's Exhibit Number 299 was received in evidence)**

19          **MR. PENA:**  Thank you, your Honor.

20          **THE COURT:**  I take it none of the other Defendants

21  have an opposition to it?

22          **MR. LEE:**  No.

23          **MR. SULLY:**  No, your Honor.

24          **THE COURT:**  It's admitted.

25          //

Dulgheru - Cross / By Mr. Pena                          115

1    **BY MR. PENA:**

2    Q    All right, so what we're looking at here -- and we can see

3    it -- is the overall exhibit that we looked at, written by you,

4    correct?

5    A    Yes.

6         **MR. PENA:**  Excuse me, your Honor.  Those screens

7    aren't working.

8         **MR. SPEAKER:**  (Indisc.) screens.

9    **BY MR. PENA:**

10   Q    And to speed things along, since we're close at lunch, we

11   can see that we have several different -- you're giving your

12   background.

13        But I want to focus, in particular, on number five; do you

14   see that?

15        **MS. YUAN:**  Your Honor, may I just have a moment with

16   Defense Counsel?

17        **THE COURT:**  Sure.

18      **(Counsel confer)**

19        **MR. PENA:**  Your Honor, can we approach?

20      **(Begin Bench Conference)**

21        **MS. YUAN:**  Your Honor, this is apparently a letter

22   from the witness to her attorney, so it would be attorney-

23   client privilege.

24        So I do object to --

25        **THE COURT:**  So how did you get the letter?

Dulgheru - Cross / By Mr. Pena                          116

1          **MR. PENA:**  The Government produced it.

2          **THE COURT:**  Okay.

3          **MR. PENA:**  So there's a waiver of attorney-client

4    privilege since she waived the privilege.

5          And, number two, you didn't object.

6          **MS. FRAZIOR:**  We were just shown it for the first

7    time today, actually.

8          **THE COURT:**  But they say that you put in there.

9          **MR. PENA:**  And this time, your Honor, I made sure

10   that we had the Bates stamp that they like to make sure we

11   have.

12         **MS. FRAZIOR:**  It's just that it wasn't on their

13   exhibit list you gave us, your Honor.

14         **MR. PENA:**  We hadn't known we were going to get into

15   this.

16         **MS. FRAZIOR:**  Well, neither did we.

17         **MS. YUAN:**  We didn't get into it.

18         **MR. PENA:**  You-all brought it up on direct.

19         **MS. YUAN:**  We did not bring this up at all.

20         **MS. FRAZIOR:**  We didn't bring up this letter on

21   direct.

22         **MR. PENA:**  The complaint -- no, not the letter.  But

23   I have a right to impeach her.

24         **MS. YUAN:**  It's not the complaint that we brought up.

25         My concern, your Honor, is just that we don't admit

1    privileged information in this trial.

2              So I thought, at the time, that (indisc.) you know,

3    receive my engagement letter.

4              **THE COURT:**  What's wrong with this letter?

5              **MS. YUAN:**  I just want to make sure that we're not

6    admitting attorney-client privileged information here.

7              **MR. PENA:**  She already waived attorney-client

8    privilege.  She produced the letter.  The client has the

9    ability to waive privilege.

10             **MS. YUAN:**  She produced the letter to us.

11             Do you have a written attorney-client privilege

12   waiver from her?

13             **MR. PENA:**  We don't have to.  The minute she went

14   ahead and breached the privilege.

15             **MS. FRAZIOR:**  How do you know how the Government got

16   it?

17             **MR. PENA:**  Because it was attached to one of

18   (indisc.).

19             **THE COURT:**  And what's the problem from attorney-

20   client privilege here?  She's complaining about this billing.

21             **MS. FRAZIOR:**  I think we should ask her if she's

22   going to waive the attorney-client privilege first.  Give her

23   that opportunity, if that's her intention.

24             **THE COURT:**  Well, you can take her and deal with the

25   rest of that.

Dulgheru - Cross / By Mr. Pena                              118

1           But the purpose of this letter is what?

2           MR. PENA:  Is the fact that she was requesting

3    protocols, your Honor, and standing orders.

4           And she would not continue supervising unless she had

5    the protocols in the standing orders, which she just testified

6    that she would not practice with standing orders or protocols.

7           MS. FRAZIOR:  Just to be clear, your Honor --

8           THE COURT:  I don't understand what you're saying

9    (indisc.) this letter.

10          MR. PENA:  But the standing orders (indisc.).

11          (Indisc.) just do it with the witness.

12          THE COURT:  I don't get what you find helpful in this

13   letter.  What is it?

14          MR. PENA:  Your Honor, she just testified that her

15   big complaint with the doctor is that he was operating with

16   protocols.

17          A big part of the Government's theory is that this

18   doctor was operating with protocols and standing orders that

19   were repetitive.

20          She testified, under direct, that she did not believe

21   in that.  She just testified, under cross, that she did not

22   believe in standing orders from protocols, that she believed

23   every patient should be treated individually.

24          However, what she's instructed her attorney is that

25   she would only continue under the contract if there were

Dulgheru - Cross / By Mr. Pena                    119

1    standing orders and protocols put in place.

2              **THE COURT:**  You didn't ask her that question.

3              And just ask her, "Does this letter refresh your

4    memory?"  (indisc.).

5              But's not going to be admitted.  It is attorney-

6    client privilege.

7         **(End Bench Conference)**

8              **THE COURT:**  Defendant's Exhibit 299 is not admitted

9    into evidence here.

10             Go ahead.

11   **BY MR. PENA:**

12   Q    Okay, I'm going to hand you what's been marked as 299, but

13   was not admitted into evidence, so that you can refresh your

14   recollection.

15        You see that document?

16   A    Yes.

17   Q    And that document's a letter that you wrote --

18   A    Yes.

19   Q    In number five -- do you see that?  Could you read that to

20   yourself?

21   A    Yes.

22   Q    Okay, now, in that particular letter that you're writing

23   to another attorney, do you recall telling that attorney that

24   the only way you were --

25             **THE COURT:**  No.

1          **MR. PENA:**  Well, I'm asking what she told the

2    attorney.

3          **THE COURT:**  Well, no.  You cannot ask that question.

4    I think I straightened that out up here.

5          You can ask her something else.

6    **BY MR. PENA:**

7    Q    Your understanding was it was -- you were not --

8          **THE COURT:**  You were going to -- can you come up

9    here?

10       **(Begin Bench Conference)**

11         **THE COURT:**  You were trying to impeach her on that.

12   You can try to do that and, "Does that letter refresh your

13   memory?"  But not what's in the letter, okay?

14         **MR. PENA:**  I actually thought -- I understand.  I

15   apologize, your Honor.

16         **MR. LEE:**  Once she's done discussing the letter,

17   she's waived her privilege.

18         There's no attorney-client privilege.

19         **THE COURT:**  She's done discussing the letter.  All it

20   is -- she doesn't disclose that by saying she wrote a letter to

21   her lawyer.  She doesn't give up that privilege.

22         **MR. PENA:**  Can we voir dire her on that?

23         **THE COURT:**  She doesn't disclose it any more than if

24   she talked to a lawyer.

25         She can say that she talked to the lawyer.  She was

1   asked that question.  Yes, she did.

2           You-all can go on back and, no, we don't need to

3   anything else here.  And just follow the Court's instructions.

4       **(End Bench Conference)**

5           **THE COURT:**  Go ahead.

6           **MR. PENA:**  Thank you, your Honor.

7   **BY MR. PENA:**

8   Q    You wanted to put -- to continue working with the doctor,

9   you did insist on having protocols and standing orders for any

10  of the nurse practitioners and any of the assistants that were

11  working under your supervision, correct?

12  A    Protocols for supervision.

13  Q    That's right.  You wanted to make sure --

14  A    Chain of command.

15  Q    The purpose of protocols --

16  A    Yes.

17  Q    The purpose of having standing orders in place is so

18  that --

19  A    It's not standing orders; it's protocols for supervision.

20  It's chain of command.

21  Q    Exactly.  And protocols, slash, standing orders are the

22  same thing, aren't they?

23  A    No.  Standing orders, if you're referring to the labs, are

24  not the same.

25  Q    Okay, and to refresh your recollection, would you like to

Dulgheru - Cross / By Mr. Pena                          122

1    look at the letter number five.

2         You used it in conjunction together, didn't you?

3    A    Which letter number five?

4    Q    299.

5    A    I don't see that.

6              **THE COURT:**  Okay, go ahead and ask the question.

7              **MR. PENA:**  Okay.

8    **BY MR. PENA:**

9    Q    The purpose of having protocols is that people that are

10   operating under your supervision are following a standard of

11   care, correct?

12   A    Yes.

13   Q    And that's your intent.  And even in your practice today,

14   if you were supervising people, you put in place standing

15   orders and protocols, correct?

16   A    Yes.

17   Q    And at the hospitals that you work at, you say there are

18   standing orders and protocols, correct?

19   A    Yes.

20   Q    And at the university where you taught, you teach --

21   A    Uh-huh.

22   Q    -- for the doctors to maintain quality of care --

23   A    Yeah.

24   Q    -- that there are standing orders in place that are to be

25   followed by everybody at the clinic, correct?

Dulgheru - Cross / By Mr. Pena                    123

1    A    Correct.

2    Q    And to have the doctor, here, operating with standing

3    orders and protocols is something that's within the standard of

4    care of medical practice, not only in the Valley, but in the

5    United States, correct?

6    A    Correct.

7    Q    You have no criticism of that, whatsoever?

8    A    No.

9    Q    Correct?  Am I correct?

10   A    Yes.

11   Q    Now, another term you discussed a little bit with Mr. Lee,

12   was this concept of differential diagnosis; you recall that?

13   A    Yeah.

14   Q    And differential diagnosis -- my understanding, from what

15   you testified, is that many times, when you're seeing a

16   patient, especially in rheumatology, there are multiple

17   conditions that a patient can have, correct?

18   A    Every time.

19   Q    That's right.  I mean, because this is a complicated

20   field, correct?

21   A    Yes.

22   Q    And so usually people do not present, in your field, with

23   just one simple diagnosis.  But they can have a whole list of

24   diagnoses, correct?

25   A    Correct.

1  Q    But in order for you to confirm it, you have to run a

2  battery of tests to identify which one it may be, correct?

3  A    Correct.

4  Q    I mean, we saw an example in the medical records that they

5  just presented where you had -- and you went through it with

6  Mr. Lee -- lab after lab after lab, correct?

7  A    Perfectly appropriate.

8  Q    Correct.  And I saw one for Sjogren's.

9  A    Yes.  Perfectly appropriate.

10  Q    Correct.

11      Even though you didn't ultimately diagnosis it --

12      **THE COURT:**  She's over here.  I mean, there's no

13  reason to turn that way.  You're talking to her.

14      **MR. PENA:**  I understand.  I'm sorry.  I apologize,

15  your Honor.  I just want to be sure everybody hears me.

16      **THE COURT:**  And everybody is hearing you.  If they

17  weren't hearing you, I would tell you you're not speaking loud

18  enough.

19      **MR. PENA:**  Yes, your Honor.  Thank you.

20      **THE COURT:**  And if you're screaming, I will tell you

21  you're speaking too loud, as I would tell everybody else that.

22      **MR. PENA:**  Thank you, your Honor.

23      **THE COURT:**  Okay.

24      **MR. PENA:**  Now, once again, I lost my thought.

25      **THE COURT:**  It was a question.

1  **BY MR. PENA:**

2  Q    So the understanding was that you had, for example, a test

3  that would be specific to a particular disease and you didn't

4  diagnose that disease, correct?

5  A    Yes.  The reason being because there's primary and

6  secondary Sjogren's syndrome.

7       So patients with scleroderma can have secondary Sjogren's

8  syndrome.

9  Q    But yet --

10 A    But that's related to the primary diagnosis.

11 Q    Right, it's related?

12 A    Yes.

13 Q    But, ultimately, you didn't diagnose that, correct?

14 A    No.

15 Q    Okay, so the fact you ran a test where there was no

16 diagnosis to support the test, correct?

17 A    Correct.

18 Q    I mean, somebody could look at that and say, "Wait a

19 minute, that could be fraud, because you're running tests and -

20 -

21 A    No.

22 Q    -- you don't have a diagnosis to support it?"

23 A    Absolutely not.

24 Q    Well, you never once wrote the diagnosis of it?

25 A    The labs are part of your differential diagnosis.

1  Q    Ah, so the labs themselves would suggest the differential

2  diagnosis?

3  A    The results.

4  Q    The results?

5  A    The results.  Of course.

6  Q    Okay, so you're justified in running those tests?

7  A    Yes.

8  Q    Correct?

9       And the fact that you ran those tests would be suggestive

10 of the fact that you, as a medical practitioner, are

11 suspecting, as part of your differential diagnosis, that the

12 person can have that condition, correct?

13 A    Correct.

14 Q    And that would be -- I mean, that would help support the

15 medical necessity at the time out of the running of that lab,

16 correct?

17 A    Correct.

18 Q    Which is exactly what you did in that case?

19 A    Yes.

20 Q    And if somebody were to come in and accuse you of that --

21 A    They won't.

22 Q    They won't because your labs support it, correct?

23 A    Yes.

24 Q    Okay, even if, ultimately, you did not have the diagnosis?

25 A    Correct.

Dulgheru - Cross / By Mr. Pena                    127

1    Q    Okay, and that you see with all rheumatologists?

2    A    It's a pre-test probability that it's important.

3         What did the clinical scenario suggest?  You order test

4    based on what does the patient present with.

5         If you do not have the pre-test probability, you don't

6    have to order them.

7    Q    Right.  And so -- and part of that is not just what you

8    examine.  And we've heard from other doctors in the courtroom

9    that --

10             THE COURT:  She hasn't been here for all the other

11   doctors who have been in the courtroom.

12             MR. PENA:  I'm just laying predicate, your Honor.

13   BY MR. PENA:

14   Q    There's other doctors that have testified that a big part

15   of rheumatology is the clinical aspect of it?

16   A    Yes.

17   Q    The examination of the patient?

18   A    Yes.

19   Q    There's a lot of rheumatologists do not even rely on the

20   labs, correct?

21   A    Correct.

22   Q    But there's nothing improper about running labs and

23   relying on those labs, correct?

24   A    If it's clinically appropriate.

25   Q    Which we saw, in your case, you run a lot of labs as well?

Dulgheru - Cross / By Mr. Pena                    128

1   A    Yes.

2   Q    And that's for you -- to help you in your evaluation, you

3   consider that proper?

4   A    Absolutely.

5   Q    Even though another doctor, another rheumatologist may not

6   do it and they think that they can diagnose solely on clinical,

7   that's -- that's up to them?

8   A    They would always do it.

9   Q    You should always run all the labs?

10  A    Not all the labs.  The labs that I order appropriately for

11  that patient will be ordered by every single rheumatologist.

12  Q    Okay, and that's within the --

13  A    I don't dispute that that's going to be done.

14  Q    Now, another area I saw you -- I saw some discussion

15  during your examination for the Government -- was the

16  discussion of the MRIs; you recall that?

17  A    Yes.

18  Q    And you described -- I think it was the Quraishi brothers?

19  A    Yes.

20  Q    And then Farolan?

21  A    Yes.

22  Q    Were there any other radiologists?

23  A    Not that I remember.

24  Q    Okay, so I just want to be clear here.

25       Are you insinuating that the Quraishis were improperly

Dulgheru - Cross / By Mr. Pena                129

1    reading MRI films?

2    A    Not all the radiologists are trustworthy.

3    Q    But, I mean, you're not --

4    A    That's why certain doctors use certain radiologists.

5    Q    And this is an outside radiology group?

6    A    Yeah.

7    Q    Correct?

8    A    Yeah.

9    Q    I mean, you're not insinuating here that Dr. Zamora had

10   anything to do with these radiologists?

11   A    No.  I just question the radiologist as well.

12   Q    Okay, and he also was using a Dr. Farolan from this group?

13   A    Uh-huh.

14   Q    And you had no problem with that?

15   A    I'm not sure he was from the same group.  But I had no

16   problem with him.

17   Q    Okay, I just want to clarify that, that you're not --

18   A    Yeah.

19   Q    You know, I've heard this for the first time here and I

20   just want to make sure you're not trying to say, "Oh, there's

21   something wrong here because Dr. Zamora was using this group

22   that had the Quraishi brothers, and we think something was

23   going on.

24        You're not trying to suggest that in any way, are you?

25   A    I'm not.

1   Q    Okay, now, the method of the superbills -- first off,

2   you've seen other physicians use superbills, correct?

3   A    Correct.

4   Q    I mean, that's something that's pretty standard practice

5   in the medical field, isn't it?

6   A    Used to be.

7   Q    Okay, is it more electronic now?

8   A    Yes.

9   Q    Okay, so but prior to compute -- or the EMRs --

10  A    Uh-huh.

11  Q    -- people would have paper printouts --

12  A    Yes.

13  Q    And they would have all the codes, correct?

14  A    Correct.

15  Q    And you used them?

16  A    Yes.

17  Q    Correct?

18  A    I used them.

19  Q    And you still use them?

20  A    No.

21  Q    Okay, but when you worked with Dr. Zamora for the three

22  years that you worked there --

23  A    Yeah.

24  Q    -- you used them and you had no problem with it?

25  A    Yes.

Dulgheru - Cross / By Mr. Pena                     131

1    Q    Okay, so I just want to make very clear here that you're

2    not suggesting to the jury that the fact that the doctor is

3    using a superbill that there anything wrong with it?

4    A    No, there is nothing wrong with that.

5         But the problem with that piece of paper is people can

6    come and add things to it.

7    Q    Right.  And you came up here and the Government had you

8    talk very generally about that?

9    A    Yeah.

10   Q    But the fact is, you have no evidence of that that you can

11   bring to this Court, saying here --

12   A    I don't.  I did not keep any evidence of that.

13   Q    Right.  And when you went and talked -- I guess, when you

14   sent these letters -- when you sent the letter to the COO of

15   the clinic --

16   A    Uh-huh.

17   Q    -- and when you talked to the Government, you never

18   mentioned that people were going in and changing your

19   superbills, correct?

20   A    I might have mentioned it.

21   Q    Well, you weren't asked any questions about that, were

22   you -- about having said it before?

23        The fact is, this is the first time that you're saying it,

24   isn't it?

25   A    No, it's not the first time.  I discussed that.

1  Q    Okay, so you're saying you discussed it, but nobody ever

2  wrote any notes of it?

3  A    No.

4  Q    Okay.

5  A    Or maybe they did.  I don't know.

6  Q    Okay, so --

7          **THE COURT:**  They didn't show you their notes for you

8  to approve them, right?

9          **THE WITNESS:**  No.

10          **THE COURT:**  So you don't know what notes they took?

11          **THE WITNESS:**  No.

12  **BY MR. PENA:**

13  Q    Well, in the letter that you just --

14          **THE COURT:**  You're here to testify about what you

15  know?

16          **THE WITNESS:**  Yeah.

17  **BY MR. PENA:**

18  Q    But in reviewing the letters that you just reviewed up

19  there on the stand, you never once mentioned, at any point,

20  that people were changing your superbills, did you?

21  A    I didn't have proof, right?  I didn't know whose

22  handwriting was.

23      I couldn't say, "This person changed my superbill,"

24  because it was a handwritten note and I had no idea who put

25  that on my superbill.

1   Q    Okay, and to be clear here, then you're not saying that

2   Dr. Zamora did that?

3   A    No.  I can't say who that person was.

4           **MR. PENA:**  Pass the witness, your Honor.

5           **THE COURT:**  Do you have any other questions of this

6   witness?

7           **MS. YUAN:**  Yes, your Honor.

8           **THE COURT:**  Go ahead.

9                        **REDIRECT EXAMINATION**

10  **BY MS. YUAN:**

11  Q    Good afternoon, Dr. Dulgheru.  Just a few questions to

12  clarify.

13       Mr. Pena asked you about protocols and standing orders.

14  Do you remember those questions?

15  A    Yes, yes.

16  Q    Are some protocols and standing orders appropriate in

17  medical settings?

18  A    Yes.

19  Q    Are some protocols and standing orders inappropriate in

20  medical settings?

21  A    Yes.

22  Q    Where, in your 16 years of rheumatology practice, did you

23  see inappropriate standing orders?

24  A    In Dr. Zamora's practice.

25  Q    What were they?

1    A    The labs, that I just mentioned; the first visit, second

2    visit, third visit.

3        But outside of that, I did not see any other suspicious

4    protocols.

5            MS. YUAN:  If we could just switch to the computer,

6    please.

7    BY MS. YUAN:

8    Q    We spoke this morning about one particular patient, Irma

9    Gonzalez.

10   A    Uh-huh.

11   Q    You remember us speaking about that?

12   A    Yeah.

13   Q    And she was a patient who you treated when you had your

14   own rheumatology practice?

15   A    Yes.

16   Q    And based on your training, experience, and your

17   evaluation of Irma Gonzalez, how long did you evaluate her?

18   A    From 2015 to 2017, I believe.

19   Q    Could it have been to 2018?

20   A    Could have been, yeah.

21   Q    And so, over those two or three years, how sure are you

22   that Irma Gonzalez did not have rheumatoid arthritis three

23   months before you saw her?

24   A    Hundred percent sure.

25           MS. YUAN:  Ms. Barton, could we please go to

Dulgheru - Redirect / By Ms. Yuan                    135

1    Government Exhibit 5, at page 21.

2    **BY MS. YUAN:**

3    Q    We've looked at this document a copy of times already,

4    Dr. Emilia Dulgheru.  This is your patient file for that

5    patient, Irma Gonzalez.

6    A    Uh-huh.

7         **MS. YUAN:**  And, Ms. Barton, can you please zoom into

8    the labs that were ordered by Dr. Emilia Dulgheru here?

9    **BY MS. YUAN:**

10   Q    This is on your first visit of January 27, 2015.  And labs

11   are right under treatment.

12   A    Uh-huh.

13   Q    Are these the labs that you ordered for Irma Gonzalez on

14   your first visit with her?

15   A    Yes.

16   Q    Are these the same or different than the labs that were

17   ordered by Dr. Zamora-Quezada on the first visit for all

18   patients in his practice?

19   A    Different.

20   Q    How are they different?

21   A    So I believe he's included several other tests for

22   autoimmune thyroiditis, for autoimmune GI diseases, for -- let

23   me see -- immunoglobulin levels, a vasculitis test -- I don't

24   remember the whole panel, but it was, as I said, five or six

25   pages when you get the results.

1    Q    Was it always the same for each patient?

2    A    Yes.

3          MS. YUAN:  Ms. Barton, can we go to the page -- the

4    first page.

5          This is going to be page 20 of Government Exhibit 5.

6    BY MS. YUAN:

7    Q    So still your patient file, Dr. Emilia Dulgheru, for Irma

8    Gonzalez.  This is the first page of your first visit with her.

9          MS. YUAN:  And if we could zoom in, please, on the

10   history of present illness; that narrative.

11   BY MS. YUAN:

12   Q    Do you remember when Mr. Lee asked you questions about the

13   various rheumatologists that Irma Gonzalez had seen --

14   A    Uh-huh.

15   Q    -- over the past -- the seven years before she saw you --

16   or eight years before she saw you?

17   A    Yeah.

18   Q    Which rheumatologists were those?

19   A    Dr. Encarnacion Rodriguez, Dr. Glazer, Dr. Garcia, and

20   then Dr. Zamora.

21         MS. YUAN:  Please highlight where it says,

22   "Dr. Zamora."

23   BY MS. YUAN:

24   Q    What does it say after Dr. Zamora, Dr. Dulgheru?

25   A    She had multiple tests.

1  Q    When you wrote, "Multiple tests," is that consistent with

2  what you saw when you worked with Dr. Zamora, in 2003 to 2006?

3  A    Yes.

4  Q    How is it consistent?

5  A    I couldn't say it differently, right?

6       So I didn't know exactly what those tests are.  I might or

7  might not have had the medical records at the time, but this is

8  what the patient said -- that she had multiple tests and I

9  think she implied multiple X-rays and maybe MRIs.

10      I don't know.

11 Q    And this was in 2015 when you saw her?

12 A    Yeah.

13      **MS. YUAN:**  And we can take that down.  Thank you,

14 Ms. Barton.

15 **BY MS. YUAN:**

16 Q    Finally, Dr. Dulgheru, Mr. Lee asked you about the few

17 times that you confronted Dr. Zamora when you were working with

18 him.

19 A    Uh-huh.

20 Q    You remember those questions from Mr. Lee?

21 A    Yeah.

22 Q    Why didn't you confront him more?

23 A    I had a feeling that he believed in what he was doing, and

24 I didn't know how to approach that.

25 Q    How did you feel working for Dr. Zamora over the three

Dulgheru - Recross / By Mr. Lee                          138

1   years?

2   A    Very, very stressed; stressed, overwhelmed, scared.  I was

3   just taking a day at a time, tired.

4   Q    Why did you feel scared?

5   A    I was not comfortable practicing medicine the way it was

6   practiced there.  I was not comfortable supervising so many

7   procedures.

8        It was like a mini-hospital and you're the only physician

9   there.  I was concerned that patients may have infusion

10  reactions, may have allergic reactions when they do a CT scan.

11  And I was the only one -- the only physician present in the

12  building.

13       Imagine a mini-hospital with one single physician.  It was

14  really concerning.

15            **MS. YUAN:**  No further questions, your Honor.

16            **THE COURT:**  Does anybody -- go ahead, Mr. Lee.

17            **MR. LEE:**  Yes, your Honor.

18                      **RECROSS EXAMINATION**

19  BY MR. LEE:

20  Q    Dr. Dulgheru, on redirect, right now, the Government asked

21  you about how confident you were in your diagnosis of Irma

22  Gonzalez, based on all the times you saw this patient, correct?

23  A    Yes, yes.

24  Q    And you're confident because you've seen her multiple

25  times over a three-year period, correct?

1  A    Yes.

2  Q    All right, would you be so confident if you had seen this

3  patient only one time?

4  A    Not as confident.  I've seen the patient multiple times.

5  Q    Right.  So if you only saw the patient one time, the

6  diagnosis that you give on that one time might not be as

7  certain one way or another as if you had the chance to see this

8  patient multiple times?

9  A    It depends on the diagnosis.  With scleroderma, it's

10 pretty obvious.

11 Q    Okay.

12         **MR. LEE:**  Nothing further, your Honor.

13         **THE COURT:**  Mr. Sully, did you have anything else?

14         **MR. SULLY:**  Yes, your Honor.

15                   **RECROSS EXAMINATION**

16 **BY MR. SULLY:**

17 Q    Doctor, you mentioned, a few moments ago, that, based on

18 what you observed, that you believe that Dr. Zamora believed in

19 what he was doing; is that right?

20      Can we get just a verbal yes, since the record doesn't

21 pick up when you nod your head.

22 A    So, yeah.  I wasn't sure.  I didn't know what to believe.

23 Q    So you obviously disagreed with some of the things that he

24 did, right?  You had a different opinion --

25 A    Yeah.

1   Q       -- on what should be done?

2   A       Yeah.

3   Q       But even though you didn't agree with all of the things

4   that he was doing, your impression or your belief was that he

5   believed that what he was doing was right, even if you didn't

6   agree with that?

7   A       I couldn't tell exactly what was going on, but that could

8   have been true as well.

9           I wasn't sure.

10  Q       All right, very well.

11          **MR. LEE:**  I'll pass the witness, your Honor.

12          **THE COURT:**  Mr. Alvarez, did you want anything.

13          **MR. ALVAREZ:**  No questions, your Honor.

14          **THE COURT:**  Mr. Pena?

15          **MR. PENA:**  Yes, your Honor.

16                          **RECROSS EXAMINATION**

17  BY MR. PENA:

18  Q       All right, I want to touch -- I want to go back over that

19  standing order idea.

20          Your testimony is that there's standing orders during the

21  time you were there.  And so, as a result, it didn't matter who

22  the patient was, this -- Dr. Zamora would have every patient

23  run under the same labs.

24  A       Yes.

25  Q       That's your testimony?

1   A    Yes.

2   Q    And so if we were to go back, if we were to look at the

3   different patients or the jury were to see the different

4   patients that the Government brings before them in this case,

5   then we should see the exact same labs being run for every

6   single patient?

7   A    Yes.

8   Q    Correct?

9   A    Especially on the first visit.

10  Q    And if we don't see that, then it could be that maybe your

11  recollection of so many years back may not be as accurate as

12  you think it is, correct?

13  A    I don't know.  I can't have control of all the patient,

14  right?  So I don't know every single patient that has been

15  evaluated.

16  Q    Right.  It's a very small subset of patients that you

17  actually saw, correct?

18  A    Not small subset.  Including the P.A.s and the nurse

19  practitioners that I was supervising, it's not small.

20  Q    Right.  And, again, you would never operate with the

21  standing orders or have these protocols in place, correct?

22  A    For labs, no.

23  Q    Okay, let's go back to what's been marked as Exhibit 296,

24  which was the letter that you wrote to Mario Garza.

25  A    Uh-huh.

Dulgheru - Recross / By Mr. Pena                         142

1   Q    You see that?

2   A    Yeah.

3   Q    Okay.

4           MR. PENA:  Your Honor, we're going to offer 296.

5           THE COURT:  I think they're already admitted, aren't

6   they?

7           MR. PENA:  I don't think --

8           THE COURT:  No?

9           MR. PENA:  296 was just marked.

10          THE COURT:  296; is there any objection to that one?

11          MS. YUAN:  One moment, your Honor.

12          No objection.

13          THE COURT:  It's admitted.

14      **(Defendant's Exhibit 296 admitted into Evidence)**

15          MR. PENA:  Thank you, your Honor.

16  BY MR. PENA:

17  Q    All right, now I found the right spot.

18       Highlighted here, in your communication to the center --

19  let's see if I read this correct.  "There are several

20  procedures that are performed in the clinic for patient that I

21  have never seen.

22       "I cannot take responsibility for these procedures unless

23  the protocols for standing orders are in place and the document

24  patient is appropriate."

25       Did I read that correctly?

1   A    Yeah.

2   Q    So the idea here was -- your instruction to the CEO of the

3   company was, the only way you would operate is if you had

4   standing orders and protocols in place for everybody that was

5   working under you, correct?

6   A    Yes.

7   Q    And that would include what labs you would want run --

8   A    No.

9   Q    -- for certain procedures?

10  A    I was not referring to that.

11  Q    Okay.

12  A    I was referring to allergic reactions, reactions that can

13  happen in the clinic, emergency protocols, who needs to be

14  called then; chain of command.

15  Q    Right.

16  A    I was not referring to labs.

17  Q    Right.  If there's an emergency, for example, or an

18  allergic reaction, there should be a set protocol --

19  A    Yes.

20  Q    -- of medications that should be run -- that should be

21  administered, correct?

22  A    And you have to call the appropriate person to supervise

23  your treatment, right?

24  Q    Right.  It has the name of who you call --

25  A    Yes.

Dulgheru - Recross / By Mr. Pena                    144

1   Q    -- of the situation?

2   A    Correct.

3   Q    Correct?

4        And it includes the medications that you prescribe for a

5   patient?

6   A    Yes.

7   Q    Correct?

8        And sometimes you have to run diagnostic procedures on

9   those patients to know what's going on?

10  A    Yes, sometimes.

11  Q    And they're standard, correct?

12  A    Yes, for that particular reaction --

13  Q    Okay, well --

14  A    -- or incidence.

15  Q    What you're saying here, in front of this jury, is you

16  meant only for emergencies?

17  A    Absolutely.

18  Q    Okay, but as far as what your practice was -- I mean, your

19  practice was just to see rheumatology patients, correct?

20  A    Which practice you're referring to?

21  Q    With Dr. Zamora.

22  A    He was doing many other things, not only rheumatology.  I

23  already mentioned that.

24       There were CT scans done, ultrasounds, multiple procedures

25  that are internal medicine procedures.

Dulgheru - Recross / By Mr. Pena                    145

1  Q    Right.  And you just disagree that a rheumatologist

2  shouldn't be doing those procedures?

3  A    Not necessarily.  But it was my liability ultimately.

4  Q    Right, because you would have P.A.s and nurse

5  practitioners under you.  And you wanted to make sure that, if

6  you're not in the room but are still responsible for them, that

7  you had set procedures in place so they were running under a

8  standard of practice that you approved, correct?

9  A    Yes.

10 Q    Okay, and it wasn't just for emergency.  This was for all

11 the patient care that they were giving, whether it was for

12 ultrasounds, whether it was for injections, or whether it was

13 seeing a patient.

14      And that's your --

15 A    I do not understand your question.

16 Q    My point is, you're trying to limit the standing orders to

17 just emergencies.

18      But the truth is, it wasn't just emergencies, was it?

19 A    No, it was emergencies only.

20 Q    Okay, it didn't apply to any other part of the practice?

21 A    No.  And at the time, I didn't think that it was necessary

22 to mention.

23 Q    But in this letter -- you would agree with me that the

24 only complaint you had was --

25 A    The letter is just a letter, you know.

1   Q    Okay, but the only thing you talked about in that letter

2   was that you had people under you --

3   A    If I had to write about everything, it would have been a

4   novel.

5   Q    Okay, so you decided the most important aspect to you --

6   A    Yes.

7   Q    -- wasn't these other concerns, as you described to the

8   Government.

9        What was important to you was just not having the

10  protocols and the standing orders for emergency --

11  A    My license was important.

12  Q    Right.  And your --

13       **THE COURT:**  You've answered that question by saying

14  that that was not the only thing you were concerned about.

15       **THE WITNESS:**  Yes, yes.

16       **THE COURT:**  That you wrote a letter, but you didn't

17  list everything that you were concerned about.

18       **THE WITNESS:**  Absolutely, yes.

19       **THE COURT:**  And, in fact, you went a little bit

20  further and said, you would have written a novel.

21       But that was just --

22       **THE WITNESS:**  A comment.

23       **THE COURT:**  -- a comment.  Not that you could

24  actually write a novel?

25       **THE WITNESS:**  Yeah.

147

MR. PENA:  Pass the witness.

THE COURT:  Anything else?

MS. YUAN:  No further questions.  The Government --

THE COURT:  Okay, Ladies and Gentlemen, we'll break for lunch.  If you'll come back so we can start at 1:30.

Please rise for the jury.

MS. YUAN:  May the witness be excused, your Honor?

THE COURT:  Do you all have any objection to the witness being excused?

MR. LEE:  No, your Honor.

MR. SPEAKER:  No, your Honor.

THE COURT:  You may be excused, ma'am, which means you don't have to stay here anymore.

We'll see you all at 1:30.

(Lunch recess taken at 12:17 p.m.)

(End morning session)

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    <u>December 15, 2019</u>

             Signed                                                        Dated


*TONI HUDSON, TRANSCRIBER*