UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  7:18-CR-00855 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | McAllen, Texas |
| | ) | |
| JORGE ZAMORA-QUEZADA, | ) | Thursday, December 26, 2019 |
| MEISY ANGELICA ZAMORA, | ) | |
| ESTELLA SANTOS NATERA, | ) | (1:23 p.m. to 4:23 p.m.) |
| FELIX RAMOS, | ) | |
| | ) | AFTERNOON SESSION |
| Defendants. | ) | |

JURY TRIAL - DAY 13

BEFORE THE HONORABLE RICARDO H. HINOJOSA,
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:                    See next page


Court Interpreter:        Steven Mines; Maria Foraker (Standby)

Court Reporter [ECRO]:    Antonio Tijerina

Transcribed By:           Exceptional Reporting Services, Inc.
                          P.O. Box 8365
                          Corpus Christi, Texas 78468
                          361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES FOR:**


Plaintiff:                      JACOB FOSTER, ESQ.
                                EMILY GURSKIS, ESQ.
                                REBECCA YUAN, ESQ.
                                CYNTHIA VILLANUEVA, ESQ.
                                Office of the United States Attorney
                                1701 W. Business Hwy. 83
                                Suite 600
                                McAllen, TX 78501

Jorge Zamora-Quezada:           BENIGNO TREY MARTINEZ, III, ESQ.
                                STEPHEN LEE, ESQ.
                                1201 E. Van Buren St.
                                Brownsville, TX 78520

Meisy Zamora:                   CHRISTOPHER SULLY, ESQ.
                                5804 N. 23rd St.
                                McAllen, TX 78504

Estella Natera:                 AL ALVAREZ, JR., ESQ.
                                4409 N McColl Rd
                                McAllen, TX 78504

Felix Ramos:                    JAIME PENA, ESQ.
                                Pena Garza PLLC
                                900 Kerria Ave
                                McAllen, TX 78501

3

```
 1                        INDEX

 2   GOVERNMENT'S WITNESS      DIRECT    CROSS    REDIRECT  RECROSS

 3   ** JURORS NOT PRESENT **

 4   RENE LUCIO, JR.

 5     VOIR DIRE                4

 6

 7   ** JURORS PRESENT **

 8   RENE LUCIO, JR.

 9     BY MR. FOSTER           26                  145

10     BY MR. LEE                       81                 155

11     BY MR. SULLY                   100/106

12     BY MR. PENA                     116

13

14   GOVERNMENT'S EXHIBITS                            RECEIVED

15   305 THROUGH 312                                    130

16

17   DEFENDANTS' EXHIBIT                              RECEIVED

18   303                                                99

19

20

21

22

23

24

25
```

1    **McAllen, Texas; Thursday, December 26, 2019; 1:23 p.m.**

2                      **(Call to Order)**

3       **(Outside the presence of the jury)**

4            **THE COURT:**  Please be seated.

5            You-all wanted to take out -- take something outside

6    the presence of the jury.  What is it?

7            **MR. LEE:**  Yes, Your Honor.  As we discussed

8    beforehand, Defense would like to *voir dire* Mr. Lucio regarding

9    some of the statements that the Government intends to elicit

10   regarding hearsay.

11           **THE COURT:**  Well, how many statements is the

12   Government thinking of asking him about?

13           **MR. LEE:**  There are -- the Government has told us

14   about three types of statements.

15           **THE COURT:**  There are three types of statements?

16           **MR. FOSTER:**  That's correct, Your Honor.

17           **THE COURT:**  From three different people?

18           **MR. FOSTER:**  Billers.  Just three different

19   statements that the billers told (indisc.).

20           **THE COURT:**  Okay, go ahead.

21                   **VOIR DIRE EXAMINATION**

22   **BY MR. LEE:**

23   Q    All right, Mr. Lucio.  Hello.  All right, where I'll be

24   speaking -- well, first of all, I was going to clarify.

25           You worked at the center for about four or five years,

1    correct?

2    A    Yes, sir.

3           THE COURT:  And you said it was five years in San

4    Antonio?

5           THE WITNESS:  I've lived in San Antonio for about

6    five -- five years.

7           THE COURT:  Five years.  And so you worked at which

8    center, then?

9           THE WITNESS:  At the San Antonio location, probably

10   for, I want to say, maybe three years, I believe -- two --

11   somewhere around there; two and half, three years.

12          THE COURT:  And the other years where?

13          THE WITNESS:  It was in Brownsville first, and then

14   Edinburg.

15          THE COURT:  So three years, more or less, in San

16   Antonio, and then another two years between Brownsville and

17   Edinburg?

18          THE WITNESS:  Yes, sir.

19          THE COURT:  Go ahead.

20          MR. LEE:  Thank you.

21   BY MR. LEE:

22   Q    All right, and you were originally an office manager,

23   correct?

24   A    Yes, sir.

25   Q    So at the time you in San Antonio, you were an office

1    manager, correct?

2    A    Yes, sir.

3    Q    All right, and then you said that you were a practice

4    administrator.  That was only for the last two and a half

5    months that you worked there, correct?

6    A    Yes, sir.

7    Q    Okay, so --

8              **THE COURT:**  What kind of administrator?

9              **THE WITNESS:**  Practice administrator, which was over

10   the -- all the clinics.

11             **THE COURT:**  And, before that, you were an office

12   manager?

13             **THE WITNESS:**  Yeah.  But they called it, "practice

14   manager."  But, yes, and office manager.

15             **THE COURT:**  Go ahead.

16   **BY MR. LEE:**

17   Q    And just to be clear, what were your duties as office

18   manager?

19   A    To make sure that the schedules were there -- the

20   scheduling for the employees, make sure the equipment was up to

21   par and ready to go.

22   Q    All right, yet you didn't -- people did not come to you

23   with medical questions, right?

24   A    Define, "people."

25   Q    Did -- you didn't have a medical -- if there was a medical

Lucio - Voir Dire / By Mr. Lee                         7

1   question that came up, people -- employees at the center would

2   not come to you, correct?

3   A    At which location?

4   Q    At any of the locations.

5   A    Yes.  If it was a clinical question, the provider would

6   come to me.

7   Q    Can you explain what you mean by that?

8   A    So if a provider had a complaint or an issue doing

9   something, they would bring up the attention to myself.  And

10  then I would relay the message to my supervisor.

11  Q    Okay.

12        **THE COURT:**  And who was the provide -- who would be a

13  provider?

14        **THE WITNESS:**  Dr. Salinas was one of those in

15  Brownsville.

16  **BY MR. LEE:**

17  Q    All right, and then you would take -- but you would simply

18  relay it to someone else, correct?

19  A    Yes.

20  Q    Okay, so you didn't actually make any kind of medical or

21  clinical decisions, right?

22  A    No.

23  Q    Okay, if other issues arose, you would simply transmit it

24  to the appropriate person, correct?

25  A    Yes.

Lucio - Voir Dire / By Mr. Lee                          8

1    Q    Okay, and the same thing with billing.  You're not a

2    biller, right?

3    A    No, sir.

4    Q    And you weren't the billing supervisor, right?

5    A    No, sir.

6    Q    Okay, and so if a billing question came up, you would

7    simply relay to someone else, right?

8    A    Yes, sir.

9    Q    Okay, all right.  Because you couldn't actually answer any

10   question about billing one way or another, right?

11   A    I'm not a biller.

12   Q    Okay, all right.  So what I'll be speaking, actually in

13   the time -- let's break it down.

14        In your time in -- well, broadly speaking, did anyone

15   bring a concern to you about a misdiagnosis, at some point

16   working, while you're working the center?

17   A    Yes.

18   Q    Okay, who?

19   A    Aidee was one of them.

20   Q    Okay, and you mean Aidee Dejesus?

21   A    I believe that's her last name, yes.

22   Q    Okay, what was her position at the time?

23   A    A biller, I believe.

24   Q    All right, when did this -- when did she bring anything --

25   when did she bring this concern to you?

1   A    I don't remember the time frame.

2   Q    Okay, you worked there about five years.

3   A    Uh-huh.

4   Q    So was it -- can you pin down where this was, in the time

5   that you worked there?

6   A    I was in the San Antonio location, so the latter part.

7   Q    Okay, all right.  You said -- we'll go back to that.

8        But you said there was -- were there any -- was there

9   anyone else?

10  A    It was said of concern, but not -- I mean, there was other

11  billers that were there.  I don't remember their names.

12  Q    Okay, so the only one you actually remember bringing this

13  concern to you is Aidee Dejesus, correct?

14  A    Yes.  Because she had brought it to the practice

15  administrator at the time as well.

16  Q    Okay, well, I'm just going for what you yourself -- did

17  she talk to you?

18  A    Yes.

19  Q    All right, where -- when did she talk to you?

20  A    Just in San Antonio.

21  Q    Okay, no.  Like, was it -- can you pin down -- how did

22  this come about?

23  A    It was in the office, I know that.  Because, like I said,

24  the practice administrator was there at the time.

25  Q    Okay, and who was that?

1  A    Janie.

2  Q    And what's Janie's last name?

3  A    Solis.

4  Q    Okay, so is there -- was there an incident in which Aidee

5  Dejesus talked to you and to Janie?

6       Is that what you're saying?

7  A    Yes.

8  Q    Okay, and, again, you said this took place sometime when

9  you were in San Antonio?

10  A    Yes, sir.

11  Q    Okay, and was this in the course of a normal workday, was

12  this something that had been scheduled?  When was this meeting?

13  A    In the course of a normal workday.

14  Q    Okay, did she just walk into the room when you were there?

15  A    There were -- she was there.  I forgot why she was there.

16  But, I mean, she had come up from Edinburg.

17  Q    Okay.

18  A    And then the conversation came up, yes.

19  Q    Okay, so what did she say?

20  A    I don't remember what she said.  It wasn't -- I mean, it

21  was a long time ago.

22  Q    Yes, it was a long time ago.

23       What did -- so you don't remember what Aidee Dejesus said?

24  A    She had said a complaint about how why everybody has RA --

25  is one of the reasons.

1        I mean, I don't remember what else was said.

2   Q    Okay, that's all you remember her saying?

3   A    That was one of her complaints, yes.

4   Q    What else did she say in that meeting?

5   A    Like I said, I cannot recall.

6   Q    So the only thing you remember is her making a comment

7   about why everyone has RA?

8   A    Yes.

9   Q    Okay, now Aidee Dejesus, she's not a doctor, right?

10  A    No.

11  Q    Okay, she's not -- she doesn't actually participate in

12  patient examinations, right?

13  A    She was a biller.

14  Q    Right.  So she has no medical training, correct?  You're

15  not aware of her having any medical training, correct?

16  A    I cannot recall if she did.

17  Q    Okay, so -- okay, so she made this comment at some time

18  that you don't remember.

19       Okay, and why did she make this comment to you?  What is

20  your understanding of why she made this comment to you?

21  A    Well, like I said, Janie was in the room as well.

22  Q    Okay, so it's your understanding that -- was she talking

23  to you or was she talking to Janie?

24  A    Both of us, I believe.

25  Q    Okay, and, again, what was your understanding of why this

Lucio - Voir Dire / By Mr. Lee                    12

1   conversation was happening?

2   A    She had a concern, an issue.

3   Q    Okay, and what did he do?  What did you do afterwards?

4        **MR. FOSTER:**  Your Honor, I think this outside the

5   scope of whether the foundation is sufficient now.

6        **THE COURT:**  Outside of the scope of what?

7        **MR. FOSTER:**  Of whether the foundation has

8   sufficiently been laid under the rule, establishing that this

9   is an employee --

10       **THE COURT:**  I don't even know -- Aidee Dejesus had

11  already testified here.  Why do we need somebody else to come

12  testify about it?

13       She's been a witness here a while back.

14       **MR. LEE:**  Yes, Your Honor.

15       **MR. FOSTER:**  Yes, Your Honor.  And I believe the

16  witness -- I can ask some questions to the witness as well.

17       **THE COURT:**  And what are you going to ask him -- what

18  she told him --

19       **MR. FOSTER:**  No.

20       **THE COURT:**  -- when she was here herself?

21       **MR. FOSTER:**  In addition to Ms. Dejesus, with her

22  other employees of Defendant Zamora-Quezada, who raises some

23  more concerns.

24       **THE COURT:**  Okay, and have you --

25       **MR. LEE:**  We just covered that, Your Honor.

1              **THE COURT:**  -- told the Defense who those are?

2              **MR. FOSTER:**  Your Honor, those -- Mr. Lucio has said

3    he doesn't remember their names.  But under the rule, that is

4    not required.

5              They reported to him and they were employees of the

6    Defendant.

7              **THE COURT:**  But we don't even know who they are.

8              **MR. FOSTER:**  That's correct, Your Honor.  We don't

9    know their names.  I believe the witness said he didn't recall

10   their names.

11             **THE COURT:**  Okay, and so how does he testify if he

12   doesn't even remember their names?

13             **MR. FOSTER:**  He testifies that there were billers who

14   came to him with concerns about patients being misdiagnosed,

15   just by Ms. Dejesus.

16             **THE COURT:**  First of all, the billers are not

17   doctors.  So we already have that 403 problem to begin with.

18   There's no experience that would show that a biller really

19   knows whether the diagnosis is correct or not.

20             A biller may say, "Well, we diagnose so many people

21   with this," but a biller cannot diagnose and would not be an

22   expert to testify that there's a misdiagnosis.

23             **MR. FOSTER:**  That's correct, Your Honor.  They're not

24   an expert.  And that would go to the weight of the evidence,

25   not as an expert.

Lucio - Voir Dire / By Mr. Lee                    14

1              **THE COURT:**  No.  It goes into the -- it's not

2    relevant.

3              **MR. FOSTER:**  Well, Your Honor, under 701, it would be

4    relevant that a biller raised concerns about substantially all

5    the patients getting the same diagnosis, which is what's

6    alleged --

7              **THE COURT:**  Well, you can ask --

8              **MR. FOSTER:**  -- in the indictment.

9              **THE COURT:**  -- that question, but not anything else

10   about, "It was a misdiagnosis."

11             **MR. FOSTER:**  Fair enough, Your Honor.

12             **THE COURT:**  That's all you can -- you'll be limited

13   to that.

14             **MR. FOSTER:**  Correct.  We don't intend to imply that

15   the billers had --

16             **THE COURT:**  Because, really, I mean --

17             **MR. FOSTER:**  -- medical knowledge.

18             **THE COURT:**  -- if you have a case here, you bring

19   somebody that can actually talk about misdiagnosis.  And,

20   frankly, there's been presentation of that before you got here.

21             And so now the idea of anybody telling us that there

22   was a misdiagnosis, they thought, who is like just somebody

23   working there without any kind of medical knowledge doesn't

24   really rise to the level of admissibility.

25             But you can ask, did other people complain -- tell

1    you that, but that's it.

2              **MR. ALVAREZ:**  Judge --

3              **MR. FOSTER:**  Thank you, Your Honor.

4              **MR. ALVAREZ:**  We would object, because they don't

5    know -- they don't identify the person who's complaining.

6              **THE COURT:**  Right.  That's the whole thing.  They

7    can't even tell us who it is, other than it's a biller.

8              And then the biller, really, there's nothing to

9    indicate that they have any medical knowledge to find out

10   whether somebody was diagnosed properly or not.

11             That's the problem here for them in trying to

12   bring this --

13             **MR. ALVAREZ:**  Well, we would object to him asking

14   that question.

15             **THE COURT:**  He can just ask that question, but you

16   will have every right to find out, "Do you know what their

17   names were?  What experience -- did they have any medical

18   experience to be able to express an opinion to you?"

19             You can ask all those questions on cross-examination.

20             **MR. LEE:**  All right, Your Honor.  May I -- I think

21   I'll move on to the second --

22             **THE COURT:**  Sure.

23             **MR. LEE:**  -- of the three topics.

24             //

25             //

1    **BY MR. LEE:**

2    Q    All right, broadly speaking, while you were working at the

3    center, did anyone bring a concern to you about billing

4    services while Dr. Zamora was not in the office?

5    A    Yes.

6    Q    Okay, and who was that?

7    A    Well, it was a biller.

8    Q    You remember that biller's name?

9    A    No.  Because they were -- I mean, the turnaround was high,

10   so there was billers all the time.

11   Q    You remember any of these billers?

12        Do you remember anyone who brought this -- the name of

13   anyone who brought this concern?

14   A    I do not remember the names, no.

15   Q    Do you know when this conversation with this identified

16   person took place?

17   A    One was when he went out of the country; I believe it was

18   Israel.

19   Q    Okay, and how did this conversation with this unidentified

20   biller come about?

21   A    They didn't want to bill, because they didn't feel

22   comfortable billing under his name, when he wasn't there.

23   Q    All right, and where did this --

24        **THE COURT:**  Okay, but did they tell you who had asked

25   them to bill under his name?

1          **THE WITNESS:**  I'm sorry?

2          **THE COURT:**  Did they tell you who had asked them to

3   bill under his name?

4          Did they say, "Dr. Zamora asked me."  Or --

5          **THE WITNESS:**  They said, "Dr. Zamora."  Yes.

6          **THE COURT:**  That Dr. Zamora had asked them to bill

7   when he had not been there?

8          **THE WITNESS:**  Yes.

9   **BY MR. LEE:**

10  Q    Okay, so what -- stepping back, what did the person say?

11  A    I just repeated -- I'm going to repeat myself.

12  `    They said --

13  Q    Yeah, please do.

14  A    -- that they weren't comfortable billing for a provider

15  that wasn't there.

16  Q    No.  What did they say about this instruction?  What did

17  they say?

18       What were their words, to the best you can remember?

19  A    To put it under Dr. Zamora's NPI number; to bill under his

20  NPI number.

21  Q    Right.  And who did they say gave that instruction?

22  A    Dr. Zamora.

23  Q    All right.  And, again, I'm just -- I want your words.

24  A    Uh-huh.

25  Q    I don't want, you know -- again, what did the person say

Lucio - Voir Dire / By Mr. Lee                    18

1   in this conversation?

2   A    That they weren't comfortable billing for a provider that

3   wasn't there.

4   Q    Okay, is that all you remember of what the person actually

5   said?

6   A    Yeah.

7   Q    Okay.

8            THE COURT:  Did they actually tell you, "Dr. Zamora

9   asked me to do this"?

10           THE WITNESS:  Yes.

11           THE COURT:  Well, how did they tell you that?

12           I mean, that's the question.  Tell us exactly what

13   they told you; not just, "I'm not comfortable" or "The doctor

14   wasn't here."

15           What exactly -- if you remember those things, tell us

16   exactly what they told you.

17           THE WITNESS:  That they weren't comfortable billing

18   under a provider that wasn't there.

19           And I said, "Okay, well, I mean, then you need to

20   bring that up to the practice administrator," because I was in

21   San Antonio at the time.

22           THE COURT:  Okay, but you tell us that, but then you

23   never tell us that doctor -- that they mention that Dr. Zamora

24   asked them to bill for that.

25           THE WITNESS:  They had said that.

1              And I said, "Okay, well, why would you do that?"

2              They had said, "Well, Dr. Zamora told me to bill."

3              **THE COURT:**  Okay, so you did -- they did tell you

4    that?

5              **THE WITNESS:**  Yes, they told me that.

6              **THE COURT:**  Okay, that's why I'm asking you.  Tell us

7    everything that they told you.

8              **THE WITNESS:**  Okay, they did tell me, "Dr. Zamora

9    told me to go ahead and bill under -- while he was gone."

10   **BY MR. LEE:**

11   Q    Okay, and now I'm going to be abundantly clear.

12        Again, you're not a biller, right?

13   A    No, sir.

14   Q    Okay, are you familiar with the concept of incident to

15   billing?

16             **MR. FOSTER:**  Objection, Your Honor.  This doesn't

17   have anything to do with the *voir dire*.

18             **MR. LEE:**  It goes to whether he understands the

19   concept that's being talked about.

20             **THE COURT:**  Go ahead.

21   **BY MR. LEE:**

22   Q    Do you under -- do you -- are you familiar with something

23   called, "incident to billing"?

24   A    No, sir.

25   Q    Are you familiar with how the work of medical assistants

1  or physician's assistants who do not have a Medicare NPI, how

2  those services can get billed?

3  A    Repeat the question?  Sorry.

4  Q    Do you understand that some people, like Dr. Zamora --

5  A    Uh-huh.

6  Q    -- have what's called, "a national provider identification

7  number"?

8  A    Yes.

9  Q    Okay, and do you understand that there are also people who

10  perform services who do not have one?

11        THE COURT:  Well, that's something, once whether this

12  is admissible --

13        MR. LEE:  Okay.

14        THE COURT:  -- or not.  I mean, that's not having to

15  do with the *voir dire*.

16        MR. LEE:  Okay.

17  BY MR. LEE:

18  Q    All right, so you recalled one conversation with someone

19  you don't remember the day of in which expressed a concern

20  about billing services while Dr. Zamora was in Israel?

21  A    Yes.

22        THE COURT:  And that Dr. Zamora had asked them to

23  bill?

24        THE WITNESS:  Yes, sir.

25        //

1    **BY MR. LEE:**

2    Q    All right, and where did this -- where was this?  Which

3    location did this conversation --

4              **THE COURT:**  Well, this is all cross-examination also.

5              The question is:  Can he be allowed to testify?

6              And the answer is:  Yes, he can be allowed --

7              **MR. LEE:**  Okay, I'll --

8              **THE COURT:**  -- to testify as to this.

9              **MR. LEE:**  -- move on to the third topic, all right.

10             **MR. SULLY:**  Let me observe another objection.

11             I don't think they're allowed to testify under 701,

12   which is cited.

13             That's just my objection.

14             **THE COURT:**  They are people who work there.  Just

15   because he doesn't remember the name, doesn't mean that they're

16   not allowed to testify.

17             **MR. SULLY:**  Then how is it an opinion of a lay

18   witness -- is what I'm asking -- from him?

19             **THE COURT:**  This was not an opinion of a lay witness.

20             This is the -- the statement is here that they were

21   billing for something which did not occur because the doctor

22   was not there.

23             This is not a misdiagnosis question.

24             **MR. LEE:**  Actually, I can clarify that, Your Honor.

25             //

1    **BY MR. LEE:**

2    Q    Do you understand that the service had not been performed?

3    Or do you understand that it was more the issue -- the service

4    had been performed, but the problem was that Dr. Zamora wasn't

5    in the office at the time the service was performed?

6    A    Service was performed, but that Dr. Zamora wasn't in the

7    office.

8            **THE COURT:**  So who performed the service?

9            **THE WITNESS:**  Whoever the mid-level provider was

10   there.  I mean, they would fill in, mid-level.  Or, if not,

11   another physician.

12           **THE COURT:**  Okay, so then it wasn't billed that

13   Dr. Zamora had done it.  It was going to be billed of whoever

14   did it.

15           **MR. LEE:**  If I may, Your Honor, perhaps I -- if I

16   may, I can -- again, but

17           **THE COURT:**  Go ahead.

18           **MR. LEE:**  We'll pass the -- okay, I'll --

19   **BY MR. LEE:**

20   Q    Mr. Lucio, again, do you know how the work of a medical

21   assistant -- what NPI -- if a medical assistant performs a

22   service, do you understand what NPI that service should be

23   billed under if the medical assistant does not have an NPI?

24   A    No.  It should be billed under the doctor, I guess.

25   Q    Okay, all right.  Okay, turning to the third topic --

Lucio - Voir Dire / By Mr. Lee                          23

1   A     Uh-huh.

2   Q     I think you testified before the Grand Jury about how, at

3   one point, you were asked to go to a barn, correct?

4   A     Yes.

5   Q     And you testified that you did not go to the barn at that

6   time, correct?

7   A     Yes.

8   Q     All right, and you testified --

9              THE COURT:  And what bar were you asked to go to?

10             THE WITNESS:  I'm sorry?

11             MS. SPEAKER:  A barn.

12             THE COURT:  A barn?  I heard you just say, "bar."

13             MR. LEE:  Sorry, Your Honor.

14             THE COURT:  So far, there had been no bar in this

15  case, so I was wondering what bar we were talking about.

16  BY MR. LEE:

17  Q     You testified that you did not go to the barn when you

18  were -- when the request came, right?

19  A     Yes.

20  Q     All right, you had a conversation with someone afterwards,

21  correct?

22  A     I'm sorry?  I had a conversation with someone afterwards?

23  Q     Did you have a conversation with someone about what

24  happened at the barn?

25  A     Yes.

Lucio - Voir Dire / By Mr. Lee                              24

1   Q    All right, and who was that conversation with?

2   A    A Practice administrator and some M.A.s that were there.

3   Q    Okay, who, specifically?

4   A    There was a couple people working that day.  I'm not too

5   sure who it was.

6   Q    Okay, and is Janie one of those people that you're

7   mentioning?

8   A    Janie was there, yes.

9   Q    Okay, and --

10  A    I remember because I specifically talked to her, and then

11  I told her that I couldn't stay because I had some family

12  things to do, and then I left.

13  Q    Okay, all right.  So that's why you didn't go to the bar.

14       Did you have a conversation with someone later on about

15  what, if anything, happened at the barn?

16  A    Yes.

17  Q    Okay, and who was that conversation with?

18  A    It was just in passing.  I mean, runners, just M.A.s.

19  Q    Okay, and what did -- let's go through that.

20  What did the M.A.s tell you about what happened at the barn

21  when you were not there?

22  A    They were looking for records.  They had to look for

23  records that were missing.

24  Q    Okay, did they say anything else about what they did or

25  did not do while there?

Lucio - Voir Dire / By Mr. Lee                    25

1   A    They had to be there -- finish the records that, you know,

2   were incomplete, and then, you know, hand them off.

3   Q    Okay, did you have a conversation with Tomas Moreno?

4   A    I believe he was there that day too.

5   Q    All right, what did he tell you about what, if anything,

6   he did at the barn?

7   A    I don't remember if he went to the barn, but I know he was

8   getting documents ready for the doctor to review.

9   Q    Okay, did he say anything else about what he did or did

10  not do there?

11  A    Just that, that they needed to finish medical records;

12  complete records that were incomplete.

13            **THE COURT:**  So what is the *voir dire* on this point?

14            **MR. LEE:**  Yes, I think, actually --

15            **THE COURT:**  I mean, other than cross-examination,

16  what are you doing here?

17            **MR. LEE:**  Your Honor, to be honest, based on what the

18  Government said, I thought this witness was going to say

19  something different about this line.

20            So given this, I have -- if this is the line of

21  testimony, I have no objection to this -- hearing the line

22  testimony.

23            **THE COURT:**  Okay, so we can go ahead and bring the

24  jury in now?

25            **MR. LEE:**  Unless anyone -- yes.

 1            **MR. FOSTER:**  Thank you, Your Honor.

 2            **THE COURT:**  Yeah.

 3            **THE MARSHAL:**  All rise for the jury.

 4        **(Jurors enter the Courtroom)**

 5            **THE COURT:**  Please be seated.  Nobody forgot that

 6   you-all were here, Ladies and Gentlemen.

 7            Sometimes things are done outside your presence that

 8   can sort of speed things up a little bit.  And so that's why we

 9   may have taken some of your time being in there while we were

10   taking care of things in here.

11            Go ahead, sir.

12            **MR. FOSTER:**  Thank you, Your Honor.

13                   **DIRECT EXAMINATION (RESUMED)**

14   **BY MR. FOSTER:**

15   Q    Mr. Lucio, when we left, you were talking about claims

16   being submitted when the doctor was outside of the country; do

17   you recall that?

18   A    Yes, sir.

19   Q    Did you meet with a biller about those claims?

20   A    They came up to me about the concerns.

21   Q    Okay, and what concerns did they raise with you?

22   A    Billing.

23            **MR. LEE:**  Objection; foundation.  Can we get some

24   clarity on what they he's referring to?

25            **THE COURT:**  Go ahead.

1   **BY MR. FOSTER:**

2   Q    Did you meet with a biller?

3   A    Yes.

4   Q    Do you remember the biller's name?

5   A    No, I do not.

6          **THE COURT:**  Okay, and this would have been around

7   when?

8          **THE WITNESS:**  When he -- I don't know when he took

9   that trip -- when Dr. Zamora took that trip.

10         **THE COURT:**  Okay, and the doctor had taken a trip

11  someplace?

12         **THE WITNESS:**  To Israel.

13         **THE COURT:**  Go ahead.

14  **BY MR. FOSTER:**

15  Q    And what concern did the biller raise with you?

16  A    That they didn't feel comfortable billing for -- under his

17  NPI while he was gone.

18  Q    When you say, "NPI," can you explain to the jury what you

19  mean?

20  A    That's a National Provider Identification Number.  So

21  that's what you use to bill out claims.

22  Q    When they say, "Bill under NPI," what was being indicated

23  to insurance about who had performed the services?

24  A    Dr. Zamora.

25  Q    And where was Dr. Zamora at the time?

1  A    Out of the country.

2  Q    Now, before we broke, you also mentioned that you had

3  ethical concerns about quotas; do you recall that?

4  A    Yes, sir.

5  Q    Did you hear Defendant Zamora-Quezada talk about quotas?

6  A    Yes.

7  Q    What did he tell you about quotas?

8  A    We needed a certain number of billable items to cover

9  overhead.

10 Q    When you said, "billable items," can you explain to the

11 jury what you mean?

12 A    X-rays, injections, how many visits we needed to see.

13 Q    MRIs?

14 A    Yes, sir.

15 Q    Were there quotas for CT scans?

16 A    When it was working, yes.

17 Q    Were there quotas for bone density testing?

18 A    Yes.

19 Q    And were there quotas for X-rays?

20 A    Yes.

21 Q    And you said, "overhead."

22      What did Defendant Zamora-Quezada say was the purpose of

23 the quotas?

24 A    To meet overhead on payroll.  Everything that it entitles;

25 paying bills.  Everything like that.

Lucio - Direct / By Mr. Foster                          29

1  Q    And when you say, "everything that entitles," what do you

2  mean?

3  A    I guess everything that the practice owned.

4  Q    And what did that include?

5  A    His plane, cars, I guess, salaries.

6  Q    Now, did you have concerns about the quotas?

7  A    Yes.

8  Q    What was your concern about the quotas?

9  A    Well, the amount of patients to be seen.

10 Q    Why was that a concern?

11 A    Because it was a lot of patients.

12 Q    When you say, "a lot of patients," how many patients was

13 it?

14 A    I want to say anywhere between 40 to 50 at times.

15 Q    And were the quotas determined before or after the 40 to

16 50 patients would come to the clinic each day?

17 A    It was before.

18 Q    And is it possible to decide the number of treatments

19 before diagnosing the patients?

20 A    I'm sorry, can you --

21        MR. SULLY:  Objection, Your Honor; he's not entitled

22 to give medical opinions, as far as what's possible diagnosis.

23        THE COURT:  What was your question?

24        MR. FOSTER:  I'll rephrase, Your Honor.

25        //

1   BY MR. FOSTER:

2   Q     Have you received compliance training in your career?

3   A     Yes.

4   Q     And did that compliance training include indications of

5   fraud?

6   A     Yes.

7   Q     And how did the existence of the protocol relate to the

8   training that you've received?

9         MR. LEE:  Objection, Your Honor; opinion.

10        Is he talking about training he received afterwards?

11  He's not talking about observations he made at the time.

12        THE COURT:  But it's training he's received since

13  then.

14        Go ahead.

15        MR. SULLY:  Your Honor, just to add to our objection,

16  he wasn't noticed as an expert witness, Your Honor.  He tried

17  to elicit expert testimony from him.

18        THE COURT:  Are you trying to make him an expert

19  witness when you didn't disclose him as an expert witness?

20        MR. FOSTER:  No, of course not, Your Honor.

21        THE COURT:  Well, then why are you asking him all

22  these questions about was he trained to do this.

23        Because he's going to express an expert opinion, is

24  what you're leading to.

25        MR. FOSTER:  No.  It's a 701 opinion, Your Honor.

1          **THE COURT:**  I don't know that he can do that.

2          And he certainly was not notified as an expert

3  opinion, right?

4          **MR. FOSTER:**  He is not an expert, Your Honor.

5          **THE COURT:**  Can you come up here?

6          Because I don't know that 701 really applies the way

7  you're trying to use it here.

8      **(Begin Bench Conference)**

9          **THE COURT:**  This one says 701 is to clearly limit it,

10  "not based on scientific, technical, or other specialized

11  knowledge within the scope of Rule 702."

12          **MR. FOSTER:**  That's correct, Judge.

13          **THE COURT:**  He doesn't qualify for that because he

14  doesn't have a specified knowledge with regards to expressing

15  an opinion on something like that.

16          **MR. FOSTER:**  If I may, Your Honor, a lay witness can

17  express an opinion, based on their personal experience, if it

18  is not an expert opinion.

19          He's not expressing a medical opinion.

20          **THE COURT:**  701 is written as, "and," not "or."

21          **MR. FOSTER:**  Correct, Your Honor.

22          **THE COURT:**  And, "and not based on scientific,

23  technical, or other specialized knowledge within the scope of

24  Rule 702."

25          For me, it has to be specialized knowledge for him to

 1  express an opinion.

 2           **MR. PENA:**  And it's foundation, Your Honor.

 3           Establish the fact.  Because his foundation is, he's

 4  trying to qualify, saying that the witness has specialized

 5  training.

 6           **THE COURT:**  Which pushes it in (indisc.)

 7  possibilities.  It's an, "and," not an, "or."

 8           **MR. FOSTER:**  That's correct, Your Honor.

 9           **THE COURT:**  Okay, and so what's his scientific,

10  technical, or other specialized knowledge within the scope of

11  Rule 702?

12           **MR. FOSTER:**  We don't believe that it requires

13  specialized knowledge to testify that something's fraud.  You

14  can notice that as a non-clinical practitioner.

15           **THE COURT:**  (Indisc.) because fraud here is it wasn't

16  properly done with the (indisc.) medical situation.

17           **MR. FOSTER:**  Or if it was done, but not provided.

18  And, for example, it's --

19           **THE COURT:**  Well, you can get into (indisc.), but not

20  provide it, but not into the ones that were done, and,

21  therefore, they were fraudulent; you can't do that.

22           **MR. FOSTER:**  I think -- correct.  He's not express a

23  clinical opinion in any way.

24           **THE COURT:**  But you certainly were leading in that

25  direction.

1          So what exactly are you going to ask him?

2          **MR. FOSTER:**  So, in that respect, Your Honor, I'm

3   going to ask him if, in his experience, it's a red flag, based

4   on the patients being assigned X-rays --

5          **THE COURT:**  You can't do that --

6          **MR. FOSTER:**  Okay, that's fine, Your Honor.

7          **THE COURT:**  -- with this witness.

8          **MR. FOSTER:**  Okay.

9          **THE COURT:**  Okay, thanks.

10         **MR. FOSTER:**  Thank you.

11      **(End Bench Conference)**

12         **THE COURT:**  Go on to something else.

13         **MR. FOSTER:**  Thank you, Your Honor.

14  **BY MR. FOSTER:**

15  Q    Did you oversee the mid-level providers while working for

16  Defendant Zamora-Quezada?

17  A    Yes.

18  Q    Can you explain to the jury what mid-level providers are?

19  A    Nurse practitioner or a physician assistant.

20  Q    And when nurse practitioners or physician assistants made

21  complaints to you, did you convey those to Defendant Zamora-

22  Quezada?

23  A    To the practice administrator at the time; Janie and

24  Dr. Meisy.

25  Q    And that's Defendant Meisy Zamora, correct?

1  A    Yes.

2  Q    And why did you speak with the mid-level providers, as

3  part of your job?

4  A    At the time -- that's when I was in Edinburg.  And I was

5  kind of in limbo.  I did a little bit of HR there.

6  Q    And who directed you to do those job responsibilities?

7  A    Felix Ramos.

8  Q    And did the mid-level providers tell you about their work

9  for Defendant Zamora-Quezada?

10 A    I'm sorry.  Can you --

11 Q    Did they tell you about their work; their job

12 responsibilities for Defendant Zamora-Quezada?

13 A    Yes, to see patients.

14 Q    And what did they say about the pressure that they were

15 under?

16        **MR. SULLY:**  Objection, Your Honor; hearsay,

17 Confrontation Clause, also lack of foundation, as far as who is

18 that we -- we're talking about.

19        **THE COURT:**  You can't tell us their names; is that

20 right?

21        **THE WITNESS:**  I remember one that complained.  She

22 was only there for a little amount of time.  But now I don't

23 remember what her name was.

24        **THE COURT:**  We don't know who they are.  We don't

25 really know when they were there.

1          **MR. FOSTER:**  This is for notice -- that he then

2    conveyed it to the Defendants -- for knowledge of intent; not

3    the issue we were talking about previously.

4          **THE COURT:**  I know what it is.  You're asking him if

5    somebody expressed an opinion to him.

6          **MR. FOSTER:**  Yes.

7          **THE COURT:**  But we don't know who that person was and

8    we don't know when they were there.

9          **MR. FOSTER:**  Yes, Your Honor.  The relevance would be

10   it was transmittal to the Defendant.

11         **THE COURT:**  I think he's already said that.

12         **MR. FOSTER:**  May I ask what he told the Defendant?

13         **THE COURT:**  Go ahead.

14         **MR. FOSTER:**  Yes.

15   **BY MR. FOSTER:**

16   Q    So after the mid-level provider complained to you, what

17   did you tell Defendant Meisy Zamora?

18   A    Just that the mid-level had issues.

19        And she said that she would talk to the provider.

20   Q    What issues, specifically?

21   A    Was a lot of patients was one thing that everybody -- all

22   the providers had complained about the number of patients.

23   Q    And what was the complaint about the number of patients?

24   A    That it was a lot of patients to see in one day.

25   Q    And did you --

Lucio - Direct / By Mr. Foster                    36

1              THE COURT:  And you told Ms. Zamora that; is that

2    right?

3              THE WITNESS:  I'm sorry?

4              THE COURT:  And you told Ms. Zamora that; is that

5    correct?

6              THE WITNESS:  Yes, sir.

7              THE COURT:  Okay.

8    BY MR. FOSTER:

9    Q    And did those complaints that were conveyed to you relate

10   to diagnoses as well?

11   A    For mid-level, no; for a M.D., yes.

12   Q    Okay, and what M.D. complained to you?

13   A    It was the doctor from Brownsville; Dr. Salinas.

14   Q    Okay, and what -- and did you convey that complaint to the

15   Defendants?

16   A    Yes.

17   Q    Who did you convey it to?

18   A    I had specifically told Dr. Zamora and the practice

19   administrator at the time.

20   Q    And what did you tell Dr. Zamora about the complaint?

21   A    That he just had issues with some diagnoses.  And he said

22   that he would talk to the provider himself.

23   Q    And, specifically, what were the issues with the diagnoses

24   that you raised?

25   A    I believe that it was RA, a lot of them.  A lot of them

Lucio - Direct / By Mr. Foster                    37

1   were diagnosed with RA.

2   Q    And what was the concern that was raised to you and that

3   you raised to Defendant Zamora?

4   A    On some of them, he didn't think it was RA.

5   Q    And when you raised that with Defendant Zamora, how did he

6   react?

7   A    He got angry.  But he said that he was going to talk to

8   the provider himself.

9   Q    How angry did he get?

10  A    He just said that he was the clinician.

11       And I said, "Well, that's why I'm bringing it up to you."

12       He's the doctor.

13  Q    Now, you talked about these quotas.

14       How did you keep track of the quotas?

15  A    It was through a spreadsheet.

16  Q    And how was the spreadsheet made each day?

17  A    So there was a ticket that each department would get.  And

18  then the departments would turn that in to the managers.  And

19  the managers just copy the numbers onto the spreadsheet.  And

20  then we would e-mail it.

21  Q    And when you say, "We would e-mail it," who would e-mail

22  it?

23  A    The managers at the time of each clinic.

24       And we would e-mail it to the doctor himself, Meisy, and

25  Felix.

Lucio - Direct / By Mr. Foster                    38

1    Q    And what was your involvement in preparing the

2    spreadsheet?

3    A    I would copy the numbers from the departments, put it on

4    the spreadsheet, and then e-mail it out.

5    Q    And how frequently would you do that?

6    A    That was a daily basis.

7    Q    And who did you e-mail to?

8    A    It was Dr. Meisy, Dr. Zamora, and Felix.

9    Q    Holding in my hand three exhibits, which previously have

10   been marked as Exhibits E-51, E-52, and E-53.

11        **MR. FOSTER:**  They've been provided to Defense

12   Counsel.  May I approach, Your Honor?

13        **THE COURT:**  Sure.

14        **MR. FOSTER:**  Thank you.

15   **BY MR. FOSTER:**

16   Q    Showing you what's been marked as Exhibits E-51, 52, and

17   53.

18   Do you recognize these exhibits?

19   A    These are a form of the spreadsheets that were -- that had

20   to be filled out.

21   Q    How do you know that?

22   A    Because it's marked here, like, by the departments; IV

23   therapy injections, fast track.

24        It says, "radiology," that's here -- the DEXA.  And then

25   it's broken down by the providers.

 1  Q    And were these spreadsheets that you provided to law

 2  enforcement?

 3  A    This was on the thumb drive, yes.

 4          **MR. FOSTER:**  Your Honor, I'd move to admit Exhibits

 5  E-51, 52, and 53.

 6          **THE COURT:**  Is there any objection to them?

 7          **MR. LEE:**  One moment, Your Honor.

 8          No objection, Your Honor.

 9          **THE COURT:**  They're admitted.

10          **(Government Exhibits E-51, E-52, and E-53 exhibits were**

11  **received, but later retracted by Judge)**

12          **MR. FOSTER:**  Thank you, Your Honor.  May we publish?

13          **THE COURT:**  Sure.

14          **MR. FOSTER:**  Thank you.

15          Will you bring up what's been admitted as Exhibit

16  E-53?

17  **BY MR. FOSTER:**

18  Q    So looking at page 1, of E-53, can you describe to the

19  jury what this is?

20  A    That is the counts for the radiology.

21  Q    When you say, "the counts," can you explain to the jury

22  what you mean?

23  A    How many services were provided that day.

24  Q    And are there averages displayed on that?

25  A    Yes.

1  Q    And what would those be averages for?

2  A    Averaging for the total for the day, and then a total for

3  the week.

4  Q    And so I want to turn to page 5, of Exhibit E-53.

5       Do you recognize this?

6  A    Those are the pie charts.

7  Q    And looking in the upper left-hand corner, IV therapy --

8           **MR. FOSTER:**  Can we zoom in on that, please?

9  **BY MR. FOSTER:**

10 Q    Can you explain to the jury what this pie chart shows?

11 A    That's the number of infusions that were done -- or the

12 percentages of infusions that were done.

13 Q    And what was the greatest percentage of infusion?

14 A    Remicade.

15 Q    And is this consistent, generally speaking, with the

16 percentages you would see on other spreadsheets, that you

17 conveyed?

18 A    About.

19 Q    And what was your understanding of how Dr. Zamora ranked

20 in terms of his use of Remicade?

21 A    I believe --

22          **MR. LEE:**  Objection; foundation.

23          **MR. SPEAKER:**  We would also join that objection, Your

24 Honor.  I think he's laid proper -- proper predicate for this

25 witness.

1          **THE COURT:**  You have to establish as to how he would

2    have knowledge about that.

3    **BY MR. FOSTER:**

4    Q    Did you speak with employees that reported to you about

5    Dr. Zamora's use of Remicade?

6    A    Yes.

7    Q    What employees did you speak with?

8    A    One of them was Tomas.

9    Q    Okay, and what did Tomas tell you about Dr. Zamora's use

10   of Remicade?

11         **THE COURT:**  And what was Tomas' job?

12         **THE WITNESS:**  I'm sorry?

13         **THE COURT:**  What was Tomas' job in the clinic or

14   whatever it --

15         **THE WITNESS:**  He was a medical assistant supervisor.

16         **MR. SPEAKER:**  Your Honor, we're going to object as to

17   (indisc.) just reviewing these exhibits.

18         They're dated 2002.  So I don't think he's laid the

19   proper predicate for this witness having personal knowledge as

20   to these exhibits.

21         Because these are from, I believe, 2011, 2015.

22         **THE COURT:**  These are from 2002?

23         **MR. FOSTER:**  Yes.  And the witness provided them to

24   law enforcement.  That was the foundation that was laid for

25   this witness.

Lucio - Direct / By Mr. Foster                          42

1          **THE COURT:**  Yeah.  But the witness was not there in

2   2002.

3          **MR. FOSTER:**  That's correct, Your Honor.

4          **THE COURT:**  Okay, so then how can he testify about

5   some documents that we don't even know how he has them from

6   2002?

7          **MR. FOSTER:**  I can explain that, Your Honor.

8          **THE COURT:**  Well, you need to explain it up here.

9       **(Begin Bench Conference)**

10         **THE COURT:**  How do you explain that?

11         **MR. FOSTER:**  He used these documents on his job as a

12  template and for the spreadsheets that he used.

13         And then he provided these documents to law

14  enforcement and the (indisc.).

15         **THE COURT:**  He wasn't there in 2002.

16         **MR. FOSTER:**  That is correct.

17         **THE COURT:**  How can he use them on something he has

18  no idea who prepared them?

19         **MR. FOSTER:**  He does know who prepared them.

20         **THE COURT:**  How does he know that?

21         **MR. FOSTER:**  Because he took over from that person.

22         And when that person left, he acquired the contents

23  of her computer.  And then he used these documents as the basis

24  for the templates he then used to circulate and substantially

25  summarize spreadsheets on a daily basis.

Lucio - Direct / By Mr. Foster                    43

1          **THE COURT:**  But this is extremely weird that he's

2   testifying about somebody else's documents that he had nothing

3   to do with, other that they were on a computer.  And you want

4   to somehow have him testify about that?

5          **MR. FOSTER:**  He can authenticate those documents as

6   belonging to the Defendants, and was using them in the course

7   of his daily activities.

8          **THE COURT:**  Used them for what?

9          **MR. FOSTER:**  Used them to send the same spreadsheets

10  to the Defendants.

11         **THE COURT:**  Why don't he use his own spreadsheets?

12         **MR. FOSTER:**  The spreadsheets were not on the thumb

13  drive.

14         **THE COURT:**  So where are they?

15         **MR. FOSTER:**  They are in the possession of the

16  Defendants.

17         **MR. PENA:**  Your Honor, it's in the e-mail.

18         He's saying that they were e-mailed.  And so they

19  have access to e-mails.

20         **MR. FOSTER:**  We do not have access to this

21  Defendant -- to this witness' e-mails.

22         **THE COURT:**  Well, then you should have, before you

23  put him on the stand, so it could at least be admitted here.

24         **MR. FOSTER:**  Well, Your Honor, that would require a

25  search warrant.

Lucio - Direct / By Mr. Foster                    44

1           **THE COURT:** He's your witness.

2           **MR. FOSTER:** It's the clinic's e-mails, Your Honor.

3  He doesn't have access to it.

4           **THE COURT:** Well, then you should have asked for them

5  a while back.

6           **MR. FOSTER:** Well, from who, Your Honor?

7           They were the clinic's e-mails.  They were on a

8  server that's not accessible.

9           **THE COURT:** Well, you had an arrest warrant, you got

10 an indictment.  I think you could have done a warrant to get

11 them.

12          **MR. FOSTER:** That's there, Your Honor.

13          **MR. LEE:** A search warrant was executed.

14          There were computers taken.  There were, we believe,

15 five computers that were seized.

16          **THE COURT:** So how is he going to tell them that

17 something in 2002 that he found those in the --

18          **MR. FOSTER:** That he was directed to use these to

19 send some more spreadsheets.

20          **THE COURT:** By whom?

21          **MR. FOSTER:** By the doctor.

22          **THE COURT:** When?

23          **MR. FOSTER:** When he started his job and started

24 sending the spreadsheets.

25          **THE COURT:** Did he tell those are Dr. Zamora -- he

1  told him to follow these particular ones?

2          **MR. FOSTER:**  That he used these as a template, yes.

3  And then --

4          **THE COURT:**  Dr. Zamora specifically told him, "These

5  are the ones you have to follow"?

6          **MR. FOSTER:**  Yes.  That he was told that to send

7  spreadsheets like this, and the ones that he sent were

8  substantially similar to this.

9          And this format, he's familiar with them.  He used

10  them in carrying out his job responsibilities.

11         **THE COURT:**  He just told him to follow the templates.

12  But you have -- now you have figures on there, not just, "This

13  is the form that you fill out."

14         **MR. FOSTER:**  Correct.

15         **THE COURT:**  You could have found an empty one and

16  then just say, "Is this the form that you filled out?"  And he

17  could testify about the ones he sent out.

18         **MR. FOSTER:**  Well, what the witness told us were

19  these were the ones that he looked at.

20         **THE COURT:**  He hasn't said that.

21         **MR. SPEAKER:**  And he's asking for conclusions --

22         **MR. FOSTER:**  I can lay that foundation, Your Honor.

23         **THE COURT:**  Okay, maybe you can lay that foundation,

24  but you have to explain to us -- you're going to have to

25  explain to us exactly who told him that those particular ones

Lucio - Direct / By Mr. Foster                                    46

1   were the ones he had to use.

2           **MR. FOSTER:**  Yes, Your Honor.

3           **THE COURT:**  Out of all the ones that were there, this

4   is the --

5           **MR. FOSTER:**  Okay.

6           **THE COURT:**  -- somebody told him that these were the

7   ones he was supposed to use.

8           **MR. FOSTER:**  Uh-huh.

9           **MR. LEE:**  And then somehow the data in 2002 applies

10  to (indisc.).

11          **THE COURT:**  What?

12          **MR. LEE:**  That that data is from 2002, when he wasn't

13  even there, Judge.

14          **MR. PENA:**  Because he's trying to elicit

15  testimony regarding interpretation.

16          **THE COURT:**  Yes.  that's exactly what he's trying to

17  do.  And I'm not used to the Government trying to do something

18  that they're not supposed to do.  I'm really not used to that.

19          And that's why I'm trying to get somehow to show that

20  this really relevant here, as opposed to something that, under

21  the rules that people are supposed to play by.

22          There's some other choice should be presented here.

23          **MR. SPEAKER:**  Your Honor --

24          **MR. FOSTER:**  Your Honor, this is what the witness has

25  talked about.  It was in his 302.  It was provided to the

1   Defense.  And he said this was the basis for what --

2           **THE COURT:**  He said that these particular ones were

3   the basis?

4           **MR. FOSTER:**  This has been on our exhibit list, yes.

5           And he's talking about this --

6           **THE COURT:**  But did he -- in his statement, does he

7   specifically mention these?

8           **MR. FOSTER:**  Yeah, these have been shown to him, and

9   agents have taken notes of them.  And they --

10          **MR. PENA:**  I'm not sure that --

11          **THE COURT:**  I'd like to see that.

12          **MR. FOSTER:**  The --

13          **MR. SPEAKER:**  You just represented it to the Judge.

14  Show the Judge.

15          **MR. FOSTER:**  Okay, well, I'll have to get the

16  reports.

17          **THE COURT:**  Yeah.

18          **MR. FOSTER:**  Your Honor, in the Grand Jury, the

19  witness testified about spreadsheets -- extending these quota

20  spreadsheets to Defendant Zamora.  (Indisc.) interview report,

21  dated 6/12 --

22          **THE COURT:**  Okay, spreadsheets.  But he didn't

23  mention these in particular.

24          **MR. FOSTER:**  He did not name the specific date of the

25  spreadsheet.  But these were the spreadsheets that he'd shown.

Lucio - Direct / By Mr. Foster                    48

1            (Indisc.).

2            **THE COURT:**  (Indisc.) spreadsheets that (indisc.).

3   You just told us (indisc.) had them in the computer.  He looked

4   them up.  You have yet to tell me that somebody told him,

5   "These are the spreadsheets that you need, per state law."

6            **MR. FOSTER:**  Okay, I will attempt to lay that

7   foundation.  And if he doesn't say that, I understand, Your

8   Honor's ruling.

9            **THE COURT:**  Okay.

10           **MR. FOSTER:**  Thank you.

11           **MR. LEE:**  Your Honor, at this time, are the

12  exhibits -- we would object to these exhibits.

13           I know we earlier --

14           **THE COURT:**  They're not admitted.

15           **MR. LEE:**  Not admitted at this point, okay.

16           **THE COURT:**  If he doesn't lay the foundation, they're

17  not admitted.

18           **MR. LEE:**  Okay, Your Honor.

19           **THE COURT:**  Okay.

20           **MR. LEE:**  Thank you.

21        **(End Bench Conference)**

22           **THE COURT:**  And you-all will have an opportunity,

23  also, to ask questions about these.

24                //

25                //

1    **BY MR. FOSTER:**

2    Q    Thank you, Mr. Lucio.

3    A    Uh-huh.

4    Q    When we left, we were talking about these spreadsheets.

5         How did you come into possession of the spreadsheets?

6    A    They were on the practice administrator's computer.

7    Q    And why were you looking on the practice administrator's

8    computer?

9    A    She was going to get let go.  So Dr. Meisy had instructed

10   me to get what I needed off of that computer in case -- you

11   know, before she --

12           **THE COURT:**  Okay, this would have been in what year?

13           **THE WITNESS:**  The last year I was there; so '15.

14           **THE COURT:**  2015?

15           **THE WITNESS:**  Yes.

16           **THE COURT:**  So when had you started there?

17           **THE WITNESS:**  2011.

18           **THE COURT:**  Okay, so you didn't see these until 2015?

19           **THE WITNESS:**  This exact same one?  No.  But there's

20   variations.  I mean, it went through different --

21           **THE COURT:**  So you've never -- do you even remember

22   seeing those at any point, other than at this trial or right --

23   in preparation for this trial?

24           **THE WITNESS:**  This specific one, no.

25           **THE COURT:**  Any one of those three?

1          THE WITNESS:  Like I said, there's different

2    variations that we filled out.  And I previously mentioned

3    that.

4          THE COURT:  But these are not yours?  These --

5          THE WITNESS:  No.

6          THE COURT:  -- are from two thousand and when?

7          THE WITNESS:  On here, it says, "2002."

8          THE COURT:  Okay, and so at the time that you're

9    talking about, you did not look at -- don't remember actually

10   looking at those particular ones?

11         THE WITNESS:  No.

12   BY MR. FOSTER:

13   Q    How did you obtain them?

14   A    Dr. Meisy had told me to get what was on her computer in

15   case anything was erased or deleted.  So the only thing I had

16   at the time was a personal USB.

17   Q    And then did you look at the spreadsheets and provide them

18   to law enforcement?

19   A    Yes.

20         THE COURT:  Okay, when did you do that?

21         THE WITNESS:  I'm sorry?

22         THE COURT:  When did you look at them for the very

23   first time and provide them to law enforcement?

24         THE WITNESS:  When Agent Wilson had come and, you

25   know, ask questions.

Lucio - Direct / By Mr. Foster                    51

1         **THE COURT:**  So it was never during your -- you had

2    never looked at those to see what you were supposed to be

3    filling out, in particular?

4         **THE WITNESS:**  No, sir.  I mean, I got a copy of the

5    USB, and then I had to give it -- well, I gave it to the IT

6    person at the time, so he could put it on the share drive.

7         **THE COURT:**  Okay, so you never relied on these three

8    documents as to what you were supposed to fill out?

9         **THE WITNESS:**  No.  But there was different variations

10   of the ones that we filled out.

11        **THE COURT:**  Okay, so you have the ones you filled

12   out, but these were never relied on by you?

13        Or nobody instructed you to rely on these three

14   particular ones?

15        **THE WITNESS:**  No, sir.

16        **MR. SULLY:**  Your Honor, can we clarify when he said,

17   "get off her computer," which employees he was referring to;

18   which person.

19        **THE WITNESS:**  Janie Solis.

20        **THE COURT:**  I take it that the Defense still has the

21   same objection?

22        **MR. LEE:**  We do, Your Honor.

23        **MR. ALVAREZ:**  Yes, Your Honor.

24        And I have (indisc.) --

25        **THE COURT:**  Well, the objection is sustained with the

1    rest of these three documents.

2            These three documents, Ladies and Gentlemen, are not

3    exhibits; 51, 52, and 53 -- that I said were admitted, are not

4    admitted.

5            So you cannot consider these three documents.

6            **MR. LEE:**  And, Your Honor, we ask for the testimony

7    regarding these exhibits to be stricken from the record.

8            **THE COURT:**  With regards to these particular

9    exhibits, yes.

10           **MR. LEE:**  Thank you.

11           **THE COURT:**  Not stricken from the record, but just

12   that the jury's instructed not to consider that.

13           **MR. LEE:**  Thank you, Your Honor.

14           **MR. SULLY:**  Thank you, Your Honor.

15           May we approach on another issue?

16           **THE COURT:**  Ladies and Gentlemen, approaching doesn't

17   mean they really like me or anything.  It has something to do

18   with legal matters.

19           Come on up here.

20       **(Begin Bench Conference)**

21           **MR. SULLY:**  Your Honor, at one point, there had been

22   a Motion to Suppress the information that Mr. Lucio would have

23   obtained at the Government's request.

24           When we were contending (indisc.) Government's

25   request, the representation made at the time was that he hadn't

1  obtained that information at the Government's request and,

2  therefore, wasn't suppressible.

3          Based on his testimony, it seems that he's testifying

4  he did obtain it on behalf of the Government.

5          And, therefore, we would renew that Motion to

6  Suppress released as to *voir dire* on that issue, because it

7  relates to whether or not this information that he was asked to

8  get out obviously wasn't a warrant.  He was doing it at the

9  behest of the Government.

10         And, therefore, there's a multiple Fourth Amendment

11 violation if he did, in fact, do it on behalf of the Government

12 like he just testified to.

13         Then I think we do have a suppressible -- an issue

14 that would need to be looked at before he's allowed to testify

15 as to those documents.

16         **MR. LEE:**  I understand that it was that he was

17 interviewed by the FBI about a year and a half after he stopped

18 working at the center.

19         So at least my understanding -- my assumption was --

20 and we can obviously correct if I'm wrong -- is that this was a

21 USB he had when he worked there; he still happened to have, at

22 the time he was interviewed.  And, thus, that's how he had it

23 in his possession.

24         Obviously, if that's the case, there might be an

25 issue with him.  He might have -- should have turned it over to

Lucio - Direct / By Mr. Foster                        54

1    his employer before leaving.

2              THE COURT:  But knowing he --

3              MR. LEE:  (Indisc.).

4              THE COURT:  If he already had it, we don't have a

5    problem.

6              MR. LEE:  So if that's the case, if the Government's

7    account is correct, then that is a Fourth Amendment issue.

8              MR. SULLY:  All right, I just wanted to make sure

9    because I thought he was saying something different.

10             THE COURT:  No.  (Indisc._ already had it.  Thank

11   you.

12             MR. SULLY:  All right.

13             MR. SPEAKER:  It's my understanding that he did a

14   very good (indisc.).

15             MR. SPEAKER:  Yes, he did.

16        **(End Bench Conference)**

17             THE COURT:  Go ahead.

18   **BY MR. FOSTER:**

19   Q    Now, Mr. Lucio, you referred to these spreadsheets.

20        Can you explain to the jury what was on the spreadsheets

21   that you e-mailed?

22   A    It was the number of done procedures for that day; whether

23   it be, you know, in the X-rays, injections, infusions, how many

24   patients were seen by the provider.

25   Q    Would there be a specific section for IV therapy, for

Lucio - Direct / By Mr. Foster                                    55

1   example?

2   A    Yes.

3   Q    And do you recall what drug was administered most

4   frequently for IV therapy?

5   A    No, I cannot recall.

6   Q    Are you familiar with Remicade?

7   A    Yes.

8   Q    Is that an IV therapy drug?

9   A    That is an IV therapy.

10  Q    And how frequently was it administered?

11  A    I mean, I know it's one of the ones that he did prescribe.

12  Q    How frequently?

13  A    No, I don't know.

14  Q    In terms of injections, was there a separate line item for

15  injections?

16  A    There was methotrexate.

17  Q    And explain to the jury what methotrexate is?

18  A    It's, I guess, like a steroid injection.

19       **MR. SULLY:**  Objection, Your Honor.  He's not an

20  expert in medicine.  He's not able to give an opinion as far --

21       **THE COURT:**  He can't --

22       **MR. SULLY:**  -- as what medicine --

23       **THE COURT:**  -- give us a medical opinion if he

24  doesn't know what it was.

25            //

Lucio - Direct / By Mr. Foster                    56

1    **BY MR. FOSTER:**

2    Q    Did you know what it was?

3    A    No.

4    Q    Okay.

5    A    I just know it was given for the diagnosis.

6             **MR. SULLY:**  Your Honor, and we'd also object if the

7    witness is still referring to the spreadsheets that weren't

8    admitted -- during his testimony, that he not refer to those.

9             I don't know if he still has them up there.

10            **THE COURT:**  You cannot use those to refresh in any

11   way whatsoever.

12            **THE WITNESS:**  I didn't look at them.

13            **THE COURT:**  Okay.

14            **THE WITNESS:**  Yeah.

15   **BY MR. FOSTER:**

16   Q    How frequently was methotrexate used in the spreadsheets

17   that you had e-mailed around?

18   A    All the time.  That was one of the biggest ones.

19   Q    Now, and who were the recipients of these spreadsheets on

20   a daily basis?

21   A    Dr. Zamora's patients.

22   Q    Uh-huh.

23   A    You know, were patients of the clinic, yes.

24   Q    Okay, and which doctors would be listed on the

25   spreadsheets?

1   A    Dr. Zamora.  In San Antonio, he was the only provider.

2   Q    And what about in other locations?

3   A    There was a couple mid-levels.  Dr. Salinas was the main

4   one for Brownsville.

5   Q    And did there come a time when Defendant Zamora-Quezada

6   talked to you about one of these spreadsheets being obtained by

7   law enforcement?

8   A    Yes.

9   Q    What did he say to you?

10  A    That it was stupid that we were e-mailing them.

11  Q    When you said it was stupid that you were e-mailing these

12  spreadsheets, where were you?

13  A    In his office.

14       MR. FOSTER:  Can we bring up what's previously been

15  admitted as Government Exhibit N-2, at page 37?

16  BY MR. FOSTER:

17  Q    Do you recognize this?

18  A    Yes.

19  Q    What is it?

20  A    That his little conference table in the room, in Edinburg.

21  Q    And where were you when you said it was stupid to be e-

22  mailing these spreadsheets?

23  A    There, at that table.

24  Q    At that table, in the middle, right there?

25  A    Yes.

Lucio - Direct / By Mr. Foster                          58

1   Q    And who else was in that room when he said it was stupid

2   to be e-mailing these spreadsheets?

3   A    Practice administrator at the time -- Janie, Felix, and

4   Dr. Meisy.

5   Q    And when you say, "Felix," is that Defendant Ramos?

6   A    Yes.

7   Q    And Dr. Meisy, is that Defendant Meisy Zamora?

8   A    Yes.

9   Q    And where were they when Defendant Zamora-Quezada said it

10  was stupid to be e-mailing these spreadsheets?

11  A    At the table as well.

12  Q    How angry was he when he said it was stupid to be e-

13  mailing these spreadsheets?

14  A    He was pretty angry.  He was yelling.

15  Q    When you were saying, "yelling," how loud was he yelling?

16  A    Pretty loud.

17  Q    Who was he yelling at?

18  A    At all of us.

19  Q    And what kind of names did he use?

20  A    He said, "*es una pendeja*."

21  Q    Can you explain to the jury what that means?

22       **THE COURT:**  The interpreter will do that.

23       It's just, "stupidity."  Isn't that what it is?

24       **THE INTERPRETER:**  "That's an idiotic thing to do."

25       //

1    **BY MR. FOSTER:**

2    Q    And what did he say about law enforcement in this

3    conversation?

4    A    That they had obtained it and it was just stupid to be e-

5    mailing things like that.  And from that point forward, not to

6    e-mail them anymore.

7    Q    How did you react when he said not to e-mail things like

8    this quota spreadsheet anymore?

9    A    Just follow orders, kind of -- I mean, kind of asking,

10   like, "Well, why can't we?"

11        But I didn't ask the question.

12   Q    Why didn't you ask the question?

13   A    Well, I mean, for one thing, he was mad; like I said.

14   Q    Were you concerned for your job?

15   A    Yes.

16   Q    Now, did you handle patient complaints as part of your

17   job?

18   A    Yes, I did.

19   Q    When you received a complaint from a patient, who would

20   you tell?

21   A    I would bring it up to the practice administrator or the

22   doctor himself.

23        Depending whether he was in a good mood or bad mood, I

24   would bring it up to Dr. Meisy.  She was kind of like the

25   buffer.

Lucio - Direct / By Mr. Foster                    60

1  Q    And did there come a time when patients told you that they

2  believed they had been misdiagnosed with rheumatoid arthritis?

3  A    Yes.

4  Q    And did you convey that to Defendant Meisy Zamora?

5  A    Yes.

6  Q    Are you familiar -- you talked about a drug called,

7  "methotrexate."

8       Did patients complain about that?

9  A    Yes, at times.

10 Q    And what were their complaints?

11         **MR. LEE:**  Can we get some foundation; when, who?

12         **THE COURT:**  Why don't you ask about when and --

13         **MR. FOSTER:**  Sure.

14         **THE COURT:**  -- who these patients were.

15         **MR. FOSTER:**  Sure.

16 **BY MR. FOSTER:**

17 Q    Was this one complaint or more than one complaint?

18 A    It was more than one complaint.

19 Q    Was it infrequent or frequent?

20 A    It was pretty frequent.

21 Q    And do you remember the names of these patients?

22 A    I mean, he had thousands of patients.

23 Q    But you do remember complaints by multiple patients?

24 A    I do remember complaints by multiple patients.

25 Q    About methotrexate?

1    A    About methotrexate or whatever he was giving at the time.

2    Q    And where would you be when they made these complaints?

3    A    In the office.

4    Q    And what would they tell you?

5    A    They were just feeling ill or they went to a second

6    opinion and that they didn't have the diagnosis or they

7    shouldn't be getting that treatment.

8    Q    When you say, "they went for a second opinion," what do

9    you mean?

10   A    Went to another rheumatologist.

11           **THE COURT:**  And so they told you they had already

12   been to a second opinion, and they were told not to do that,

13   but they still came back?

14           **THE WITNESS:**  Yes.

15           **THE COURT:**  Go ahead.

16   **BY MR. FOSTER:**

17   Q    And did some of these patients complain directly to

18   Defendant Zamora-Quezada?

19   A    Yes.

20   Q    And how would he react when patients complained to him?

21           **MR. LEE:**  Objection; foundation.

22           **THE COURT:**  Were you present --

23           **MR. LEE:**  How would they notice?

24           **THE COURT:**  -- when they personally complained to

25   him?

1          **THE WITNESS:**  No, sir.  I was in my office.

2          **THE COURT:**  And so could you actually hear what they

3    were telling him?

4          **THE WITNESS:**  No, sir.  I was in --

5          **THE COURT:**  Then he can't --

6          **THE WITNESS:**  I was in my office.

7          **THE COURT:**  He can't testify as to that.

8    **BY MR. FOSTER:**

9    Q    After the patients interacted with Defendant Zamora-

10   Quezada, would he ask you to talk with the patients?

11   A    Yes.  Because I had to discharge them from the practice.

12   Q    Okay, so explain to the jury what the process was in this

13   situation, where there was a patients complaint to Defendant

14   Zamora-Quezada.

15   A    I would go in there and just see what the issue was.

16        And then they would tell me what they would tell the

17   doctor; they got a second opinion or they just didn't agree

18   with what he was giving them and that he would just get angry

19   or he would get out of the room and that I would come in.

20        And then, from there, I would have to tell them that we're

21   going to discharge them from the practice and give them 30 days

22   to find another rheumatologist.

23   Q    When you say, "He would get angry," how angry would he

24   get?

25   A    He would get angry outside of the -- outside of the -- not

1    inside of the patient's room, but outside of the patient's

2    room.

3    Q    Can you explain to the jury what happened outside of the

4    patient room?

5    A    He would just get angry because they were questioning his

6    judgment.

7    Q    And what would he say about them questioning his judgment?

8    A    That he's had so many years, and he's the expert.

9    Q    Now, when you said --

10              **THE COURT:**  He would resolve this by then just

11   telling them not to come see him anymore?

12              **THE WITNESS:**  Yes, sir.

13              **THE COURT:**  He would tell them that?

14              **THE WITNESS:**  No.  That was my job.

15              **THE COURT:**  But he told you to tell them, "I'm not

16   going to see them anymore"?

17              **THE WITNESS:**  Yes, sir.

18              **THE COURT:**  Go ahead.

19   **BY MR. FOSTER:**

20   Q    How concerned were these patients when you interacted with

21   them?

22   A    They seemed pretty concerned.

23   Q    Can you explain that to the jury?

24   A    I mean, they got a second opinion, and if it's not the

25   same diagnosis that another doctor has given them -- I mean,

1   anybody would be concerned about that.

2   Q    And what did Defendant Zamora-Quezada tell you to do with

3   these patients?

4   A    Discharge them.

5   Q    How did that make you feel?

6   A    I mean, bad, at times.

7        But it's -- I mean, he's the doctor.

8             **THE COURT:**  And I guess these were patients who had

9   already told you that they had -- or told him that they had

10  already seen another doctor?

11            **THE WITNESS:**  Yes, sir.

12            **THE COURT:**  Go ahead.

13  **BY MR. FOSTER:**

14  Q    Now, when Defendant Zamora-Quezada dismissed a patient,

15  would that patient visit be taken off the schedule?

16  A    I believe not, no.

17  Q    Why you believe not?

18  A    Because they were still seen or they were -- you know,

19  they were, during the examination process.

20  Q    And so would the patient visit be billed?

21            **MR. LEE:**  Objection, Your Honor; lack of foundation.

22            **THE COURT:**  What patient visit are we talking about?

23            **MR. FOSTER:**  One where a patient comes in and

24  complains and then leaves.

25            **THE COURT:**  Okay, would you know whether they were

Lucio - Direct / By Mr. Foster                          65

 1   billed or not?

 2          **THE WITNESS:**  I didn't see any superbills or anything

 3   like that.

 4          **THE COURT:**  Okay.

 5   **BY MR. FOSTER:**

 6   Q    Now, did the patients who were let go, did they have

 7   trouble getting medical records?

 8          **MR. LEE:**  Objection, Your Honor; foundation.

 9   **BY MR. FOSTER:**

10   Q    Did you speak with patients?

11   A    Yes.

12   Q    And did you speak with them about attempts to get medical

13   records?

14   A    Yes.

15   Q    And what did they tell you?

16   A    That they were waiting a long time to get medical records,

17   or that --

18          **THE COURT:**  This is after they had already quit

19   coming there?

20          **THE WITNESS:**  Yes.

21          **THE COURT:**  And they would call you?

22          **THE WITNESS:**  Well, they would call the clinic.  And

23   then whenever they didn't get medical records, they would ask

24   for the supervisor.

25          **THE COURT:**  Okay, and that would be --

1           THE WITNESS:  Or the manager.

2           THE COURT:  And that would be you?

3           THE WITNESS:  Yes, sir.

4           THE COURT:  And once you got that call, did you do

5    something about it?

6           THE WITNESS:  Yes.  I instructed the front office to

7    print them out.

8           THE COURT:  And they would?

9           THE WITNESS:  They would print them out, yes.

10          THE COURT:  All right.

11          THE WITNESS:  If they were complete.

12   BY MR. FOSTER:

13   Q    What did you discover about whether the medical records

14   were complete?

15   A    If they weren't complete, then Dr. Zamora would have them

16   completed.

17        That means we'd have to complete and then Dr. Zamora would

18   sign off on them.

19   Q    And was that before or after the patient visit?

20   A    After the patient visit.

21   Q    What was the level of organization of the patient files?

22   A    I'm sorry?

23   Q    What was the level of organization of the patient files

24   that you saw?

25          MR. LEE:  Lack of foundation.

1           **THE COURT:**  Go ahead.

2    **BY MR. FOSTER:**

3    Q    Did you see patient files?

4    A    Yes.

5    Q    And were you involved in the process of obtaining patient

6    files for patients?

7    A    No.

8    Q    And did you become familiar with the organization of the

9    patient files?

10   A    Yes.

11   Q    How did you become familiar with that?

12   A    The M.A. supervisor would come and do -- teach the M.A.s

13   at San Antonio what to do with the files or, you know, how to

14   write them and stuff like that.

15   Q    And did you become familiar with the level of

16   organization?

17   A    Level -- can you --

18   Q    Organization of the patient files.

19   A    Yes.

20   Q    And what was the level of organization?

21   A    I mean, it was chaotic sometimes.  I mean, they weren't

22   completed on time.

23   Q    Now, are you familiar with what a medical insurance audit

24   is?

25   A    Yes.

Lucio - Direct / By Mr. Foster                    68

1   Q    How are you familiar with medical insurance audits?

2   A    Because we got a couple while we were there.

3   Q    Where?

4   A    While I was employed with Dr. Zamora, he got a couple of

5   audits.

6   Q    And can you explain to the jury what an audit is?

7   A    And audit is just an insurance checking -- randomly

8   checking -- or if not, deliberately checking -- medical records

9   to see if they're complete or if what was being said on there

10  actually was being charged the way it was supposed to.

11  Q    And what was your understanding of the purpose of

12  responding to the audits?

13  A    It needed to be asap.  Because either you would get

14  refunded money back or they would take away money.

15  Q    Who talked to you about the audits?

16  A    Dr. Zamora.

17  Q    And what did he say about them?

18  A    We needed to get them ASAP.

19  Q    Was he concerned?

20  A    Yes.

21  Q    How concerned was he?

22  A    Concerned because it was a lot of patients sometimes on

23  patient records.

24  Q    What kind of documents did you have to retrieve?

25  A    The patient notes.

EXCEPTIONAL REPORTING SERVICES, INC

Lucio - Direct / By Mr. Foster                          69

1  Q    And how involved was Defendant Zamora-Quezada in the audit

2  response?

3  A    He would sign off on them.

4  Q    How many people would be working on these audit responses?

5  A    At times, sometimes everybody, like all of the front desk

6  if needed.  We had to print them out and send them to Edinburg.

7  Q    And what type of hours would the staff be working?

8  A    If it was an ASAP one, either little bit later or

9  sometimes on the weekend to print them out.

10 Q    And as part of the audit response, did you become aware

11 that documents were missing from the files?

12 A    Yes.

13 Q    What types of documents?

14       MR. SULLY:  Objection, Your Honor, lack is -- lack of

15 foundation as to how he became aware.

16       THE COURT:  He laid the predicate that if he became

17 aware there were some documents missing as part of his job

18 there in trying to get these together.  Go ahead.

19       THE WITNESS:  Can you repeat the question?

20 BY MR. FOSTER:

21 Q    What types of documents were missing?

22 A    Sometimes it was the actual like what the doctor had to

23 write down, like at the visit summary I guess you could say.

24 There was images missing like --

25 Q    When you say --

Lucio - Direct / By Mr. Foster                              70

1   A    -- ultrasound images missing at times.

2   Q    And what would Defendant Zamora-Quezada do when there were

3   notes missing?

4   A    Fill them in.

5   Q    When you say "fill them in," what do you mean?

6   A    He would fill by filling his notes as to I guess what

7   happened during the visit.

8   Q    Now how far back were these audit response going in terms

9   of the patient files they were looking for?

10  A    Some of these were a couple of years back.

11  Q    Couple of years back.

12  A    Yes.

13  Q    And so then what time period were the notes being written

14  for?

15  A    I want to say some -- one of them was even like five years

16  back from the date that it was issued.

17  Q    Now as part of the audit responses, did you become aware

18  that patient files were being maintained offsite?

19  A    Yes.

20  Q    And who told you about that?

21       **MR. SULLY:**  Objection, Your Honor, calls for hearsay

22  (indisc.) clause, lack of personal knowledge.

23       **THE COURT:**  Who did tell you about that is the

24  question.

25       **THE WITNESS:**  I'm sorry?

1          **THE COURT:**  Go ahead.

2    **BY MR. FOSTER:**

3    Q    Who told you that the patient files were maintained

4    offsite?

5    A    It was Felix Ramos himself, who was the practice

6    administrator at the time, because they had to go and get --

7          **THE COURT:**  And the reason they told you is because

8    you were trying to get things together or why did you have --

9          **THE WITNESS:**  Yeah, because I told them there's some

10   of these patients are missing information.  So we were

11   instructed to send everything -- anything that we had in San

12   Antonio to Edinburg because that's where they would audit, do

13   the final audit there, and then send it off from there to the

14   insurances.

15         **THE COURT:**  Go ahead.

16   **BY MR. FOSTER:**

17   Q    And did Defendant Ramos and others mention something

18   called "the barn?"

19   A    Yes.

20   Q    And what was the barn?

21   A    That is where they kept the documents.

22   Q    In what town was the barn?

23   A    In Edinburg.

24   Q    Approximately how many patient files were in the barn?

25   A    All of them.

Lucio - Direct / By Mr. Foster                          72

1    Q    How were they stored in the barn?

2           **MR. LEE:**  Objection, lack of foundation, personal

3    knowledge.

4           **THE COURT:**  Did you ever go to the barn?

5           **THE WITNESS:**  No, sir.

6           **THE COURT:**  So you just know they were stored at the

7    barn.

8           **THE WITNESS:**  Yes, sir.

9    **BY MR. FOSTER:**

10   Q    Did others report to you about attempts to retrieve

11   patient files from the barn?

12   A    Yes, they did.

13   Q    As part of carrying out your job responsibilities.

14   A    I'm sorry?

15   Q    As part of carrying --

16   A    Yes.

17   Q    -- out your job responsibilities in the audit response,

18   correct?

19   A    Yes.

20   Q    And then you reported to Defendant Meisy Zamora and

21   Dr. Zamora-Quezada.

22   A    Yes, and the practice administrator at the time also.

23   Q    And what were you told about the condition of the barn?

24   A    That it was horrible --

25          **MR. SULLY:**  Objection, hearsay, lack of personal

1   knowledge.

2          **THE COURT:**  He's just telling us what somebody else

3   told him as he's asking them to get these records prepared.  Go

4   ahead.

5   **BY MR. FOSTER:**

6   A    That the conditions were horrible.  There was animal feces

7   and urine everywhere, papers scattered everywhere.  They had to

8   dig through them sometimes because the boxes were torn from the

9   animals that made nests there.

10  Q    Did you have concern about animals making nests in the

11  patient files?

12  A    Yes.

13  Q    What was your concern?

14  A    I mean, the patient files is a -- I mean, that's a HIPAA

15  regulation.

16         **MR. SULLY:**  Objection, Your Honor.  He's not

17  qualified as an expert to --

18         **THE COURT:**  He doesn't qualify as an expert.  And do

19  you really need to ask him the question if he was confirmed

20  (sic) about -- concerned about what he just described?

21         **MR. FOSTER:**  I'll move on then, Your Honor.

22  **BY MR. FOSTER:**

23  Q    Did there come a time when Defendant Meisy Zamora asked

24  you to work one weekend at the barn?

25  A    Yes.  She asked me to help with an audit.

Lucio - Direct / By Mr. Foster                     74

1   Q    And approximately when was that?

2   A    I want to say -- I'm not too -- well, maybe '14.  I'm not

3   too sure of the time period.

4   Q    Approximately 2014.

5   A    Yes.

6   Q    And what did she say in regards to the audit?

7   A    That they needed help getting things together.

8   Q    And what if anything did Defendant Meisy Zamora say about

9   a request for files?

10  A    I'm sorry?

11  Q    What did she say if anything about a request for files?

12  A    I don't understand the question.

13  Q    Sure.  What files were they looking for?

14  A    Oh, the medical records for the patients.

15  Q    And were you already planning to come to Edinburg at the

16  time?

17  A    Yes.  I would be back and forth sometimes.  I mean, I have

18  family here that I visit plus I would get supplies for the San

19  Antonio clinic.

20  Q    And did you come to Edinburg?

21  A    Yes, I did.

22  Q    Where did you go when you got to Edinburg?

23  A    I went to the office, the Edinburg office.

24  Q    Why didn't you go to the barn right away?

25  A    Because I had to pick up the supplies and I had to like

1   get them ready.

2   Q    What day of the week was it?

3   A    It was on a Saturday morning.

4   Q    When you say "supplies," what are you referring to?

5   A    Like the knee injections for HYALGAN, like some --

6   whatever we're missing, like any other -- like the

7   methotrexates or any other things that didn't come in from

8   Henry Schein that I could take from Edinburg.

9   Q    So is that related or unrelated to the audit request?

10  A    That's unrelated.

11  Q    Okay.  And what time of day did you get to the Edinburg

12  office?

13  A    In the morning.

14  Q    And what entrance did you come in?

15  A    Through the back.

16  Q    Where was Defendant Zamora-Quezada when you came into the

17  office?

18  A    I believe he was in his office.

19  Q    And where was Defendant Meisy Zamora?

20  A    She was actually coming back from the conference room.  I

21  said "hi" in passing.  She was going back to the -- back to her

22  office.  And that's when I saw the people in the conference

23  room.

24  Q    What did you see when you looked into that conference

25  room?

Lucio - Direct / By Mr. Foster                    76

 1   A    The audit.  They had the papers all on the conference

 2   tables.  They had some shredders there.

 3   Q    When you say they had some shredders there, what did you

 4   see?

 5   A    The shredders that -- I mean, they're just there next to

 6   the conference tables.

 7   Q    Were there normally shredders in the conference room?

 8   A    No.

 9   Q    Had you ever seen shredders in the conference room before?

10   A    No.  They're usually at the nurse's stations or in the

11   offices.

12   Q    Was there just one shredder or more than one shredder?

13   A    There was more than one shredder.

14   Q    And what types of papers were in the conference room

15   alongside the shredders?

16   A    The audit paperwork, the medical records.

17   Q    Can you describe how you reacted when you saw these

18   shredders?

19   A    I was thrown back a little bit.  I got a gut feeling so

20   that's when I went to Janie office and I told her that I had a

21   family thing to do, and I got the rest of the stuff that I

22   needed for San Antonio and I left.

23   Q    And why did you leave?

24   A    Just I had a gut feeling.

25   Q    What was the gut feeling?

Lucio - Direct / By Mr. Foster                          77

1          **MR. LEE:**  Objection, Your Honor, relevance.

2          **THE COURT:**  No, I'm interested in what the gut

3   feeling was.

4   **BY MR. FOSTER:**

5   A    That I didn't want to be there.  I mean, when you have an

6   audit and you have shredders there, I mean, --

7          **THE COURT:**  But you didn't tell anybody.  You just

8   decided, I'm going to leave.

9          **THE WITNESS:**  I mean, I told Janie when she was

10  there.  You know, I was like, you know, I'm just not

11  comfortable.  I have things that I have to do with my family so

12  I'm going to take off.  And she said, "Okay."

13         **THE COURT:**  Did you tell her why you were not

14  comfortable?

15         **THE WITNESS:**  No.

16         **THE COURT:**  Go ahead.

17  **BY MR. FOSTER:**

18  Q    Now why didn't you tell the Defendants why you weren't

19  comfortable?

20  A    I'm sorry?

21  Q    Why didn't you tell Defendant Zamora-Quezada why you

22  weren't comfortable?

23  A    It's happened in the past and then people get fired.

24  Q    Now, did Defendant Meisy Zamora talk to you about what you

25  should do in the event that law enforcement came to the clinic?

Lucio - Direct / By Mr. Foster                    78

1   A     To say that Dr. Zamora wasn't there.

2   Q     What if Dr. Zamora was there?

3   A     We were still instructed to tell them that he was not in

4   the building.

5   Q     Who told you that?

6   A     Dr. Zamora himself and Dr. Meisy.

7   Q     And did you observe Meisy Zamora tell other people besides

8   yourself to tell law enforcement that Dr. Zamora wasn't in the

9   building?

10  A     Yes.  She also told, you know, the departments that were

11  there.

12  Q     When you say "the departments," what do you mean?

13  A     Like the radiology or other employees that were there,

14  front desk, IV (phonetic).

15  Q     So let's say Defendant Zamora-Quezada's in the building;

16  what was the staff directed to tell law enforcement if they

17  showed up?

18  A     That he wasn't there.

19  Q     Where were they directed to say that he was?

20  A     Out of the office.

21  Q     And would that be true or a lie?

22  A     That was a lie.

23  Q     Now, did this ever happen in Edinburg where law

24  enforcement came to the office?

25  A     Yes.

1    Q    And what were they told?

2    A    That he was not there.

3    Q    And was that true or a lie?

4    A    That was a lie.

5    Q    Now, in your conversations with Defendant Zamora-Quezada,

6    how did he talk about the patients?

7    A    Is they were numbers.

8    Q    When you say they were "numbers," what do you mean?

9    A    I mean referring to you know how many visits that we need

10   to see.  I mean, we need to keep up productivity so that we can

11   make overhead.

12   Q    Did he ever show any compassion for the patients?

13          **MR. LEE:**  Objection, Your Honor.

14          **THE COURT:**  Objection sustained.

15   **BY MR. FOSTER:**

16   Q    In terms of Defendant Ramos, how did he talk about the

17   patients?

18   A    Same thing.  I mean, you know, he would tell us, you know,

19   directing from Dr. Zamora, hey, you know, we need to bring up

20   the productivity.

21   Q    Now, at some point did you decide to quit?

22   A    Yes, sir.

23   Q    And who did you tell?

24   A    I told the doctor himself, Dr. Zamora, and Dr. Meisy.

25   Q    And what was their reaction?

1    A    They wanted me to stay or if not, stay until they could

2    find somebody.

3    Q    And what did you do?

4    A    I asked for a raise, first of all, and then I said, you

5    know, I'm -- no, I'm going to take off.

6    Q    Why did you say, no, I'm going to take off?

7    A    Well, I had ethical reasons, I mean, for the fact that,

8    you know, I mean, there's quotas that needed to be met, just

9    the stressful environment, billing issues, you know, billing

10   when he wasn't there.  Patient complaints when they would

11   complain in how they were feeling, and I would bring that --

12   those concerns up to the doctor and nothing, I mean, changed.

13   The amount of patients that I had to discharge, I mean,

14   sometimes it was like one or two patients a week to discharge

15   them from the practice.  And one of the biggest ones was the

16   way he treated staff.

17   Q    And after you left, did you speak with the FBI?

18   A    Yes.

19   Q    And did you subsequently testify before a Grand Jury?

20   A    Yes, sir.

21            **MR. FOSTER:**  No further questions, Your Honor.

22            **THE COURT:**  Mr. Lee?

23            **MR. LEE:**  Thank you, Your Honor.  Good afternoon,

24   Mr. Lucio.

25   //

Lucio - Cross / By Mr. Lee                    81

**CROSS EXAMINATION**

**BY MR. LEE:**

1

2

3    Q    Prior to today, we have never spoken, correct?

4    A    No.

5    Q    All right.  Now, you were just talking about how you came

6    to leave the center, correct?

7    A    Yes, sir.

8    Q    And you left in October of 2015, correct?

9    A    I believe so.

10   Q    Okay, so that was about a year or so after what you were

11   talking about earlier about this audit, correct?

12   A    Yes.

13   Q    Okay, so you had this gut feeling in 2014 and you kept

14   working for the center for about a year afterwards, correct?

15   A    Yes.

16   Q    Okay.  And you asked for a raise prior to deciding to

17   leave, correct?

18   A    Yes.

19   Q    Okay, so if you'd gotten the raise, you would have kept

20   working at the center, correct?

21   A    No.

22   Q    Okay, so you asked for a raise and then --

23   A    To see for a response.

24   Q    All right.  And when you left the center and you resigned,

25   correct?  You weren't fired, correct?

Lucio - Cross / By Mr. Lee                        82

1  A    No, I resigned, yes, sir.

2  Q    Okay.  And when you resigned, you wrote a letter to

3  Dr. Zamora, correct?

4  A    Yes, sir.

5  Q    All right, and in the letter, you wrote that you had

6  enjoyed working for him, correct?

7  A    If that's what it states, yes.  I mean, the letter was a

8  long time ago.

9  Q    You told -- in the letter, you told Dr. Zamora in the

10 letter that you had enjoyed managing a very successful team

11 dedicated to quality healthcare delivered to your patients,

12 correct?

13 A    If that's what it says there.  I don't remember what I had

14 put on there.

15 Q    Okay.  In your letter, you didn't raise any ethical

16 concerns, right?

17 A    If it's not in there then, no.  Like I said, I don't

18 remember what I put in the letter.

19 Q    Now, you resigned in October, 2015, correct?

20 A    I believe so, yes.

21 Q    And then you were interviewed by the FBI about a year and

22 a half later, correct?

23 A    Yes.  I don't remember the timeframe but --

24 Q    It was at least a year between the time you left the

25 center and the time you were first interviewed, correct?

Lucio - Cross / By Mr. Lee                                83

1    A    Uh-huh.

2    Q    Okay.  So you didn't leave the center and immediately go

3    to law enforcement, correct?

4    A    No, sir.

5    Q    Okay.  In fact they contacted you, right?

6    A    Yes, sir.

7    Q    Okay.  And they contact you and they interviewed you for

8    the first time in -- at the FBI office here in McAllen,

9    correct?

10   A    Yes, sir.

11   Q    All right, and that was about March, 2017, correct?

12   A    I believe so.

13   Q    Okay, so about a year and a half after you left the center

14   because of these ethical concerns that you testified about on

15   direct, correct?

16   A    Yes.

17   Q    Okay.  And that was the first time you were interviewed.

18   And at the time that you interviewed, that's when -- you were

19   interviewed for the first time in March, 2017, correct?

20   A    Uh-huh.

21   Q    All right, and then you provided documents to the

22   Government afterwards, correct?

23   A    Yes.

24   Q    Okay.  And these are documents that you had on a USB

25   drive, correct?

Lucio - Cross / By Mr. Lee                                    84

1   A    It was a personal USB drive, yes.

2   Q    Okay.  And this was a personal USB drive having files that

3   you copied while you were working for the center, correct?

4   A    Yes.

5   Q    Okay.  And these were the files that -- and these were

6   files you kept even after you stopped working at the center,

7   correct?

8   A    Like I said, I mean, I hardly used that USB, and to be

9   honest, I mean, I had forgotten stuff was on there until I had

10  to start updating resume and stuff like that.

11  Q    And that contained copies of various files that you had in

12  your possession at the time you left the center, correct?

13  A    Yes.

14  Q    Okay.  And then you were interviewed again in April, 2018,

15  about a year after your first interview, correct?

16  A    I believe so.

17  Q    All right, and you talked to the Government on other

18  occasions since then, correct?

19  A    Yes.

20  Q    All right, in the past -- when was the last time you

21  talked to the Government in preparation for your testimony here

22  today?

23  A    It was -- no, what's -- yesterday.

24  Q    All right.  And how long did you meet with the Government?

25  A    Not long, like 30, 40 minutes maybe.

Lucio - Cross / By Mr. Lee                          85

1   Q    All right.  Now, you testified that you were -- you start

2   off at the center as an office manager, correct?

3   A    Yes, sir.

4   Q    All right, and you were the office manager for about three

5   years, correct?

6   A    Yes.

7   Q    Okay, so you worked at the center for about five years

8   total, correct?

9   A    Well, yes, but I was for longer.  I was an office manager

10  longer than three years.

11  Q    Okay, so how long were you an office manager?

12  A    Up until two months of when I left.

13  Q    All right, so most of your time working at the center you

14  were the -- an office manager, correct?

15  A    Yes.

16  Q    Okay, and you were an office manager in San Antonio,

17  correct?

18  A    Yes.

19  Q    All right, but you also -- and that was your main

20  responsibility, correct?

21  A    At first I started off in Brownsville; then when that

22  closed, I went to Edinburg and I did a little bit of HR stuff.

23  And then from there, I went to San Antonio and I replaced the

24  manager that was there.

25  Q    Okay.  What were your duties as office manager?

Lucio - Cross / By Mr. Lee                                    86

1   A    Handle patient complaints like I said, making sure that

2   everything was ready for the doctor, like the schedule was

3   ready, the employees' schedule, the maintenance of the

4   equipment.

5   Q    All right.  You didn't handle billing, correct?

6   A    No, sir.

7   Q    All right.  You're not a biller, correct?

8   A    No, sir.

9   Q    All right, you've had no training in billing, correct?

10  A    No.

11  Q    All right, there was someone else who was in charge of

12  billing, correct?

13  A    Yes.

14  Q    All right.  In terms of medical assistants, you weren't in

15  charge of the medical assistants, correct?

16  A    At the San Antonio, yes.  But there were -- Tomas was over

17  them.

18  Q    Okay, Tomas Moreno, correct?

19  A    Yes.

20  Q    He was the supervisor of the medical assistants, correct?

21  A    Yes.

22  Q    All right, they reported to him, correct?

23  A    In a sense.

24  Q    All right.  And you were the practice manager only for the

25  last two or three months that you worked at the center,

Lucio - Cross / By Mr. Lee                    87

1   correct?

2   A    Yes, sir.

3   Q    All right, and what were your duties as practice manager,

4   as practice administrator?

5   A    It was for to oversee both of the clinics.

6   Q    Okay.  Now, you testified on direct examination about some

7   chart and you were asked to describe a chart, correct?

8   A    Yes, sir.

9   Q    All right.  You don't have a copy of that chart, correct?

10  A    No, sir.

11  Q    All right, the Government's never shown you a copy of that

12  chart, correct?

13  A    No.

14  Q    Okay, so you're just going based on what you remember,

15  correct?

16  A    Yes.

17  Q    Okay.  All right, and in terms of some of the other things

18  you testified about before, you don't have any -- the

19  Government didn't show you -- strike that.

20       All right, you testified on direct examination, you were

21  asked about a conversation you had with a biller, correct?

22  A    Yes, sir.

23  Q    All right.  And who was that biller?

24  A    Which conversation are you talking about?

25  Q    You testified about a conversation with a biller about a

1    concern about billing under Dr. Zamora's national provider

2    identification number when he was gone, correct?

3    A    Yes.

4    Q    All right and, again, you're not a biller, right?

5    A    No, sir, I'm not a biller.

6    Q    All right, and you're not familiar with the concept of

7    incident-to-billing, correct?

8    A    No.  I just relied (sic) the message to the practice

9    administrator.

10   Q    All right, and you're not familiar with what -- how

11   services performed by a medical provider without an NPI number

12   can or cannot be billed, correct?

13   A    Yes.

14   Q    Okay, you don't know how that's being done.

15   A    No.

16   Q    Okay, and this biller, you don't remember who that biller

17   was, correct?

18   A    No.

19   Q    Okay, and when did this -- and you don't remember when

20   this conversation took place, correct?

21   A    It was when he went to Israel.

22   Q    All right, but you don't remember when --

23   A    No.

24   Q    -- in the five years you worked at the center --

25   A    Time of day, no, I mean, that was a long time ago.

Lucio - Cross / By Mr. Lee                           89

1  Q    Okay, but you remember this one concern that was brought

2  up about billing when the doctor was out in Israel, correct?

3  A    Yes.

4  Q    Okay.  All right, you also testified on direct examination

5  about a conversation you had with Dr. Salinas, correct?

6  A    Yes.

7  Q    Okay.  And Dr. Salinas was a doctor who worked at the

8  center, correct?

9  A    Yes.

10 Q    And he was a rheumatologist, correct?

11 A    No.

12 Q    He was a doctor, correct?

13 A    He was a doctor.

14 Q    All right, you don't know what his specialty was, correct?

15 A    Pathology.

16 Q    Okay.  And he worked at the center for several years,

17 correct?

18 A    Yes.

19 Q    All right, he was still working there when you left the

20 center, correct?

21 A    I believe so, yes.

22 Q    Okay.  And this conversation you had with Dr. Salinas, you

23 don't remember when this conversation took place, correct?

24 A    It was when I first started working so it was, I mean,

25 what, years and years ago.

Lucio - Cross / By Mr. Lee                            90

1   Q    Okay, so it was at towards the beginning of your time,

2   correct?

3   A    Yes.

4   Q    Okay, the beginning of your five years working there,

5   correct?

6   A    Yes, sir.

7   Q    And Dr. Salinas continued to work for the center

8   throughout the end of your time, correct?

9   A    Yes, sir.

10  Q    All right.  Now, when you were an office manager and

11  practice administrator, did you keep records of what you did

12  during the course of the day?

13  A    Yes.  Those we actually emailed those also.

14  Q    Okay, these are administrative daily activity reports.

15  A    Yes.

16  Q    Okay, and these are things that you tracked to track what

17  conversations you had, what things you dealt with in the course

18  of a day, correct?

19  A    Yes.

20  Q    Okay.  So if you had these conversations, if you had this

21  conversation with a biller, for example, you would have

22  documented that in administrative daily activity report; is

23  that right?

24  A    They weren't supposed to be as in detail the stuff that we

25  emailed.  What I would track was more of like the who I spoke

1    with for like the equipment maintenance, for credentialing,

2    like who I spoke with at the insurances, any reference numbers,

3    stuff like that is what I would put on those.  And then

4    eventually we had to stop sending those.

5    Q    Okay.  But while you were maintaining those, that's where

6    you would track the things you did during the course of a day,

7    correct?

8    A    That wasn't all -- not everything was tracked on that.

9    Q    All right.  Now, you testified on direct examination about

10   spreadsheets, correct?

11   A    Yes.

12   Q    All right, you testified that you created spreadsheets,

13   correct?

14   A    That I created?  No.  That I filled out spreadsheets, yes.

15   Q    You filled out spreadsheets, correct?

16   A    Yes.

17   Q    And you'd do one every day, correct?

18   A    Yes.

19   Q    Okay.  And you testified that there was some conversation

20   with Dr. Zamora about these spreadsheets at some point.  You

21   testified about a conversation you had with Dr. Zamora in that

22   meeting room about these spreadsheets, correct?

23   A    About not the spreadsheets in general but that it was a

24   lot of patients to be seen --

25   Q    Okay.

Lucio - Cross / By Mr. Lee                              92

1   A    -- so that, I mean, I guess maybe the spreadsheets would

2   come up.

3   Q    All right.  You testified on direct examination about a

4   meeting you had in the conference room talking about the

5   spreadsheets and how they were transmitted, correct?

6   A    Yes.

7   Q    Okay, when did that conversation take place?

8   A    That was after -- timeframe I don't now but I know that

9   was when the FBI had shown up.  And like I said, timeframe, I'm

10  not too sure.

11  Q    Okay, so your testimony is at some point you think the FBI

12  showed up.

13  A    No, not think; they did show up and --

14  Q    Right.

15  A    -- that's why he got angry, because they got a hold of

16  some documentation.

17  Q    All right.  So the FBI had some of the spreadsheets,

18  correct?

19  A    I believe so.  I mean, --

20  Q    All right.

21  A    -- I can't say whether they did or didn't.

22  Q    Okay, your understanding is that the -- and how did you

23  gain this understanding that the FBI had some of these

24  spreadsheets?

25  A    Through Dr. Zamora himself --

Lucio - Cross / By Mr. Lee                    93

1   Q    All right.

2   A    -- because they got it through Dr. Meisy's emails.

3   Q    Okay.  Has the Government ever shown you those

4   spreadsheets?

5   A    No.

6   Q    No.  If they had them, would you have expected them to

7   show them to you?

8        **MR. FOSTER:**  Objection, speculation.

9        **MR. LEE:**  I'll move on, Your Honor.

10       **THE COURT:**  Objection sustained.

11  **BY MR. LEE:**

12  Q    All right, so this conversation -- so but you weren't

13  present when the FBI showed up, correct?

14  A    No, sir.

15  Q    You just -- it's just your understanding based on what you

16  have heard from Dr. Zamora.

17  A    Yes.

18  Q    All right.  And but your understanding is the FBI had some

19  of these spreadsheets.

20  A    The information, yes.

21  Q    Okay.  And after this meeting, did you continue to keep

22  track of things like the number of injections or visits in a

23  day?

24  A    Yes.  But we would -- it was printed.

25  Q    Okay, so you still tracked the things you had been

Lucio - Cross / By Mr. Lee                              94

1    tracking, correct?

2    A    Yes.  It was printed.

3    Q    All right, and was it then delivered?

4    A    Yes.

5    Q    Okay, and you did these on a computer, correct?

6    A    Yes.

7    Q    All right, and you saved them to your computer, correct?

8    A    Uh-huh.

9    Q    Okay.  So these things still existed, correct?

10   A    Yes.

11   Q    All right, and you didn't delete -- you know, once you

12   create a spreadsheet and printed it out, you didn't delete them

13   from your computer every day, correct?

14   A    It was -- no, well we didn't save them.  I mean, it was

15   just a template, we would put the number, we would print it

16   out, and then hand it.  So it's not like it was saved.

17   Q    All right.  But these things continued to be done

18   throughout, correct?

19   A    Yes.

20   Q    Okay, you testified on direct examination about quotas,

21   correct?

22   A    Yes, sir.

23   Q    All right.  You testified that this came up in meetings,

24   correct?

25   A    Yes.

Lucio - Cross / By Mr. Lee                              95

1  Q    All right, what meetings did this come up in?

2  A    Well, it would be face-to-face or conference call

3  meetings.

4  Q    Okay.  How often were the face-to-face meetings?

5  A    Sometimes when he was there, so I want to say once a week

6  if not once every other week.

7  Q    All right, so there's a once a week meeting in person.

8  A    If he was there, yes, in person.

9  Q    All right, and what would be -- how long would these

10  meeting go be?

11  A    Quick.  I don't know, no longer than 20 minutes, 30

12  minutes.  So, I mean, it just depended on what situations or

13  what needed to get talked about.

14  Q    All right.  And who attended these meetings?

15  A    If -- sometimes it was just me and him or me, him, and

16  Dr. Meisy or me, him, Dr. Meisy, and Felix Ramos.  If not, on

17  times it would be conference calls.

18  Q    All right, so you say typically the meeting would just be

19  between you and Dr. Zamora.

20  A    Not typically, did not say typically.  I said sometimes it

21  would be with between me and Dr. Zamora when he was at the San

22  Antonio location.  If Dr. Meisy was with him, she would be

23  there.  If I was in the Edinburg location, then, you know, we

24  would all be there.  It would be Dr. Zamora, Dr. Meisy, Felix

25  Ramos, and Janie at the time.

Lucio - Cross / By Mr. Lee                                        96

1  Q    Okay.  Well, again, but when you say there was no -- the

2  billing supervisor wasn't in the room, correct, wasn't at the

3  meetings?

4  A    No.

5  Q    Okay.  The head of radiology wasn't in this room, correct?

6  A    No.

7  Q    All right, the medical assistant supervisor wasn't in the

8  room, correct?

9  A    They had separate meetings with them.

10  Q    Okay, but you weren't at those meetings, correct?

11  A    No.

12  Q    The only meetings were focused on how the practice was

13  doing, correct?

14  A    Yes.

15  Q    All right, that was the point of these meetings, correct?

16  A    Yes.

17  Q    All right, and so in these meetings to discuss how the

18  practice was going, Dr. Zamora would bring up how the numbers

19  looked in that regard, correct?

20  A    Yes.

21  Q    All right, and you don't have any kind of documentation

22  that were -- you don't have any agendas for these meetings,

23  correct?

24  A    No.

25  Q    All right, you don't have any documentation about what was

Lucio - Cross / By Mr. Lee                          97

1    discussed in these meetings, correct?

2    A    No.

3        **(Pause)**

4    Q    All right, you testified on direct examination about the

5    various -- some of the records that were kept at the center,

6    correct?

7    A    Yes.

8    Q    All right, and as part of your duties, you understood that

9    some of the medical assistants were behind on their notes,

10   correct?

11   A    Yes.

12   Q    All right, that was a problem, correct?

13   A    Yes.

14   Q    In fact, sometimes there was at least one person who got

15   demoted because they were so behind on their notes, correct?

16   A    I don't recall.

17   Q    All right.  But this was a problem that people were behind

18   on their notes, correct?

19   A    Yes.

20   Q    All right.  And this existed before the audits, correct?

21   A    Yes, they were always behind.

22   Q    All right.  You testified on direct examination about

23   patient complaints.  Your understanding is that some of these

24   patients were -- had complained to you about a second opinion

25   they had received from another rheumatologist, correct?

Lucio - Cross / By Mr. Lee                    98

1   A    Yes.

2   Q    All right.  And so in the complaints, they were reporting

3   what another rheumatologist had said, correct?

4   A    Yes  And all I said was I can relay the message.

5   Q    Okay.  So when patient -- when Dr. Zamora discharged these

6   patients, these are patients who had already started seeing

7   another rheumatologist, correct?

8   A    I don't know if they continued seeing them but they went

9   for a second opinion.

10  Q    They had at least seen another rheumatologist --

11  A    Once.

12  Q    -- around the time --

13  A    Yes.

14  Q    -- that they -- this complaint was brought to you.

15  A    Yes.

16  Q    All right.

17  A    But not all of them but, yes.

18  Q    Okay.

19          **MR. LEE:**  Okay, all right, may I approach, Your

20  Honor?

21          **THE COURT:**  Sure.

22  **BY MR. LEE:**

23  Q    Mr. Lucio, I'm handing you a copy of what's been marked as

24  Defendants' Exhibit 303.  All right, Mr. Lucio, do you

25  recognize Defendants' Exhibit 303?

Lucio - Cross / By Mr. Lee                                    99

1   A    Yes.

2   Q    All right, and that's your resignation letter, correct?

3   A    Yes.

4   Q    All right, that's -- and that's your signature at the

5   bottom of the letter, correct?

6   A    Yes, it is.

7   Q    And you gave this to Dr. Zamora or the center when you

8   resigned from the practice, correct?

9   A    Yes, I did.

10         **MR. LEE:**  Your Honor, the defense moves to admit

11  defense Exhibit 303.

12         **THE COURT:**  Is there any objection?

13         **MR. FOSTER:**  No, Your Honor.

14         **THE COURT:**  It's admitted.

15      **(Defendants' Exhibit Number 303 was received in evidence)**

16         **MR. LEE:**  May I put it on the ELMO, Your Honor?

17         **THE COURT:**  Sure.

18      **(Pause)**

19  BY MR. LEE:

20  Q    All right, Mr. Lucio, just to be clear, this letter is

21  dated October 19th, 2015, correct?

22  A    Yes.

23  Q    All right, can you please read the letter for the record?

24  A         "Dear Dr. Zamora:  Please accept this letter as a

25            notice of my resignation from my position as practice

Lucio - Cross / By Mr. Sully                    100

1           manager.  My last day of employment will be October

2           30th, 2015.  This was not an easy decision to make.

3           For the past four years I have been very rewarding.

4           I have enjoyed working for you and managing a very

5           successful team dedicated to quality healthcare

6           delivered to your patients.  Please accept my sincere

7           thanks for all that you have done for me during my

8           time working for you, and the opportunities for

9           growth that you have provided me.  I wish you and the

10          company all the best and look forward to staying in

11          touch with you.  I would like to help with the

12          transition of all managerial duties so that the

13          systems continue to function smoothly after my

14          departure.  I would be more than happy to answer any

15          questions you may have for me as you look forward for

16          my replacement, and will make certain all reporting

17          and records are updated before my last day of work."

18               **MR. LEE:**  Nothing further at this time, Your Honor.

19     I pass the witness.

20               **THE COURT:**  Mr. Sully?

21               **MR. SULLY:**  Thank you, Your Honor.

22                         **CROSS EXAMINATION**

23     **BY MR. SULLY:**

24     Q    Mr. Lucio, in the resignation letter that you wrote to

25     Dr. Zamora, where in there did you raise any concerns about any

**EXCEPTIONAL REPORTING SERVICES, INC**

Lucio - Cross / By Mr. Sully                    101

1   issues that you were concerned about?

2   A    Wasn't in the letter.  It was throughout my employment

3   that I spoke with my supervisors about the concerns I had.

4   Q    Okay, so when you told Dr. Zamora that you were resigning

5   in the letter, you didn't raise a single concern to him about

6   anything, right?

7   A    I mean, there's a chain of command to follow so obviously

8   you put it to your supervisor, your supervisor's supposed to

9   put it, you know, to whoever they go to.

10  Q    Right, but my question is, you had the opportunity in your

11  letter and also before that to raise any concerns with

12  Dr. Zamora that you may have had and you didn't raise any

13  letter -- any concerns in that letter (indisc.)

14  A    The concern I did bring up was his treatment of staff, and

15  I did have a direct conversation with Dr. Meisy about that

16  just --

17  Q    My question is you didn't raise that in the letter, right?

18  A    You asked -- you didn't ask it that way.  But, no, I did

19  not do it in the letter.

20  Q    Okay.  Now, as far as Meisy, you testified that she would

21  sometimes be present at meetings.  But she wasn't always

22  present for meetings, right?

23  A    No, not all the time.

24  Q    All right.  In fact frequently you wouldn't see her at

25  meetings or in the clinic, right?  It wasn't like she was there

Lucio - Cross / By Mr. Sully                    102

1   every day.

2   A    No, she wasn't there every day.

3   Q    And you yourself, you stopped working at the clinic in

4   2015, right?

5   A    Yes, sir.

6   Q    And so before you left, there were no Grand Jury subpoenas

7   that were issued to the clinic before you left, right?

8   A    No.

9   Q    And there was no search by the FBI or anything like that

10  before you left at the clinic, right?

11  A    I believe they had tried to go like once or twice but I

12  don't think they got in.  I mean, I'm not too sure.

13  Q    Okay.  But whenever you were present at the clinic, you

14  were --

15  A    No.

16  Q    -- never there when anything like that happened.

17  A    No, sir.

18  Q    Okay.  As far as the number of patients, I think you

19  mentioned to the Government that there was around 2,000

20  patients on file at the Edinburg clinic; would that be correct?

21  A    I never said a number.  I said thousands.

22  Q    Okay.  So you never said that the patient census at the

23  Edinburg clinic was around 2,000.

24  A    I don't remember.

25  Q    Oh, okay, so you may have said it, you just don't remember

Lucio - Cross / By Mr. Sully                          103

1   or are you sure you didn't say that to law enforcement?

2   A    I thought you were referring to what I said right now.

    When I said that he has -- when he had thousands of patients.

4   Q    No, I'm referring to before testifying, you had met with

5   the Government several times, right?

6   A    Yeah.

7   Q    And you answered questions and one of the things that you

8   talked about was you told them how many patients the clinics

9   had, right?

10  A    Yes.

11  Q    And at least during one of those times you told the

12  Government that there were around 2,000 patients at the

13  Edinburg clinic (indisc.)

14  A    If I said that at the time, I mean, I believe so.  I mean,

15  depending on when I said it.  I mean, it's been a couple years.

16  Q    Okay.  And but you have no reason to disagree that there

17  could be that number of patients just at that one clinic.

18  A    No.  Dr. Zamora saw a lot of patients.  Well actually all

19  the providers saw a lot of patients.

20  Q    Right.  There were other doctors besides Dr. Zamora,

21  right, that were seeing these patients.  And as far as getting

22  a first visit with Dr. Zamora or getting some of these

23  appointments, there was actually a wait for some of these

24  patients, right, to be able to come in?

25  A    Yes, there was.

Lucio - Cross / By Mr. Sully                    104

1    Q    And so that was part of the reason that it was important

2    for you and others to make sure that the right number of

3    patients were seen per day so that the wait wouldn't get

4    longer, right?

5    A    I'm sorry, can you ask the question again?

6    Q    One of the reasons that it was important to get -- to make

7    sure that enough patients were scheduled per day was so that

8    that wait wouldn't get longer, right?  If not enough patients

9    came in, the waiting list would only get longer instead of

10   shorter, right?

11            **MR. FOSTER:**  Objection, compound, speculation.

12            **THE COURT:**  He can ask that question.

13   **BY MR. SULLY:**

14   A    Yeah, he -- I mean, he did have a lot of new patients

15   scheduled.

16   Q    And in order to make sure that enough patients were being

17   seen per day, you weren't, you know, pulling in healthy people

18   off the street just to make a number, right?  These were

19   patients that actually were waiting to come in for an

20   appointment, right?

21   A    Yes, I mean, sometimes I would have to do some marketing

22   so, yes.

23   Q    Okay.  Well, when you say "marketing," there weren't any

24   people that were brought in that weren't wanting to see the

25   doctor or weren't referred to (indisc.)

Lucio - Cross / By Mr. Sully                    105

1   A    There are referred, yes, sir.

2   Q    Okay.  And so you would agree there's nothing wrong in

3   terms of scheduling people who've been referred or otherwise

4   need to see the doctor so they don't have to wait too long,

5   right, --

6   A    Yeah.

7   Q    -- until they see the doctor?  And as far as the

8   spreadsheets that you testified about, you know, reporting to

9   Dr. Zamora-Quezada as far as, you know, how many patients were

10  being seen, how many things were being done at the clinic, you

11  don't see anything wrong with tracking the numbers of what's

12  going on at the clinic, right, and reporting that to

13  Dr. Zamora?

14  A    If that's what's needed, that's what's needed.

15  Q    Right.  And you're not a doctor so you yourself wouldn't

16  be able to determine what's needed and what's not needed.

17  A    Yes, sir.

18          THE COURT:  Do you have a lot more questions?

19          MR. SULLY:  I do have a few, Your Honor.  We can take

20  a break --

21          THE COURT:  Okay, the jury has spoken.  We're taking

22  a break.  Please rise for the jury.

23      (Jurors exit at 3:03 p.m.)

24          THE COURT:  We'll see you all at 3:20.

25          //

Lucio - Cross / By Mr. Sully                    106

1          **(Recess taken from 3:03 p.m. to 3:22 p.m.)**

2          **(Jurors present)**

3                **THE COURT:** Please be seated.  Go ahead.

4                **MR. SULLY:** Thank you, Your Honor.

5                     **CROSS EXAMINATION (CONTINUED)**

6    **BY MR. SULLY:**

7    Q    Mr. Lucio, before the break I think we were talking about

8    scheduling patients and the wait for that.  Do you remember

9    when we were talking about that?

10   A    Yes, sir.

11   Q    Now, when patients were scheduled for their appointment,

12   oftentimes patients would miss their appointment, right?  They

13   would be no-shows?

14   A    Yes.

15   Q    And so, when that would happen, that's when you or other

16   employees would have to try to call the patient in and try to

17   bring them in and reschedule?

18   A    Yes.  The front-desk staff.

19   Q    Okay.  So, you personally didn't work at the front desk,

20   right?

21   A    No.

22   Q    Okay.  So, when you're testifying about employees calling

23   patients to schedule or reschedule, things like that, those are

24   not things that you personally did.  That was other people --

25   A    The front desk who did it, yes.

Lucio - Cross / By Mr. Sully                    107

1  Q     -- the front desk.  Okay.  And as far as when patients

2  would miss their appointment and would need to be called to

3  reschedule, you don't see anything wrong in that either, right?

4  Calling them to reschedule when there's a no-show?

5  A     No.

6  Q     Now, if a patient was a no-show and didn't come in or, for

7  some other reason, an opening came up in the schedule, the

8  front desk would sometimes try to call, say, the next patient

9  on the list who was waiting to try to bring them in sooner if

10 there was opening, right?

11 A     Yes.

12 Q     And, again, if there was an opening and they could bring

13 them in sooner, you didn't see anything wrong with doing that

14 so the patient wouldn't have to wait as long, right?

15 A     No.

16 Q     One of the employees that you worked with was Aidee

17 De Jesus, right?

18 A     Yes.

19 Q     And were there, at least, a couple of occasions where you

20 had to discipline her, write her up, for her attitude toward

21 other employees?

22 A     I believe that was done in the Edinburg office.

23 Q     Okay.  And you were --

24 A     In San Antonio.

25 Q     -- you were in the San Antonio office?  But you were one

Lucio - Cross / By Mr. Sully                    108

1    of the -- as practice manager, you had to sign off on that?

2    A    It depends who her supervisor was.  Jaine was at the

3    Edinburg site.

4    Q    Okay.  All right.  So, you -- but you were aware,

5    basically, that she was disciplined for that?

6    A    I can't recall.

7    Q    Okay.  Now, as far as meeting with the Government, I think

8    you described that you met with the Government at least about

9    half-a-dozen times, about -- was it six times before testifying

10   before today or --

11   A    I didn't give a number.

12   Q    -- okay.  Can you recall how many times it was or is it

13   too many to remember how many it was?

14   A    It's been a couple.  I want to say like maybe four or five

15   times.

16   Q    About four or five times?  Okay.  And I think you said the

17   most recent time was yesterday, right?

18   A    Yes, sir.

19   Q    And the first time was about a year and a half after you

20   left the clinic?

21   A    I'm sorry?

22   Q    The first time was in 2017 or when was --

23   A    Yes.

24   Q    -- the first time?

25   A    I believe so.

Lucio - Cross / By Mr. Sully                              109

1  Q    Okay.  So, between 2017 and yesterday's, you had met with

2  the Government several times?

3  A    Yes.

4  Q    And one of those times you actually came in and you

5  testified before a grand jury, right?

6  A    Yes, sir.

7  Q    And you were asked questions similar to what the topics

8  we've been discussing today, right?

9  A    Yes.  I believe so.

10  Q    Now, one thing that you mentioned earlier was something

11  about seeing a shredder in a conference room.  Do you recall

12  testifying about that?

13  A    Yes.

14  Q    Now, as far as that -- any concerns that you had about

15  that, you didn't raise those with Dr. Zamora in your

16  resignation letter or with him in any way, did you?

17  A    No.

18  Q    And as far as what you saw that day, you didn't actually

19  go into the conference room, right?

20  A    No, sir.

21  Q    So, you didn't actually see what the documents were on the

22  table?

23  A    No.  I could see from the nurses' station.

24  Q    Okay.  You could see the documents, but you weren't close

25  enough to actually read them and see what they were?

Lucio - Cross / By Mr. Sully                110

1   A    No, sir.

2   Q    Okay.  And you said you saw a shredder there, but you

3   didn't actually see any documents being shredded, right?

4   A    Yes.

5   Q    Okay.  Yes, you didn't see any documents or?

6   A    Oh, yeah, yeah.  Yes, I didn't see any documents.

7   Q    Okay.  Being shredded.  And so, other than seeing some

8   unidentified documents on a table and seeing a shredder there,

9   as far as you're personally aware, you don't even know if those

10  documents were shredded?

11  A    Correct.

12  Q    When you -- all these times that you met with the

13  Government before testifying, when did you first mention to

14  them your concerns about seeing these unidentified documents

15  and seeing the shredder in the conference room?

16  A    I don't remember.

17  Q    Did you bring up the first time yesterday or was it

18  brought --

19  A    No.  It was --

20  Q    -- up before that?

21  A    -- previously, I believe, but I don't remember when.

22  Q    Okay.  But as far as -- okay, but that's something that

23  you -- you told them at some point before today?  You just

24  don't remember when?

25  A    Correct.

Lucio - Cross / By Mr. Sully                          111

1   Q    And, as far as when you testified before the grand jury

2   though, you recall that you didn't mention anything about what

3   you just testified about -- shredders in the conference room or

4   anything like that, right?

5   A    I don't remember.

6   Q    Okay.  Would it refresh your recollection to review your

7   testimony that you gave to the grand jury?

8   A    If you have it?

9        **MR. SULLY:**  May I approach the witness, Your Honor?

10       **THE COURT:**  Go ahead.

11  Q    Mr. Lucio, I'm giving you a transcript of your testimony

12  before the grand jury.  You want to take a couple of minutes to

13  review it and then let us know if you see anything in your

14  testimony about the incident that you just described.

15       **(Pause)**

16  A    Do you have somewhere highlighted where I said that?  This

17  is a lot of documents to read.

18  Q    Well, I'll represent to you that I didn't see in there,

19  but I'm giving you an opportunity to check for yourself if it's

20  in there or not.

21       **(Pause)**

22  Q    Mr. Lucio, just to save time, you haven't found that

23  anywhere in the transcript, anything where you mention anything

24  about a shredder?

25  A    Not yet.  No.

Lucio - Cross / By Mr. Sully                         112

1   Q    Okay.  And as far as you can recall, you don't recall

2   mentioning anything about a shredder in your testimony to the

3   grand jury, right?

4   A    Like I said, I -- I mean, I can't remember.

5   Q    And did the -- any of these times that you met with the

6   Government, did they go over the transcripts of your grand jury

7   testimony with you?

8   A    Not giving it to me like this, no.

9   Q    Okay.

10          **MR. SULLY:**  I'll move on to the next question, Your

11  Honor, if I can retrieve the transcript?

12          **THE COURT:**  Go ahead.

13          **MR. SULLY:**  And I'll mark it for identification as

14  Defense Exhibit 304, but I'm not seeking to admit it.

15  Q    During the times that you met with the Government, did

16  they ever review your prior statements that you made to the

17  Government in the course of (indisc.) statements?

18  A    At times.

19  Q    And in those statements that you were shown, there was no

20  mention about a shredder in a conference room either, was

21  there?

22  A    I don't remember.

23  Q    Okay.  Now, as far as -- you testified about a storage

24  building or you called it a barn.  Remember you talked about

25  that?

1   A    That's what it was called.  Yes.

2   Q    And that was near the Edinburg Clinic?

3   A    Yes.

4   Q    But you were at the San Antonio Clinic at the time?

5   A    I was here.

6   Q    That was when you were still here in Edinburg?

7   A    No.  No.  I mean I would come down, but I --

8   Q    Okay.

9   A    -- needed to get supplies for the San Antonio office.

10  Q    Okay.  So, you were in town to get supplies for the San

11  Antonio office as you were, I guess, stationed at the time in

12  the San Antonio office, right?

13  A    Uh-huh.

14  Q    And you said that you had been asked to go to the barn,

15  but you never actually actually ended up going to the barn,

16  right?

17  A    I was asked to help with an audit is what I said.

18  Q    Okay.  I guess to clarify, you never actually went to the

19  barn, right?

20  A    No, sir.

21  Q    And as far as -- do you know who was responsible for

22  maintaining the barn or making sure it was in okay condition?

23  A    No.

24  Q    When you were, I guess, made aware about concerns about

25  the condition of the barn and the cleanliness and all that, did

Lucio - Cross / By Mr. Sully                     114

1   you report that to Dr. Zamora or take any steps to fix that?

2   A    I reported to Jaine Solis (phonetic).

3   Q    To Jaine Solis?  Okay.

4   A    Yes.

5   Q    Now, you said you were in town to get supplies for the San

6   Antonio Clinic, right, that we had.  And you testified that you

7   were asked to go to the barn, but you ended up not going,

8   right?

9   A    Yes.

10  Q    And you --

11  A    To clarify, I was asked to help with an audit.

12  Q    -- (indisc.) said, was that -- did that involve going to

13  the barn to get records or?

14  A    Yes.  But it wasn't specifically said.

15  Q    I'm sorry?

16  A    It wasn't specifically said.

17  Q    Okay.  It wasn't specifically said to go to the barn?

18  A    Yes.  It was to help with the audit.

19  Q    Okay.  So, -- all right.  So, to clarify, you were asked

20  to help with the audit.  You weren't specifically asked to go

21  to the barn and do anything there?

22  A    No.

23  Q    Okay.  Do you recall testifying to the grand jury though

24  that you were asked by Dr. Zamora to go to the barn?

25  A    I was -- no.  I'm sorry.  Can you repeat the question?

Lucio - Cross / By Mr. Sully                    115

1    Q    Yeah.  Do you remember when you testified before the grand

2    jury that this whole topic came up about whether you were asked

3    to go to the barn and (indisc.) all of this?

4    A    It happened a while ago, so --

5    Q    Right.

6    A    -- I don't specifically remember.  No.

7    Q    And when you -- to be specific, when you testified before

8    the grand jury that was in April of last year, right?

9    A    I guess.  Yes.

10   Q    Okay.  You may not remember the exact date --

11   A    Yeah.

12   Q    -- but you recall it was some time last year.

13   A    Some time.

14   Q    Right.  So, it's been, you know, over a year.  It's hard

15   for you to remember exactly what you told the grand jury back

16   then.  And it's even harder for you to remember what happened

17   at the clinic in 2015 or 2011, or even more years ago, right?

18   A    I mean -- yes.

19   Q    Now, when you testified to the grand jury, do you recall

20   telling them under oath that it was Dr. Zamora, not Meisy, who

21   asked you to work one weekend at the barn?

22   A    I don't remember that.

23   Q    Would it help refresh your recollection to review the

24   transcript of your testimony?

25   A    If you can give it to me, yeah.

1    Q    Okay.  And this time I'll give you the --

2    A    Specific?

3    Q    -- specific page, starting on page 20 and I believe

4    continuing to page 21.  The bottom of page 20 is where you

5    start talking about that.

6         **(Pause)**

7    A    Okay.

8    Q    And so, now that you've refreshed your recollection of

9    your testimony, is it correct that you testified that it was

10   Dr. Zamora who --

11   A    It does say here, Dr. Zamora.

12   Q    -- and at no point in your testimony did you say that it

13   was Meisy who asked you to go to the barn or --

14   A    It doesn't say that here.

15   Q    -- help with that?  All right.

16           **MR. SULLY:**  I'll pass the witness, Your Honor.

17           **THE COURT:**  Mr. Alvarez?

18           **MR. ALVAREZ:**  I have no questions of this witness,

19   Your Honor.

20           **THE COURT:**  Mr. Pena?

21           **MR. PENA:**  Thank you, Your Honor.

22                    **CROSS EXAMINATION**

23   **BY MR. PENA:**

24   Q    Mr. Lucio, I represent Felix Ramos.  Let me see if I can

25   understand your testimony today.  Based on Defendant's Exhibit

1   303, which was the letter that you wrote to Dr. Zamora, you

2   went over.  Do you remember that?

3   A    Yes, sir.

4   Q    So, let me see if I understand.  You started working in

5   2011 for Dr. Zamora, correct?

6   A    Yes.

7   Q    And you continued working until the time, I believe, you

8   wrote this letter on October 19th, but your last day was

9   October 30th, correct?

10  A    Yes.

11  Q    And what you expressed in this letter was that it was a

12  rewarding experience and they were dedicated to quality health

13  care, correct?

14  A    That's what it says there.

15  Q    And between October 19th to October 30th you stayed and

16  you helped in transitioning the business to people who were

17  going to take over, correct?

18  A    Yes.

19  Q    That's what you said in the letter, correct?

20  A    To -- yes.

21  Q    And you did that and one of the people that you

22  communicated with was Felix Ramos, correct?

23  A    Some of it, yes.  The other one was the -- was Hope, who

24  was the -- kind of like the MA supervisor over there.

25  Q    In San Antonio?

Lucio - Cross / By Mr. Pena                                    118

 1  A    In San Antonio.  Yes, sir.

 2  Q    So, you passed off different job responsibilities you had

 3  to different people?

 4  A    Yes, sir.

 5  Q    Because as practice -- you said practice manager -- were

 6  you a practice manager or the practice administrator?

 7  A    I don't know.  I was doing the duties as Jaine -- Jaine's

 8  position, which was practice administrator unless they reworded

 9  it there.

10  Q    Okay.  And then, anyway, I think you testified that the

11  real reason why you left was because you asked for a raise

12  because you wanted to continue working there, correct?

13  A    No.  That's a play on words.  I didn't leave because of

14  that.

15  Q    Say again?

16  A    I said no, that's a play on words.  I didn't leave because

17  of that.

18  Q    Okay.  Then it's just a timing issue.  You asked for a

19  raise.  They did not give you the raise and then you left?

20  A    I had already -- gave my resignation.  When they asked me

21  to stay, that's when I had asked for compensation.

22  Q    Okay.  So, you wrote this letter.  You resigned?

23  A    Yes, sir.

24  Q    They wanted you to stay?

25  A    Yes.

Lucio - Cross / By Mr. Pena                                119

1    Q    And you said I'd stay if you pay me more money?

2    A    It was either to stay or to stay to train somebody else.

3    Q    Okay.  Well, but you said you wanted more money to stay,

4    correct?

5    A    Yes.

6    Q    And then, they said no, they couldn't give you more money

7    and so you left?

8    A    Yes, sir.

9    Q    Okay.  So, you had no problem staying there because you

10   understood they were giving quality healthcare, correct?

11   That's what you wrote?

12   A    That's what's on there.  That's not how I felt.  There's

13   context to that.

14   Q    Okay.  There's context?

15   A    Yes.

16   Q    So, you don't necessarily always mean what you say?

17   A    Well, I mean this is a standard letter that you send to

18   any employer.

19   Q    So, this is just a template?

20   A    It's a template.  You can Google it if you want.

21   Q    Okay.  And that's what you did?

22   A    I Googled a template for a resignation.  Yes.

23   Q    Okay.  And then you just adapted it here and you added the

24   quality health care and everything else, correct?

25   A    I don't remember if it had that already or not.

Lucio - Cross / By Mr. Pena                    120

1    Q    Okay.  Well, see, I'm trying to understand then what

2    happened because after you left, you did not talk to the

3    Government until 2017, correct?

4    A    Yes.

5    Q    And it was -- you didn't go to the Government, they came

6    looking for you?

7    A    Yes, sir.

8    Q    And, matter of fact, it was Agent Wilson who's sitting

9    over there who came to talk to you, correct?

10   A    Yes.

11   Q    Along with another Agent?

12   A    Yes.  But I don't remember who the Agents were.

13   Q    Okay.  But you recognize him sitting there?

14   A    Yes, sir.

15   Q    Because you didn't just meet with him once.  You met with

16   him multiple times, correct?

17   A    Uhm --

18   Q    Five or six?

19   A    -- not five or six times, no.

20   Q    Okay.  Well, if the Government gave us statements or

21   report, you know, that every time they talked to you --

22   A    Uh-huh.

23   Q    -- they write a report.  And if we've been given all the

24   reports of when you met with him -- there's five reports that

25   we have, and you've spoken to him five times that we're aware

1   of, correct?

2   A    Uh-huh.

3         **MR. FOSTER:**  Objection.  That's speculation.

4   Q    Well, as far as you remember?  Would five sound accurate

5   if I have five reports from the Government?

6   A    Probably five, yes.

7   Q    Okay.  And that's up until 2018 and then, from that point

8   to the present, you've met with him again, correct?

9   A    Yes, sir.

10  Q    And you've met with him up until -- when was the last

11  time?

12  A    Yesterday.

13  Q    Yesterday, Christmas Day?

14  A    Yes.

15  Q    And you met with who?

16  A    I met with Agent Wilson and Jacob, the Prosecutor.

17  Q    Who's Jacob?

18  A    The Prosecutor.

19        **THE COURT:**  Mr. Foster, you mean?

20  Q    Mr. Foster?

21  A    Yes.  Yes.  I didn't know the last name.

22  Q    Okay.  But you know him as Jacob?

23  A    Yes.

24  Q    And you met with two of them and you were here to discuss

25  the testimony that you were going to give in front of this

1    Jury, correct?

2    A    Yes.

3    Q    How long did that meeting last?

4    A    Not long.

5    Q    Okay.  Well --

6    A    I believe I said like 30 minutes before.

7    Q    Okay.  Now, -- then be clear.  So then -- the way it seems

8    is, you were here to say as much as you possibly can about

9    Felix Ramos and Meisy Zamora?

10   A    I'm sorry?

11   Q    To say that -- to say as much as you possibly can about

12   Felix Ramos?

13   A    Can you repeat the question?

14   Q    Sure.

15   A    I don't understand what you're trying to ask me.

16   Q    Sure.  Because here's what I heard.  I heard about a --

17   you said there was a chart thing that the Government attorney

18   said there's a hierarchy chart?

19   A    Uh-huh.

20   Q    And then he described that hierarchy chart with you?

21   Remember that?

22   A    Yes.

23   Q    And you remember that you said that Dr. Zamora was up on

24   the top?

25   A    Yes.

Lucio - Cross / By Mr. Pena                    123

1   Q    Okay.  And I don't remember if he said or you said it, but

2   that Meisy Zamora and Felix Ramos were at the bottom -- or

3   under him?

4   A    Yes, sir.

5   Q    And then you were under that?

6   A    The practice administrator and then the practice --

7   whoever the practice managers were.

8   Q    Okay.  And so, was this an actual chart that was written

9   up and was kept there at the practice?

10  A    It was being created.  Yes.

11  Q    Okay.  So then, there wasn't an actual chart?  It was in

12  the process of being created?

13  A    Yes.

14  Q    Okay.  Who was creating it?

15  A    It was the practice administrator at the time.

16  Q    Who was that?

17  A    Jaine Solis.

18  Q    So, Jaine Solis was working on a hierarchy chart?

19  A    Yes.

20  Q    And you saw on this chart -- did you see on the computer

21  or did you see it printed up?

22  A    It was printed up.

23  Q    Okay.  And on there it had the doctor's name at the top?

24  A    Yes, sir.

25  Q    Did it have his name?

Lucio - Cross / By Mr. Pena                    124

1    A    Yes, sir.

2    Q    And then it had Misey (phonetic) Zamora -- or Meisy Zamora

3    under it?

4    A    Yes.

5    Q    And then it had Felix Ramos' name right next to hers?

6    A    Yes.

7    Q    And then, under that it just had -- did it have other

8    people's names?

9    A    It had her name.

10   Q    Who?  Jaine Solis?

11   A    Jaine, yes.

12   Q    And then, under that was -- where was your name?

13   A    On the San Ant -- San Antonio --

14   Q    Okay.

15   A    -- location for a practice manager.

16   Q    But then, this was never -- this is something you saw but

17   you never saw it officially adopted by the practice?

18   A    I don't know if she had disbursed it out or not.

19   Q    Well, I mean, you're -- at some point, you became the

20   office administrator or the practice administrator?

21   A    Uh-huh.

22   Q    You never remember seeing a chart like this, correct?

23   A    No.  I didn't.  I didn't disburse any chart like that.

24   Q    Okay.  Matter of fact, there never was a chart, was there?

25   A    It was being created.

Lucio - Cross / By Mr. Pena                                      125

1    Q    Wasn't this a chart that the Government asked you to

2    testify to so that they could try to put Felix Ramos as a

3    number two person under the doctor?

4              **MR. FOSTER:**  Objection.  Argumentative, Your Honor.

5              **THE COURT:**  I think he's already answered that he

6    did.

7    **BY MR. PENA:**

8    Q    Well, then let's go to the next thing.  I heard you say

9    that Felix Ramos was somebody that -- there was these

10   spreadsheets.  Remember that?

11   A    Yes, sir.

12   Q    And there was these spreadsheets that you were concerned

13   about, according to you?

14   A    Yes, sir.

15   Q    Okay.  And you said that you had to do these spreadsheets

16   and then you had to email them to three very particular people?

17   A    Yes.

18   Q    You were very specific.  You said you emailed the copy to

19   the doctor, correct?

20   A    Yes, sir.

21   Q    You emailed a copy to the doctor's wife?

22   A    Yes, sir.

23   Q    And then you emailed a copy to Felix Ramos?

24   A    Yes, sir.

25   Q    Okay.  And you did that several times?

Lucio - Cross / By Mr. Pena                                    126

1    A    Yes, sir.

2    Q    And then, at some point, the doctor supposedly got upset

3    about this, correct?

4    A    Yes.

5    Q    All right.  And so, not once when you met with the

6    Government all these different times, up until yesterday --

7    Christmas Day -- did they ever get in front of you and actually

8    show you a copy of one of these spreadsheets that you emailed,

9    correct?

10   A    Correct.

11   Q    I mean, because if they had it, you would have come up

12   here and you would have testified this being the ema -- the

13   spreadsheet that I actually saw?

14   A    I did say that there was a -- there was variations of

15   that.

16   Q    Right.  But I'm talking about the spreadsheet that you

17   specifically emailed to my client, Felix Ramos?

18   A    Yes.

19   Q    Okay.  So, -- and you're still swearing under oath.  You

20   understand that you're swearing under oath today, correct?

21   A    Okay.  But what is your question?

22   Q    Well -- I'm not finished.  So, you swore under oath --

23            THE COURT:  He knows that, okay?

24   Q    -- that you spoke -- that you sent an email with a

25   spreadsheet -- or multiple emails specifically to Felix Ramos,

Lucio - Cross / By Mr. Pena                          127

1    correct?

2    A    Yes, sir.

3    Q    Okay.  But you've never been shown one of these emails?

4    A    No.

5    Q    All right.  Now, you understand that the Government got

6    access to Felix Ramos' email, correct?

7              **MR. FOSTER:**  Objection.  Speculation.

8              **MR. PENA:**  But --

9              **THE COURT:**  He can tell us if he doesn't.

10   A    No.  I didn't know that.

11   Q    All right.  So then, we actually have a image of every

12   single one of the emails that Felix Ramos received while

13   working there for the clinic.

14             **MR. FOSTER:**  Objection.  Counsel's testifying, not

15   asking a question.

16             **THE COURT:**  What is the question.

17   Q    Did you know that?

18   A    Can you ask the question again?

19   Q    Sure.  Did you know --

20   A    Uh-huh.

21   Q    -- that we actually have copies of every single email that

22   Felix Ramos received --

23             **THE COURT:**  Who is "we?"

24   Q    -- I guess all the parties have copies of all the emails

25   that were sent by you to Felix Ramos.

1    A    And no, I didn't know that.

2    Q    Okay.  So, if we wanted to, we could actually look at the

3    types of conversations you were having with Felix Ramos?

4    A    Okay.

5    Q    Okay?  Now, isn't it true that the conversations you were

6    having with him, were almost strictly regarding the time

7    sheets, as a matter of fact, correct?

8    A    Uh-huh.  That's one of them, yes.

9    Q    Okay.  You were also communicate with him regarding

10   payroll?

11   A    Yes.

12   Q    You would communicate with him regarding, I guess,

13   maintenance issues?

14   A    Yes.

15   Q    Okay.  Because up in San Antonio you were the one

16   responsible for the properties, correct?

17   A    For the properties?

18   Q    The properties -- the rental properties?

19   A    It was the runner who would pick up the rent or whatever

20   it was and then after the runner left, then yes, I would pick

21   up rent if needed.

22   Q    Right.  You would pick up rent.  You would do maintenance?

23   A    Ah --

24   Q    You would negotiate potential purchases of property up in

25   San Antonio, didn't you?

Lucio - Cross / By Mr. Pena                          129

1   A    Yes.

2   Q    Okay.  That was your job?

3   A    Yes.

4   Q    And then, you would report back information that needed to

5   be known to Felix Ramos and that he could then just tell the

6   doctor about it, correct?

7   A    Yes.

8   Q    And then, as far as employees, like Aidee De Jesus, you're

9   the one responsible for doing the disciplining of those

10  employees, correct?

11  A    I didn't discipline her.  No.

12  Q    Okay.

13          **MR. PENA:**  Your Honor, may I approach?

14          **THE COURT:**  Sure.

15  Q    I'm going to hand you what I've marked as Defendant's

16  Exhibit 305 to 312.  Just look -- I've already numbered them

17  for you.

18          **MR. FOSTER:**  Do we have a copy?

19          **MR. PENA:**  I'll show them to you in a second.

20      **(Pause)**

21  Q    Do you recognize your email?

22  A    Yes.

23  Q    Are those emails that you were using while you were

24  working there at the clinic?

25  A    Yes, sir.

1         **MR. PENA:**  I tender 305 to 312 to the Government,

2    Your Honor?

3         **THE COURT:**  You all go ahead and look at them and let

4    the Court know if you have any objections.

5         **(Pause)**

6         **MR. FOSTER:**  No objection, Your Honor.

7         **THE COURT:**  Defendant's Exhibits 305 to 312 are

8    admitted.

9         **(Government's Exhibits Numbers 305 through 312 were**

10   **received in evidence)**

11   BY MR. PENA:

12   Q    Like you said with this letter, sometimes the context of

13   the situation is important, correct?

14   A    Yes.  Yes.

15   Q    All right.  So, I want to show you what's been marked as

16   Defendant's Exhibit 305.  Do you see that?  And  then -- that's

17   your email there?

18   A    Yes.

19   Q    Okay.  And this was being sent to Aidee De Jesus, correct?

20   A    Yes.

21   Q    All right.  And then you see you ccd the doctor and you

22   ccd Meisy --

23   A    Yes.

24   Q    -- Zamora?  And the date would have been April 2015.  You

25   left on October 2015, correct?

Lucio - Cross / By Mr. Pena                     131

1    A    Yes.

2    Q    All right.  If we look at that, see if I read it

3    correctly.  It says, "Aidee, attached is the corrected action

4    form.  Please open it up, print it out, read it, and fill it

5    out.  If you have any comments, please place them in the

6    'Employee Comments Section.'  You can agree or disagree with

7    it.  Just sign at the bottom of the page.  After you are done,

8    please place it in the manila envelope and hand it to Felix.

9    He will hold it for me.  Please call me when you receive this

10   email.  Thank you for your cooperation.  Rene Lucio."  Did I

11   read that correctly?

12   A    Yes.

13   Q    So, this was the actual disciplinary email that you sent

14   to Aidee De Jesus that you told Mr. Sully that you did not know

15   about, correct?

16   A    I believe so.

17   Q    Okay.  Well, does this now refresh your recollection that

18   you were the one that were disciplining her?

19   A    Well, it doesn't say what it was for and there's no

20   attachment to it.

21   Q    Okay.  Well, it's not attached to here, but you see an

22   attachment reference, correct?

23   A    Correct.  But if you have access to it, then you have

24   access to the attachment.

25   Q    Okay, so now let's go to the actual text.  It says here

Lucio - Cross / By Mr. Pena                      132

1    you was just going to have it handed to Felix, correct?

2    A    Yes.

3    Q    Because you understood as far as Felix is concerned, I

4    mean, he assisted with the employees, he assisted with the

5    payroll, but he was not the one responsible for administering

6    the practice or dealing with the employees, correct?

7    A    Corrective actions were for the manager.

8    Q    Right, which was you.

9    A    Yes.

10   Q    Okay.  And then we have number 306, Defendants' Exhibit

11   306, again that's your email; you see that?

12   A    Yes.

13   Q    And actually we can go -- we'll go backwards, start here,

14   this is an email from Felix on May 12th, timesheets attached,

15   please correct and return, Felix Ramos.

16   A    Yes, sir.

17   Q    Okay, so when Felix was actually communicating with you,

18   he was sending you copies of timesheets, correct?

19   A    Yes.

20   Q    And then when he said to correct and return, that meant

21   what?

22   A    To correct them with the employee, have the employee sign

23   the corrections, and send back to him.

24   Q    Yeah, because you understand that to be one of the rules,

25   that if you have the timesheets when they get the reports back,

Lucio - Cross / By Mr. Pena                           133

1    sometimes an employee may say, I wasn't there or I left early

2    or I --

3    A    Missing punches or --

4    Q    Right.

5    A    -- something like that.

6    Q    And that's what he was asking for here, correct?

7    A    Yes.

8    Q    And then you have -- you were responding you see here,

9    attached are the corrected timesheets and then that is from

10   you; you see that?

11   A    Yes.

12   Q    Okay.  And then there's communication email back from him,

13   Felix Ramos:  "Why is Chris not punching in and out?"  I assume

14   that's one of the employees.

15   A    Yes.

16   Q    And then you're responding:  "I've asked him that question

17   as well and have given him a note to file for this."

18   A    Yes.

19   Q    "He should be punching in and out from now on," correct?

20   A    Yes.

21   Q    All right.  So, I mean, would this be now an actual

22   detailed reflection of one of the types of conversations you

23   were having with Felix Ramos while working there?

24   A    Yes.

25   Q    And as far as you understood, the other managers besides

1    yourself, that was the interaction they were having with Felix

2    Ramos, correct?

3    A    One of the interactions.

4    Q    One of the -- and there's some more in here, we'll get to

5    them.  So we have rental properties.  So Mayra Martinez, who

6    was that?

7    A    She was the accounts payable, I believe.

8    Q    Yeah.  She was actually one of the bookkeepers for the

9    practice, correct?

10   A    I believe so.

11   Q    I mean, because you understood that Felix Ramos did not do

12   the bookkeeping.

13   A    Well she paid the bills.

14   Q    Right.  I mean, matter of fact, and we're going to see

15   here, you sent her an email:  "Can you please cut a check for

16   at least a hundred dollars for maintenance issues on the rental

17   properties?"  Did I read that correctly?

18   A    Yes.

19   Q    So you're the one instructing her to cut a check.

20   A    Yes.

21   Q    Because you understood she was the one that was actually

22   doing bookkeeping.

23   A    At that time, yes.

24   Q    Right.  Well, the time that you were there and she was

25   there.

Lucio - Cross / By Mr. Pena                            135

1    A    At that time of when she was there, yes.

2    Q    Okay.  "The monies will not go on the Walmart debit card.

3    I actually need the cash on hand to pay for multiple handymen

4    to go out there and give me an estimate.  Please cut the check

5    today and give it to Felix.  I already have discussed the issue

6    with him so he can stamp it and send it with the doctor

7    tomorrow.  Thank you, Rene Lucio."  You see that?

8    A    Yes, sir.

9    Q    So, again, when it was San Antonio, while you were there,

10   Felix Ramos didn't have anything to do with the management of

11   the properties up there; you were the one responsible for that,

12   correct?

13   A    I would do what he would tell me.  If I needed to collect

14   something, then, yes.  That was after the runners left.  But I

15   was not in charge of him.  If he would ask me to help, I would

16   help out, yes.

17   Q    So you weren't really familiar with the properties

18   themselves.

19   A    I went out there a couple of times.  But as for getting

20   quotes, if he was really, really busy, I -- you know, I would

21   offer to help him.

22   Q    Okay.  Because and like -- and so he would be the one

23   negotiating for property.  You never participated in

24   negotiation of properties or on the purchase of properties or

25   anything like that, correct?

Lucio - Cross / By Mr. Pena                    136

1    A    I believe when he was trying to sell it, yes.  And like I

2    said, I tried to help him on that or, if not, relay messages.

3    Q    So here we see another email from you.  Now we're in

4    August, 2015; you see that?

5    A    Yes.

6    Q    All right.

7              "(Indisc.) spoke with Dr. Zamora regarding the

8              maintenance of 25006 Aida May (phonetic) house.

9              Attached are the quotes for this work.  What was

10             approved from this quote was the floor renovation

11             which totals 1,150.  Can you please break this up

12             into two checks so I can give him half to start the

13             work and buy the material, and the other half I will

14             give him when the work is completed and satisfactory.

15             I have this work schedule for this Friday so you can

16             please send the checks with the doctor.  Thank you."

17   Did I read that correctly?

18   A    Yes.

19   Q    Okay, so this is not an email where you're following

20   instructions from Felix Ramos.  The truth is you were the one

21   actually managing the property up there, weren't you?

22   A    No.  There was conversations.  Like I said, there's

23   context after this.

24   Q    Okay, but in the context here, though, doesn't it appear

25   that it's you who spoke directly to the doctor, not you taking

Lucio - Cross / By Mr. Pena                                137

1    instructions from Felix Ramos.

2    A    On here, on this document, it appears that way.  But

3    there's context.

4    Q    Okay, well then here's another follow-up email, you see

5    it's a chain.  It says:  "Mayra, doctor approved."  So

6    ultimately the doctor's the one that approved it.

7    A    Yes.

8    Q    And then we see here from Mayra back saying:  "As per

9    Rene, yes, only paying half of it, the other upon completion.

10   I will mention it to Dr. Zamora."  Okay, and what I'm trying to

11   do is give us some context.  There's been a lot of very broad

12   statements that Felix Ramos was involved in the financial.  But

13   we can actually look at the emails and you can see that there

14   is very limited involvement by Felix Ramos, correct?

15   A    Well, he had multiple hats.

16   Q    Right.  I think you've described him that way, that it was

17   no real definite job description.  We've heard other witnesses,

18   I'll represent to you, that say that he would be there

19   sometimes bringing coffee to the doctor, he would have to go

20   repair properties, he would have to go -- just whatever needed

21   to get done, Felix would do it.  And --

22           MR. FOSTER:  Objection, Your Honor, that's a speech,

23   not a question.

24   Q    And that was your understanding.

25           THE COURT:  Was that -- okay, you now made it a

1    question.

2    **BY MR. PENA:**

3    Q    And that was your understanding, correct?

4    A    He did have multiple hats, yes.

5    Q    Okay.  Now, here's an email to you.  Now we're talking

6    October 29th, which is Defendants' Exhibit 309; you see that?

7    A    (No audible response)

8    Q    And there's an email from you, Terry Robolla (phonetic);

9    you see that?

10   A    Yes.

11   Q    This is about a property, 1814 McCullough, and it's to you

12   saying:  "Rene, just to keep you updated, I want you to know

13   that Charles Jeffers went through the contract with the seller

14   today and the seller has made changes.  The seller is

15   confirming then with his partner.  Charlie should hear back

16   today or tomorrow."  Do you see that?

17   A    Yes.

18   Q    And it was to you; you see that?

19   A    Yes.

20   Q    I think this is when you're just about to leave, aren't

21   you?

22   A    I believe so, yes.

23   Q    And then there's a response from you, you CC Felix, please

24   read email below.  This is to the doctor's wife, correct?

25   A    Yes.

Lucio - Cross / By Mr. Pena                          139

1  Q    And then from Felix:  "Are they talking about a

2  counteroffer?  Has a counteroffer been made from the seller?"

3  You can see he's not really aware of what's going on, correct?

4  A    He's asking questions.

5  Q    Yeah.  And then you're responding back to Felix saying:

6  "No counter offer has been made yet.  They are working on it.

7  The appraisal was done and established that it was worth

8  900,000.  Our first initial offer was 500,000.  Rene Lucio."

9  That -- you see that?

10 A    Yes.

11 Q    I mean, the truth of the matter is you didn't see anything

12 wrong with this, correct?

13 A    I'm -- wrong with what?

14 Q    Well, I mean, you're involved in negotiating a property.

15 There's nothing wrong with this.

16 A    I was helping out Felix, yes.

17 Q    Okay, well not just helping out Felix, you were working

18 there and this was part of what your work was, correct?

19 A    Yes.

20 Q    And the time that you were working there doing this, you

21 didn't see anything wrong with it, correct?

22 A    Helping out in that, no.

23 Q    Well not only help, I mean, you're just negotiating on the

24 purchase of a property, correct?

25 A    Yes.

Lucio - Cross / By Mr. Pena                    140

1   Q    Okay.  Now, as far as the -- there were some properties

2   that Felix, like you say, you're just helping him out.  But the

3   truth is, you're the one that actually had the communication

4   with the tenants and were the one collecting rent from the

5   tenants, correct?

6   A    At times, yes.  Not all the time.

7   Q    Well, again, same day, we can see October 29th.  And like

8   you said, you were going to help transfer properties, correct?

9   Or the different job duties that you had.

10        **(Mr. Speaker/Mr. Speaker confer)**

11  Q    You're sending an email; you see that?

12  A    (No audible response)

13  Q    It says:

14            "Felix, I have already spoken to both tenants and let

15            them know I was no longer going to be here and to

16            contact you for anything that's needed.  There should

17            not be that much that is needed since I have already

18            fixed a lot of the odds and ends at both properties.

19            Also, I have spoken with Antonio Baez and told him

20            that they are now to bring the rent to the clinic and

21            turn it into Hope."

22  And Hope is the lady you said is taking over for you, correct?

23  A    Yes.

24  Q    "I have already told Hope what rent is for what house and

25  have given her the receipt book as well as the tenant's

Lucio - Cross / By Mr. Pena                    141

1   numbers, just in case."  Did I read that correctly?

2   A    Yes.

3   Q    And then of course he says here, he responds back to you:

4   "Send me the phone number to Antonio, and I have Sylvia's

5   number."  Do you see that?

6   A    Yes.

7   Q    And then your response is with the number.

8   A    Yes.

9   Q    Nothing more.  Again, another email.  This is I guess your

10  last day.  This is your last day of working, correct, the 30th?

11  A    Yes.

12  Q    And you're sending to Felix:  "Can you send over the

13  timesheets?"

14  A    Yes.

15  Q    Now, here an email to you to Felix Ramos:  "I'll be

16  sending files with Dr. Salinas tonight so Priscilla can pick

17  them up."  Who was Priscilla?

18  A    She was the doctor's secretary.

19  Q    Okay.  And so when you've been there going to the doctor's

20  office, she had the office that was right -- I guess the

21  entrance way into the doctor's office.

22  A    Yes.

23  Q    Because the way to get into the doctor's office was to go

24  through the secretary's office and then you go then into the

25  doctor's office, correct?

Lucio - Cross / By Mr. Pena                    142

1   A    There was two ways or three ways to get into the doctor's

2   office.

3   Q    Okay, well one through Meisy's office, through Felix, --

4   A    Yes.

5   Q    -- and then through Meisy's.  Then you had that one door

6   that doesn't have a way in, it's --

7   A    Yes.

8   Q    -- just out.  And you understand that that was a door just

9   to go out into the nurse's station, right?

10  A    Yes.

11  Q    And it didn't have an entrance the other way so that

12  patients and people wouldn't just go into the doctor's office,

13  correct?

14  A    Yes.

15  Q    Okay.  And then it says here:  "I will be sending the

16  files with Priscilla to pick them up.  There's a new employee

17  that just started yesterday but since your scan jobs are still

18  down, I have not been able to send you the information.  Please

19  make an employee number for her and email it to Hope."  You see

20  that?

21  A    Yes.

22  Q    "Since Hope is already a supervisor, she will take over

23  some of the things I do here, as well as timesheets.  Please

24  send the timesheets to her.  I've also taught her about the new

25  employee packets and everything ready for her when any new

Lucio - Cross / By Mr. Pena                    143

1    hires come in.  She already knows to send the whole packet to

2    Edinburg."

3    A    Yes.

4    Q    You see that?  Okay, and then this is the last email that

5    I found.  Now, I went searching through every single email that

6    you sent and we couldn't find an email from you with a copy of

7    a spreadsheet to Felix Ramos, okay?

8              MR. FOSTER:  Objection, Your Honor.  Speaks, not a

9    question, and it assumes facts not in evidence.

10             THE COURT:  What is the question?

11             MR. PENA:  Well he keeps interrupting my questions,

12   Your Honor.  I was just --

13             THE COURT:  Well what -- finish your question.

14             MR. PENA:  Okay.

15   BY MR. PENA:

16   Q    Isn't the truth that you never sent any emails with

17   spreadsheets to Felix Ramos?

18   A    No.

19   Q    Isn't the truth that the only reason you're up here

20   testifying is the Government asked you that you needed to find

21   some way to link Felix Ramos and Meisy Zamora to spreadsheets

22   and to the healthcare and things like that?

23   A    No.

24   Q    Because the truth is, you never had any problems

25   whatsoever with this practice up until the FBI visited you and

 1  they visited you over six times, right?

 2  A    I did have problems with the practice and that's why I

 3  left.

 4  Q    Yeah, well, that's what you're saying to day, but in every

 5  piece of documented evidence we have, every email, every letter

 6  that you signed --

 7          THE COURT:  Well, you're arguing with him so

 8  what's --

 9          MR. PENA:  Okay.

10          THE COURT:  -- make it a question.

11  BY MR. PENA:

12  Q    You never made one of these complaints, correct?

13  A    I followed the chain of command and I brought it up to my

14  supervisor.

15  Q    Right, but you never made any of these complaints to the

16  doctor in writing, anything that we can see documented in an

17  email or a letter.

18  A    In writing, no.

19  Q    Right.  In writing, every piece of documented evidence is

20  contrary to what you're testifying here today, correct?

21  A    There's context.

22  Q    Got you.

23          MR. PENA:  Pass the witness, Your Honor.

24          THE COURT:  Did you have any more questions,

25  Mr. Foster?

Lucio - Redirect / By Mr. Foster                    145

1          **MR. FOSTER:**  Just briefly, Your Honor.

2          **THE COURT:**  Sure.

3                     **REDIRECT EXAMINATION**

4    **BY MR. FOSTER:**

5    Q    Do you recall being asked about your resignation letter?

6    A    Yes.

7    Q    And did you recall saying there was context to it?

8    A    Yes.

9    Q    Can you explain to the jury what you mean by "context?"

10   A    Context meaning I wanted to leave on a good note and

11   that's why I googled a letter of resignation.  I just changed

12   it to where my name was on there, turned that in to leave into

13   good terms in case anybody needed to verify my employment

14   there.

15         **THE COURT:**  You had to make some changes to the form,

16   in reference to the --

17         **THE WITNESS:**  Well, yes.

18         **THE COURT:**  --- names and the --

19         **THE WITNESS:**  Addresses.

20         **THE COURT:**  -- clinic and all that stuff.

21         **THE WITNESS:**  And putting --

22         **THE COURT:**  What?

23         **THE WITNESS:**  -- Dr. Zamora's name on there, yes.

24   //

25   //

1   **BY MR. FOSTER:**

2   Q    Did you need a job?

3   A    I'm sorry?

4   Q    Did you need a job?

5   A    Yes.

6   Q    And did you want a reference for any future jobs?

7   A    I mean I would assume that they would call for reference,

8   yes.

9   Q    And how important was you to have a job that paid you?

10  A    Important.  I mean that's somebody's livelihood.  You got

11  to pay for bills.

12  Q    Now, there were a lot of questions about when you told the

13  Government certain things; do you recall that?

14  A    Yes.

15  Q    And counsel asked you if you had been just saying things

16  recently; do you recall that?

17  A    Yes.

18  Q    Do you recall being interviewed by the FBI in 2017?

19  A    Not what was asked specifically but, I mean, yes, I have

20  met with them.

21  Q    And what do you recall saying to them about whether the

22  practices were outright fraudulent?

23  A    That I had concerns.  I mean, there was red flags.  I also

24  talked to them about Dr. Zamora's demeanor for employees and

25  some I guess health issues, like the complaints from patients.

Lucio - Redirect / By Mr. Foster                          147

1  Q    And you were also asked about the chart; do you recall

2  that?

3  A    Yeah, the organizational chart?

4  Q    Yes.

5  A    Yes.

6  Q    And did the organizational chart accurately reflect the

7  chain of command in the clinics?

8  A    Yes.

9  Q    And you were just showed a lot of emails, correct?

10  A    Yes.

11  Q    And were you reporting to Defendant Ramos or was Defendant

12  Ramos reporting to you?

13  A    Like I said, I mean I helped him on the -- what the emails

14  said, I helped him on his duties that he had.  I mean, he did

15  wear a lot of hats.

16  Q    And were you in charge of those duties or was he in

17  charge?

18  A    He was in charge of the duties but I would help him to

19  take some of the load off of him.

20  Q    And then who did you report to in those emails?

21  A    That's why I mean he was either CC'd on them or if not,

22  conversations on the phone would happen.  Also to Dr. Meisy and

23  whoever, like the accounts payable that was there.

24  Q    And you were also asked about your Grand Jury testimony;

25  do you recall that?

Lucio - Redirect / By Mr. Foster                    148

1    A    Yes.

2    Q    And your Grand Jury testimony in relation to the barn; do

3    you recall that?

4    A    Yes.

5    Q    And do you recall explaining to the Grand Jury why you

6    didn't go to the barn that weekend?

7    A    I believe I said I had a gut feeling.

8    Q    And do you recall explaining that gut feeling to the Grand

9    Jury?

10   A    Not verbatim, no.

11   Q    Would it refresh your recollection to look at the

12   transcript?

13        MR. SULLY:  Objection, Your Honor, as to the

14   relevance of his gut feeling.  Also, it's outside the scope of

15   cross.  We didn't talk about his feelings.

16        THE COURT:  You did ask him about his Grand Jury

17   testimony.  You wanted him to review the entire testimony.

18        MR. SULLY:  Yes, Your Honor, but not --

19        THE COURT:  Go ahead and show it to him.

20        MR. SULLY:  -- talk about his gut feelings.

21        MR. FOSTER:  Thank you, Your Honor.

22        (Pause)

23   BY MR. FOSTER:

24   A    Okay.

25   Q    And so what did you tell the jury -- the Grand Jury about

Lucio - Redirect / By Mr. Foster                    149

1   your -- about why you didn't go to the barn that weekend?

2   A    What it says there is:  "Possibly they're add in things

3   that he forgot, kind of like what he was doing with the billing

4   practice.  So I didn't feel" --

5              THE COURT:  Is that what you said or you're -- it's a

6   synopsis written by somebody?

7              THE WITNESS:  It's -- well this is what's on the

8   paper.

9              THE COURT:  Well but did you say that?

10             THE WITNESS:  I don't remember if I said it but, I

11  mean, if it's here, then --

12             THE COURT:  That it said some things like -- that

13  wasn't even a --

14             THE WITNESS:  This is a transcript, is it not?

15             THE COURT:  What does it say?

16             THE WITNESS:  It says:  "Possibly either add in

17  things" --

18             MR. SULLY:  Objection, Your Honor.

19             MR. LEE:  Objection, we're getting into -- I don't

20  think there's actually been --

21             MR. SPEAKER:  It's improper --

22             MR. LEE:  (Indisc.) should be allowed to --

23             THE COURT:  Right.  I don't know what the question --

24             MR. LEE:  -- read it in, prior testimony --

25             THE COURT:  -- was that he's responding to in this

Lucio - Redirect / By Mr. Foster                    150

1  Grand Jury thing so, no, he can't answer that question.

2            MR. FOSTER:  It's the transcript of the Grand Jury.

3            THE COURT:  I know what it is.

4            MR. FOSTER:  Yes.

5            THE COURT:  The question is I don't know the way he

6  was reading it, it doesn't even make any sense unless if you --

7  we would know what the question was.

8            MR. FOSTER:  Sure.

9  BY MR. FOSTER:

10 Q    Do you recall telling the Grand Jury why you didn't go to

11 the barn that weekend?

12 A    What it says here is possibly add --

13           MR. LEE:  Objection, Your Honor.

14           THE COURT:  It was the --

15           MR. MARTINEZ:  It's improper (indisc.)

16           THE COURT:  Was the question made to him do you --

17           MR. FOSTER:  Yes.

18           THE COURT:  Well, ask the question and then his

19 response.

20           MR. FOSTER:  May I approach?

21           THE COURT:  Yes.

22           MR. SULLY:  Your Honor, we object, there's improper

23 foundation.  He hasn't testified as far as refreshing his

24 recollection as to that statement (indisc.) --

25           THE COURT:  You all asked him about the Grand Jury

Lucio - Redirect / By Mr. Foster                    151

1   and gave him the transcript and wanted him to answer what he

2   told the Grand Jury.

3              **MR. SULLY:**  Can we approach, Your Honor, --

4              **THE COURT:**  Yes, but that's how -- that's why we have

5   this Grand Jury testimony, because you all were asking

6   questions about it.  You all can come on up here.

7        **(Begin bench conference at 4:11 p.m.)**

8              **THE COURT:**  The defense brought up this Grand Jury

9   testimony (indisc.) wanted him to testify what he told the

10  Grand Jury.  So what's your objection?

11             **MR. SULLY:**  Your Honor, it's -- the part that he's

12  trying to elicit or that he's reading, he's basically saying he

13  didn't go to the barn.  But then he's speculating as far as

14  what happened at the barn and who was there.  He has no

15  personal knowledge as far as who was there, what happened.

16  They're basically trying to backdoor his speculation --

17             **THE COURT:**  He can testify (indisc.)

18             **MR. FOSTER:**  That is not the question I'm asking.

19  It's not the --

20             **THE COURT:**  (Indisc.) that is the (indisc.) here why

21  did you not go to the grand jury.

22             **MR. FOSTER:**  That's what --

23             **THE COURT:**  Why did you not go to the barn?

24             **MR. FOSTER:**  That's the wrong page.  I did not ask

25  him about that page, Your Honor.

1          **THE COURT:**  So what part are you asking him about?

2          **MR. FOSTER:**  I asked him about this part.

3          **THE COURT:**  What page is that?

4          **MR. FOSTER:**  That is page 21.

5          **THE COURT:**  What line?

6          **MR. FOSTER:**  It's line 18 through 25.  Or it's 13

7    through 25.  And the Grand Jury transcript itself would be

8    admissible as a prior consistent statement as well.

9          **MR. SPEAKER:**  Under oath.

10          **THE COURT:**  It starts off:  "What did Dr. Zamora ask

11   you to do in connection with" (indisc.) that we wanted to go

12   and look at files (indisc.) that had been done and pull out the

13   files, that way he could review them and get them ready.  And

14   when Dr. Zamora said that, did you suspect that Dr. Zamora was

15   asking you to do something that you didn't feel comfortable

16   doing?  Yes.  Tell the Grand Jury what that was.

17          **MR. SULLY:**  That is our objection, Your Honor.  He's

18   saying possibly this, possibly that.  He's speculating as far

19   as what Dr. Zamora's intent is.  He's not (indisc.) testimony

20   as to what he (indisc.) answer (indisc.)

21          **THE COURT:**  He's allowed to tell his feeling, though,

22   because he had a gut feeling.  All this is the stuff he's

23   already told them.  You can get (indisc.) cross examination.

24   He really doesn't -- all it is is something that he thought.

25          **MR. SPEAKER:**  Your Honor, I don't even think he

Lucio - Redirect / By Mr. Foster                    153

1  should be (indisc.) recollection (indisc.) testifying from the

2  transcript (indisc.)

3         THE COURT:  You all are the ones that asked him about

4  this.

5         MR. SULLY:  Your Honor, --

6         MR. SPEAKER:  (Indisc.) he's going to do that, he can

7  show the transcript, the witness can read it, and then he can

8  ask him to (indisc.)

9         THE COURT:  I don't have any problem (indisc.)

10        MR. SPEAKER:  They're trying to read the (indisc.)

11        MR. SULLY:  (Indisc.)

12        THE COURT:  Go ahead.

13        MR. FOSTER:  Okay.

14        THE COURT:  But you have to start at the part that I

15 started at.

16        MR. FOSTER:  Right here, line 13.

17     (Pause)

18        THE COURT:  Yes.

19     (End bench conference at 4:13 p.m.)

20        THE COURT:  Go ahead.

21 BY MR. FOSTER:

22 Q    So before the Grand Jury, do you recall being asked what

23 did Dr. Zamora ask you to do in connection with the barn that

24 weekend?

25 A    No.

1   Q    Would it refresh your recollection to look at the

2   transcript?

3   A    Yes.

4            **MR. FOSTER:**  May I approach?

5            **THE COURT:**  Sure.

6        **(Pause)**

7   **BY MR. FOSTER:**

8   A    Okay.

9   Q    And do you recall answering that:  "We were going to go

10  and look at files for requests that had been done and pull out

11  the files so that way he could review them and get them ready?"

12  A    Yes.

13  Q    And do you recall being asked:  "And when Dr. Zamora said

14  that, did you suspect that Dr. Zamora was asking you to do

15  something that you didn't feel comfortable doing?"

16           **MR. LEE:**  Your Honor, objection, this is leading.

17  He's on -- this is not refresh your recollection.

18           **THE COURT:**  He -- you just need to ask him it's in

19  the Grand Jury testimony, not you're asking questions that are

20  not in there.

21  **BY MR. FOSTER:**

22  Q    Yes, do you recall being asked that in the Grand Jury

23  testimony?

24  A    Yes.

25  Q    And do you recall what your answer was?

1  A    Yes.

2  Q    What was your answer?

3  A    It said --

4        **MR. SULLY:**  Your Honor, I'm going to object.  He

5  still has the transcript in front of the witness.  He's going

6  to refresh the recollection, he can refresh the --

7        **THE COURT:**  He can just have him by reading it.

8  **BY MR. FOSTER:**

9  A    It says:  "Do you suspect the doctor was asking you to do

10 something that you didn't feel comfortable doing?"  I said:

11 "Yes."  "Tell the Grand Jury what that was," that was the

12 question.  Answer was:  "Possibly either add in things that he

13 forgot, kind of like what he was doing with the billing

14 practices, so I didn't feel comfortable with that."

15       **MR. FOSTER:**  Thank you.  No further questions, Your

16 Honor.

17       **THE COURT:**  Do you have --

18       **MR. LEE:**  Briefly, Your Honor.

19                  **RECROSS EXAMINATION**

20 **BY MR. LEE:**

21 Q    So, Mr. Lucio, you testified earlier today on direct

22 examination about getting instructions from Meisy Zamora,

23 correct?

24 A    Yes.

25 Q    All right, and you just read aloud testimony that you gave

Lucio - Recross / By Mr. Lee                    156

1   about two years ago or a year ago about instructions you got

2   from Dr. Zamora, correct?

3   A    Yes.

4   Q    All right.  And you didn't remember what you testified to

5   before the Grand Jury and you were just reading aloud what you

6   saw in the transcript, right?

7   A    I was reading what was on the transcript, yes.

8   Q    Okay.  And so -- and, again, this all happened about a

9   year before you left the practice, right?

10  A    The audit?  Yes.

11  Q    Okay.  And, again, that audit, as far as you know, that

12  audit was -- that was as far as you understood, that was just

13  an audit, correct?

14  A    Correct.

15  Q    Okay.  And again you stayed at the center for about a year

16  after this event, correct?

17  A    Yes.

18          MR. LEE:  Nothing further, Your Honor.

19          THE COURT:  Does anybody have any other questions?

20      (No audible response)

21          You may go ahead and step down, Mr. Lucio.  Thank you

22  very much.

23          THE WITNESS:  Thank you.

24      (Witness steps down)

25          THE COURT:  Can the attorneys come up here, please?

1          **(Begin bench conference at 4:17 p.m.)**

2              **THE COURT:**  Schedule wise, what I'm going to announce

3     to the jury is that we're not working on the 1st but we are

4     working on Saturday from 9:00 to 3:00.  And the 31st we'll work

5     from 9:00 to 3:00.

6              **MS. YUAN:**  Which Saturday, Your Honor?

7              **THE COURT:**  This Saturday.

8              **MS. YUAN:**  Okay.

9              **THE COURT:**  Nine to 3:00, Monday, 9:00 to 3:00, the

10    1st a day off.

11             **MS. YUAN:**  Okay.

12             **THE COURT:**  Okay?

13             **MR. SPEAKER:**  Tuesday?

14             **MS. YUAN:**  Tuesday, 9:00 to 3:00, the 31st.

15             **THE COURT:**  The 31st is 9:00 to 3:00, correct.  The

16    rest of the week the regular schedule.

17             **MS. YUAN:**  Okay.

18         **(End bench conference at 4:17 p.m.)**

19             **THE COURT:**  Ladies and gentlemen of the jury, for

20    those of you who are thinking about your schedule, I'm going to

21    give you a heads-up with regards to tomorrow.  We'll be here at

22    the regular schedule, 9:00 to 4:00.  You do get January 1st

23    off.  And the Tuesday before the January 1st, we're working

24    from 9:00 to 3:00.  And I also need to tell you that this

25    Saturday we will be working from 9:00 to 3:00.  I hope this is

1    not a burden for you because what I'm trying to do is to make

2    sure that we get this trial moving to the point where we can

3    finally finish it at some point.  And I wanted you to know in

4    advance what the schedule was, that we're on the same schedule

5    for tomorrow is 9:00 to 4:00, although today is past 4:00 but I

6    still have other cases that are going to take me longer, but

7    that doesn't affect you.  Saturday we're working from 9:00 to

8    3:00 because we're getting off on the 31st at 3:00 and we're

9    not working on the 1st.  Don't look so happy.  Thank you all

10   very much and thank you for your patience.  Please rise for the

11   jury.

12        **(Jurors exit at 4:19 p.m.)**

13            We'll see you all tomorrow.

14        **MR. MARTINEZ:**  Judge, we do have a couple issues we

15   need to bring up to the Court.

16        **THE COURT:**  Okay, what are the issues that you all

17   need to bring up with the Court?

18        **MR. MARTINEZ:**  Judge, just a couple things I would

19   say.  Prior to today, all the Defendants were referred to as

20   Mr. Ramos, Ms. Natera, Dr. Zamora, Mrs. Zamora.  Today has been

21   the first time I've ever heard Defendant Zamora, Defendant

22   Ramos.  We just ask out of respect for all the parties here,

23   they still have the same prefix as they've been referred to

24   since the beginning.  Just a request by all parties of the

25   Defendants.  That's number one.

1          **THE COURT:**  It's not unusual in any trial for

2    somebody to refer to them as the Defendant.

3          **MR. MARTINEZ:**  It's simply a request, Judge.

4          **THE COURT:**  Well, yeah, I mean, but it's not --

5    there's nothing in the rules that forbids that or anything like

6    that.

7          **MR. MARTINEZ:**  Thank you, Judge.  The other thing

8    that we'd like to get is --

9          **THE COURT:**  It isn't like the jury doesn't know who

10   the Defendants are.

11         **MR. MARTINEZ:**  I understand, Judge.  I mean, just

12   today has been a whole different Defendant Zamora-Quezada,

13   Defendant Ramos, Defendant Natera, and so we just out of

14   respect for all the Defendants they be referred to with the

15   prefixes that we all get referred to.

16         In addition to that, Judge, we have the list of

17   witnesses.  And we brought this up with the Court (indisc.) we

18   don't get our list of witnesses until evening before, late at

19   night.  There was one --

20         **THE COURT:**  After all this time that we've been here,

21   you all can't give them the witnesses?

22         **MS. YUAN:**  Your Honor, we've been giving the

23   witnesses before 7:00 o'clock the night before.  I did say --

24         **THE COURT:**  Seven o'clock the night before doesn't

25   give anybody any notice.  You were supposed to have given the

1    witnesses before we trialed -- started the trial basically.

2         **MS. YUAN:**  Well of course, Your Honor, we have the

3    witness --

4         **MR. MARTINEZ:**  No.

5         **MS. YUAN:**  -- list.  It was disclosed in September.

6         **MR. MARTINEZ:**  No, no, the list of witnesses for the

7    next day.  And the issue is obviously preparing and then in

8    addition to that, I think the Government said they would cut

9    down their list of witnesses by --

10         **THE COURT:**  Okay, well they need to tell you what the

11    list is down to so that we can --

12         **MR. MARTINEZ:**  Yeah, we --

13         **THE COURT:**  -- you can at least know that.

14         **MR. MARTINEZ:**  We'd like to get that at least we can

15    get that done.  And then other than that, in regards to

16    Dr. Zamora, I know that --

17         **THE COURT:**  I think it's only fair that you tell them

18    what the list is of the people you're actually going to call.

19         **MS. YUAN:**  Yes, Your Honor.

20         **THE COURT:**  There's no reason to waste time thinking

21    about witnesses that aren't going to be here or are not going

22    to be called.

23         **MS. YUAN:**  Yes, Your Honor.  I have a follow-up to

24    that but I'll let Mr. Martinez --

25         **THE COURT:**  I'll hear it now.

1        **MS. YUAN:**  Okay.  The defense has also noticed 54

2   witnesses on their defense witness list.  There's about 26

3   patients.  Some of them we are already aware of, we have their

4   patient files.  About more than 15, we don't even have dates of

5   birth for so we don't know who they are.  Some of them have

6   names where Dr. Zamora has seen five patients with that same

7   name.  So we've repeatedly asked for dates of birth --

8        **THE COURT:**  So you need to tell them exactly which of

9   the patients are going to be.

10        **MR. MARTINEZ:**  We are pulling those from NextGen.

11   And just for the record, those records have already been in the

12   server that they've had but we will get those specific

13   documents that she's talking about, or their dates of birth.

14        **THE COURT:**  Okay.  And anything else?

15        **MR. MARTINEZ:**  No.  Other than that, just stuff

16   Dr. Zamora unfortunately did not have access to his computer

17   over the holiday.  And I don't know if there was just lack of

18   resources but he asked me to bring this up to the Court that

19   once again they gave access to a computer the days when he's

20   not in trial.  And then apparently there was (indisc.) dealing

21   with some sewage issues and didn't get any sleep last night so

22   I don't know how to deal with that other than bring it up to

23   the attention of the Court.

24        **THE COURT:**  Well what you need to do is bring it to

25   the attention of the Marshals and the Marshals will look into

1   it and see what the problem is.

2           **MR. MARTINEZ:**  We'll do that, Judge.

3           **THE COURT:**  Because that's what I would do.  I would

4   tell the Marshals and so they would check and they would check

5   with La Villa to see what the problem if he's at La Villa.  I

6   don't know --

7           **MR. MARTINEZ:**  He's at Willacy County now.

8           **THE COURT:**  Okay, well then they will check that and

9   tell him that we -- since they get paid by the Federal

10  government to keep people, that they should be kept under the

11  conditions they're supposed to be kept.

12          **MR. MARTINEZ:**  Thank you, Judge.

13          **THE COURT:**  Okay.  And if the doctor would make sure

14  that he explains everything to the Marshals so they know

15  exactly what it is they're supposed to be checking.

16          **MR. MARTINEZ:**  I'll ask him to do that.

17          **THE COURT:**  And if I were you, I'd be present with

18  him while he's doing that so that you know exactly what it is

19  that he -- is being looked into.

20          **MR. MARTINEZ:**  You got it, Judge.

21          **THE COURT:**  Okay, you all can be excused.

22          **(This proceeding was adjourned at 4:23 p.m.)**

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    <u>January 1, 2020</u>

              Signed                                          Dated



                    *TONI HUDSON, TRANSCRIBER*