IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | Case No.  18-CR-0855-S (1) |
| JORGE ZAMORA-QUEZADA, ) | |
| ) | |
| Defendant. ) | |

### UNITED STATES' OPPOSED MOTION
### FOR PRELIMINARY ORDER OF FORFEITURE

The United States of America moves the Court to order the preliminary forfeiture of the specific property listed in the Superseding Indictment because the evidence shows that it is more likely than not that each property constitutes or is traceable to the gross proceeds of the Defendant's conspiracy to commit health care fraud and/or his scheme to defraud health care benefit programs.

### Procedural Background

Defendant Jorge Zamora-Quezada was convicted by a jury of the health care fraud conspiracy alleged in Count 1 of the Superseding Indictment, as well as engaging in a scheme to defraud health care benefit programs as alleged in Counts 2-4 and 6-9.

In the Superseding Indictment, the Government provided notice under 18 U.S.C. §982(a)(7) that "all property, real or personal, which constitutes or is derived, directly or indirectly, from gross proceeds traceable to [health care fraud] offenses, is subject to forfeiture." The Superseding Indictment listed a number of specific properties alleged to be forfeitable, including seized funds, a Maserati, an aircraft, and 16 pieces of real property.  Because J. Zamora-Quezada did not seek to retain the jury for purposes of forfeiture, the Court must determine pursuant to FED.R.CRIM.P. 32.2(b)(1) whether the Government has established the requisite nexus between each property and the Defendant's health care fraud offenses, by a preponderance of the evidence.

**ORGANIZATION OF MOTION**

The organizational headings in this motion are as follows:

I. The Mandatory Nature of Forfeiture

II. Preponderance of the Evidence

III. Pervasive Fraud

    A. The Law on Pervasive Fraud

    B. The Defendant's Clinics were Built on and Based on Fraud

IV. The Financial Analysis Supports Forfeiture

    A. Patterns of Financial Activity and Overview

    B. Bank Accounts

    C. Cash Seized from Clinic

    D. The 2015 Maserati

    E. The Eclipse 500 Aircraft

    F. The Real Properties

        (1) Loans and CDs

        (2) Individual Real Property Purchases

V. Conclusion

**ARGUMENT AND AUTHORITIES**

Forfeiture is mandatory for specific properties that the Government shows—by a preponderance of the evidence—constitute or are derived, directly or indirectly, from gross proceeds traceable to the Defendant's health care fraud offenses.

Under the "but for" test, the gross proceeds of health care fraud include any property the Defendant would not have obtained but for the criminal offenses. Because the Defendant's clinics were permeated with health care fraud, the proceeds generated by the Defendant's clinics were the proceeds of fraud.

As supported by the trial evidence and by the financial analysis presented in the attached (sealed) Affidavit of FBI Forensic Accountant Isabel Barbarena, *it is more likely than not that each property listed in the Superseding Indictment constitutes or is derived from fraud proceeds, whether directly or indirectly.* The specific properties are thus subject to forfeiture, and the United States moves that the Court issue a Preliminary Order of Forfeiture for the properties.

## I. The Mandatory Nature of Forfeiture

As with restitution, forfeiture is a mandatory element of sentencing imposed following conviction. *United States v. Sanjar*, 876 F.3d 725, 751 (5th Cir. 2017). The mandatory forfeiture statute language for health care fraud offenses is as follows:

> The court, in imposing sentence on a person convicted of a Federal health care offense, *shall order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds* traceable to the commission of the offense.

18 U.S.C. § 982(a)(7) (emphasis added). Thus, gross proceeds obtained from health care fraud, and all property traceable to those proceeds, are subject to forfeiture. Traceable property includes any appreciated value of the initial proceeds. *See generally United States v. Betancourt,* 422 F.3d 240, 250-51 (5th Cir. 2005) (holding that the entire amount of Texas lottery winnings were subject to criminal forfeiture where the winning lottery ticket was purchased with drug proceeds); *United States v. Hawkey,* 148 F.3d 920, 928 (8th Cir. 1998).

The U.S. Supreme Court has recognized the mandatory nature of forfeiture and stated:

> Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied, or broader words to define the scope of what was to be forfeited.

*United States v. Monsanto*, 491 U.S. 600, 607 (1989) (interpreting similar forfeiture statute, 21 U.S.C. § 853(a)); *see also Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 631 (1989) ("It is our view that there is a strong governmental interest in obtaining full recovery of all

3

forfeitable assets, an interest that overrides any Sixth Amendment interest in permitting criminals to use [those assets] to pay for their defense.").

Generally, after a finding that property is subject to forfeiture, a district court issues a Preliminary Order of Forfeiture listing the properties being forfeited (an order which would be final as to the Defendant at sentencing). The United States would then serve any potential third parties with the Preliminary Order of Forfeiture, and the Court would later address any third parties claiming an interest in the property. *See* FED. R. CRIM. P. 32.2(b)(4)(a) ("The court must enter the order without regard to any third party's interest in the property. Determining whether a third party has such an interest must be deferred until any third party files a claim in an ancillary proceeding under Rule 32.2(c).").

The United States seeks the forfeiture of property that constitutes or is derived from proceeds of the health care fraud that the Defendant conducted through his medical clinics. The specific property includes:

- funds seized from 7 bank accounts, and $11,161 in cash seized from the clinic;
- a 2015 Maserati;
- an Eclipse 500 aircraft; and
- 16 pieces of real property (13 in the United States; 3 in Mexico).

The properties were obtained during the health care fraud scheme and conspiracy, between the years 2000 and 2018.

## II. **Preponderance of the Evidence**

The standard for forfeiture determinations is preponderance of the evidence. *United States v. Gasanova,* 332 F.3d 297, 300-01 (5th Cir. 2003). Because forfeiture is a part of the sentencing process, "the district court may consider any information which bears 'sufficient indicia of

reliability to support its probable accuracy,' including hearsay evidence, without regard to admissibility under the Federal Rules of Evidence which govern at trial." *United States v. Solis,* 299 F.3d 420, 455 (5th Cir. 2002) (citation omitted). Furthermore, the Court's forfeiture determination "may be based on evidence already in the record… and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." FED.R.CRIM.P. 32.2(b)(1)(B).

An FBI Forensic Accountant reviewed the records of at least 36 bank accounts, as well as voluminous other financial records related to the Zamoras. Aff. at p.3. Her affidavit, which is attached to this Motion under seal because it contains detailed personal financial information, describes how each of the specific properties was purchased. In this case, the trial evidence and additional evidence and information from a financial analysis of the records demonstrates that it is more likely than not that all of the specific properties, whether directly or indirectly, constitute or are derived from gross proceeds traceable to the Defendant's health care fraud.

### III.   Pervasive Fraud

Under the "but for" test, the proceeds of health care fraud include any property the Defendant would not have obtained but for the criminal offense. Because there was pervasive fraud in the Defendant's clinics (*e.g.,* fraudulent diagnoses, batteries of repetitive and unnecessary tests given irrespective of individual patient need, and patient medical records falsified in order to support fraudulent billing), the proceeds generated by the Defendant's clinics were the proceeds of health care fraud.

#### A. The Law on Pervasive Fraud

All proceeds of a defendant's business are forfeitable if the business was "permeated with fraud"; and even if a part of the business was legitimate, the proceeds of that part are nevertheless

forfeitable if the legitimate side of the business would not exist but for the "fraudulent beginnings" of the entire operation. *United States v. Warshak*, 631 F.3d 266, 329-330 (6th Cir. 2010) (where "the very nucleus of [the defendant's company] business model remained rotten and malignant" and the district court found evidence "that the entire operation was permeated with fraud," the forfeiture of all business revenues, including legitimate sales, was affirmed). *See also United States v. Smith*, 749 F.3d 465, 488-89 (6th Cir. 2014) (following *Warshak*; if business is so pervaded by fraud that its revenue stream would not have existed but for the fraud, any asset derived from that revenue stream is forfeitable as proceeds); *United States v. Hoffman-Vaile*, 568 F.3d 1335, 1344 (11th Cir. 2009) (applying the "but for" test: health care provider convicted of Medicare fraud is liable to forfeit the funds she received from Medicare and the funds she received from private insurers because she would not have received either but for her fraudulent billings).

The Fifth Circuit Court of Appeals has upheld a district court's civil restraint of assets where the Government provided evidence of "pervasive Medicaid fraud." *United States v. Melrose East Subdivision*, 357 F.3d 493, 506 (5th Cir. 2004). The owner of the medical facility in that case contended that the Government had not shown that all of the billings in the relevant time period were fraudulent. The Court held that the Government was not required to trace the assets to particular billings and noted in that case that:

> [I]t appears that the thirty-nine people [sampled] received services at various times in 1999, both before and after the purchase of the Melrose lots [alleged to be forfeitable]. Still, *the pattern of responses from this sample was indicative of widespread fraud*.

*Melrose East*, 357 F.3d at 506 (emphasis added).

In the instant case, there is more than just a sampling indicating a pattern of widespread fraud (although such a pattern also exists); in addition, there is abundant documentary evidence and the trial testimony of witnesses who worked in the clinics at several different time periods

6

during the fraud scheme, establishing that the Defendant's clinics regularly committed fraud against health benefit programs generally and altered patient records to ensure that those fraudulent bills would be paid.

      B.      <u>The Defendant's Clinics were Built on and Based on Fraud</u>

The United States alleges there was pervasive fraud in J. Zamora-Quezada's medical clinics and billing practices. In paragraph 20 of the Superseding Indictment, the United States details some of the allegations, including that as part of the conspiracy, J. Zamora-Quezada and his co-conspirators:

- would falsely diagnose vulnerable patients with diseases such as rheumatoid arthritis and other auto-immune diseases, such that the patients became a source of substantial revenue;
- would administer infusions and/or injections containing chemotherapy and other toxic medications to patients, including patients who had been falsely diagnosed with various diseases;
- would conduct a battery of fraudulent, repetitive, and excessive medical procedures on patients in order to increase revenue;
- would direct staff to increase the number of patient office visits and the number of medical procedures that were performed on patients in order to generate profits; and
- would falsify patient records in order to create the false appearance that certain procedures were medically necessary and that certain procedures had been performed.

The clinic business was permeated with fraud, as the evidence the Government presented at trial clearly showed. For nearly two decades, J. Zamora-Quezada executed a scheme in which he routinely falsified medical records and falsely diagnosed patients with life-long, incurable conditions like rheumatoid arthritis, all so that he could bill health care benefit programs for procedures that were medically unnecessary. The trial evidence includes, but is not limited to, the following:

- Former employee Tomas Moreno worked at the clinic from 2002 to May 2017. 12/9/19 PM Trial Tr. 6:16–18; 7:9–11. He created false ultrasound images and added symptoms to patient files to justify the lab work being done at the clinics and billed by Defendant. *Id.* at 32:17–24. He was taught in classes led by J. Zamora-Quezada to fill out the patient notes so that the diagnosis and symptoms matched the labs being billed. *Id.* at 33:1-19.

- Former employee Michelle Rocha testified that in response to audits, she and other employees were asked take ultrasounds of their own bodies to be placed in patient files. 1/3/20 PM Trial Tr. 13:16–19.

- Former employee Raymundo Moreno testified that he falsified documents by creating notes for visits that had occurred up to three years prior. 12/18/19 AM Trial Tr. 49:15–19.

- Former employee Rene Lucio testified to witnessing employees gathered on a weekend to shred documents in response to an audit. 12/26/19 PM Trial Tr. 75:22–25; 76:1–16.

- Former Medical Assistant Raymundo Moreno, who accompanied J. Zamora-Quezada during patient visits, testified that he could still remember the pattern of the same five diagnoses, in the same order, that J. Zamora-Quezada would give to "almost all" patients. 12/18/19 AM Trial Tr. 30–35. This is corroborated by diagnoses on J. Zamora-Quezada's superbills in multiple patients' files, all which show the same five diagnoses (rheumatoid arthritis, bursitis, knee osteoarthritis, fibromyalgia, and GIO) in the same order. *See* GX C-44.012 (patient J.H.), C-39.102 (patient M.G.), C-48.171 (patient M.A.), C-32.206 (patient S.C.), C-31.299 (patient M.B.), C-56.030 (patient M.P.), C-58.093 (patient K.W.), C-43.215 (M.N.), C-47.216 (patient C.J.), C62 at ZAM23861 (R.S.), C-55.166 (patient E.P.), C-57.045 (S.R.), C60 at ZAM22734 (patient M.G.).

- Former employee Graciela Salinas testified that after J. Zamora-Quezada's claims were denied by insurance companies as medically unnecessary, she observed patients' test results being changed from "normal" to "positive" so that the insurance companies would pay the claims when J. Zamora-Quezada appealed the denials. 12/6/19 PM Trial Tr. 58–60.

- Three rheumatologists who worked at Defendant's clinics, Dr. Robert Persellin, Dr. Emilia Dulgheru, and Dr. Bricia Toro, all testified that J. Zamora-Quezada's patient files were "cookie-cutter" and inconsistent with the symptoms that the patients actually presented. 12/11/19 PM Trial Tr. 87:7-10 (Persellin), 12/12/19 AM Trial Tr. 37:1-3 (Dulgheru), 1/2/19 PM Trial Tr. 104:4-10 (Toro). They also testified that, based on their observations while working at the clinics, J. Zamora-Quezada ordered a high volume of medically unnecessary tests and procedures. 12/11/19 PM

8

> Trial Tr. 89:12-25-90:1-2 (Persellin), 12/12/19 AM Trial Tr. 30:7-13 (Dulgheru), 1/2/19 PM Trial Tr. 118:11-22 (Toro).

- Dr. Monty Tew was the independent rheumatologist asked by the Texas Medical Board to review J. Zamora-Quezada's patient files for two years. Dr. Tew found that J. Zamora-Quezada had a pattern of diagnosing patients with the same diseases and ordering medically unnecessary and redundant tests. See GX D-24, D-26, D-28, D-30, and D-32.

- J. Zamora-Quezada owned the machines that performed the x-rays, MRIs, ultrasounds, and labs at the clinic, providing additional incentive to order excessive and medically unnecessary tests for which he could improperly bill. *See* 12/12/19 AM Trial Tr. 30:1-6 (Dulgheru), 1/2/19 PM Trial Tr. 118:1-10 (Toro), GX B-12.

- Medicare claims data corroborates J. Zamora-Quezada's practice of falsely diagnosing a large number of patients. Of the nearly 10,000 Medicare patients he treated, J. Zamora-Quezada diagnosed 72.9 percent of them with rheumatoid arthritis. GX A-46. In comparison, seven other rheumatologists who testified at trial cumulatively diagnosed just 13.8 percent of their Medicare patients with rheumatoid arthritis. Id. Further, five of these rheumatologists who practice in the Valley saw hundreds of patients previously diagnosed with rheumatoid arthritis by J. Zamora-Quezada and found no evidence of rheumatoid arthritis for these patients 79 percent of the time. GX A-46.03.

The Government incorporates the evidence cited in its Response in Opposition to Defendant's Post-Verdict Motion for Judgment of Acquittal or New Trial (Doc. 696), particularly the evidence related to the individual patients in Counts 2-4 & 6-9, at pp. 10-17.

Because the specific property listed as being subject to forfeiture was obtained with clinic proceeds during the conspiracy period, the listed properties are derived from the "gross proceeds traceable to" health care fraud offenses, directly and indirectly, subjecting the property to forfeiture under Section 982(a)(7).

## IV. **The Financial Analysis Supports Forfeiture**

The attached Affidavit of Isabel Barbarena, a forensic accountant with the Federal Bureau of Investigation, goes through the information on each specific property in detail. Because the financial documents were so voluminous, Ms. Barbarena created summary charts, which are

9

attached to her Affidavit. Ms. Barbarena's two main conclusions after review and analysis of the financial documents in this case are:

(1) that the property listed in the Superseding Indictment constitutes or is derived, directly or indirectly, from the proceeds generated from the Defendant's medical clinics from the year 2000 forward; and

(2) that the only significant source of the Zamoras' income during the conspiracy period was the clinic proceeds, including rental income from real properties previously purchased with clinic proceeds; Ms. Barbarena looked for but did not find a source of income for the listed assets other than clinic proceeds.

Affidavit at pp. 1-2.

    A. Patterns of Financial Activity and Overview

The financial analysis in this case is complicated by three patterns of financial activity that the Zamoras engaged in, both personally and through their various entities: (1) they took out numerous loans, then would sometimes partially renew them and sometimes use them to pay off multiple other loans; (2) they purchased numerous bank Certificates of Deposit (CDs), which were used as collateral for loans and which were ultimately redeemed to partially or fully pay multiple loans and to purchase other CDs; and (3) they would sometimes take out interest-only loans, with the property (and sometimes a CD) for collateral, making monthly payments but not paying off the bulk of the asset cost until much later than the purchase date. Aff. at p. 2. In addition, the Zamoras transferred money from one type of account to another account, or CD, whenever funds were needed, treating the various accounts and CDs as a personal piggy bank, and seemingly unconcerned about what name the accounts and CDs were held in. Nevertheless, specific property purchases were analyzed and traced (to the extent the records allowed, as some older bank records no longer exist). It is clear by at least a preponderance of the evidence that the properties were purchased with loans and CDs that traced back to clinic proceeds.

10

Most of the real properties were titled to the J&M Zamora Family LP and generated their own rental income, which constitutes indirect clinic proceeds. The clinic revenues were the source of the money used to purchase real properties[1], starting with land at 451 E. Alton Gloor in Brownsville, a 2001 purchase which the Zamoras financed. Another lien was taken out in order to construct a medical office building on the land, and in 2006, the Alton Gloor property was transferred to the J&M Zamora Family LP, which assumed the loan. Aff. at pp. 20-21; X-11. Likewise, the Cornerstone property in Edinburg was purchased in 2002 with a loan in the name of the Family LP, and a series of loans were paid off and renewed, with monthly payments being made from both the Family LP accounts and the Clinic Payables accounts. Aff. at pp. 19-20; X-11. By 2005, the Zamoras were also purchasing other types of real property with clinic proceeds.

In April 2017, the day after search warrants were executed, the Zamoras made an early redemption of a $2.5 million CD, LSNB x0570. They paid off a bank loan, and then later that year purchased two additional real properties for the Family LP with the remaining CD money, 425 Soledad and 4230 Gardendale. **Attachment X-6**. A financial analysis showed that the $2.5M CD had itself been purchased with clinic proceeds. Aff. at pp. 14-15; **Attachment X-7**.

Over the conspiracy time period, the rental income from the various real properties, combined with infusions of funds from the Clinic Payables Account, were used to pay the Zamoras' significant personal expenses, to buy more real properties, to purchase various assets, and to pay expenses on those assets (including real property, vehicle, and aircraft expenses). Aff. at pp. 2-3.

---

[1] Three real properties that the Zamoras purchased were not listed for forfeiture in the Superseding Indictment: (a) their residence (purchased in 1993 by Meisy Zamora and transferred to Jorge Zamora in early 2000); (b) a property in McAllen, Texas, purchased by Jorge Zamora in 1999; and (c) a property in Mission, Texas, that Meisy Zamora purchased in June 2001 in her name alone.

11

B. Bank Accounts

As Ms. Barbarena explains in Section IV of her Affidavit, the Zamoras' bank accounts fall into the general categories of Clinic Operating, Clinic Payables, Clinic Payroll (not sought for forfeiture), Angeles Pharmacy (a dba of the clinic that was located within the clinic), J&M Zamora Family LP (which held most of the real estate), and the Zamoras' Personal Accounts. The general flow of funds was that the insurance companies, including but not limited to Medicare, would make payment for medical claims into the Operating Account. The Operating Account would transfer money to the Payables Account, which then paid expenses and transferred money to other accounts. Aff. at p.4.

The Government seeks to forfeit funds seized from seven of the bank accounts in May and June of 2018 (some accounts have both an "old" and a "new" account number, as they were being transitioned during that time period). A summary chart is attached to the Affidavit as **Attachment X-1**, showing the seizures and the general flow of funds among bank accounts. As Ms. Barbarena explains, the Operating Account (seizures of $55,760.70 and $12,474.51) and the Payables Account (one seizure of $127,863.12) clearly consisted of clinic proceeds derived from insurance payments. The Angeles Pharmacy was located inside the Edinburg clinic and was a d/b/a of the clinic. Its bank account (seizures of $1,040.77 and $13,870.70) was first opened in 2016, and as it was supported by Payable Account infusions of over $650,000, the seized funds likewise constitute clinic proceeds. Aff. at pp. 5-7.

The J&M Zamora Family LP is the entity that holds most of the Zamoras' real properties, and its bank account (seizure of $28,704.76) received the majority of the rents from the real properties. There were also many transfers of funds from the Payables Account into the Family LP account, sometimes shortly before the purchase of another real property. The clinic itself also

paid rent to the Family LP account for the Cornerstone real property. With respect to the seizure of the $28,704.76, Ms. Barbarena traced the seized funds to transfers from the Payables Account, rental payments from the clinic, and rental payments from the Estrella de Mar property in California. The seized funds are thus both direct and indirect clinic proceeds. Aff. at pp. 7-9.

Finally, the Government seized $237,171.96 from a Personal Account in the name of Jorge and Meisy Zamora. A financial analysis showed that the seized amount was made up of four sources: salaries[2] that came from the Payables Account (through Payroll); rent from the two condos in Puerta Vallarta, Mexico; and rent from two U.S. properties held in the name of J & M Zamora Family LP. *See* Aff. at p. 9.

Based on the foregoing evidence and information, it is more likely than not that the seized funds constitute direct and indirect clinic proceeds.

C. Cash Seized from Clinic

A search warrant was executed at the Zamoras' clinic in April 2017, and cash was seized from two places. One safe contained $10,200 in cash, along with a handwritten ledger the Zamoras kept with a running balance. The cash consisted of cash rental payments from certain property tenants for February, March, and April 2017, with the properties and amounts listed, and thus constitutes indirect proceeds of the clinic. Aff. at pp. 9-10.

---

[2] The salaries included $49,416.43 paid to Meisy Zamora. Meisy Zamora's salary payments are forfeitable as a preliminary matter because they constitute clinic proceeds, but since Meisy Zamora was acquitted in the criminal case, she would have the later opportunity to file a third-party claim to those funds in an ancillary hearing. Regardless of the acquittal (which was judged on a beyond a reasonable doubt standard), to prevail on a claim to the seized salary funds, Meisy Zamora would have to show by a preponderance of the evidence that she was a "bona fide purchaser for value of the right, title or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture." 21 U.S.C. § 853(n)(6)(B), applicable through 18 U.S.C. § 982(b)(1).

The remaining $961 cash found in another clinic office had no ledger. Because there were no other sources of cash discovered, however, it is more likely than not that this cash was also clinic proceeds, whether directly from clinic payments in cash, or indirectly through rental payments in cash. Aff. at p. 10.

D. <u>The 2015 Maserati</u>

J. Zamora-Quezada purchased the Maserati on November 27, 2015, for $132,843.00. <u>The $10,000 down payment came from the J&M Zamora Family LP bank account</u>. The vehicle was financed by a $88,843.80 loan from Ally Financial, and the <u>Clinic Payables Account</u> made the Maserati loan payments of $7,653.59 per month, <u>paying off the lien in the total amount of $91,604.79</u>. In addition, there was a $40,000 credit from a trade-in of a 2005 Porche 911 Turbo, which was itself financed and the (multi-purpose) loan eventually paid off with the redemption of CD x9878, which was an $11 million CD purchased in 2007, during the conspiracy period and with $7,595,728.31 coming from the J&M Zamora Family LP. Aff. at pp. 10-11. **Attachment X-4** is a summary chart related to the purchase.

Based on the evidence and information above, and the additional details given in the Affidavit, it is more likely than not that the 2015 Maserati was purchased with clinic proceeds, directly and indirectly.

E. <u>The Eclipse 500 Aircraft</u>

J. Zamora-Quezada ordered the Eclipse 500 Aircraft, Serial No. 000162, in December 2005, and it was delivered in April 2008. The purchase price was $1,516,340.70, and the aircraft was placed in the name of JZACE #1 LLC, one of the Zamora entities. Aff. at pp. 11-12.

The aircraft was purchased with various loans from LSNB, many of which were interest-only loans with repayment due at the end of the loan. The multiple bank loans involved were used

for more than just the aircraft, and they were taken out by Dr. Zamora, by the clinic, and by the Family LP. **Attachment X-5** lists the loan numbers and amounts and shows that:

1. Loan 77493 funded the $388,500 down payment on the aircraft.

2. The multi-purpose loans were partially paid with $799,239.92 in proceeds of CD x9878 (which was the $11 million CD purchased in 2007 with $7,595,728.31 from the J&M Zamora Family LP).

3. Payments on the various loans were made from the Clinic Payables Account ($660,011.76) and from the J&M Zamora Family LP account ($2,891,489.15), for a total far in excess of the purchase price of the aircraft.

Based on the evidence and information above, it is more likely than not that the Eclipse 500 Aircraft was purchased with clinic proceeds, directly and indirectly.

F. The Real Properties

The 16 real properties listed in the Superseding Indictment and sought for forfeiture are listed in **Attachments X-8** (U.S. properties) and **X-9** (Mexican properties). Most but not all are held in the name of the J&M Zamora Family LP. Three real properties purchased and owned by the Zamoras (including their residence) are not included in the list of forfeitable real properties. Aff. at pp. 12-13.

During the pendency of the criminal case, the United States did not seize the ongoing rents being generated by the Zamora real properties. However, it appears that the Zamoras have not paid the property taxes with the rent money, and the property taxes continued to accrue. **Attachment X-10** shows the amount of overdue property taxes, per a public records search, which comes to a total of $783,190.94 (which is the previously accrued amount of $688,967.87 plus an additional $285,987.57 that was due January 31, 2020). Aff. at p. 23.

Based on her review of available financial records, Ms. Barbarena believes that the Zamoras' income generated from 2001 through 2017 came from the operation of the clinics, or from the rental income of real properties purchased with clinic proceeds.

### (1) Loans and CDs

The Zamoras often purchased assets with the proceeds of a loan (sometimes interest-only loans); and then after making monthly payments for a while, they would renew the loan, or pay it off with another loan or with a combination of loans and redeemed Certificates of Deposits (CDs). Over the course of the conspiracy, the Zamoras purchased a number of CDs in various names and would sometimes purchase a new CD with the proceeds of multiple other CDs. There are two CDs in particular that come up in the real property purchase history a number of times:

  (a) <u>LSNB CD x0570,</u> purchased for $2.5M in May 2013 (ultimately tracing back to the Clinic Operating Account, Clinic Payables Account, and the J&M Zamora Family LP; *see* **Attachments X-6** and **X-7;** Aff. at pp. 14-15), and which the Zamoras redeemed early, the day after the execution of a search warrant at the clinic; and

  (b) <u>LSNB CD x9878</u>, purchased for $11 million in 2007 and funded by $7,595,728.31 from the J&M Zamora Family LP (CD x9878 is the CD that paid many loans, and also partially paid for the Maserati and the aircraft).

Aff. at p. 13.

### (2) Individual Real Property Purchases

In Section VIII of her Affidavit, Ms. Barbarena analyzes the purchase of each real property. In addition, she attaches summaries for the purchase of each real property, providing even more detail (*see* Real Property Summary Charts, **Attachments X-11** (U.S. Properties, individually) and **X-12** (Mexican Properties, individually)). After review of the records, Ms. Barbarena believes that each real property was purchased with clinic proceeds. Aff. at pp. 12-22.

All of the real properties were purchased during the conspiracy period. Based on the evidence and information above, and as outlined in detail in the Affidavit and Attachments, it is more likely than not that the real properties constitute direct and indirect clinic proceeds and are thus subject to forfeiture.

## CONCLUSION

The United States has proven by at least a preponderance of the evidence that that specific properties listed in the Superseding Indictment are subject to forfeiture because, directly or indirectly, they are all derived from the proceeds of the Defendant's health care fraud offenses.

The United States moves for entry of a Preliminary Order of Forfeiture for the specific properties. A proposed order is attached for the Court's consideration.

Respectfully submitted,

ROBERT ZINK, CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

/s/ *Adrienne Frazior*
ADRIENNE FRAZIOR
REBECCA YUAN
EMILY GURSKIS
Trial Attorneys
United States Department of Justice
1400 New York Avenue, N.W.
Washington D.C. 20005

RYAN K. PATRICK
UNITED STATES ATTORNEY

*/s/ Kristine E. Rollinson*
KRISTINE E. ROLLINSON
1000 Louisiana, Suite 2300
Houston, TX 77002

>CYNTHIA VILLANUEVA
>U.S. Attorney's Office
>1701 W. Highway 83, #600
>McAllen, TX 78501
>
>Assistant United States Attorneys
>Southern District of Texas

**CERTIFICATE OF CONFERENCE**

I hereby certify that on February 25, 2020, I spoke with Trey Martinez, counsel for J. Zamora-Quezada, and asked whether his client was opposed to the forfeiture of the specific property. Defendant is opposed to the relief sought by this motion.

>*/s Kristine E. Rollinson*
>Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on February 26, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, causing service on all attorneys of record. The sealed Affidavit and attachments were emailed to J. Zamora-Quezada's counsel of record on this same day.

>*/s Kristine E. Rollinson*
>Assistant United States Attorney