**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**McALLEN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | 7:18-CR-0855-1 |
| | § | |
| JORGE ZAMORA-QUEZADA | § | |

**SUPPLEMENTAL BRIEF REGARDING SENTENCING GUIDELINES**

COMES NOW, JORGE ZAMORA-QUEZADA, Defendant, by and through his undersigned counsel, and files this supplemental memorandum regarding the Sentencing Guidelines applicable to him.

At the hearing on May 20, 2021, this Court indicated that it would not accept the government's argument that the fraudulent conduct at issue in this case was so "pervasive" that the Court could assume that every claim that Dr. Zamora-Quezada submitted to Medicare, Medicaid, Blue Cross and TRICARE were fraudulent. The Court ordered the government to provide a list of the patients that it specifically believed had been fraudulently diagnosed and to provide the evidence supporting that position.

In its June 2021 submission (Docket 750), the government failed to provide such evidence and completely disregarded the Court's instruction. Instead, the government merely re-iterated its position that the fraudulent conduct at issue in this case was pervasive. The government also dropped its loss figure. After telling the public that the loss amounts here were $240 million (May 2018 press release) and then $325 million (January 2020 press release), the government has dropped down to $148 million. This might seem like a concession, but the government is still continuing to just throw numbers around without actually presenting reliable evidence.

The Court should disregard the government's attempts to avoid its obligation to prove loss by a preponderance of the evidence and instead find a loss figure that is consistent with the

evidence that has actually been presented.  As Dr. Zamora indicated in his earlier submission, while disagreeing with the jury's verdict, Dr. Zamora accepts that a loss amount of $100,000 would be appropriate based on the jury's findings about the small number of patients for whom evidence was actually provided at trial, as well as based on other specific instances in which evidence was actually provided.

In addition, as discussed below, the government has failed to establish that enhancements for sophisticated means, an offense involving risk of death or serious bodily injury, large number of vulnerable victims, and aggravating role should be applied.  Finally, Dr. Zamora-Quezada also requests an evidentiary hearing if the Court intends to consider the uncharged conduct that the government has asked the Court to consider as a sentencing factor.

## I.   <u>Loss Amount</u>

Throughout this case, the government has ignored methods that could have provided a reasonable estimate of loss.  Now, despite the Court's requests, the government has refused to present evidence that would have proven its claimed loss figure by a preponderance of the evidence.  The Court can and should assume that the government's failures are not accidental but intentional, and the Court should not reward the government's failures here.

### A.    <u>The Government's Initial $240 Million Figure Was Not Justified</u>

From the very beginning, the government told the public that Dr. Zamora was responsible for a "$240 million health care fraud and international money laundering scheme."  The figure comes from the grand jury indictment, but the government has never provided transcripts that show the basis for this figure or what the grand jury was presented with.  This overstated and misleading loss amount had severe consequences on the trial.  The government used this loss amount to seize assets and funds that could have been used for Dr. Zamora's defense, and the case got huge publicity in the Rio Grande Valley and even nationally.

As we now know, the government had no basis for the $240 million figure, other than its incorrect *assumption* that every single claim was fraudulent.

- **The government did *not* have an independent expert review *any* patient files before charging Dr. Zamora-Quezada in this case.**  The government does this regularly in criminal health care fraud cases around the country, as well as in civil cases and administrative audits.  The government probably planned to do so here, but chose not to do so.

- **The government relied almost entirely upon the word of rheumatologists in the local area.**  This is a dangerous practice that the Texas Medical Board would not have used and that resulted in at least one instance in which a local rheumatologist probably lied to the government about a patient.

  That rheumatologist told the government in March 2018 that patient EE did not have rheumatoid arthritis and that no tests or sufficient evidence had proven that she had rheumatoid arthritis.  More than a year later, on December 4, 2019, the eve of trial, the government disclosed that the local rheumatologist had actually acknowledged that his file for patient EE did have the diagnosis of rheumatoid arthritis, which he tried to blame on his electronic medical records system.  This was almost undoubtedly a lie, as the defense would have shown if the government had called this witness at trial.

  In any event, no local rheumatologist could have said that every patient was improperly diagnosed, let alone fraudulently diagnosed.

- **The government does not have any evidence indicating that every single patient was fraudulently diagnosed.**  This might happen in some types of health care fraud, such as the cases where providers bill for patients that they did not even see, or the home health cases where patient referrals are bought and sold to doctors who certify patients without ever seeing the patent.  But that is not this case.  Dr. Zamora-Quezada did not pay marketers to bring him patients.  Patients came to him with problems that they self-reported, often based on referrals from other doctors.  And, as shown below, some patients were diagnosed with rheumatoid arthritis by other doctors *before* they even came to Dr. Zamora-Quezada.

As noted above, the government has jumped around in its loss position, going up from $240 million to $325 million based on the same assumptions as before, and finally dropping down to $148 million in its latest submission.  All of these numbers should be disregarded given the government's failure to actually present evidence.

**B.      The Government's Limited Expert Review Does Not Support The Government's Position Here**

What happened when the government did try to get independent experts to review files after the case was indicted should give the Court even more pause about the government's broad claims here.

One government expert, Dr. Calvin Brown, examined just **_three_** patient files in or around December 2018, months after the case had been charged.  According to the government, Dr. Brown told the government in that Dr. Zamora had incorrectly diagnosed each of these patients with rheumatoid arthritis.  No statistician would ever say that a review of three files that were chosen by the government was statistically valid.  Based on what government witness Michael Petron himself said, a review would have had to involve a minimum of at least **_30_** patients or claims, **_ten times_** what the government actually did with Dr. Brown.

Another government expert, Dr. Eric Ruderman, reviewed the same three patient files in or around August 2019, a few months before trial.  Significantly, Dr. Ruderman told the government that he did **_not_** disagree with Dr. Zamora-Quezada on the diagnoses for two of the three patients (66%).  The government did **_not_** disclose this to the defendant at the time, and instead provided defense counsel with a report that left out Dr. Ruderman's conclusions.  Fortunately, defense counsel saw a reference to Dr. Ruderman's conclusions in the agent's handwritten notes and asked the government about this, and the government finally produced a report with the exculpatory information.

The table below summarizes the results of the review:

|  | Patient MP (Count 6) | Patient CJ (Count 2) | Patient BM |
|---|---|---|---|
| Dr. Brown | disagreed with Dr. Zamora-Quezada's diagnosis | disagreed with Dr. Zamora-Quezada's diagnosis | disagreed with Dr. Zamora-Quezada's diagnosis |
| Dr. Ruderman | did **NOT** disagree with Dr. Zamora-Quezada's diagnosis | did **NOT** disagree with Dr. Zamora-Quezada's diagnosis | unclear from report |

That is the extent of the government's expert review. Three patients, as well as a fourth patient whom Dr. Ruderman reviewed and had not been diagnosed with rheumatoid arthritis or specifically mentioned in the indictment.

A review of just **three** patients should not be the basis for any extrapolation. To the extent that it means anything, it should give the Court caution about making broad generalizations about loss amount.

**C.      The Government's Failure to Conduct A Statistically Valid Review Should Lead to An Adverse Inference**

If the government had done this with just 30 patients, then the government might have established a reasonable estimate of loss based on evidence. Reviewing 30 files was feasible:

- The government seized patient files from Dr. Zamora-Quezada's offices and thus are actually in possession of files that could have been used for the search. The case agent's apparent inability to spend time finding specific files does not excuse the government of its burden, especially when the government could have asked Herminia Rios to help retrieve files as she has been able to do for the past few years.

- The government could have checked claims data for those patients and seen if any other rheumatologist had ever diagnosed the patients with rheumatoid arthritis. The government is actually in possession of voluminous Medicare and Medicaid data for all such patients who have seen Dr. Zamora-Quezada; they could easily have checked this for 30 or so patients.

- The government could have interviewed the patients. The government has devoted significant resources to investigating this case and to keeping Dr. Zamora-Quezada in custody; interviewing 30 or so patients would not have been difficult.

- And the government could even have had new examinations and tests done.

The government did not do those things.  The government tries to duck their responsibility by pointing to the state of Dr. Zamora-Quezada's paper records, while ignoring the fact that they seized the electronic copies that were actually what Dr. Zamora-Quezada and his office maintained and relied upon, including handwritten records that were testified about at trial.

The government's failure here to properly investigate this case is troubling, as is the government's continued attempt to argue for loss amounts that are not supported by the evidence.

D. **The Government Failed to Provide Specific Evidence of Fraud At the Evidentiary Hearing**

The Court held an evidentiary hearing in October 2020.  What was notable about the government's presentation was what the government did ***not*** do:

- The government did not call any expert to give opinions about any patients.

- The government did not present any patient files.

- The government did not call any patients.

Instead, the government asked the Court to simply accept that thousands of people who called an FBI hotline were "confirmed" victims of Dr. Zamora-Quezada.  The government presented a summary chart with the people who had called the FBI hotline and pointed out a few instances where people complained about Dr. Zamora-Quezada.

But, as shown at the hearing, many of these people provided no information that would indicate any improper conduct by Dr. Zamora-Quezada.  Some even called to report that they had no complaints about Dr. Zamora-Quezada.  And the government's own summary chart shows that the government was aware that the vast majority of people who called the hotline had not received second opinions from other doctors disagreeing with Dr. Zamora-Quezada.[1]

---

[1] As shown in the cross-examination of Michael Petron, the government itself marked with "* Second Opinion" or "* 2nd Opinion" or "* Misdiag" those few patients who reported getting a second opinion or being misdiagnosed, such as Patient KW from Count Eight.  On re-direct, the

At best, the government's evidence at the evidentiary hearing showed that only a small number of people reported being told by another doctor that they did not have rheumatoid arthritis as Dr. Zamora-Quezada had diagnosed.  And even then, the patient's own words are insufficient to conclude that Dr. Zamora-Quezada's diagnosis was ***fraudulent***, as opposed to possibly being ***mistaken***.

The government thus failed to prove at the evidentiary hearing that large numbers of patients had been fraudulently diagnosed by Dr. Zamora-Quezada.

**E.**     **The Government Failed To Provide Specific Evidence of Fraud After the May 20, 2021 Hearing**

On May 20, 2021, the Court gave the government another chance to finally do what the government should have done at the October hearing or even before indictment.  The Court asked the government to present specific evidence of fraud.

And, as the Court is already aware, the government failed to do so.

The Court also asked for information about the civil cases brought against Dr. Zamora-Quezada.  Again, the government ignored the Court's instruction because the actual answer would have been damaging to their case.

More than 1,400 patient files were provided to lawyers who were considering filing lawsuits against Dr. Zamora.  Yet all of this resulted in only three civil malpractice lawsuits being filed against Dr. Zamora-Quezada with only 14 potential claimants.  The known lawsuits are as follows:

> 1.     Case No. C-0207-19-L, in the 464th Judicial District Court of Hidalgo County, Texas.  This matter was filed on January 14, 2019 and was settled

---

government tried suggesting that there might also be patients who had been marked as "* Falsely Diagnosed."  There were not, as the government easily could have checked before making that suggestion.

in 2021.  None of the potential claimants in this matter have filed victim statements with Probation.

2.      Case No. C-3658-16-B; in the 93rd Judicial District Court of Hidalgo County, Texas.  This matter was filed on August 8, 2016 and there has been no action since March 14, 2019.  The plaintiff in this case filed a victim statement with Probation (Patient AM) indicating that her case has settled. Patient AM's statement does not refer to any false diagnosis but to an allegation of negligence.  *See* Docket #725 at 717 and 723.

3.      Case No. C-3173-20-H in the 389th Judicial District Court of Hidalgo County, Texas.  This matter was filed on September 15, 2020, well over two years after Dr. Zamora was arrested in May of 2018.  Moreover, service has not yet been attempted on this matter.  None of the potential claimants in this matter have filed victim statements with Probation.

If the fraud was as widespread and clear as the government claims, then one would have expected more malpractice lawsuits.  The absence of such lawsuits provides further reason for the Court to reject the government's argument that the Court should simply assume that thousands of specific patients were fraudulently diagnosed without the basis of any patient-specific evidence for those patients.

**F.      No Precedent for Finding the Fraud in this Case to be so "Pervasive" as to Shift the Burden onto Dr. Zamora-Quezada**

The government continues to claim that Fifth Circuit precedent supports a finding that the fraud in this case was so "pervasive" as to shift the burden onto Dr. Zamora-Quezada to disprove fraud.  This is simply wrong.

Based on counsel's legal research, there are seven health care fraud cases that involved findings of "pervasive" fraud that were affirmed by the Fifth Circuit.  None are similar to this case.

Of the seven cases, six involved home health fraud.  These cases involved unnecessary home health services, doctors who improperly certified patients as homebound without reviewing records or making actual medical judgments, and illegal payments for patient referrals.  The evidence presented in these cases showed that the schemes were set up to bill Medicare for

unnecessary services.   The chart below summarizes the evidence that supported findings of "pervasive" fraud in these seven cases:

| | Type of services | Government proof regarding majority of patients receiving unnecessary services | Government proof involving kickbacks |
|---|---|---|---|
| *United States v. Age*, 614 Fed. Appx. 141 (5th Cir. 2015) | home health | Coconspirator testified on behalf of government about the overall scheme. | Evidence presented about paying physicians to sign referrals and paying patient recruiters for patients. |
| *United States v. St. John*, 625 Fed. Appx. 661 (5th Cir. 2015) | home health, billing for "care plan oversight" | A co-defendant testified that he signed 99% of the certification forms and admitted that he did not supervise nurses as required.  There was evidence that an employee was told to bill $30,000 in "care plan oversight" per week even when no such work occurred. | |
| *United States v. Murthil*, 679 Fed. Appx. 343 (5th Cir. 2017) | home health | A co-defendant testified about the overall fraud and about doctors were paid to certify patients based upon cursory evaluations and false diagnoses. | Evidence showed that doctors were paid $75 each time that thy certified a patient. |
| *United States v. Ezukanma*, 756 Fed. Appx. 360 (5th Cir. 2018) | home health | Codefendant testified that some patients did not meet homebound criteria and that he signed certifications without reviewing records or determining that patients were actually homebound.  Assistant testified that defendant signed paperwork without reading them and that defendant could not have performed home visits because he was usually at his primary practice. Government reviewed more than 1,000 files and interviewed multiple beneficiaries. | |

|  | Type of services | Government proof regarding majority of patients receiving unnecessary services | Government proof involving kickbacks |
|---|---|---|---|
| *United States v. Mazkouri*, 94 F.3d 292 (5th Cir. 2019) | psychiatric in treatment programs | Co-conspirator testified that doctor admitted patients after speaking with them for only five minutes or after seeing them in a group or talking to them briefly on the sidewalk. District court found that defendant oversaw "systematic manipulation" of hundreds of patients who were "fraudulently committed" for no other purpose than to generate revenue. Defense counsel conceded that defendant exploited at least 36 nursing home patients. Government presented spreadsheets showing that defendant billed more than 24 hours of services in a single day, such as 58.9 hours of services for 106 patients on a single day |  |
| *United States v. Barnes*, 2020 U.S. Appl. LEXIS 34085 (5th Cir. 2020) | home health | Government presented evidence that doctor was paid for patient referrals and that doctor was aware of his conduct. Government presented statistical evidence during trial regarding statistically significant variations between defendant's diagnosis codes and other providers in Louisiana. | Government presented evidence that doctor had an agreement to be paid for referrals and had an employment agreement that was created to establish a paper trail. |
| *United States v. Dubor*, 821 Fed. Appx. 327 (5th Cir. 2020) | home health | Yes. Government alleged that defendant billed for services that were not provided and that were not medically necessary. | Yes. Government showed that defendant paid tens of thousands of dollars for referrals. |

But this case is very different.

Here, the evidence shows that Dr. Zamora-Quezada actually saw each of the patients whom he diagnosed and treated. The evidence also shows that he actually performed the services that were billed. The government disagrees with Dr. Zamora-Quezada's judgments, but he was not simply signing stacks of orders for patients whom he had never seen like in many home health cases.

Here, there was substantial evidence that patients came to him based on legitimate referrals or with actual medical complaints consistent with being seen by a rheumatologist. He was not

seeing patients whom marketers had solicited for home health agencies in misleading and unnecessary ways, like in many home health cases.

Here, there was no evidence of kickbacks (unlike the home health cases where doctors were paid for each certification). He was not receiving envelopes in cash or sham director payments like in many home health cases.

And here, determining a reasonable estimate of fraud would have been practicable. As discussed above, the government could have done a statistical sample of patients or claims, as the government regularly does in civil cases around the country. Based on the government's theory of the case, it would have been practicable to do such a sample. The government believes that if someone is diagnosed with rheumatoid arthritis, then every subsequent doctor should diagnose that patient with rheumatoid arthritis. A sample would have begun by determining if a subsequent rheumatologist (not just those who happened to testify at trial and whose data was provided in discovery) diagnosed the patient with rheumatoid arthritis. Then, for those who were not diagnosed with rheumatoid arthritis, an expert could have reviewed Dr. Zamora-Quezada's files to see if his diagnoses were reasonable. The patients could also have been interviewed or examined by the expert to determine if there was materially false information in the file relating to Dr. Zamora-Quezada's diagnoses.[2]

There is no Fifth Circuit case affirming a "pervasive" fraud finding for a case like this, and this Court should reject the government's attempt to evade its responsibilities here.

---

[2]     As noted above, the government's complaints about the way that Dr. Zamora-Quezada's paper files were kept has no bearing on whether a statistical sample could have been done. As shown in the trial, Dr. Zamora-Quezada's files were scanned into an electronic medical records system, and both the government and Dr. Zamora-Quezada had access to that system.

G.      **Some Patients' Own Words Shows The Need For Patient-Specific Evidence**

Dr. Zamora-Quezada does not have the burden to disprove fraud and does not have the ability to disprove the government's claims here, given the way that the government improperly seized his assets and prevented him from hiring any expert assistance for the sentencing phase.

Even so, a simple review of medical records shows significant problems in the government's position.

Herminia Rios, who is the records custodian for the Center for Arthritis and Osteoarthritis, was asked to try to locate the patients' own words for some patients who appeared on the government's charts and were associated with large paid amounts.  She found history and physical forms that were completed by the patients *themselves* and that showed that they already knew that they had rheumatoid arthritis *before* seeing Dr. Zamora-Quezada.

| Patient Initials | Chart | Paid Amount | Date of Personal History Form | Excerpt from Personal History Form[3] |
|---|---|---|---|---|
| MG | Ex. 3, page 76, line 2 | $110,745.40<br><br>Medicaid | 7/18/03<br>(same as first DOS on government chart) | RHEUMATOLOGIC (ARTHRITIS) HISTORY. At any time, have you or a blood relative had any of the Yourself / Relative: Arthritis, Osteoarthritis, Rheumatoid arthritis, Gout |
| SR | Ex. 3, page 103, line 16 | $74,058.01<br><br>Medicaid | 3/31/03<br>(same as first DOS on government chart) | RHEUMATOLOGIC (ARTHRITIS) HISTORY. At any time, have you or a blood relative had any of the Yourself / Relative: Arthritis, Osteoarthritis, Rheumatoid arthritis, Gout |
| MR | Ex. 3, page 72, line 2 | $57,322.97<br><br>Medicaid | 9/8/00<br>(before first DOS on chart) | RHEUMATOLOGIC (ARTHRITIS) HISTORY. At any time, have you or a blood relative had any of the fo Yourself / Relative: Arthritis(type unknown), Osteoarthritis, Rheumatoid Arthritis, Gout |
| MV | Ex. 3, page 78, line 9 | $68,491.27<br><br>Medicaid | 8/2/99<br>(before first DOS on chart) | RHEUMATOLOGIC (ARTHRITIS) HISTORY. At any time have you or a blood relative had any of the fol yourself / relative: Arthritis(type unknown), Osteoarthritis, Rheumatoid Arthritis, Gout |

---

[3]      The full forms will be provided to the government and can be provided to the Court under seal.

| Patient Initials | Chart | Paid Amount | Date of Personal History Form | Excerpt from Personal History Form[3] |
|---|---|---|---|---|
| LA | Ex. 2, page 4, line 3 | $32,933.69 <br><br> Medicare | 2/20/07 (same as first DOS on government chart) |  |
| ME | Ex. 4, page 4, line 36 | $32,184.68 <br><br> Tricare | 12/6/10 (same as first DOS on government chart) |  |
| DD | Ex. 3, page 25, line 1 | $49,665.51 <br><br> Medicaid | 8/12/02 (before first DOS on government chart) |  |
| CA | Ex. 3, page 17, line 38 | $45,539.63 <br><br> Medicaid | 9/18/03 (same as first DOS on government chart) |  |
| MC | Ex. 3, page 83, line 35 | $38,042.03 <br><br> Medicaid | 2/11/02 (before first DOS on government chart) |  |
| MD | Ex. 3, page 77, line 33 | $34,654.30 <br><br> Medicaid | 5/30/01 (before first DOS on government chart) |  |

This raises serious concerns about the government's position and the shoddiness of its investigation.

First, this shows that the government is asking the Court to sentence Dr. Zamora-Quezada on the basis of patients who were *not* fraudulently diagnosed. According to the patients themselves, they knew they had rheumatoid arthritis *before* seeing Dr. Zamora-Quezada.

Second, this shows the dangers in the Court making specific findings about patients without the benefit of patient-specific evidence. Had the government interviewed any of the patients

mentioned above, the government could have learned that these patients knew they had rheumatoid arthritis prior to seeing Dr. Zamora-Quezada.  And if the government interviewed more of the thousands of patients whom the government wants the Court to find were fraudulently diagnosed, the government probably would learn that many patients had been diagnosed with rheumatoid arthritis after seeing Dr. Zamora-Quezada.

Third, this shows that the government is asking the Court to sentence Dr. Zamora-Quezada without even checking data and files that are in the government's possession.  The government seized all the files that Ms. Rios searched and were summarized below.  The government possesses full Medicare, Medicaid and Tricare data for each of the roughly 12,000 Medicare, Medicaid and Tricare patients that it wants the Court to find were fraudulently diagnosed, not just the data that was presented during the course of the trial (which was limited to billing data for the physicians whom the government planned to call as witnesses at trial).  If the government had checked this data and files that it actually possesses, the government would know that some of the patients that it is asking the Court to find were fraudulently diagnosed were actually diagnosed with rheumatoid arthritis by other physicians.

## H.    Conclusion Regarding Loss

For the reasons stated in his November 2020 submission and above, Dr. Zamora-Quezada stands by his position that a reasonable estimate of loss here would be $100,000.  While the government theoretically might have been able to show a higher amount if they had actually presented evidence, the government chose not to, even after ordered by this Court.  The government's effort to avoid doing the work that should have been done here should not be rewarded.

Finally, Dr. Zamora-Quezada reiterates his position that loss should not be based on every claim that Dr. Zamora-Quezada ever submitted, but to the diagnosis of rheumatoid arthritis.  The

government claims that if a patient was once diagnosed with rheumatoid arthritis, that somehow taints every single claim that Dr. Zamora-Quezada ever submitted.  This makes no sense.  As shown at trial, there are instances when Dr. Zamora-Quezada used the diagnosis code for rheumatoid arthritis for a diagnostic test, but did not actually diagnose the patient with rheumatoid arthritis and did not submit claims relating to patient care with the diagnosis code for rheumatoid arthritis.  The government's theory that somehow every claim was tainted makes no sense and should be rejected.

In its May 20, 2021 submission, the government provided the Court with almost 400 pages of charts listing patients.  The government provided "total billed" amounts and "total paid" amounts for each patient, while providing **no** information about the "billed" and "paid" amounts that relate to the diagnosis of rheumatoid arthritis.  The government's failure to tie its loss position to rheumatoid arthritis should not be rewarded, especially given the evidence shown at trial that the overall amounts tied to rheumatoid arthritis were much less than the total amounts billed and paid for all conditions.

## II.    <u>Sophisticated Means</u>

The government has failed to prove that the crime here involved sophisticated means.  As stated in Note 9 to Guideline § 2B1.1, "sophisticated means" means "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." This means that Dr. Zamora-Quezada's case must be compared to other health care fraud cases involving false diagnoses.

While Dr. Zamora-Quezada respectfully disagrees with the jury's verdict, the evidence at trial did not show "especially complex or especially intricate" conduct for a case involving false diagnoses.  The core of the fraud alleged here is that Dr. Zamora-Quezada saw patients and diagnosed them with rheumatoid arthritis when they did not have rheumatoid arthritis.  The

government argues that his diagnoses and his interpretations of x-rays were erroneous, but there was no evidence that he engaged in the kind of conduct that would warrant the sophisticated means enhancement here. For example, if Dr. Zamora-Quezada had lab techs conduct tests and alter the results, that would warrant the sophisticated means enhancement.  But there was no evidence of this.

No enhancement should be applied under Guideline § 2B1.1(b)(10)(C).

**III.**   **Offense Involving Risk of Death or Serious Bodily Injury**

The government has failed to prove that the crime here involved a risk of death or serious bodily injury.  To begin with, this is not a case where Dr. Zamora-Quezada paid marketers to bring him patients who otherwise would not have gone to him.  He saw patients who actually had serious problems warranting treatment by a rheumatologist and often were referred to him.

Given this, the government has not provided evidence sufficient to support a finding that any of the patients who came to see Dr. Zamora-Quezada suffered a risk of death or serious bodily injury.

The government claims that some patients got more x-rays than they should have.  Even if this were true, the government failed to present reliable evidence that any patient actually suffered a risk of death or serious bodily injury as a result of getting x-rays ordered by Dr. Zamora-Quezada. In fact, information from the American College of Radiology (https://www.acr.org/-/media/ACR/Files/Radiology-Safety/Radiation-Safety/Dose-Reference-Card.pdf) indicates that the types of x-rays and tests that many patients got were equivalent to just a few days or hours of natural background radiation exposure.

- **Bone densitometry:**  equivalent to approximately <u>3 hours</u> of natural background radiation exposure

- **X-ray of extremities such as hands and feet:**  equivalent to <u>less than 3 hours</u> of natural background radiation exposure

- **Chest x-ray:**  equivalent to about <u>10 days</u> of natural background radiation exposure

The government also claims that some patients got methotrexate who should not have.  But even if this was true, this would not be enough to establish risk of death or serious bodily injury. As government witnesses testified, the dosages that rheumatologists use to treat rheumatoid arthritis are much lower than the dosages that are used to treat cancer.  The PSR itself reports that only a small number of patients might have problems taking methotrexate, but nothing life-threatening - fatigue, nausea, upset stomach, hair loss, sores in their mouth, liver and lung inflammation.

The harms that the government claims here are mostly theoretical and cannot be a proper basis for an enhancement under § 2B1.1(b)(16).

IV.   **<u>Number of Vulnerable Victims</u>**

The government has failed to prove that a four-level enhancement sought by the government under § 3A1.1(b)(2) would be appropriate.  That enhancement would only be appropriate if the government established a "large number of vulnerable victims."  Given the government's failure to prove a large loss amount or many victims beyond those specifically discussed at trial, a four-level enhancement under § 3A1.1(b)(2) is not warranted.

V.   **<u>Organizer or Leader of Criminal Activity</u>**

The government has failed to prove that an enhancement under § 3B1.1 would be appropriate.  This enhancement is designed to penalize people who oversaw and led others in criminal activity, and is not just a way to add additional levels based on the scope of a scheme (which is already covered by loss amount).

Here, the evidence at trial showed only one person who may be considered a criminal "participant" for purposes of § 3B1.1.  That was Tomas Moreno, but the only offense that he admitted committing was the alteration of some charts to show that x-rays were used as they had been used.  Moreno did not admit to participating in the false diagnosis of any patient and did not admit to creating any falsified charts that went to the diagnosis of rheumatoid arthritis or any other condition.

The crime that is really at issue here is the allegedly false diagnoses of rheumatoid arthritis by Dr. Zamora-Quezada. Even if one accepts the jury's verdict, the crime largely was complete when Dr. Zamora-Quezada dictated his diagnosis to the assistants who transcribed his observations and diagnoses into the patient charts and superbills that were used for billing purposes.  No one knowingly and willfully helped commit this crime.

If there had been multiple witnesses who had confessed to falsely diagnosing patients at Dr. Zamora-Quezada's orders, then this enhancement would be appropriate.  But there was no such evidence, and an enhancement under § 3B1.1 is not warranted.

## VI.    Use of Uncharged Conduct

The government is requesting an above-Guidelines sentence in part due to conduct that has not been charged or adjudicated and that would not constitute relevant conduct to the offenses of conviction here.   As reported in the PSR, there were seven individuals who have claimed inappropriate conduct by Dr. Zamora-Quezada during patient encounters.

| Patient Initials | Incidents reported in the PSR |
|---|---|
| CS | one incident on June 2, 2016 |
| VG | one incident on or about May 2018 |
| GM | "every visit" over 17 years |
| RO | "several occasions" from May 2016 through March 2018 |
| RR | one incident in or around 2013, two other occasions at unspecified times |
| MDLG | "every time" she got an injection from 2012 through 2018 |
| ROM | one occasion in 2002 or 2003 |

Even assuming the uncharged allegations described in the PSR were true, they would not establish a crime under federal law.  Moreover, the uncharged allegations would *not* qualify as "sexual assault" under Texas Penal Code 22.011 or "sexual intercourse" or "deviate sexual intercourse" under Texas Penal Code 21.01.  At the worst, the uncharged allegations described in the PSR might constitute "indecent assault" under Texas Penal Code 22.012, which is a Class A misdemeanor.  Given the nature of the offenses and the lack of relevancy to the offenses of conviction, Dr. Zamora-Quezada's position is that this conduct should not be considered here.

If the Court were to consider these uncharged allegations for sentencing purposes here, then Dr. Zamora-Quezada requests an evidentiary hearing at which time the government can present these witnesses to testify and to be subject to cross-examination.

First, there are aspects of the accounts that are inconsistent with the evidence presented about Dr. Zamora-Quezada's practice.  As the evidence showed at trial, medical assistants accompanied Dr. Zamora-Quezada during his patient encounters, raising doubt about the allegations of improper patient contact.  If the government calls the patients at an evidentiary hearing, Dr. Zamora-Quezada expects to call some of the medical assistants who accompanied Dr. Zamora-Quezada during the patient encounters that he had with these patients so they can provide testimony about what happened and did not happen.

Second, Dr. Zamora-Quezada has no record of patient VG visiting his practice in May 2018.  According to the PSR, patient VG told police on May 23 that she had seen Dr. Zamora-Quezada on or about May 2018.  Records reviewed by Herminia Rios show that patient VG last visited the practice in January 2018, several months earlier.  This shows the need for live testimony so that the Court can properly evaluate the credibility of patient VG and other patients before considering any of these uncharged allegations for sentencing.

19

## VII.    <u>Unwarranted Sentencing Disparities</u>

While Dr. Zamora-Quezada will address sentencing factors relating specifically to him under 18 U.S.C. § 3553 in a separate memorandum and at sentencing, the Court should take into account how this case compares to a similar federal case.

In early 2017, federal law enforcement authorities raided the offices of two rheumatologists.  There was the search of Dr. Zamora-Quezada's offices in Texas, and there was also the search of a rheumatologist's offices in Montana.  Based on a search of the U.S. Department of Justice's website, these appear to be the only federal cases involving allegedly false diagnoses of rheumatoid arthritis by a rheumatologist.

But the government handled the two cases very differently.

As the Court is well aware, the government charged Dr. Zamora-Quezada in March 2018 without having an independent expert review any files, and the government had Dr. Zamora-Quezada detained from that time onwards.  The government also charged Dr. Zamora-Quezada's wife and initially had her detained, all on charges that ultimately resulted in dismissals or acquittals.   The government also charged Estella Natera and Felix Ramos on charges that ultimately resulted in dismissals and acquittals.  The government now asks this Court to find that Dr. Zamora-Quezada owes more than $148 million in restitution and should be imprisoned for the rest of his life.

The Montana doctor was treated very differently by the government.  According to the government's July 20, 2021 press release (https://www.justice.gov/usao-mt/pr/former-billings-rheumatologist-settles-alleged-health-care-fraud-claims-2-million), the government believes that it had claims relating to "false and exaggerated" claims such as the use of biologic infusions for patients who did not have seronegative rheumatoid arthritis.  Yet the government there did not

charge that doctor and did not detain that doctor.  Instead, the government resolved its claims with the Montana doctor with a civil settlement for $2.07 million.

The Court can and should consider unwarranted sentencing disparities when sentencing Dr. Zamora-Quezada.  When the government believes that two rheumatologists engaged in similar conduct, it would be an unwarranted sentencing disparity for one rheumatologist to go to prison for life while the other simply pays a settlement amount.

## VIII.  Conclusion

Dr. Zamora-Quezada again asks the Court to issue its finding on loss prior to the sentencing hearing.  This would enable Dr. Zamora-Quezada to properly prepare for the sentencing hearing, to try to come to agreement with the government regarding forfeiture in advance of the sentencing hearing, and to submit a memorandum on the 3553 factors knowing the applicable Guidelines range.

Respectfully submitted,

**MARTINEZ/TIJERINA, PLLC**

1201 East Van Buren
Brownsville, Texas 78520
Tel:  956-550-4868
Fax:  956-621-0135

By: /s/Benigno (Trey) Martinez
BENIGNO (TREY) MARTINEZ
State Bar No.  00797011
Federal ID No. 23945
E-mail: Trey@mbmtlawfirm.com
TOMAS F. TIJERINA
State Bar No. 24070746
Federal ID No. 1062166
E-mail: TTijerina@mbmtlawfirm.com

Benesch, Friedlander, Coplan & Asonoff, LLP
71 S. Wacker Drive, Suite 1600
Chicago, IL 60606
Tel: 361-624-6361

By: /s/Stephen Chahn Lee
STEPHEN CHAHN LEE
State Bar No. 6331822
Federal ID No. 4002697
E-mail: slee@beneschlaw.com
**COUNSEL FOR DEFENDANT**
**JORGE ZAMORA-QUEZADA**

### CERTIFICATE OF SERVICE

On August 9, 2021, this motion was served on all counsel of record via ECF.

/s/Benigno (Trey) Martinez
BENIGNO (TREY) MARTINEZ