IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § | |
| v. | § | Case No. 7:18-cr-00855 |
| JORGE ZAMORA-QUEZADA | § § | |

### DEFENDANT'S MEMO OPPOSING THE GOVERNMENT'S LOSS CALCULATION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW DEFENDANT, JORGE ZAMORA-QUEZADA to present further objections to the government's loss calculation here.

**I.     Intended Loss**

The government's loss calculation is premised on the idea that amounts "billed" to Medicare, Medicaid, TRICARE and Blue Cross Blue Shield should be used as a measurement of "intended loss."  Application Note 3 to 2B1.1. states that "intended loss" as "the pecuniary harm that the defendant *purposely* sought to inflict" (emphasis added).

Here, the government has not proven that Dr. Zamora-Quezada purposely sought to inflict the *billed* amounts on patients' insurance providers.  The evidence overall shows that Medicare and private insurance companies typically pay claims based on their rates and schedules, not based on the amounts that providers may cite when submitting claims and that might apply for patients who do *not* have insurance.

Accordingly, the Court should base its loss calculation here on "actual loss," measured by the amounts paid on claims that have been shown to be fraudulent.

**II.     Government Has Failed to Prove an Actual Loss Figure by a Preponderance of the Evidence**

The government's loss calculation is not supported by a preponderance of the evidence, but on huge assumptions and leaps of inferences.

First, the government failed to do a statistically valid sample of Dr. Zamora-Quezada's patient population. This is the method used regularly around the country in civil cases and administrative proceedings, and the government chose not to do that here. Had the government done so, the Court would have a solid evidentiary basis to make a loss calculation that was appropriate. The government chose not to do so.

Significantly, that may have been because the government knew that a sample would not support its position. As the Court may recall from prior filings, a government expert did review three patient files in or around August 2019, a few months before trial. This doctor reviewed the file for patient MP (Count 6) and said that he did **not** disagree with Dr. Zamora-Quezada's diagnosis. He reviewed the file for patient CJ (Count 2) and said that he did **not** disagree with Dr. Zamora-Quezada's diagnosis. Ultimately, the government's own expert disagreed with Dr. Zamora-Quezada on only one of the three files. The government did not disclose this at the time as it should have under *Brady*, and instead provided defense counsel with a report that left out the expert's conclusions. Defense counsel saw a reference to the expert's conclusions in an agent's handwritten notes and asked the government about this, and only then did the government produce a report with the exculpatory information.

A sample of three files is too small to be statistically valid, but even this shows that a statistically valid review would not support the loss figures that the government has sought here, which are premised on the idea that nearly every claim that Dr. Zamora-Quezada submitted was fraudulent.

Second, the government failed to do a statistical analysis that made a meaningful comparison between Dr. Zamora-Quezada's practice to other providers. The PSR cites two doctors who estimated that rheumatologists, not surprisingly, generally treat many patients with rheumatoid arthritis. One doctor estimated that 30 to 40 percent of a rheumatologist's patients would have rheumatoid arthritis, and another doctor estimated that 50 percent of a rheumatologist's patients would have rheumatoid arthritis. Data introduced by the government at trial showed that Dr. Zamora-Quezaada's rates of diagnoses for Medicare, Medicaid, BCBS, and Tricare patients were more than 50 percent[1] and that his rate for Medicare patients was more than the rates for seven doctors whom the government either called as witnesses at trial and one additional doctor in the area, but there was insufficient evidence to determine whether these differences are statistically significant given differences in their patient populations.

Notably, one doctor who once worked for Dr. Zamora-Quezada estimated that approximately **95** percent of Dr. Zamora-Quezada's patients were diagnosed with rheumatoid arthritis, and one former employee who was not a doctor claimed that "**every**" patient treated by Dr. Zamora-Quezada was diagnosed with rheumatoid arthritis. These claims were simply not true and are contradicted by the data presented at trial.

Third, the government improperly tried to rely on complaints to a law-enforcement hotline. As reflected in the PSR, the government told Probation that approximately 1,485 patients had been "confirmed" to be a victim of the offense and had been "misdiagnosed with Rheumatoid Arthritis and/or other auto-immune diseases." In actuality, the government was simply counting every person who had responded to a hotline as being "confirmed" as "misdiagnosed."

---

[1]     The government's analysis showed that 72.9 percent of Dr. Zamora-Quezada's 9,966 Medicare patients were diagnosed with rheumatoid arthritis, 71.2 percent of his 6,372 Medicaid patients, 57.8% of his 970 TRICARE patients, and 56.3% of his BCBS patients.

As shown at the hearing, many of the people who called the hotline provided no information that would indicate any improper conduct by Dr. Zamora-Quezada. Some even called to report that they had no complaints about Dr. Zamora-Quezada. And the government's own summary chart shows that the government was aware that the vast majority of people who called the hotline had not received second opinions from other doctors disagreeing with Dr. Zamora-Quezada.

At best, the government's evidence at the evidentiary hearing showed that only a small number of people reported being told by another doctor that they did not have rheumatoid arthritis as Dr. Zamora-Quezada had diagnosed. And even then, the patient's own words are insufficient to conclude that Dr. Zamora-Queada's diagnosis was *fraudulent*, as opposed to possibly being *mistaken*. Moreover, these people represented a small percentage of Dr. Zamora-Quezada's overall practice. As the government's data at trial showed, Dr. Zamora-Quezada saw more than 17,000 patients over more than a decade. The vast majority of Dr. Zamora-Quezada's patients have not come forward with proof that he intentionally misdiagnosed them with rheumatoid arthritis.

<u>Fourth</u>, the government attempted to claim that the evidence of fraud was so "pervasive" that the Court should simply assume that every single patient whom Dr. Zamora-Quezada diagnosed and treated for rheumatoid arthritis was fraudulently diagnosed with rheumatoid arthritis. The government made this claim, even knowing that this would sweep in thousands of patients who likely were properly diagnosed with rheumatoid arthritis because those patients had been referred to Dr. Zamora-Quezada and because a typical rheumatologist likely would have many patients with rheumatoid arthritis.

In a hearing on May 20, 2021, the Court indicated that it would not accept the government's argument that the fraudulent conduct at issue in this case was so "pervasive" that the Court would assume that every claim that Dr. Zamora-Quezada submitted to Medicare, Medicaid, BCBS and Tricare was fraudulent. The Court ordered the government to provide a list of the patients that it specifically believed had been fraudulently diagnosed and to provide the evidence supporting that position.

The government's June 2021 response completely disregarded the Court's instruction. Instead, the government merely re-iterated its position that the fraudulent conduct at issue was pervasive, and it identified thousands of patients whom they claimed to be victims of the offense. Like the 1,485 patients that it originally claimed had been "confirmed" as victims, these patients were not identified on the basis of a medical review. The government simply took every patient whom Dr. Zamora-Quezada treated and for whom a claim was submitted using a diagnosis code for rheumatoid arthritis, took out a handful of patients, and the government asked the Court to assume that the patients were fraudulently diagnosed.

The government's June 2021 submission establishes only that Dr. Zamora-Quezada, a rheumatologist, saw many patients who he thought had rheumatoid arthritis. It does not prove that he *falsely* diagnosed those patients with rheumatoid arthritis.

To rebut the government's sweeping allegation, Dr. Zamora-Quezada requested data about these patients. The government initially refused to provide such information. In November 2022, the Court ordered the government to provide such information. *See* Docket #783, 786. Dr. Zamora-Quezada received this data in 2023 and retained an expert, Mariela Ruiz, to review the data. She has found that thousands of patients whom the government has claimed as "victims"

here were in fact diagnosed with or treated for rheumatoid arthritis by other Medicare providers inconsistent with the government's position.[2]

Ms. Ruiz's findings are consistent with evidence from some of the patients themselves. As shown in the table below, many of the patients who the government claims were "victims" completed history and physical forms themselves that showed that they already knew that they had rheumatoid arthritis *before* seeing Dr. Zamora-Quezada.

| Patient Initials | Chart | Paid Amount | Date of Personal History Form | Excerpt from Personal History Form |
|---|---|---|---|---|
| MG | Ex. 3, page 76, line 2 | $110,745.40<br><br>Medicaid | 7/18/03<br>(same as first DOS on government chart) | |
| SR | Ex. 3, page 103, line 16 | $74,058.01<br><br>Medicaid | 3/31/03<br>(same as first DOS on government chart) | |
| MR | Ex. 3, page 72, line 2 | $57,322.97<br><br>Medicaid | 9/8/00<br>(before first DOS on chart) | |
| MV | Ex. 3, page 78, line 9 | $68,491.27<br><br>Medicaid | 8/2/99<br>(before first DOS on chart) | |
| LA | Ex. 2, page 4, line 3 | $32,933.69<br><br>Medicare | 2/20/07<br>(same as first DOS on government chart) | |
| ME | Ex. 4, page 4, line 36 | $32,184.68<br><br>Tricare | 12/6/10<br>(same as first DOS on government chart) | |
| DD | Ex. 3, page 25, line 1 | $49,665.51<br><br>Medicaid | 8/12/02<br>(before first DOS on government chart) | |

---

[2] Ms. Ruiz's report will be provided separately to the Court and the government, and she will be available to testify at a hearing if that would be helpful to the Court.

| Patient Initials | Chart | Paid Amount | Date of Personal History Form | Excerpt from Personal History Form |
|---|---|---|---|---|
| CA | Ex. 3, page 17, line 38 | $45,539.63<br><br>Medicaid | 9/18/03<br>(same as first DOS on government chart) | |
| MC | Ex. 3, page 83, line 35 | $38,042.03<br><br>Medicaid | 2/11/02<br>(before first DOS on government chart) | |
| MD | Ex. 3, page 77, line 33 | $34,654.30<br><br>Medicaid | 5/30/01<br>(before first DOS on government chart) | |

Ultimately, the government's attempt to meet its burden with its June 2021 submission was flawed and improper. Its submission swept in thousands of patients who were diagnosed with rheumatoid arthritis by other providers. This undercuts the government's claim that fraudulent conduct was pervasive, and it shows that the government's June 2021 submission is unreliable for sentencing purposes.

### III.  Conclusion

The government has the burden to prove loss by a preponderance of the evidence, and it has failed to prove the $148 million intended-loss figure that it proposes.

Ultimately, Dr. Zamora-Quezada asks the Court to make an independent evaluation of the evidence overall and find an amount of actual loss that is based on the evidence that was actually presented in the trial and post-trial and that does not simply assume that every patient whom this rheumatologist saw for rheumatoid arthritis was fraudulently misdiagnosed. Such an evaluation would result in a number that is far less than any of the numbers that the government has proposed.

In any event, the government's decision to cut corners and save costs should not be held against Dr. Zamora-Quezada, especially when the government wants the Court to sentence him based on its flawed assumptions.

Moreover, the Court should also take into account the government's forfeiture allegation and the need for additional proceedings if the Court determines that the loss amount is greater than the amount of money that the government previously seized from Dr. Zamora-Quezada. The government's forfeiture allegation identifies specific assets as subject to forfeiture, but the government must connect those assets to particular false claims. The government's forfeiture allegation, like its loss calculation, is premised on the incorrect assumption that every claim that Dr. Zamora-Quezada was paid for was fraudulent. This is not sufficient. Accordingly, if the Court finds that the loss amount is more than the amount of money that was seized, then the Court should conduct a forfeiture hearing under Federal Rule of Criminal Procedure 32.2(b) to determine whether the government "has established the requisite nexus between the property and the offense" so that it can issue an appropriate preliminary order of forfeiture before sentencing.

Respectfully submitted,

**MARTINEZ/TIJERINA, PLLC**
1201 East Van Buren
Brownsville, Texas 78520
Tel: 956-550-4868
Fax: 956-621-0135

By: /s/ Benigno (Trey) Martinez
BENIGNO (TREY) MARTINEZ
State Bar No. 00797011
Federal ID No. 23945
E-mail: trey@mbmtlawfirm.com
TOMAS F. TIJERINA
State Bar No. 24070746
Federal ID No. 1062166
E-mail: ttijerina@mbmtlawfirm.com

AND

**LAW OFFICE OF STEPHEN CHAHN LEE, LLC**
209 S. LaSalle St, Suite 950
Chicago, IL, 60604
Tel: 312-436-1790

By: /s/ Stephen Chahn Lee
STEPHEN CHAHN LEE

State Bar No. 6331822
Federal ID No. 4002697
E-mail: slee@stephenleelaw.com
**COUNSEL FOR DEFENDANT**
**JORGE ZAMORA-QUEZADA**

CERTIFICATE OF SERVICE

On July 3, 2024, this report was served on all counsel of record via ECF.

/s/ Benigno (Trey) Martinez
Benigno (Trey) Martinez