UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 18-CR-0855 |
| | ) | |
| JORGE ZAMORA-QUEZADA, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S "MEMO OPPOSING THE GOVERNMENT'S LOSS CALCULATION" (DE 810) AND EXPERT REPORT (DE 811)**

Rheumatoid arthritis is a lifelong condition that requires lifelong treatment. Why, then, did approximately 9,000 Medicare and Medicaid patients who Defendant Jorge Zamora-Quezada diagnosed with rheumatoid arthritis not receive any treatment for rheumatoid arthritis in the five years after Zamora-Quezada was arrested and detained? Because they never had the condition in the first place. These patients were victims of Defendant's 18-year fraud scheme in which he falsely diagnosed vulnerable patients with lifelong conditions and subjected them to unnecessary treatments, including toxic medications, all so he could defraud health insurance programs to line his own pockets and enjoy a lavish lifestyle.

The pervasiveness of Defendant's fraud scheme was proven over the course of six weeks of trial, through testimony from 36 Government witnesses and over 250 exhibits. Trial testimony from patients, second-opinion rheumatologists who treated Defendant's patients, rheumatologists who worked in Defendant's clinics, an expert rheumatologist who reviewed 150 of Defendant's patient files, and Defendant's own clinic staff demonstrated that his fraud permeated every aspect of his practice.

The Court now has yet another piece of evidence before it that supports the Government's case: defense expert Mariela Ruiz's report (DE 811). The report corroborates the evidence at trial

proving that Zamora-Quezada's fraud scheme was pervasive and that, of the more than 13,000 patients Defendant diagnosed with rheumatoid arthritis, 78% of those patients were falsely diagnosed.  The Court has more than sufficient evidence to find that Zamora-Quezada's pervasive, 18-year health care fraud conspiracy resulted in an intended loss of $118,365,310 to health care benefit programs, and that he caused an actual loss of $29,732,057 to those programs.

I.  **Ms. Ruiz's Expert Report Corroborates Trial Evidence that Zamora-Quezada Falsely Diagnosed over 9,000 Medicare and Medicaid Patients with Rheumatoid Arthritis**

Zamora-Quezada diagnosed 11,810 Medicare and Medicaid patients with rheumatoid arthritis before his April 2018 arrest.[1]  Only 1,565 of these patients were treated for rheumatoid arthritis by another provider after Zamora-Quezada's arrest and detention, and another 1,207 patients died in or before 2018 but had been treated for rheumatoid arthritis by another provider before their death.[2]  Thus, of the 11,810 Medicare and Medicaid patients diagnosed with rheumatoid arthritis by Zamora-Quezada, 9,038 did not receive treatment for rheumatoid arthritis in the nearly five years[3] since Zamora-Quezada's arrest.  This amounts to a false diagnosis rate of **76.5%**.  Because ample evidence at trial established that rheumatoid arthritis is an incurable,

---

[1] DE 810 at 12, Ex. 1 (Zamora-Quezada diagnosed **7,270** Medicare patients with rheumatoid arthritis from January 1, 2006 through April 19, 2018, and he diagnosed **4,540** Medicaid patients with rheumatoid arthritis from January 3, 2000, through May 1, 2018).  The sum is 11,810, but the number may be lower if there were patients who had both Medicare and Medicaid coverage, which Ms. Ruiz's report does not address.

[2] DE 810 at 5, Table D (**1,105** Medicare patients diagnosed with rheumatoid arthritis by Zamora-Quezada were diagnosed with rheumatoid arthritis by another provider after April 15, 2018; **1,207** Medicare patients diagnosed with rheumatoid arthritis by Zamora-Quezada were diagnosed with rheumatoid arthritis by another provider before April 15, 2018, and had a date of death in or before 2018); *id.* at 9, Table H (**460** Medicaid patients diagnosed with rheumatoid arthritis by Zamora-Quezada were diagnosed with rheumatoid arthritis by another provider after May 1, 2018).  This totals **2,772** Medicare and Medicaid patients.

[3] Some of these patients may have passed away since 2018; Ms. Ruiz's report does not address this.

lifelong condition requiring lifelong treatment, and because more than 9,000 patients went five years without receiving a diagnosis of, or treatment for, rheumatoid arthritis from any provider after Zamora-Quezada was arrested and detained, the Court can conclude, based on evidence submitted by Defendant, that these patients never had the condition in the first place.

Indeed, this 76.5% false diagnosis figure is remarkably consistent with the false diagnosis rate proven at trial. Rheumatologists Emilia Dulgheru, Naiara Alvarez, Eugene Nunnery, Muhammad Shamim, and Bricia Toro testified that they saw, examined, diagnosed, and treated patients in the Valley who Zamora-Quezada had diagnosed with rheumatoid arthritis and determined that the patients did not have rheumatoid arthritis. Claims data analysis admitted as GX A46.003 and GX A53 corroborated and quantified their testimony, showing that these doctors examined 772 Medicare patients diagnosed with rheumatoid arthritis by Zamora-Quezada and concluded that 605, or 78%, <u>did not have rheumatoid arthritis</u>.

What's more, it is apparent that even Defendant recognizes that Ms. Ruiz's report supports the conclusion that Defendant falsely diagnosed over 9,000 Medicare and Medicaid patients with rheumatoid arthritis because Defendant's brief devotes only two sentences to his own expert's report. (DE 810 at 5–6.) Defendant makes no attempt to explain how Ms. Ruiz's report supports his untenable position that the loss should be the paltry $100,000 that he urged the Court to find in his prior submission. *See* DE 751 at 2. In fact, Ms. Ruiz's report supports the Government's position on loss.

## II.     Defendant's Loss Arguments Are Meritless

Instead of explaining how his new expert report supports his loss position, Defendant spends all but two sentences of his submission repeating, sometimes verbatim, the same meritless arguments that he raised in prior sentencing submissions.

First, Defendant's argument regarding intended and actual loss (DE 810 at 1) is repeated from his objections to the Presentence Investigation Report ("PSR") (DE 706 at 5) and his brief on loss (DE 741 at 17–18). He provides no new caselaw or evidence to support his position. The Government explained why the law and the evidence support using intended loss, which is the amount fraudulently billed to health care benefit programs, when calculating the loss amount in this case in its sentencing memorandum (DE 740 at 49–50), its supplemental sentencing memorandum (DE 750 at 5–7), and its notice of supplemental authority (DE 756 at 2–3). The Court should follow Fifth Circuit precedent and use the billed amount to calculate loss under the Guidelines.

Second, Defendant's argument about the lack of review of a statistically valid sample of his patient files (DE 810 at 2) is repeated from his objections to the PSR (DE 706 at 2), his brief on loss (DE 741 at 8), and his supplemental brief regarding the Sentencing Guidelines (DE 751 at 4–5). The Government responded to this argument in its response to Defendant's objections to the PSR (DE 714 at 6–7) and its reply to Defendant's brief regarding loss (DE 747 at 7–10). Defendant now attempts to mislead the Court by stating that a doctor retained by the Government reviewed Defendant's patient files for patients M.P. and C.J. and "did not disagree with Dr. Zamora-Quezada's diagnosis." This is false. After reviewing Zamora-Quezada's medical records for M.P. and C.J., the doctor opined that the patients could have rheumatoid arthritis *assuming Zamora-Quezada's medical records were accurate*. In its previous filing, the Government recounted the substantial evidence presented at trial proving that Zamora-Quezada routinely and systematically falsified patient files (DE 747 at 8–10). Defendant fails to rebut this evidence and fails to explain how an expert could determine whether a patient actually had rheumatoid arthritis by reviewing falsified medical records. Indeed, Defendant's own medical expert testified that if he knew

4

Zamora Quezada's patient files contained false information, his analysis would have changed. (1/7/20 PM Trial Tr. at 79:7–9).  Furthermore, Defendant ignores the fact that Dr. Monty Tew, who reviewed 150 of Zamora-Quezada's patient files for the Texas Medical Board, provided expert testimony that he found substantial evidence that Zamora-Quezada falsified medical records, including that all patients were described as having the exact same symptoms.  Finally, Defendant ignores the testimony of eight rheumatology experts who *physically examined and treated* hundreds of patients who Zamora-Quezada had falsely diagnosed.

Third, Defendant's argument regarding the FBI hotline (DE 810 at 3–4), which received complaints from approximately 2,500 patients of Zamora-Quezada, are repeated from his supplemental objections to the PSR (DE 716 at 1–4), brief on loss (DE 741 at 10–12), and supplemental brief regarding the Sentencing Guidelines (DE 751 at 6–7).  Ms. Ruiz's report corroborates that Zamora-Quezada falsely diagnosed more than 9,000 Medicare and Medicaid patients with rheumatoid arthritis.  This does not include, of course, patients with other insurance or no insurance.  Thus, the new evidence before the Court shows that there are thousands *more* patient victims than those who reported to the FBI hotline.

Fourth, Defendant's argument that his patient files contain information suggesting that ten patients reported having rheumatoid arthritis before seeing him (DE 810 at 6–7) is repeated from his supplemental brief regarding the Sentencing Guidelines (DE 751 at 12–13).  Defendant fails to explain why the Court should trust the information in his patient files in the face of the substantial evidence that he routinely and systematically falsified patient records.  Defendant also fails to point to any other evidence suggesting that he accurately diagnosed these patients.  Thus, Defendant's unsupported position regarding ten patients should be afforded no weight.

Finally, Defendant's argument that the Government "failed to do a statistical analysis that

5

made a meaningful comparison" between his practice and other providers (DE 810 at 3) is meritless. Defendant attempts to call into question GX A46.001, which showed that seven rheumatologists who testified at trial diagnosed approximately 13.8% of their Medicare patients with rheumatoid arthritis, whereas Zamora-Quezada diagnosed a staggering 72.9% of his Medicare patients with rheumatoid arthritis:[4]

**Percentage of Medicare Beneficiaries Diagnosed with Rheumatoid Arthritis**

| Provider | Min of Date of Service | Max of Date of Service | Total Medicare Beneficiaries | Medicare Beneficiaries with RA Diagnosis | % of Medicare Beneficiaries with RA Diagnosis |
|---|---|---|---|---|---|
| Dr. Jorge Zamora-Quezada | 01/01/06 | 04/19/18 | 9,966 | 7,270 | 72.9% |
| Dr. Emilia Dulgheru | 01/02/07 | 04/18/18 | 1,051 | 306 | 29.1% |
| Dr. Monty Tew | 01/02/06 | 03/30/18 | 3,972 | 873 | 22.0% |
| Dr. Naiara Alvarez | 09/24/15 | 04/19/18 | 600 | 120 | 20.0% |
| Dr. Angela Christensen | 01/30/18 | 04/17/18 | 9 | 1 | 11.1% |
| Dr. Eugene Nunnery | 01/01/06 | 04/18/18 | 10,425 | 1,138 | 10.9% |
| Dr. Bricia Toro | 01/02/06 | 04/20/18 | 2,840 | 266 | 9.4% |
| Dr. Muhammad Shamim | 01/05/06 | 04/19/18 | 1,904 | 158 | 8.3% |
| **Total – 7 Doctors** | 01/01/06 | 04/20/18 | 20,176 | 2,782 | 13.8% |

Source: B 1, B 22

GX A-46.001

GOVERNMENT EXHIBIT
A-46
18-CR-00855

---

[4] This exhibit also corroborates the 78% false diagnosis rate. Had Zamora-Quezada had a rheumatoid diagnosis rate of 13.8%, consistent with his rheumatologist peers in the Valley, he would have diagnosed 1,375 of his 9,966 Medicare patients with rheumatoid arthritis. Instead, he diagnosed 7,270 of them with rheumatoid arthritis, meaning that the difference, or approximately 5,895, were likely falsely diagnosed. 5,895 of 7,270 is **81%**.

Defendant's contention that there is "insufficient evidence to determine whether these differences are statistically significant given differences in their patient populations" (DE 810 at 3) ignores the fact that the Government also presented evidence at trial regarding this analysis for the *exact same patients*. Specifically, Drs. Toro, Nunnery, Shamim, Dulgheru, and Alvarez testified that they saw patients who Defendant had diagnosed with rheumatoid arthritis—a chronic, lifelong condition— and determined that the patients did not have rheumatoid arthritis. Claims data analysis admitted as GX A46.003 and GX A53 corroborated this testimony, showing that these doctors examined 772 patients diagnosed with rheumatoid arthritis by Defendant and concluded that 605, or 78%, did not have rheumatoid arthritis as he claimed.

### III. Conclusion

Based on the pervasiveness of Zamora-Quezada's 18-year fraud conspiracy and the caselaw and rules for calculating loss under the Sentencing Guidelines, the Court would be well-founded in finding that Defendant caused a loss equal to the total amount of claims he submitted ($399 million billed and $99 million paid).

If the Court declines this approach, the Court has more than sufficient evidence in the record, including Ms. Ruiz's expert report (DE 811), to make a reasonable estimate of loss based on the patients Zamora-Quezada falsely diagnosed with rheumatoid arthritis. As depicted below, this reasonable estimate would equal an **intended loss of $118,365,310**, and an **actual loss of $29,732,057**:

| Beneficiaries Diagnosed with Rheumatoid Arthritis by Zamora-Quezada | | | | | |
|---|---|---|---|---|---|
| Benefit Program | Number of Beneficiaries | Total Billed | Total Paid | 78% of Total Billed | 78% of Total Paid |
| Medicare | 7,270 | $116,747,808 | $27,411,303 | $91,063,290 | $21,380,816 |
| Medicaid | 4,540 | $25,506,763 | $8,653,406 | $19,895,275 | $6,749,657 |
| TRICARE | 561 | $3,642,042 | $831,259 | $2,840,793 | $648,382 |
| BCBS | 1,610 | $5,853,785 | $1,222,054 | $4,565,952 | $953,202 |
|  |  | $151,750,398 | $38,118,022 | **$118,365,310** | **$29,732,057** |

7

*See* DE 810 at 12, Ex. 1. The Court can be assured that this approach is very conservative because it does not include (1) Medicare and BCBS claims from 2000 through 2006, which fall within the conspiracy period but were unavailable to analyze; (2) claims to other private health care benefit programs, including Humana and Allegiant; (3) loss caused to cash-paying patients; (4) claims for patients Zamora-Quezada falsely diagnosed with conditions other than rheumatoid arthritis, of which there was ample evidence at trial; (5) claims for patients who did have rheumatoid arthritis (the "broken clock is right twice a day" scenario) but for whom Zamora-Quezada billed for excessive and unnecessary treatment; and (6) claims for patients who did have rheumatoid arthritis but whose patient files Zamora-Quezada falsified.

Respectfully submitted,

GLENN S. LEON, CHIEF
U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION, FRAUD SECTION

*s/ Rebecca Yuan*
JACOB FOSTER
Principal Deputy Assistant Chief
REBECCA YUAN
EMILY GURSKIS
Assistant Chiefs
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20005

ALAMDAR S. HAMDANI
UNITED STATES ATTORNEY

*s/ Laura Garcia*
LAURA GARCIA
Assistant United States Attorney
U.S. Attorney's Office
Southern District of Texas

1701 W. Highway 83, Suite 600
McAllen, Texas 78501

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 5, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, causing service on all attorneys of record.

*s/ Rebecca Yuan*
REBECCA YUAN
Assistant Chief
U.S. Department of Justice
Criminal Division, Fraud Section